Honorable John H. Chun

1

2

3

4

5

6

7

8

9          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
10                    AT SEATTLE

11

STUART REGES,
12
            Plaintiff,
13
      v.
14
ANA MARI CAUCE, in her official capacity          Case No. 2:22-cv-00964-JHC
15 as President of the University of Washington;
MAGDALENA BALAZINSKA, in her                      **DEFENDANTS' MOTION TO DISMISS**
16 official and individual capacities as Director
of the Paul G. Allen School of Computer          Noted for Hearing: December 2, 2022
17 Science & Engineering; DANIEL
GROSSMAN, in his official and individual
18 capacities as Vice Director of the Paul G.
Allen School of Computer Science &
19 Engineering; and NANCY ALLBRITTON, in
her official and individual capacities as Dean
20 of the College of Engineering,

21            Defendants.

22

23

24

25

26

27

28

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

1
2

# TABLE OF CONTENTS

3
4
5
6
7
8
9
10
11
12
13

I.      INTRODUCTION.................................................................................................. 1

II.     BACKGROUND................................................................................................... 2

III.    LEGAL STANDARD ........................................................................................... 7

IV.     ARGUMENT ........................................................................................................ 7

  A.   Reges fails to plausibly plead First Amendment retaliation (Counts II & III).................... 7

    1.   *Reges did not speak "as a citizen."* ................................................................ 7

    2.   *Reges cannot satisfy the Pickering balance*................................................. 13

  B.   Reges fails to plausibly plead viewpoint discrimination (Count I). ................................ 16

  C.   Reges fails to plausibly plead that Exec. Order 31 is overbroad (Count IV). .................. 18

  D.   Reges fails to plausibly plead that Exec. Order 31 is unconstitutionally vague (Count V). 22

V.      CONCLUSION ................................................................................................... 24

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

*i*

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abcarian v. McDonald,*
617 F.3d 931 (7th Cir. 2010).................................................................................. 8

*Adams v. Trustees of the Univ. of N.C.-Wilmington,*
640 F.3d 550 (4th Cir. 2011).............................................................................. 8, 9

*Alozie v. Arizona Bd. of Regents,*
431 F. Supp. 3d 1100 (D. Ariz. 2020)................................................................... 8

*Arce v. Douglas,*
793 F.3d 968 (9th Cir. 2015)................................................................. 19, 20, 23

*Arnett v. Kennedy,*
416 U.S. 134 (1974)......................................................................................... 22, 24

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................. 7

*Berry v. Dep't of Social Servs.,*
447 F.3d 642 (9th Cir. 2006)............................................................................... 16

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973)......................................................................................... 19, 21

*Cochran v. City of Atlanta,*
289 F. Supp. 3d 1276 (N.D. Ga. 2017) .............................................................. 17

*Connick v. Myers,*
461 U.S. 138 (1983)............................................................................... 13, 14, 15

*Coszalter v. City of Salem,*
320 F.3d 968 (9th Cir. 2003).......................................................................... 7, 15

*Demers v. Austin,*
746 F.3d 402 (9th Cir. 2014)....................................................................... 7, 8, 9

*Dobbs v. Jackson Women's Health Org.,*
142 S. Ct. 2228 (2022) ........................................................................................ 24

*Downs v. Los Angeles Unified School District,*
228 F.3d 1003 (9th Cir. 2000).....................................................................passim

*Edge v. City of Everett,*
929 F.3d 657 (9th Cir. 2019)............................................................................... 23

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

ii

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ................................................................................. 24

*Ford Motor Co. v. Tex. Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) ................................................................................... 24

*Fowler v. Bd. of Educ. of Lincoln Cnty*,
    819 F.2d 657 (6th Cir. 1987) ................................................................................... 24

*Gammoh v. City of La Habra*,
    395 F.3d 1114 (9th Cir. 2005) ................................................................................. 23

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ........................................................................................ *passim*

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...................................................................................... 22, 23

*Hernandez v. City of Phoenix*,
    43 F.4th 966 (9th Cir. 2022) ............................................................................ *passim*

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*,
    No. 4:20-CV-321-SDJ, 2022 WL 748502 (E.D. Tex. Mar. 11, 2022) ................................... 22

*Johnson v. Poway Unified School District*,
    658 F.3d 954 (9th Cir. 2011) ........................................................................ 10, 11, 12

*Knight v. Conn. Dep't of Pub. Health*,
    275 F.3d 156 (2d Cir. 2001) ................................................................................... 16

*Levin v. Harleston*,
    770 F. Supp. 895 (S.D.N.Y. 1991) ........................................................................... 10

*Levin v. Harleston*,
    966 F.2d 85 (2d Cir. 1992) ................................................................... 9, 10, 15, 16

*Mpoy v. Fenty*,
    901 F. Supp. 2d 144 (D.D.C. 2012) ........................................................................... 9

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
    391 U.S. 563 (1968) ........................................................................................ *passim*

*San Filippo v. Bongiovanni*,
    961 F.2d 1125 (3d Cir. 1992) ................................................................................. 24

*Shoemaker v. Cnty of Glenn*,
    490 F. App'x 894 (9th Cir. 2012) ............................................................................... 6

*State v. Day*,
    96 Wn.2d 646, 638 P.2d 546 (1981) ........................................................................ 20

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

iii

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

*State v. Evergreen Freedom Found.*,
192 Wn.2d 782, 432 P.3d 805 (2019) ................................................................. 19

*State v. Roggenkamp*,
153 Wn.2d 614, 106 P.3d 196 (2005) ................................................................. 20

*Tuscon Women's Clinic v. Eden*,
379 F.3d 531 (9th Cir. 2004) .............................................................................. 24

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ................................................................................ 3

*United States v. Stevens*,
559 U.S. 460 (2010) ............................................................................................ 19

*United States v. Williams*,
553 U.S. 285 (2008) ..................................................................................... 19, 23

*Utter v. Building Ind. Ass'n of Wash.*,
182 Wn.2d 398, 341 P.3d 953 (2015) ................................................................. 20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ............................................................................................ 23

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ..................................................................................... 17, 18

**Statutes**

20 U.S.C. § 1681 Title IX ....................................................................................... 14

42 U.S.C. § 2000d et seq. Title VI ......................................................................... 14

**Other Authorities**

First Amendment ............................................................................................. *passim*

Exec. Order 31: Nondiscrimination and Affirmative Action (updated Aug. 14,
2020), https://www.washington.edu/admin/rules/policies/PO/EO31.html § 1 .............. *passim*

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 7

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 6, 7

UW Syllabus Guidelines and Resources (Oct. 30, 2022),
https://registrar.washington.edu/staffandfaculty/syllabus-guidelines/ ....................... 9

University of Washington Faculty Code Section 15-27.D ................................ 1, 4, 5, 6

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

iv

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

1

# I.    INTRODUCTION

2     The University of Washington and the administrators named in this litigation are committed

3  to the principles of free expression. To advance the University's educational mission, they apply

4  those principles without regard to political viewpoint. No facts alleged in Plaintiff's Complaint

5  suggest otherwise.

6     The Complaint lacks factual allegations needed to support Plaintiff Stuart Reges's claims.

7  The Complaint confirms that the University of Washington's Paul G. Allen School of Computer

8  Science & Engineering, a division of the University's College of Engineering, suggests for optional

9  inclusion on course syllabi a factual statement that merely "acknowledges the Coast Salish peoples

10  of this land, the land which touches the shared waters of all tribes and bands within the Suquamish,

11  Tulalip, and Muckleshoot nations." It expresses no viewpoint-based position on land ownership or

12  dispossession; it merely acknowledges the existence of certain Native tribes with which the State

13  of Washington has formal agreements. The University does not permit "land acknowledgement

14  statements" on official Allen School syllabi that veer from the suggested factual statement into

15  position statements.[1]

16     On the syllabus for his Winter Quarter computer science class, Reges included a politically

17  charged "land acknowledgment statement" that many students and faculty found offensive, and he

18  was asked to remove the statement from the syllabus. When Reges refused to do so, the University

19  took down the statement from the online version of his course syllabus, and offered a separate

20  section of the class for any students who wished to have a different instructor for it. When Reges

21  again included an overtly political statement on his course syllabi the next term, the College of

22  Engineering started an investigation to determine whether Reges's actions violated the faculty

23  code.

24     Reges does not allege that the Defendants took any action to prevent or discourage him

25

26  [1] While not mentioned in the Complaint, and therefore not eligible to be considered on a motion to dismiss, the University and the College of Engineering have required other professors who included land acknowledgement
27  statements that veered from factual statements to political statements to remove those statements from their syllabi, as well. Those professors complied with the requests. No land acknowledgement statements that have come to the attention of the College of Engineering as a result of complaints that they diverge from the suggested statement have
28  been permitted to remain on syllabi.

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

1  from airing his political views outside the official University-sanctioned syllabus. Indeed, nothing

2  in the Complaint suggests that the University or the Defendants objected to Reges's inclusion of

3  his politically charged "land acknowledgment statement" in the signature block of his individual

4  University email, or to his posting the statement on his University office door. Reges was not denied

5  the chance to express his political views in any way outside the context of official University course

6  syllabi. In short, Reges's allegations make clear that the Defendants did nothing but enforce a

7  reasonable restriction on speech in official University documents, and offered a separate section of

8  Reges's class to accommodate students who were offended by his overtly political statement.

9  Reges's claims should be dismissed.

10  ## II.      BACKGROUND

11       Reges is a lecturer in computer science at the Allen School. Compl. ¶¶ 19, 102. Defendants

12  Magdalena Balazinska and Dan Grossman are also University employees—the Director and Vice

13  Director of the Allen School, respectively. *Id*. ¶¶ 24, 25. Defendant Nancy Allbritton is the Dean

14  of the University's College of Engineering, *id*. ¶ 26, and Defendant Ana Mari Cauce is the

15  University President, *id*. ¶ 23.

16       In 2019, the Allen School posted a document on its internal faculty website describing the

17  "Allen School best practices for inclusive teaching." *Id*. ¶ 29. As part of its "best practices," the

18  Allen School suggested that its professors could "make [their] course syllabus more inclusive" by,

19  among other optional practices, including an "Indigenous Land Acknowledgement Statement." *Id*.

20  The statement read:

21       The University of Washington acknowledges the Coast Salish peoples of this land,
     the land which touches the shared waters of all tribes and bands within the
22       Suquamish, Tulalip, and Muckleshoot nations.

23  *Id*. ¶ 30. On its face, the optional statement is a factual acknowledgment of indigenous tribes and

24  expresses no viewpoint-based position. *See id*. The statement expresses no view on whether the

25  identified indigenous tribes own, or can claim title to, certain land. *Id*. ¶ 29. The University

26  developed this statement over several years, working with its Tribal Liaison to perfect the language

27  and the message that the statement was intended to convey. *Id*. ¶ 31.

28       Near the end of 2021, Reges decided—for the first time—to include an indigenous land

acknowledgement statement on his course syllabus. *Id*. ¶ 34. But Reges departed from the Allen School's recommended factual language and, instead, included a politically charged statement expressing his view on whether indigenous people may claim title to the land:

> I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington.

*Id*. ¶ 33. Reges included this language on the syllabus for each of the classes he taught during the Winter 2022 and Spring 2022 quarters, beginning with his Computer Programming II class. *Id*. ¶¶ 34, 76. Reges distributed the syllabus on the first day of class, and posted the syllabus on the University's class portal, an online site to which all students have access. *Id*. ¶¶ 36, 39, 45. Reges does not allege that the statement has any relation to the course subject he was teaching. Nor does he allege that he discussed his statement, its relation to the class subject matter, or his reasons behind it when he distributed each syllabus in class. Nor does he allege that he engaged in any meaningful pedagogical discussion with his students surrounding this statement.

The University received complaints about Reges's land acknowledgement statement immediately after it was distributed in his class. In response, Director Balazinska emailed Reges and asked him to remove the statement from his course syllabus, explaining that it was creating a toxic environment in his course, a required course for students majoring in Computer Science. *Id.* ¶¶ 36, 43; Declaration of Balazinska, Ex. 1.[2] In the same email, Director Balazinska welcomed Reges "to voice [his] opinion and opposition to land acknowledgements … in other settings" as he had done in the past, but explained that using syllabi for that purpose was inappropriate. Balazinska Decl., Ex. 1. Reges replied that he would not remove the statement. Compl. ¶ 37. Director Balazinska further explained that she would ask other professors to similarly remove or revise their statements that departed from the Allen School's factual statement, no matter the views their language conveyed. *See id*. ¶ 38. Only statements "consistent with the University's recommended version"—i.e., factual statements that do not express a political view—are permitted

---

[2] The Court may consider documents incorporated by reference in the Complaint without converting this motion into one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Director Balazinska's January 4, 2022 email is one such document. Compl. ¶ 36.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

3

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel +1-206-839-4300

by the Allen School. *Id*. ¶ 41. Unlike Reges (*id*. ¶ 37), the other professors who received such a request from Director Balazinska complied with it.

When Reges still refused to remove or revise his statement, Director Balazinska removed it from the online version of the Computer Programming II syllabus displayed on the University's class portal. *Id*. ¶ 39. Director Balazinska then emailed the students enrolled in the course, apologizing for Reges's statement departing from the Allen School's message. *Id*. ¶ 40. To mitigate the disruption caused by Reges's statement, respond to the deluge of complaints it received, and accommodate students who were offended by Reges's statement, the Allen School also opened an alternative section of Reges's Computer Programming II class taught by a different professor. *Id*. ¶¶ 43, 47. Over thirty percent of Reges's students transferred to the alternative section. *Id*. ¶ 51.

Almost two months later, Reges emailed the Allen School's diversity-allies listserv— available to both students and faculty in the Allen School—detailing his plans to repeat his land acknowledgement statement on his syllabi for classes taught in the Spring 2022 quarter. *Id.* ¶ 54. In response to more complaints stemming from his public email announcement, Director Balazinska invited Reges to discuss University policy, including University of Washington Executive Order 31, which addresses discrimination, harassment, and retaliation:

> The University … is committed to providing equality of opportunity and an environment that fosters respect for all members of the University community. This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. To facilitate that goal, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

Compl. ¶¶ 57, 58, 60; Univ. of Wash., Exec. Order 31: Nondiscrimination and Affirmative Action (updated Aug. 14, 2020), https://www.washington.edu/admin/rules/policies/PO/EO31.html ("Exec. Order 31") § 1. Director Balazinska and Vice Director Grossman met with Reges and his legal counsel, explaining that they continued to receive student complaints about his statement and expected further disruption to his classes as a result. Compl. ¶¶ 61, 63. Even so, Reges continued to refuse any proposal to revise his land acknowledgement statement or to not place it on his course syllabi. *Id*. ¶¶ 68, 69.

As a result, Dean Allbritton invited Reges to a meeting pursuant to Faculty Code

Section 25-71.D. *Id*. ¶ 70. Section 25-71 establishes the University faculty "Standard of Conduct," and subsection D details the procedure that the dean must follow for alleged violations of the Standard of Conduct:

> If a mutually agreeable resolution is not achieved … , and if the dean … determines that the alleged violation is of sufficient seriousness to justify consideration of the filing of a formal statement of charges that might lead to dismissal, reduction of salary, or suspension for more than one quarter, the dean shall follow one of the following procedures:
>
> …
>
> [T]he dean shall appoint a special investigating committee of three faculty members who are not directly involved in the matter being considered. The committee shall assist the dean in the informal and confidential gathering of information and documentation and shall advise the dean in its interpretation. If as a result of the foregoing investigation the dean concludes that further action is not merited, then the matter shall be dropped ….

Faculty Code § 25-71.D; *see also* Compl. ¶ 71. In short, subsection D instructs the dean—before any charges may be brought against the faculty member—to appoint a committee to investigate the alleged violation. *See* Faculty Code § 25-71.D. Launching a committee investigation thus does not mean that any charges will be brought against the faculty member. *Id.*

On March 25, 2022, Reges, represented by counsel, met with Dean Allbritton. Compl. ¶ 72. At the meeting, Dean Allbritton asked Reges to consider how his statement was affecting students and why many of them chose to transfer to the alternative class section. *Id*. ¶ 73. Reges declined to alter his course. After their meeting, Dean Allbritton informed Reges that she would arrange a special investigative committee under Section 25-71.D(3). *Id*. ¶ 75. Over the next few months, Dean Allbritton assembled this committee, taking time to select potential members and obtain their acceptances to serve on the committee. *Id*. ¶¶ 80, 81. Again, under Section 25-71, the committee's job is to assist the dean in informally and confidentially gathering information and documentation and to advise the dean in interpretating the Faculty Code—*not* to determine or recommend whether any charges should be brought, based on their findings. *See* Faculty Code § 25-71.D (requiring the dean to "appoint a special investigating committee"); *see also* Balazinska Decl., Ex. 2 (charging the committee to assist the dean in gathering information and interpreting the Faculty Code). Reges's allegation that Dean Allbritton assembled a committee to review charges brought against

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

5

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

him, *see* Compl. ¶¶ 26, 78–79, thus conflicts with both Section 25-71 and the Dean's charging letter.[3] No charges may be brought until after the committee (1) is assembled, (2) investigates the situation, and (3) reports its findings to the dean, who then may determine in her discretion whether charges against the faculty member are warranted. *See* Faculty Code § 25-71. As of the date of the Complaint, no committee report had been made and no charges had been brought against Reges. *See* Compl. ¶ 82.

Reges continued to include his viewpoint-based land acknowledgement statement on his syllabi for courses he taught in the Spring 2022 quarter. Compl. ¶ 76. The Allen School offered an alternative section for his Engineering 143 course (a mandatory course for computer programming students) to accommodate student needs and avoid further disruption. *Id*. ¶ 77. The University has taken no other action. Reges does not allege, nor could he, that he was removed or suspended from his teaching position. Reges does not allege, nor could he, that his salary was impacted. Reges does not allege, nor could he, that he was restrained from expressing his personal view on indigenous land statements or Native tribes' land entitlement apart from including his views on his university-sanctioned course syllabi. And Reges does not allege, nor could he, that the University ever asked him not to express his view on University grounds: Reges was not prohibited from, for example, including his statement in his email signature block or posting it on the door to his office. In short, the Complaint alleges no material adverse action against Reges. He continues to lecture at the Allen School to this day.

Even so, Reges filed his Complaint alleging that the Defendants, in their varying individual and official capacities, violated his First Amendment rights and that the University's Executive Order 31 is unconstitutionally vague and overbroad. The Complaint fails to state a claim for relief for any of the five counts he brings. It must be dismissed with prejudice.

---

[3] Reges alleges that "[o]n April 21, 2022, Dean Allbritton notified Professor Reges she intended to proceed with formal charges against him." Compl. ¶ 78. While courts reviewing a Rule 12(b)(6) motion must generally accept as true allegations made in a complaint, they "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Shoemaker v. Cnty of Glenn*, 490 F. App'x 894, 895 (9th Cir. 2012) (internal quotation marks omitted). Because the Faculty Code—which is cited throughout the Complaint (*e.g.*, Compl. ¶¶ 26, 79)—makes clear that no formal charges could have been brought in April 2022, the Court need not credit the allegations in paragraph 78 of the Complaint.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

6

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel +1-206-839-4300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.     LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Where a challenged claim does not contain sufficient alleged facts to state a "plausible" claim for relief, the court should dismiss it under Fed. R. Civ. P. 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). For the reasons detailed below, Reges fails to state a plausible claim for relief under any of the five counts of his complaint.

### IV.     ARGUMENT

**A.      Reges fails to plausibly plead First Amendment retaliation (Counts II & III).**

The Court should dismiss Reges's First Amendment retaliation claims. To support these claims, Reges must allege facts showing that: (1) he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; (3) his speech was a substantial or motivating factor of the adverse employment action; and (4) his speech interest outweighs the University's interest in promoting the efficiency of the public services it performs through its employees. *See Garcetti v. Ceballos*, 547 U.S. 410, 417–20 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Reges fails to meet these pleading requirements for at least elements (1) and (4).[4]

#### 1.  **Reges did not speak "as a citizen."**

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Reges spoke pursuant to his official duties as a University of Washington lecturer when he included in his course syllabi a politically charged land acknowledgment statement. Compl. ¶¶ 33, 76. Reges does not dispute this. Instead, he pleads that his speech is nonetheless protected under *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), because it was expressed "in the course of his teaching." *See* Compl. ¶¶ 96, 103. Reges is wrong, and *Demers* is not an omnipotent shield for academic speech.

---

[4] It is also not clear that Reges has adequately pleaded that he suffered any adverse employment action, as creating an alternative class section and instituting an investigation are minor actions with no adverse impact on Reges that would deter a reasonable person from engaging in protected speech. *See Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003). But Defendants do not raise this deficiency here except in discussing the *Pickering* factors below.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

7

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

In *Demers*, a tenured Washington State University professor (Demers) alleged that university administrators violated his First Amendment rights by retaliating against him for distributing (1) a pamphlet he wrote about the faculty structure of the University's College of Communication and the need for increased influence from "professionals"—i.e., faculty with professional experience—and reduced influence from faculty with Ph.Ds., and (2) draft chapters from his book that included portions critical of the University. *Demers*, 746 F.3d at 406–07, 414–15. The University argued that, because Demers spoke pursuant to his official duty as a university professor in each instance, his speech was not protected by the First Amendment under *Garcetti*. *Id.* at 408–09. The Ninth Circuit disagreed, holding that *Garcetti* acknowledged a possible exception for "speech related to scholarship or teaching" and finding that Demers's speech was protected under that exception. *Id.* at 411, 414. The Court cautioned, however, that "[i]t may in some cases be difficult to distinguish between what qualifies as speech 'related to scholarship or teaching' within the meaning of *Garcetti*." *Id.* at 415. In other words, not *all* academic speech qualifies as speech "related to scholarship or teaching" under *Garcetti*. *Id.*; *see also Alozie v. Arizona Bd. of Regents*, 431 F. Supp. 3d 1100, 1118 (D. Ariz. 2020) (recognizing that not all university speech qualifies as academic speech under *Demers*, but may instead "merely constitute[] non-academic speech that receives no protection").

Other courts have similarly recognized that *Garcetti*'s academic-freedom acknowledgment is not limitless. For example, in *Abcarian v. McDonald*, 617 F.3d 931 (7th Cir. 2010), the Seventh Circuit affirmed the dismissal of a university medical school department head's retaliation claim. The court rejected the department head's argument that his speech—on issues including risk management, fees charged to physicians, and surgeon abuse of prescription medications—"could be considered 'expression related to academic scholarship or classroom instruction' possibly exempt from *Garcetti*." *Id.* at 938 n.5. The court explained that his "speech involved administrative policies that were much more prosaic than would be covered by principles of academic freedom." *Id.* Similarly, in *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011), the Fourth Circuit explained that "[t]here may be instances in which a public university faculty member's assigned duties include a specific role in declaring or administering university

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

8

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

policy, as opposed to scholarship or teaching. In that circumstance, *Garcetti* may apply to the specific instances of the faculty member's speech carrying out those duties." Likewise, when speech is "undertaken at the direction of [the university]," it does not fall outside the scope of *Garcetti. Id.* at 563, 564; *see also Mpoy v. Fenty*, 901 F. Supp. 2d 144, 152 (D.D.C. 2012) (rejecting a reading of *Garcetti* that would "extend the 'academic freedom' doctrine to anything related to school, teachers, or education" as "unprecedented in its breadth").

As in these cases, Reges's course syllabus statements are not the type of "scholarship" or "teaching" that the Supreme Court envisioned protecting as "academic freedom." *See Garcetti*, 547 U.S. at 425 (distinguishing "expression related to academic scholarship or classroom instruction"). Reges fails to allege facts showing that his one-sentence land acknowledgement statement inserted at the bottom of his course syllabi is speech "related to scholarship or teaching" within the meaning of *Garcetti*. Far from the independently published pamphlet in *Demers* or the external publications in *Adams*, Reges's speech was in a university-sanctioned document that was required to be distributed in the classroom. As Reges admits, administrators within the Allen School sought to further a school policy on the optional inclusion of indigenous land acknowledgement statements on course syllabi as part of the School's "best practices for inclusive teaching." *See* Compl. ¶¶ 2, 29, 30, 99. And, as Reges admits, that policy has been developed over several years by the University's Tribal Liaison and applied during other university events. *Id.* ¶ 31. This is precisely the type of university-directed policy administration that *Adams* recognized would *not* constitute "scholarship or teaching" within the meaning of *Garcetti. Adams*, 640 F.3d at 563–34.

Moreover, Reges's statement was included on University course syllabi, which are documents over which the University has specific oversight and approval rights.[5] That Reges's speech was included in a university-sanctioned document distributed in the classroom separates this case from *Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992), on which the Complaint repeatedly relies, *see, e.g.*, Compl. ¶¶ 89, 106. In *Levin*, the speech at issue occurred outside the classroom

---

[5] Indeed, the University prescribes specific guidelines for course syllabi, detailing the purpose and format of the document and the policies and content mentioned therein. *See* UW Syllabus Guidelines and Resources (Oct. 30, 2022), https://registrar.washington.edu/staffandfaculty/syllabus-guidelines/.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

9

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

and was unrelated to Professor Levin's official duty as a university professor. The litigation surrounded three writings by Professor Levin: (1) a letter to the *New York Times* criticizing a previous editorial, (2) a book review published in an Australian journal, and (3) a letter published in the American Philosophical Association Proceedings responding to a previous issue. *Levin*, 966 F.2d at 87; *see also Levin v. Harleston*, 770 F. Supp. 895, 900–03 (S.D.N.Y. 1991) (detailing Professor Levin's three writings). The court's holding that the university violated the professor's rights turned on the fact that Professor Levin's expression occurred *outside the classroom*. *Levin*, 966 F.3d at 90. The court explained that "the commencement, or threat thereof, of disciplinary proceedings against Professor Levin predicated solely upon his protected speech outside the classroom violates his First Amendment rights." *Id.*; *see also id.* at 88 (explaining that the university lacked any evidence that "Professor Levin's expression of his theories outside the classroom harmed the students and the educational process within the classroom"). [6]

Reges's speech here is directly the opposite. Reges included his speech on his course syllabus and distributed that syllabus to his students on the first day of class. *See, e.g.*, Compl. ¶¶ 2, 4, 29, 34. Including his speech on a course syllabus distributed as part of his role as a university professor confirms that the speech was made pursuant to his official duty. *See id.* Thus, *Levin* is inapposite. That Reges's precise language departed from the school's suggested language does not alter this analysis or transform his statement into "teaching or scholarship" under *Garcetti*. Indeed, his departure from the prescribed, fact-based message in a University sanctioned syllabus permits greater University control because, "[w]hen the government is formulating and conveying its message, 'it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs*, 228 F.3d at 1013 (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995)).

Reges's speech is far more like the teacher speech the Ninth Circuit addressed in *Johnson*

---

[6] *Levin* also predates *Garcetti*, and thus the Second Circuit did not have the benefit of the Supreme Court's analysis regarding employee speech made pursuant to an official duty. It is indisputable that Professor Levin's speech was not made pursuant to his official duty as a university professor. *See Levin*, 966 F.2d at 87. Rather, it was the type of speech that *Garcetti* recognized as "the kind of activity engaged in by citizens who do not work for the government" that retains "some possibility of First Amendment protection." *Garcetti*, 547 U.S. at 423. The Second Circuit's focus on Professor Levin's speech being outside the classroom tracks this distinction.

10

v. *Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), and *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000).[7] In *Johnson*, a high school math teacher (Johnson) hung two banners in his classroom relating to the presence of God or a "creator." 658 F.3d at 958. After the school required Johnson to remove the banners because they could make students feel unwelcome or ostracized, Johnson sued the school for an alleged First Amendment violation. *Id.* at 959. The court held that the school did not violate Johnson's constitutional rights because he had not spoken "as a private citizen." *Id.* at 964. That context controlled the outcome:

> Johnson did not make his speech while performing a function not squarely within the scope of his position. He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. Rather, Johnson hung his banners pursuant to a long-standing [school] policy, practice, and custom of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

*Id.* at 967 (internal quotation marks omitted). Just as Johnson "did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee," the court explained, he similarly "did not act as an ordinary citizen when espousing God as opposed to no God in his classroom." *Id.* (internal quotation marks and citation omitted). The court contrasted Johnson's speech with that at issue in *Pickering*: "Unlike Pickering, who wrote a letter to his local newspaper as any citizen might, … Johnson took advantage of his position to press his particular views upon the impressionable and 'captive' minds before him." *Id.* at 968 (internal citation omitted). The court concluded that nothing "prevents Johnson from himself propounding his *own opinion* on 'the religious heritage and nature of our nation' or how 'God places prominently in our Nation's history' … on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations. He may not do so, however, when he is speaking as the government, unless the government allows him to be its voice." *Id.* at 970 (internal quotation marks and citation omitted).

Similarly, in *Downs*, a high school teacher (Downs) objected to his school's recognition of

---

[7] That Johnson and Downs were high school, not college, teachers did not affect the court's analyses. In each case, the contested speech was made at the school by a government employee. *See Johnson*, 658 F.3d at 958–59; *Downs*, 228 F.3d at 1011–12. While the Ninth Circuit has acknowledged a distinction between speech related to scholarship and teaching in a university setting, as explained above, that distinction does not save Reges's claims because his speech is not scholarship or teaching within the meaning of *Garcetti*.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

11

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel +1-206-839-4300

Gay and Lesbian Awareness month by installing a bulletin board across from his classroom—competing with the school's own bulletin board—on which he posted materials describing homosexuality as immoral and illegal. *Downs*, 228 F.3d at 1006–07. Downs sued the school district after it required him to remove the materials. *Id.* at 1008. The court held that the district did not violate Downs's constitutional rights because his speech constituted government speech that the district was entitled to regulate. *Id.* at 1011, 1013. The court explained that "[a]n arm of local government—such as a school board—may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives." *Id.* at 1014. As in *Johnson*, the court acknowledged that Downs could express his own views when speaking on his own behalf, but not when speaking in his government capacity, unless the government allowed him to be its voice. *Id.* at 1016.

The same analysis applies to Reges. Reges spoke as a government employee—not a private citizen—when he went to the University, handed out his syllabus, and taught class. He then exploited his position as a university professor to press his political view on land acknowledgement statements—a subject unrelated to the content of his computer programming class—on a university-sanctioned document. Just as in *Johnson* and *Downs*, nothing prevents Reges from propounding his opinion on land acknowledgement statements "on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations." *Johnson*, 658 F.3d at 970; *Downs*, 228 F.3d at 1016. In fact, Reges does not allege that the University ever sought to preclude him from debating this topic on university grounds. But Reges cannot do so "when he is speaking as the government." *Johnson*, 658 F.3d at 970; *Downs*, 228 F.3d at 1016. Inserting an opinionated land acknowledgement statement onto a university syllabus violated that tenet, and the University acted within constitutional limits in responding to that act. *See Downs*, 228 F.3d at 1014.

Reges's attempt to shield his one-sentence speech on a university-sanctioned document under the guise of "teaching or scholarship" cannot succeed. Reges did not speak as a private citizen and his speech is not protected under the First Amendment. His retaliation claims must be dismissed.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

12

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

2. **Reges cannot satisfy the *Pickering* balance.**

Even if Reges's statement were entitled to First Amendment protection (as government speech, it is not), the retaliation claims still must fail because he cannot satisfy the *Pickering* balancing test. Under *Pickering*, a retaliation claim cannot succeed where "the interest[s] of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweigh "the interests of the teacher, as a citizen, in commenting upon matters of public concern." *Pickering*, 391 U.S. at 568. Relevant to this balancing is the manner, time, and place in which the speech was made as well as the context in which the dispute arose. *Connick v. Myers*, 461 U.S. 138, 152–53 (1983).

*Connick* is instructive. There, Assistant District Attorney Sheila Myers sued her boss, New Orleans District Attorney Harry Connick, alleging that, after she refused an office transfer, she was wrongfully terminated for distributing around her office a questionnaire concerning office policies and behaviors, including the office transfer policy. *Id.* at 140–41. The Court found no free speech violation after weighing "the manner, time, and place in which the questionnaire was distributed." *Id.* at 152. The Court explained that Connick had a valid interest in maintaining close working relationships at the office and avoiding insubordination, and "the fact that Myers . . . exercised her rights to speech at the office support[ed] Connick's fears that the functioning of his office was endangered." *Id.* at 153. The Court also found the context in which the dispute arose significant, explaining that Myers had not circulated her questionnaire "out of purely academic interest … so as to obtain useful research" but had done so only "on the heels of the transfer notice." *Id.* at 153. The Court elaborated that "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Id.* Myers's limited First Amendment interest was thus far outweighed by Connick's interests, and her claim failed.

Reges's claim similarly fails here. To be sure, the University does not dispute that—if he were speaking as a private citizen—Reges has a First Amendment interest in free speech. But that

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

13

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

interest must be balanced against the University's interest in maintaining trust and loyalty in its relationships with students and faculty and ensuring the efficient functioning of its classrooms. As Reges pleads, the University received multiple student complaints following Reges's statement. Compl. ¶¶ 40, 60, 63. The University responded to those complaints by creating an alternative class section to accommodate students offended by Reges's speech and to minimize further disruption from Reges's statement. *Id.* ¶ 63. The University has an interest in responding to campus complaints, especially complaints that are repeatedly made by students and faculty.[8] The University also has an interest in ensuring the regular operation of its school and not turning a blind eye to conduct that disrupts that operation. Moreover, as explained above, the University did not have to "allow events to unfold to the extent that the disruption of the [classroom or the school] … [wa]s manifest before taking action." *Connick*, 461 U.S. at 152.

The time, place, and manner of Reges's speech is significant. This is not a case where the professor published or distributed his speech outside of the school with only an attenuated impact on the classroom. Rather, Reges's speech was included in a university-sanctioned document in response to the Allen School's suggestion to include land acknowledgement statements as a "best practice[] for inclusive teaching." *See* Compl. ¶ 29. That university-sanctioned document was distributed in the classroom on the first day of class and "appeared on the University's class portal, an online site where students can find syllabi, class materials, and assignments." *Id.* ¶ 39.

Just as Myers distributed her questionnaire at the office in *Connick*, Reges exercised his rights to speech in the classroom, supporting the University's fears that the functioning of its school was endangered. *Connick*, 461 U.S. at 153. Indeed, Reges acknowledges those fears repeatedly in the Complaint, citing the University administrators' receipt of multiple student complaints, 30 percent of Reges's students transferring out of his class, and the University's fear of additional future class disruption. *See* Compl. ¶¶ 43, 52, 63.

The context in which the dispute arose also is significant. Like Myers's speech, Reges's inclusion of a land acknowledgement statement on his course syllabus was not "out of purely

---

[8] Indeed, responding to campus complaints of discrimination and harassment is not just a state interest but a legal obligation. *See* Title IX, 20 U.S.C. § 1681; Title VI, 42 U.S.C. § 2000d et seq.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

14

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

academic interest." *Connick*, 461 U.S. at 153. Instead, it was included only in response to the Allen School's suggestion of a land acknowledgement statement with different, factual language. And, as explained above, the University did not preclude Reges from making this speech in general—it only requested that he not do so on a university document distributed online and in class. *See* Compl. ¶ 36.

Finally, the alleged sanction imposed on Reges must be considered in the balance, and its weight is insignificant in comparison to the University's interests. There is no allegation that Reges was fired, as was the case in *Connick*. *Connick*, 461 U.S. at 142. Reges does not allege that he was prevented from teaching. He does not allege that the University asked him to take any type of leave or suspension. He does not allege that the University docked his pay. Instead, the only purported "adverse actions" Reges identifies are (1) creating additional class sections taught at the same time as two of Reges's classes, and (2) opening an investigation to consider whether any action should be taken in response to his statement. Compl. ¶¶ 5, 7. Neither outweighs the University's interests.

The University created the alternative class section to accommodate students in response to multiple student complaints following Reges's in-class statement. *Id*. ¶ 50. And as Reges acknowledges, 30 percent of his class felt the need to transfer to the alternative section. *Id*. ¶ 51. These facts distinguish Reges's claim from those in *Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992), where the university lacked a valid concern that the professor's statement offended its students or harmed the educational process within the classroom. On the contrary, the district court in *Levin* found that "the shadow classes were established with the intent and consequence of stigmatizing Professor Levin solely because of his expression of ideas." *Id.* at 88 (internal quotation marks and citation omitted). Here, Reges concedes that the University created the alternative class sections in response to student complaints. Compl. ¶¶ 43, 60, 73. Furthermore, the presence of an additional class section—so that students have the option between two professors—is not "reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter*, 320 F.3d at 970. Such a trivial action cannot weigh heavily in the *Pickering* balance.

The University's investigation similarly cannot weigh heavily in Reges's favor. Reges alleges no actual disciplinary action taken against him. Instead, he alleges merely that the

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

15

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

University started an investigation to provide information to Dean Allbritton that she can use to decide *whether* Reges violated University policy and *whether* any further action is needed. *See*, *e.g.*, Compl. ¶¶ 57, 61, 67, 70, 72. At most, Reges learned that the University was convening a committee to "look into th[e] matter." *Id.* ¶ 79. But no charges have yet been filed against him and no disciplinary proceeding has been scheduled. *Id.* ¶ 82. In sum, no adverse employment action has been taken. Again, the facts here diverge from those in *Levin*, where the university president made clear his intention to have the professor fired because of his speech. *Levin*, 966 F.2d at 89 (quoting university president's statements that "[t]he process of removing a tenured professor is a difficult one" and that the professor's "views are offensive to the basic values of human equality and decency and simply have no place here at City College").

Put simply, Reges's interest in speaking about land acknowledgement statements is outweighed by the University's legitimate interest in the efficient functioning of its school and maintaining trust in its relationships with its students and faculty.

**B.      Reges fails to plausibly plead viewpoint discrimination (Count I).**

Reges's viewpoint discrimination claim must be dismissed for two reasons: (1) it is not viable separate from Reges's retaliation claims; and (2) his speech constitutes government speech that the University was entitled to regulate.

First, a plaintiff cannot mount a viewpoint discrimination claim separately from a First Amendment retaliation claim. The Ninth Circuit has explained that "the *Pickering* balancing approach applies regardless of the reason an employee believes his or her speech is constitutionally protected." *Berry v. Dep't of Social Servs.*, 447 F.3d 642, 650 (9th Cir. 2006). The Second Circuit has held similarly. *See Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) ("[I]t is well settled that appellants' right to free speech as public employees is entitled to some First Amendment protection. However, due to the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state, appellants' free speech claims are subject to the *Pickering* balancing test."). In short, "the Supreme Court has established the test to evaluate a city's firing *of an employee* based on speech—*Pickering*—and that test is the most appropriate for any of Plaintiff's claims based upon his alleged speech-based

1  firing," no matter whether the claim is classified as viewpoint discrimination or retaliation.

2  *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1293–94 (N.D. Ga. 2017). As explained above,

3  Reges has not—and cannot—satisfy the *Pickering* test. Reges's viewpoint discrimination claim

4  thus fails for the same reasons as the retaliation claims fail.

5  　　Second, the University course syllabus land acknowledgment statement constitutes

6  government speech, the content of which the University is entitled to regulate. As explained above,

7  Reges did not speak as a private citizen when including on course syllabi his version of the Allen

8  School's indigenous land acknowledgment statement. Instead, he spoke pursuant to his official

9  duty as a university employee, making his statement government speech. The Supreme Court and

10  Ninth Circuit have been clear that "as a general matter, when the government speaks it is entitled

11  to promote a program, to espouse a policy, or to take a position" and that, "[i]n doing so, it

12  represents its citizens and it carries out its duties on their behalf." *Walker v. Texas Div., Sons of

13  Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015); *see also Downs*, 228 F.3d at 1014 ("An arm

14  of local government—such as a school board—may decide not only to talk about gay and lesbian

15  awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict

16  the contrary speech of one of its representatives.").

17  　　This is precisely what the Allen School did when it issued "a document called the 'Allen

18  School best practices for inclusive teaching' … suggest[ing that] professors 'make their course

19  syllabus more inclusive' by including an 'Indigenous Land Acknowledgment Statement.'" Compl.

20  ¶ 29. The Allen School even provided exemplary language that it recommended professors use if

21  they chose to include the statement: a factual, politically neutral statement that "[t]he University of

22  Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared

23  waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations." *Id*. ¶ 30.

24  The Allen School's suggested statement did not express an opinion on entitlement to the land; it

25  simply acknowledged the indigenous peoples of the land. *Id.* Nor did the Allen School require

26  professors to include the statement; instead, it offered the statement as one of many ways that

27  professors could choose to create a more inclusive environment as part of the school's "best

28  practices for inclusive teaching." *Id.* ¶ 29. The University may espouse this policy on land

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC
17
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

acknowledgment statements. Even if the Allen School's statement had taken a position on entitlement to indigenous land rather than make a factual statement, it could have done so. *Walker*, 576 U.S. at 208; *Downs*, 228 F.3d at 1014.

As the Supreme Court has explained, "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422–23. Because of this, the government "'may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs*, 228 F.3d at 1013 (quoting *Rosenberger*, 515 U.S. at 833). Again, this is exactly what the University did. After Reges included his version of the statement on the course syllabus, the University removed it—after Reges refused to do so himself (Compl. ¶ 37)— because it garbled the factual message the school intended to convey. *Id*. ¶¶ 36, 39. The Allen School similarly requested other professors to remove their land acknowledgement statements that had muddled the school's intended message. *See Id*. ¶ 38. The University acted within its authority in correcting these distorted messages. As the Supreme Court has explained, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421–22. Reges's viewpoint discrimination claim must be dismissed.

### C.    Reges fails to plausibly plead that Exec. Order 31 is overbroad (Count IV).

Reges also does not state a plausible overbreadth claim. According to Reges, the University's Executive Order 31 is unconstitutionally overbroad. *See* Compl. ¶¶ 124–34. But even if applying the Order in some cases might restrict expression, those applications reflect just a fraction of the Order's applications that do *not* affect expression. Reges's challenge fails for three reasons. First, construing the Order shows that its language aims at conduct akin to discrimination, harassment, or retaliation—not protected speech. Second, even the applications of the Order that may restrict expression are permissible under the *Pickering* balance discussed above, which also

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

1    governs overbreadth challenges in the public-employment context. And third, the Supreme Court

2    and other courts have repeatedly blessed regulations like the Order.

3        A law or policy is unconstitutionally overbroad only if "a substantial number of its

4    applications are unconstitutional, judged in relation to [the law or policy's] plainly legitimate

5    sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash.*

6    *State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The overbreadth doctrine is "strong

7    medicine," and policies are invalidated under it "sparingly and only as a last resort." *Broadrick v.*

8    *Oklahoma*, 413 U.S. 601, 613 (1973). Nor do courts strike down laws as facially overbroad "when

9    a limiting construction has been or could be placed on the challenged statute." *Id.*; *see also Arce v.*

10   *Douglas*, 793 F.3d 968, 985 (9th Cir. 2015) ("It would be inappropriate for us to read the statute

11   more broadly to find that this provision [is invalid,] . . . as the provision is readily susceptible to

12   the more narrow construction we have identified."). Overbreadth challenges "in the public

13   employment context" turn on a "modified *Pickering* balancing analysis that closely tracks the test

14   used for First Amendment retaliation claims." *Hernandez v. City of Phoenix*, 43 F.4th 966, 980

15   (9th Cir. 2022).

16       Reges's overbreadth claim stumbles out of the gate. "The first step in overbreadth analysis

17   is to construe the challenged statute; it is impossible to determine whether a statute reaches too far

18   without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008).

19   But Reges misinterprets the Order. The Complaint plucks a single clause from the Order to assert

20   that it is overbroad: "the University retains the authority to discipline or take appropriate corrective

21   action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the

22   conduct rises to the level of unlawful discrimination, harassment, or retaliation." Compl. ¶ 126

23   (quoting Exec. Order 31 § 1). But surgically extracting just the words "unacceptable" and

24   "inappropriate" to claim that the Order sweeps in substantial protected conduct flouts basic

25   principles of statutory interpretation.

26       Washington courts read laws as a whole and construe them to avoid constitutional

27   infirmities. *See Arce*, 793 F.3d at 984 (applying state-law principles of statutory interpretation in

28   considering overbreadth challenge to state law); *State v. Evergreen Freedom Found.*, 192

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

19

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel +1-206-839-4300

Wn.2d 782, 789, 432 P.3d 805 (2019) (holding that construction is necessary if more than one interpretation of plain language is reasonable and that the meaning of words in a statute is gleaned from "all the terms and provisions of the act in relation to the subject of the legislation, the nature of the act, the general object to be accomplished and consequences" of one construction over another (quotation omitted)); *Utter v. Building Ind. Ass'n of Wash.*, 182 Wn.2d 398, 434, 341 P.3d 953 (2015) ("We construe statutes to avoid constitutional doubt."). With those principles in mind, the Order addresses not all "inappropriate" conduct but only conduct closely resembling unlawful retaliation and discrimination, even if the conduct does not meet the test under those employment-law principles.

The Order's central concern is combatting discrimination, harassment, and retaliation:

> The University … is committed to providing equality of opportunity and an environment that fosters respect for all members of the University community. This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. ***To facilitate that goal***, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

Exec. Order 31 § 1 (emphasis added). Immediately after the language that Reges highlights, the Order lists specific policies aimed at discrimination, harassment, and retaliation. *Id.* And it defines key terms and explains that terms in the Order are meant "to have the meaning given to them by applicable federal or state laws and regulations." *Id.* § 4. The Order thus tethers the words "unacceptable" and "inappropriate"—to which Reges objects—to the concepts of unlawful discrimination and retaliation. *See State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d 196 (2005) (explaining that "a single word in a statute should not be read in isolation" and that the meaning of words "may be indicated or controlled" by other words with which they are associated). The Order also commits the University to interpret it "in the context of academic freedom in the University environment." Exec. Order 31 § 5(A); *see Arce*, 793 F.3d at 985 (rejecting overbreadth challenge in part because policy stated that it would not be construed to prohibit instruction on historical oppression). Even the titles of the Order and of the relevant subsection refer to "Nondiscrimination" and "Nondiscrimination and Non-Retaliation." *See State v. Day*, 96 Wn.2d 646, 649 n.4, 638 P.2d 546 (1981) ("It is a well recognized rule of statutory construction that the title of the act may be

20

1   resorted to as one means of ascertaining intent.").

2    In short, the Order means that conduct punishable as "unacceptable" or "inappropriate"

3   must resemble discrimination, harassment, or retaliation, even if it need not be independently

4   unlawful under those employment-law concepts. The First Amendment does not limit permissible

5   workplace discipline to conduct that is illegal under the employment laws. In any event, the Order

6   does not sweep in substantial protected conduct relative to its total coverage. So the Order is not

7   unconstitutionally overbroad.

8    Next, the same analysis that requires dismissing Reges's retaliation claim precludes

9   invalidating the Order as facially overbroad. Just as under *Pickering*, courts ask whether the

10   challenged restriction applies to employees' private speech and, if so, whether the restriction is

11   justified. *See Hernandez*, 43 F.4th at 980. But unlike Reges's as-applied claims about purported

12   retaliation, his facial challenge centers on a policy that does not target protected expression at all

13   in most instances, and will satisfy *Pickering* in almost every other. *See Broadrick*, 413 U.S. at 616

14   (identifying content and viewpoint neutrality as a factor weighing against facial invalidation based

15   on overbreadth). Put simply, the Order does not facially restrict what members of the University

16   community say in private or post on social media. It instead prohibits conduct—rarely expressive

17   in the first place—with no place in the university setting or that of any other employer. The Order

18   is thus necessarily on firmer constitutional footing than policies that facially target expression.

19    *Hernandez* is instructive. There, the Ninth Circuit affirmed—with two caveats—the

20   dismissal of plaintiffs' overbreadth challenge to a police department's social-media policy

21   restricting "a broad category of expression" when the policy advanced the government employer's

22   interest in prohibiting speech "undermin[ing] the employer's mission or hamper[ing] the effective

23   functioning of the employer's operations." 43 F.4th at 980–83. The court reasoned that the policy,

24   which restricted even off-duty social media posts "detrimental to the mission and functions of the

25   Department" or which undermined "the goals and mission of the Department or City," closely

26   "track[ed] interests that the Department may constitutionally pursue." *Id.* at 981. The court

27   therefore could not "say that a substantial number of the policy's applications are unconstitutional,

28   judged in relation to policy's plainly legitimate sweep." *Id.* (internal quotation marks and citation

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

21

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel +1-206-839-4300

omitted). Here, prohibiting conduct, much of it independently actionable, that undermines the University's mission in combatting discrimination and harassment should lead to the same result as in *Hernandez*, where the policy sweeps in far less presumptively protected expression.

Finally, other courts have rebuffed overbreadth challenges to policies like the Order. In *Arnett v. Kennedy*, for instance, the Supreme Court rejected an overbreadth challenge to a federal civil-service statute authorizing the dismissal of a government employee "for such cause as will promote the efficiency of the service." 416 U.S. 134, 158 (1974) (citation omitted). The Court explained that "the infinite variety of factual situations in which public statements by Government employees might reasonably justify dismissal" supported such a broad restriction. *Id.* at 161. The provision covered, so the Supreme Court held, no more than was needed to protect the reputation and efficiency of the employing agency. *See id.* at 162; *see also Hernandez*, 43 F.4th at 981 (upholding police department's social media policy barring posts "detrimental to the mission and functions of the Department") (citation omitted). And just this year, a trial court in Texas rejected an overbreadth challenge to a university policy prohibiting conduct that "adversely affects the mission or reputation of the university." *Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 WL 748502, at *18–19 (E.D. Tex. Mar. 11, 2022). So too here.

### D. Reges fails to plausibly plead that Exec. Order 31 is unconstitutionally vague (Count V).

Similar reasoning dooms Reges's second facial challenge: that Executive Order 31 is unconstitutionally vague. *See* Compl. ¶¶ 135–45. Because the Order, properly construed, addresses conduct like discrimination, harassment, or retaliation—even if the conduct falls short of what is unlawful and legally actionable—reasonable members of the University community are on notice of what sort of conduct is "unacceptable" or "inappropriate" under the Order. Together with the greater leeway given for civil, rather than criminal, restrictions and for restrictions aimed at public employees, rather than the public at large, interpreting the Order sinks Reges's vagueness claim.

The vagueness doctrine flows from the Fifth and Fourteenth Amendments' guarantees of due process. A law is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But the Supreme Court has never required "perfect

clarity and precise guidance … even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (citation omitted). That is so because "we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. The vagueness doctrine incorporates two main requirements. First, the law or policy must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (quoting *Grayned*, 408 U.S. at 108).[9] Second, the policy must avoid arbitrary enforcement. *See id.* The vagueness doctrine applies with less force when, like the Order, the restriction imposes only civil consequences. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). And "policies governing public employee speech may be framed in language that might be deemed impermissibly vague if applied to the public at large." *Hernandez*, 43 F.4th at 982 (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).

The Complaint's assertions that restrictions on "unacceptable" and "inappropriate" conduct are unconstitutionally vague fall flat. The Order relates to conduct closely resembling unlawful discrimination, harassment, and retaliation. The challenged language is in an executive order that promotes exactly those interests that are most vital to maintaining the University's community free of discrimination, and restricts no more than needed. That language necessarily qualifies the references to inappropriate conduct. *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005) ("[O]therwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity."). This narrowing construction offers enough specificity to put a member of the University community of reasonable intelligence on notice of the conduct the Order prohibits. *See, e.g.*, *Arce*, 793 F.3d at 988 (statute prohibiting coursework promoting resentment toward a race or class of people not void for vagueness "[f]or many of the same reasons" it was not overbroad). In other words, the statutory construction at the core of the overbreadth analysis also shows that the Order is definite enough to be understood as applying to specific categories of conduct that the law allows public employers to restrict.

Nor does the Order invite arbitrary enforcement. In fact, it must be interpreted "in the

---

[9] This requirement is heightened in First Amendment cases. *See id.*

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

23

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

context of academic freedom in the University environment." Exec. Order 31 § 5(A). Nothing supports reading Reges's cherry-picked phrase and concluding that the statute is meaningless. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (reasoning that a civil law is void for vagueness only if its terms are "so vague and indefinite as really to be no rule or standard at all" or if it is "substantially incomprehensible" (citation omitted)).

The Ninth Circuit's decision in *Tucson Women's Clinic v. Eden*—cited by the Complaint— is not to the contrary. *See* 379 F.3d 531 (9th Cir. 2004), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). There, the court held unconstitutionally vague the provisions of a statute requiring licensees to treat medical patients with "consideration," "respect," and "dignity." *Id.* at 554–55. But the court saw nothing in that language tethering the proscribed conduct to a reasonably specific context. Indeed, none of the terms at issue in *Eden* was defined or tied to terms of art within the relevant field, and the prohibition turned on entirely subjective determinations. *See id.* at 555. Here, by contrast, the Order's application is limited in scope and clear in context for the vast majority of the Order's applications. Its provisions thus "cannot be deemed unconstitutionally vague on their face." *Hernandez*, 43 F.4th at 982.

Time and again, courts have turned aside vagueness challenges to provisions as broad as those in the Order. In *Arnett*, the Supreme Court held that a standard allowing dismissal for any cause "as will promote the efficiency of the service" was not unconstitutionally vague. *See* 416 U.S. at 159–60. The Sixth Circuit ruled similarly in upholding an employment policy prohibiting "conduct unbecoming a teacher." *Fowler v. Bd. of Educ. of Lincoln Cnty*, 819 F.2d 657, 664–66 (6th Cir. 1987). So too with the Third Circuit's approval of a regulation authorizing dismissal of professors who failed to "maintain standards of sound scholarship and competent teaching." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992). This Court should do the same.

## V.    CONCLUSION

For these reasons, Defendants ask the Court to dismiss the Complaint with prejudice. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (explaining that dismissal with prejudice is warranted when amending complaint would be futile).

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

24

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5600
Seattle, Washington 98104-7097
tel+1-206-839-4300

1    DATED this 31st day of October, 2022.

2                                          ORRICK, HERRINGTON & SUTCLIFFE LLP

3                                          By:  _s/Robert M. McKenna_
                                               Robert M. McKenna (WSBA# 18327)
4                                              Aaron Brecher (WSBA# 47212)
                                               701 Fifth Avenue, Suite 5600
5                                              Seattle, WA  98104
                                               Telephone (206) 839-4300
6                                              Fax (206) 839-4301
                                               rmckenna@orrick.com
7
                                               R. David Hosp (*Pro Hac Vice Admission*)
8                                              Kristina D. McKenna (*Pro Hac Vice Admission*)
                                               222 Berkeley Street, Suite 2000
9                                              Boston, MA 02116
                                               Telephone (617) 880-1802
10                                             Fax (617) 880-1801
                                               dhosp@orrick.com
11                                             kmckenna@orrick.com

12                                         *Attorneys for Defendants Ana Mari Cauce, Magdalena
                                           Balazinska, Dan Grossman, and Nancy Allbritton*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28