1

2

3

4

5

6

7

8

Honorable John H. Chun

9

10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11

12

STUART REGES,

Plaintiff,

13

v.

14

15

16

17

18

19

20

ANA MARI CAUCE, in her official capacity
as President of the University of Washington;
MAGDALENA BALAZINSKA, in her
official and individual capacities as Director
of the Paul G. Allen School of Computer
Science & Engineering; DANIEL
GROSSMAN, in his official and individual
capacities as Vice Director of the Paul G.
Allen School of Computer Science &
Engineering; and NANCY ALLBRITTON, in
her official and individual capacities as Dean
of the College of Engineering,

21

Defendants.

Case No. 2:22-cv-00964-JHC

**DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT**

Noted for Hearing: September 22, 2023

22

23

24

25

26

27

28

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................1

II.     BACKGROUND..................................................................................................2

III.    LEGAL STANDARD ..........................................................................................5

IV.     ARGUMENT ......................................................................................................5

   A.   Reges fails to plead First Amendment retaliation (Counts II & III). ...................5

      1.   Reges did not speak "as a citizen." ...............................................6

      2.   Reges cannot satisfy the Pickering balance. ...............................10

   B.   Reges fails to plead viewpoint discrimination (Count I)...................................14

   C.   Reges fails to plead that Exec. Order 31 is overbroad (Count IV)....................16

   D.   Reges fails to plead that Exec. Order 31 is unconstitutionally vague (Count V)..............20

V.      CONCLUSION ................................................................................................22

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

*i*

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abcarian v. McDonald,*
617 F.3d 931 n.5 (7th Cir. 2010) .................................................................................... 6

*Adams v. Trustees of the Univ. of N.C.-Wilmington,*
640 F.3d 550 (4th Cir. 2011) .......................................................................................... 7

*Arce v. Douglas,*
793 F.3d 968 (9th Cir. 2015) ..................................................................... 16, 17, 18, 21

*Arnett v. Kennedy,*
416 U.S. 134, 158 (1974) .......................................................................................... 19, 21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................................... 5

*Berry v. Dep't of Social Servs.,*
447 F.3d 642 (9th Cir. 2006) ...................................................................................... 14

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ................................................................................................ 16, 18

*Cochran v. City of Atlanta,*
289 F. Supp. 3d 1276 (N.D. Ga. 2017) ...................................................................... 14

*Connick v. Myers,*
461 U.S. 138 (1983) ............................................................................................ 11, 12, 13

*Coszalter v. City of Salem,*
320 F.3d 968 (9th Cir. 2003) ...................................................................................... 13

*Demers v. Austin,*
746 F.3d 402 (9th Cir. 2014) ..................................................................................... 6, 7

*Dobbs v. Jackson Women's Health Org.,*
142 S. Ct. 2228 (2022) ................................................................................................ 21

*Downs v. L.A. Unified Sch. Dist.,*
228 F.3d 1003 (9th Cir. 2000) ......................................................................... 8, 9, 10, 15

*Edge v. City of Everett,*
929 F.3d 657 (9th Cir. 2019) ...................................................................................... 20

*Eminence Cap., LLC v. Aspeon, Inc.,*
316 F.3d 1048 (9th Cir. 2003) .................................................................................... 22

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

ii

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

*Ford Motor Co. v. Tex. Dep't of Transp.*,
  264 F.3d 493 (5th Cir. 2001) ................................................................................ 21

*Fowler v. Bd. of Educ. of Lincoln Cnty*,
  819 F.2d 657 (6th Cir. 1987) ................................................................................ 22

*Gammoh v. City of La Habra*,
  395 F.3d 1114 (9th Cir. 2005) .............................................................................. 21

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) .......................................................................................*passim*

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................................. 20

*Hernandez v. City of Phoenix*,
  43 F.4th 966 (9th Cir. 2022) ...........................................................................*passim*

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*,
  No. 4:20-CV-321-SDJ, 2022 WL 748502 (E.D. Tex. Mar. 11, 2022) .................. 19

*Johnson v. Poway Unified School District*,
  658 F.3d 954 (9th Cir. 2011) ........................................................................ 8, 9, 10

*Knight v. Conn. Dep't of Pub. Health*,
  275 F.3d 156 (2d Cir. 2001) ................................................................................. 14

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008) .................................................................................. 3

*Levin v. Harleston*,
  770 F. Supp. 895 (S.D.N.Y. 1991) ......................................................................... 8

*Levin v. Harleston*,
  966 F.2d 85 (2d Cir. 1992) ........................................................................... 7, 8, 13

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968) .......................................................................................*passim*

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995) ........................................................................................ 8, 15

*San Filippo v. Bongiovanni*,
  961 F.2d 1125 (3d Cir. 1992) ............................................................................... 22

*State v. Day*,
  96 Wn.2d 646, 638 P.2d 546 (1981) ..................................................................... 18

*State v. Evergreen Freedom Found.*,
  192 Wn.2d 782 P.3d 805 (2019) ........................................................................... 17

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

*State v. Roggenkamp*,
    153 Wn.2d 614, 106 P.3d 196 (2005) ................................................................. 18

*Tucson Women's Clinic v. Eden*,
    379 F.3d 531 (9th Cir. 2004) ............................................................................... 21

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ................................................................................. 3

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................................................. 16

*United States v. Williams*,
    553 U.S. 285 (2008) ...................................................................................... 16, 20

*Utter v. Building Ind. Ass'n of Wash.*,
    182 Wn.2d 398, 341 P.3d 953 (2015) ................................................................. 17

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ............................................................................................. 20

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ............................................................................................. 15

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................................................. 16

*Waters v. Churchill*,
    511 U.S. 661 (1994) ............................................................................................. 20

**Statutes**

20 U.S.C. § 1681 Title IX ........................................................................................... 12

42 U.S.C. § 2000d Title VI .......................................................................................... 12

**Other Authorities**

U.S. Constitution, Amendment I ........................................................................... *passim*

Fed. R. Civ. P. 8(a)(2) ................................................................................................... 5

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 5

Univ. of Wash., Exec. Order 31: Nondiscrimination and Affirmative Action
    (updated Aug. 14, 2020)
    https://www.washington.edu/admin/rules/policies/PO/EO31.html ................... *passim*

Univ. of Wash. Faculty Code Section 15-27.D ........................................... 3, 4, 5, 13

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

iv

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

UW Syllabus Guidelines and Resources (Oct. 30, 2022),
     https://registrar.washington.edu/staffandfaculty/syllabus-guidelines/ ..................................... 7

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

v

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

# I.   INTRODUCTION

The University of Washington and its administrators are committed to free expression. To advance the University's educational mission, they apply those principles without regard to a speaker's political viewpoint.

The first Amended Complaint ("FAC") lacks factual allegations to support Stuart Reges's claims to the contrary. Dkt. 46. The FAC confirms that the University's Paul G. Allen School of Computer Science & Engineering, a division of the College of Engineering, suggests an optional statement for inclusion on course syllabi that merely "acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip, and Muckleshoot nations." It expresses no view on land ownership or dispossession; it simply acknowledges the existence of certain Native tribes with which the State of Washington has formal agreements.

On his Winter Quarter 2022 computer science syllabus, Reges included a politically charged "land acknowledgment statement." After he was asked to remove the statement and refused, the University removed it from the online version of his syllabus and offered a separate section of Reges's class for students who preferred a different instructor. When Reges again included the statement on his syllabus the next term, the College of Engineering started an investigation to determine whether Reges's actions violated the faculty code—which led to no discipline.

Reges does not allege that the University, or the administrators named as defendants in this action,[1] prevented him from airing his political views outside the official University-sanctioned syllabus. Nothing in the FAC suggests that the University objected to Reges's inclusion of his alternative "land acknowledgment statement" in the signature block of his individual University email, or to his posting it outside his University office door. In short, the University did nothing but enforce a reasonable restriction on speech in official University documents and offered a separate section of Reges's class to accommodate students. Reges's claims should be dismissed.

---

[1] References to actions of the "University" or "Allen School" refer to actions taken by the named defendants, each of whom are University officials.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

1

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

## II.     BACKGROUND

Reges teaches computer science at the Allen School. FAC ¶ 20. Defendants Magdalena Balazinska and Dan Grossman are also University employees—the Director and Vice Director of the Allen School, respectively. *Id*. ¶¶ 25–26. Defendant Nancy Allbritton is the Dean of the University's College of Engineering, *id*. ¶ 27, and Defendant Ana Mari Cauce is the University President, *id*. ¶ 24.

In 2019, the Allen School posted a document on its internal faculty website describing the "Allen School best practices for inclusive teaching." *Id*. ¶ 30. As part of its "best practices," the Allen School suggested that its professors could "make [their] course syllabus more inclusive" by, among other optional practices, considering the inclusion of an "Indigenous Land Acknowledgement Statement," offering the following language as an example:

> The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip, and Muckleshoot nations.

*Id*. ¶¶ 30–31. The example statement expresses no view on whether the identified indigenous tribes own, or can claim, certain land. *Id*. ¶ 31. The University developed this statement over several years, working with its Tribal Liaison to finalize the language. *Id*. ¶ 32.

Near the end of 2021, Reges decided to include an indigenous land acknowledgement statement on his course syllabus. *Id*. ¶ 34. But instead of adopting the Allen School's recommended factual language, Reges crafted a politically charged statement on whether indigenous people may claim title to the land:

> I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington.

*Id*. Reges distributed the syllabus on the first day of class, and posted the syllabus on the University's class portal, an online site to which all students have access. *Id*. ¶¶ 37, 40. Reges does not allege any connection between the statement and the subject he was teaching. Nor does he allege that he discussed his statement, its relation to the class subject matter, or his reasons behind it when he distributed each syllabus in class.

As Reges alleges, Director Balazinska asked Reges to remove the statement from his course

2

syllabus, citing disruption to the class and explaining that it was creating a toxic environment in his course, a required course for students majoring in Computer Science. *Id.* ¶¶ 37, 44; Declaration of Balazinska, Ex. 1.[2] In the same email, Director Balazinska welcomed Reges "to voice [his] opinion and opposition to land acknowledgements … in other settings," but explained that using an official University syllabus for that purpose was inappropriate. Balazinska Decl., Ex. 1. Director Balazinska explained that she would ask other professors to similarly remove or revise statements that departed from the Allen School's factual statement, no matter the views their language conveyed. *Id.* ¶ 39. Reges refused to remove his statement. FAC ¶ 38.

When Reges persisted, Director Balazinska had the statement removed from the online version of the Computer Programming II syllabus on the University's class portal. *Id.* ¶ 40. Director Balazinska then apologized to the students in the course for Reges's statement. *Id.* ¶ 41. The Allen School also opened an alternative section of Reges's Computer Programming II class taught by a different professor, to which over thirty percent of Reges's students transferred. *Id.* ¶¶ 49, 53.

The matter could have ended there. *See id.* ¶ 56. But almost two months later, Reges emailed the Allen School's diversity-allies listserv—available to both students and faculty—detailing his plans to repeat his land acknowledgement statement on his syllabi for classes taught in the next quarter. *Id.* ¶ 57. In response to more complaints stemming from his announcement, Director Balazinska initiated the requisite Faculty Code Section 25-71 process, arranging a meeting with Reges to discuss University policy, including University of Washington Executive Order 31,[3] which addresses discrimination, harassment, and retaliation and authorizes "corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation." FAC ¶¶ 60, 61, 63; Exec. Order 31 § 1. Director Balazinska and Vice Director Grossman met with Reges and his counsel, explaining that they continued to receive student complaints about his statement and expected

---

[2] The Court may consider documents incorporated by reference in the FAC without converting this motion into one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The Court also need not accept as true allegations in the FAC "contradicting documents that are referenced in the complaint." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

[3] Univ. of Wash., Exec. Order 31: Nondiscrimination and Affirmative Action (updated Aug. 14, 2020) https://www.washington.edu/admin/rules/policies/PO/EO31.html.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

3

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1  further disruption to his classes as a result. FAC ¶¶ 64, 66. Still, Reges refused any proposal to

2  revise his statement or to keep it off his course syllabi. *Id*. ¶¶ 71, 72.

3       As a result, Dean Allbritton continued the Section 25-71 process, arranging a meeting with

4  Reges under Section 25-71.D. *Id*. ¶ 73. That meeting took place in March 2022, during which Dean

5  Allbritton asked Reges to consider how his statement was affecting students and why many of them

6  chose to transfer to the alternative class section. *Id*. ¶¶ 75, 76. Reges again declined to alter course.

7  After their meeting, Dean Allbritton informed Reges that she would arrange a special investigative

8  committee under Section 25-71.D(3), which instructs that before any charges may be brought

9  against the faculty member, the dean must appoint a committee to investigate the alleged violation.

10  *Id*. ¶ 82; *see* Faculty Code § 25-71.D. Over the next few months, Dean Allbritton assembled this

11  committee, taking time to select potential members and obtain their acceptances to serve on the

12  committee. *Id*. ¶¶ 83, 84. Under Section 25-71, the committee is to assist the dean in informally

13  and confidentially gathering information and documentation and to advise the dean in interpretating

14  the Faculty Code. *See* Faculty Code § 25-71.D; *see also* Balazinska Decl., Ex. 2 (charging the

15  committee to assist the dean in gathering information and interpreting the Faculty Code).

16       While the committee was investigating, Reges continued to include his statement on the

17  syllabus for courses he taught in the Spring 2022 quarter. FAC ¶ 79. The Allen School did not

18  remove the statement from Reges's syllabus but did offer an alternative section for his CSE 142

19  course (a mandatory course for computer programming students) to accommodate student needs

20  and avoid further disruption. *Id*. ¶ 80.

21       In June 2023, Dean Albritton informed Reges of the committee's findings. FAC ¶¶ 92, 93.

22  The committee found, "based on multiple interviews with directly affected parties … and on review

23  of contemporaneous documents and [Reges's] public statements," that Reges's including his

24  statement on the University syllabus "created an immediate and significant disruption to the

25  University teaching environment." Balazinska Decl., Ex. 3 at 1–2. The committee found that

26  numerous student and staff complaints reflected the "denigrating" nature of Reges's statement, that

27  "one Native American student [felt] compelled to take a leave of absence from the University" and

28  another "drop[ped] out of the University." *Id.* at 2. The committee also found that Reges refused to

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

4

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1   acknowledge the disruption his behavior had caused, exacerbating matters. *Id.* at 3–4. Even so,

2   Dean Allbritton "decline[d] to impose any sanction at [that] time" and reinstated Reges's merit pay

3   increase that had been held in abeyance while the committee investigated. *Id.* at 5; FAC ¶ 94. Based

4   on Reges's knowledge of this disruption his conduct caused, Dean Allbritton advised him that if

5   he continued to include the statement on University syllabi "*and* if that inclusion leads to further

6   disruption," she would conclude that Reges intended the disruption and the University would

7   proceed according to the Faculty Code. Balazinska Decl., Ex. 3 at 5–6.

8        In July 2022, while the committee's work was ongoing, Reges filed this lawsuit. Dkt. 1.

9   The FAC alleges that Defendants, in their varying individual and official capacities, violated his

10  First Amendment rights and that the University's Executive Order 31 is unconstitutionally vague

11  and overbroad. *See generally* FAC. Reges does not allege that he was removed or suspended from

12  his teaching position. Reges does not allege that he was restrained from expressing his personal

13  view on indigenous land statements or Native tribes' land entitlement apart from including his

14  views on his University-sanctioned syllabi. And Reges does not allege that the University ever

15  asked him not to express his view on University grounds: Reges was not prohibited from, for

16  example, including his statement in his email signature block or posting it on the door to his office.

17  Reges continues to lecture at the Allen School to this day.

### III.     LEGAL STANDARD

19       A complaint must contain "a short and plain statement of the claim showing that the pleader

20  is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a claim lacks sufficient allegations to state a

21  "plausible" claim for relief, the court should dismiss it under Fed. R. Civ. P. 12(b)(6). *Bell Atl.*

22  *Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

### IV.     ARGUMENT

### A.     Reges fails to plead First Amendment retaliation (Counts II & III).

25       The Court should dismiss Reges's retaliation claims. To support these claims, Reges must

26  show that: (1) he spoke as a citizen on a matter of public concern; (2) he suffered an adverse

27  employment action; (3) his speech was a substantial or motivating factor of the adverse

28  employment action; and (4) his speech interest outweighs the University's interest in promoting

the efficiency of the public services it performs through its employees. *See Garcetti v. Ceballos*, 547 U.S. 410, 417–20 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Reges fails to satisfy at least elements (1) and (4).

1.   **Reges did not speak "as a citizen."**

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. That's just what Reges did when he included in his course syllabi a politically charged land acknowledgment statement. Reges does not dispute this. Instead, he pleads that his speech is nonetheless protected under *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), because it was expressed "in the course of his teaching." *See* FAC ¶¶ 119, 126. Reges is wrong, and *Demers* does not shield his conduct.

In *Demers*, a Washington State University professor alleged that university administrators retaliated against him for distributing (1) a pamphlet he wrote about the faculty structure and the need for increased influence from "professionals"—i.e., faculty with professional experience—and reduced influence from faculty with Ph.Ds., and (2) draft chapters from his book critical of the University. *Demers*, 746 F.3d at 406–07, 414–15. The University argued that, because Demers spoke pursuant to his official duty as a university professor in each instance, his speech was not protected under *Garcetti*. *Id.* at 408–09. The Ninth Circuit disagreed, holding that Demers's speech was protected under an exception to *Garcetti* for "speech related to scholarship or teaching." *Id.* at 411, 414–15. The Court cautioned, however, that "[i]t may in some cases be difficult to distinguish between what qualifies as speech 'related to scholarship or teaching' within the meaning of *Garcetti*." *Id.* at 415. In other words, not *all* academic speech is speech "related to scholarship or teaching" under *Garcetti*. *Id.*

Other courts have recognized that *Garcetti*'s academic-freedom exception has limits. For example, in *Abcarian v. McDonald*, the Seventh Circuit rejected a medical school department head's argument that his speech—on issues including risk management, fees charged to physicians, and surgeon abuse of prescription medications—was "'expression related to academic scholarship

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

6

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1   or classroom instruction' possibly exempt from *Garcetti*." 617 F.3d 931, 938 n.5 (7th Cir. 2010)

2   (citation omitted). The court explained that the department head's "speech involved administrative

3   policies that were much more prosaic than would be covered by principles of academic freedom."

4   *Id.* Similarly, in *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th

5   Cir. 2011), the Fourth Circuit explained that, at times, "a public university faculty member's

6   assigned duties include a specific role in declaring or administering university policy, as opposed

7   to scholarship or teaching. In that circumstance, *Garcetti* may apply to the specific instances of the

8   faculty member's speech carrying out those duties." When speech is "undertaken at the direction

9   of [the university]," it falls within *Garcetti*'s scope. *Id.* at 563–564.

10        As in these cases, Reges's syllabus statements are not the type of "scholarship" or

11   "teaching" that the Supreme Court envisioned protecting as "academic freedom." *See Garcetti*, 547

12   U.S. at 425. Reges alleges no facts showing that his one-sentence statement at the bottom of his

13   course syllabi is "related to scholarship or teaching" under *Garcetti*. Far from the independently

14   published pamphlet in *Demers* or the external publications in *Adams*, Reges's speech was in a

15   University-sanctioned document required to be distributed. As Reges admits, Allen School

16   administrators sought to further a school policy on the optional inclusion of indigenous land

17   acknowledgement statements on course syllabi as part of the School's "best practices for inclusive

18   teaching." *See* FAC ¶¶ 30, 31, 102. And, as Reges pleads, that indigenous land acknowledgment

19   statement has been developed over several years by the University's Tribal Liaison and applied

20   during other University events. *Id.* ¶ 32. This is precisely the type of university-directed policy

21   administration that *Adams* recognized would *not* constitute "scholarship or teaching" under

22   *Garcetti*. *Adams*, 640 F.3d at 563–34.

23        Moreover, Reges's statement was on University course syllabi—documents over which the

24   University exercises specific oversight and approval.[4] That Reges's speech was in a University-

25   sanctioned document distributed in the classroom separates this case from *Levin v. Harleston*, 966

26

27   ———————————
[4] The University prescribes specific guidelines for course syllabi, detailing the purpose and format

28   of the document and the policies and content mentioned therein. *See* UW Syllabus Guidelines and
Resources (Oct. 30, 2022), https://registrar.washington.edu/staffandfaculty/syllabus-guidelines/.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

7

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

F.2d 85 (2d Cir. 1992), on which the Complaint repeatedly relies, *see, e.g.*, FAC ¶¶ 111, 139, 144. There, the speech occurred outside the classroom and was unrelated to Levin's duty as a university professor. The litigation involved three writings: (1) a letter to the *New York Times* criticizing a previous editorial, (2) a book review published in an Australian journal, and (3) a letter published in the American Philosophical Association Proceedings responding to a previous issue. *Levin*, 966 F.2d at 87; *see also Levin v. Harleston*, 770 F. Supp. 895, 900–03 (S.D.N.Y. 1991) (detailing the three writings). The court's holding that the university violated the professor's rights turned on the fact that Professor Levin's expression occurred *outside the classroom*. *Levin*, 966 F.3d at 90. "[T]he commencement, or threat thereof, of disciplinary proceedings against Professor Levin predicated solely upon his protected speech outside the classroom violates his First Amendment rights." *Id.*; *see also id.* at 88 (explaining that the university lacked any evidence that "Levin's expression of his theories outside the classroom harmed the students and the educational process within the classroom").

Not so here. Reges included his speech on the course syllabus and distributed that syllabus to his students on the first day of class. *See, e.g.*, FAC ¶¶ 4, 35. Including his speech on a syllabus distributed as part of his role as a university professor confirms that the speech was made pursuant to his official duty. *See id.* That Reges's language departed from the school's suggested language does not alter this analysis. Indeed, his departure from the prescribed, fact-based message in a University-sanctioned syllabus permits greater University control because, "[w]hen the government is formulating and conveying its message, 'it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995)).

Reges's speech is more like the speech addressed in *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011) and *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000).[5] In *Johnson*, a high school math teacher hung two banners in his classroom

---

[5] That *Johnson* and *Downs* were high school, not college, teachers did not affect the analysis. In each case, the contested speech was made at the school by a government employee. *See Johnson*, 658 F.3d at 958–59; *Downs*, 228 F.3d at 1011–12. While the Ninth Circuit has acknowledged a

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

8

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

referring to God or a "creator." 658 F.3d at 958. After the school required Johnson to remove the banners because they could make students feel unwelcome or ostracized, Johnson sued the school. *Id.* at 959. The court held that the school did not violate Johnson's constitutional rights because he had not spoken "as a private citizen." *Id.* at 966–704. That context controlled the outcome:

> Johnson did not make his speech while performing a function not squarely within the scope of his position. He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. Rather, Johnson hung his banners pursuant to a long-standing [school] policy, practice, and custom of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

*Id.* at 967 (internal quotation marks omitted). Just as Johnson "did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee," he "did not act as an ordinary citizen when espousing God as opposed to no God in his classroom." *Id.* (internal quotation marks and citation omitted). The court contrasted Johnson's speech with that at issue in *Pickering*: "Unlike Pickering, who wrote a letter to his local newspaper as any citizen might, … Johnson took advantage of his position to press his particular views upon the impressionable and 'captive' minds before him." *Id.* at 968 (internal citation omitted). Nothing "prevent[ed] Johnson from himself propounding his *own opinion* on 'the religious heritage and nature of our nation' or how 'God places prominently in our Nation's history' … on the sidewalks, in the parks, through the chatrooms, at his dinner table, and in countless other locations. He may not do so, however, when he is speaking as the government, unless the government allows him to be its voice." *Id.* at 970 (internal quotation marks and citation omitted).

Similarly, in *Downs*, a high school teacher objected to his school's recognition of Gay and Lesbian Awareness month by installing a bulletin board across from his classroom—competing with the school's own bulletin board—on which he posted materials describing homosexuality as immoral and illegal. *Downs*, 228 F.3d at 1006–07. Downs sued the school district after it required

---

distinction between speech related to scholarship and teaching in a university setting, that distinction does not save Reges's claims because his speech is not scholarship or teaching under *Garcetti*.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

9

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1  him to remove the materials. *Id.* at 1008. The court held that the district did not violate Downs's

2  constitutional rights because his speech constituted government speech subject to regulation. *Id.* at

3  1011, 1013. The court explained that "[a]n arm of local government—such as a school board—

4  may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to

5  advocate such tolerance if it so decides, and restrict the contrary speech of one of its

6  representatives." *Id.* at 1014 (citation omitted). As in *Johnson*, the court acknowledged that Downs

7  could express his own views when speaking on his own behalf, but not when speaking in his

8  government capacity, unless the government allowed him to be its voice. *Id.* at 1016.

9       So too here. Reges spoke as a government employee—not a private citizen—when he went

10  to the University, handed out his syllabus, and taught class. He then exploited his position as a

11  professor to press his political view on land acknowledgements—a subject unrelated to the content

12  of his computer programming class—on a University-sanctioned document. Just as in *Johnson* and

13  *Downs*, nothing prevents Reges from propounding his opinion on land acknowledgements "on the

14  sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other

15  locations." *Johnson*, 658 F.3d at 970; *Downs*, 228 F.3d at 1016. In fact, Reges does not allege that

16  the University ever sought to preclude him from debating this topic on university grounds. But

17  Reges cannot do so "when he is speaking as the government." *Johnson*, 658 F.3d at 970 (citation

18  omitted); *Downs*, 228 F.3d at 1016. Inserting an inflammatory personal opinion onto a university

19  syllabus violated that tenet, and the University acted within constitutional limits in responding to

20  that act. *See Downs*, 228 F.3d at 1014.

21      Reges's attempt to shield his one-sentence speech on a University-sanctioned document

22  under the guise of "teaching or scholarship" fails. Reges did not speak as a private citizen and his

23  speech is not protected. His retaliation claims thus fail.

## 2.  **Reges cannot satisfy the *Pickering* balance.**

25      Even if Reges's statement were entitled to protection, the retaliation claims still fail because

26  he cannot satisfy the *Pickering* balancing test. Under *Pickering*, a retaliation claim cannot succeed

27  when "the interest[s] of the State, as an employer, in promoting the efficiency of the public services

28

MOTION TO DISMISS                                  10
Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1  it performs through its employees" outweigh "the interests of the teacher, as a citizen, in

2  commenting upon matters of public concern." *Pickering*, 391 U.S. at 568. Relevant here is the time,

3  place and manner in which the speech was made as well as the context in which the dispute arose.

4  *Connick v. Myers*, 461 U.S. 138, 152–53 (1983).

5        *Connick* is instructive. There, Myers, an assistant district attorney, sued her boss, New

6  Orleans District Attorney Harry Connick, alleging that, after she refused an office transfer, she was

7  wrongfully terminated for distributing a questionnaire concerning office policies and behaviors,

8  including the office transfer policy. *Id.* at 140–41. The Court found no free speech violation after

9  weighing "the manner, time, and place in which the questionnaire was distributed." *Id.* at 152. The

10  Court explained that Connick had a valid interest in maintaining close working relationships at the

11  office and avoiding insubordination, and "the fact that Myers . . . exercised her rights to speech at

12  the office support[ed] Connick's fears that the functioning of his office was endangered." *Id.* at

13  153. The Court looked to the context in which the dispute arose, explaining that Myers had not

14  circulated her questionnaire "out of purely academic interest … so as to obtain useful research" but

15  had done so only "upon the heels of the transfer notice." *Id.* at 153. The Court elaborated that

16  "[w]hen employee speech concerning office policy arises from an employment dispute concerning

17  the very application of that policy to the speaker, additional weight must be given to the

18  supervisor's view that the employee has threatened the authority of the employer to run the office."

19  *Id.* Myers's limited First Amendment interest was thus far outweighed by Connick's interests, and

20  her claim failed.

21        Reges's claim is similar. To be sure, Reges has an interest in free speech if he speaks as a

22  private citizen. But that interest must be balanced against the University's interest in maintaining

23  an environment conducive to learning and ensuring the efficient functioning of its classrooms. As

24  the documents he incorporates by reference show, the University received multiple student

25  complaints following Reges's statement. FAC ¶ 92-93, 96; Balazinska Decl., Ex. 3 at 2. The

26  University responded to those complaints by creating an alternative class section to accommodate

27  students offended by Reges's speech and to minimize further disruption from Reges's statement.

28

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

11

*Id.* at 3–4. The University has an interest in responding to campus complaints.[6] The University also has an interest in ensuring the regular operation of its school and not turning a blind eye to conduct that disrupts that operation. Moreover, the University did not have to "allow events to unfold to the extent that the disruption of the [classroom or the school] … [wa]s manifest before taking action." *Connick*, 461 U.S. at 152.

The time, place, and manner of Reges's speech matters. He did not publish and distribute his speech outside the school with only an attenuated impact on the classroom. Rather, Reges's speech was in a University-sanctioned document in response to the Allen School's suggestion to include land acknowledgement statements as a "best practice[] for inclusive teaching." *See* FAC ¶ 30. That University-sanctioned document was distributed in the classroom and "appeared on the University's class portal, an online site where students can find syllabi, class materials, and assignments." *Id.* ¶ 40. Just as Myers distributed her questionnaire at the office in *Connick*, Reges made his statement in the classroom, supporting the University's fears that the functioning of its school was endangered. *Connick*, 461 U.S. at 153. Reges acknowledges those fears repeatedly in the FAC, citing the University administrators' receipt of multiple student complaints, 30 percent of Reges's students transferring out of his class, and the University's fear of additional future class disruption. *See* FAC ¶¶ 44, 53, 66.

The context is also significant. Like Myers's speech, Reges's statement on his course syllabus was not "out of purely academic interest." *Connick*, 461 U.S. at 153. Instead, it was included only in response to the Allen School's suggestion of an optional land acknowledgement statement with different language. And the University did not preclude Reges from making this speech in general—it only requested that he not do so on a University syllabus distributed online and in class. *See* FAC ¶ 37.

Finally, the alleged sanction imposed on Reges must be considered in the balance, and its weight pales in comparison to the University's interests. Reges was not fired, as was the case in *Connick*. *Connick*, 461 U.S. at 142. Reges does not allege that he was prevented from teaching. He

---

[6] Responding to campus complaints of discrimination and harassment is not just a state interest but a legal obligation. *See* Title IX, 20 U.S.C. § 1681; Title VI, 42 U.S.C. § 2000d et seq.

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

12

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

does not allege that the University asked him to take any type of leave or suspension. He does not allege that the University docked his pay. Instead, the only purported "adverse actions" Reges identifies are (1) creating additional class sections taught at the same time as two of Reges's classes, (2) opening an investigation to determine whether Reges had violated University policy, which concluded with no discipline imposed, and (3) holding his merit pay in abeyance while that investigation was ongoing. See FAC ¶¶ 5, 8, 107. These do not outweigh the University's interests. Indeed, they amount to no real punishment at all.

The University created the alternative class section to accommodate students in response to complaints following Reges's in-class statement. Balazinska Decl., Ex. 3 at 3. And as Reges acknowledges, 30 percent of his class transferred to the alternative section. FAC ¶ 53. These facts distinguish Reges's claim from those in *Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992), where the university lacked a valid concern that the professor's statement offended its students or harmed the educational process within the classroom. On the contrary, the district court in *Levin* found that "the shadow classes were established with the intent and consequence of stigmatizing Professor Levin solely because of his expression of ideas." *Id.* at 88 (internal quotation marks and citation omitted). Here, Reges concedes that the University created the alternative class sections in response to student complaints. FAC ¶¶ 44, 63, 76. Furthermore, an additional class section—giving students the option between two professors—is not "reasonably likely to deter employees from engaging in constitutionally protected speech." *Coszalter v. City of Salem*, 320 F.3d 968, 970 (9th Cir. 2003). Such a trivial action cannot weigh heavily in the *Pickering* balance.

The University's investigation similarly cannot weigh in Reges's favor—it resolved with no discipline imposed on Reges despite finding serious disruption to the learning environment, and Reges has received his merit pay increase. Reges's suggestion that he has been "threaten[ed]" with "future discipline" for expressing his view conflicts with documents he incorporates by reference, showing only that if Reges continues his conduct *and if* it causes a disruption, the University will follow the Faculty Code procedures again. *Compare* FAC ¶ 94, *with* Balazinska Decl., Ex. 3 at 5–6. Again, the facts here diverge from those in *Levin*, where the university president made clear his intention to have the professor fired because of his speech. *Levin*, 966 F.2d at 89 (quoting university

13

1   president's statements that "[t]he process of removing a tenured professor is a difficult one" and

2   that the professor's "views are offensive to the basic values of human equality and decency and

3   simply have no place here at City College").

4      Put simply, Reges's interest in speaking about land acknowledgement statements is

5   outweighed by the University's legitimate interest in the efficient functioning of its school and

6   maintaining an environment conducive to learning.

7      **B.    Reges fails to plead viewpoint discrimination (Count I).**

8      Reges's viewpoint discrimination claim must be dismissed for two reasons: (1) it is not

9   viable separate from Reges's retaliation claims; and (2) his speech constitutes government speech

10  that the University was entitled to regulate.

11     First, whether mounted as viewpoint discrimination or First Amendment retaliation,

12  Reges's claim cannot survive *Pickering*. *Pickering* "applies regardless of the reason an employee

13  believes his or her speech is constitutionally protected." *Berry v. Dep't of Social Servs.*, 447 F.3d

14  642, 650 (9th Cir. 2006); *see also Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d

15  Cir. 2001) ("[I]t is well settled that appellants' right to free speech as public employees is entitled

16  to some First Amendment protection. However, due to the state's significant interest in regulating

17  the expressive conduct of its employees while they are acting on behalf of the state, appellants' free

18  speech claims are subject to the *Pickering* balancing test." (citation omitted)). In short, "the

19  Supreme Court has established the test to evaluate a city's firing *of an employee* based on speech—

20  *Pickering*—and that test is the most appropriate for any of Plaintiff's claims based upon his alleged

21  speech-based firing," no matter whether the claim is classified as viewpoint discrimination or

22  retaliation. *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1293–94 (N.D. Ga. 2017). As

23  explained above, Reges has not—and cannot—satisfy the *Pickering* test. Reges's viewpoint

24  discrimination claim thus fails for the same reasons as the retaliation claims fail.

25     Second, the University syllabus constitutes government speech, the content of which the

26  University may regulate. As explained above, Reges did not speak as a private citizen when

27  including on course syllabi his version of the Allen School's indigenous land acknowledgment

28  statement. Instead, he spoke pursuant to his official duty as a university employee, making his

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

statement government speech. The Supreme Court and Ninth Circuit have confirmed that "as a general matter, when the government speaks, it is entitled to promote a program, to espouse a policy, or to take a position" and that, "[i]n doing so, it represents its citizens and it carries out its duties on their behalf." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015).

This is precisely what the Allen School did when it issued "a document called the 'Allen School best practices for inclusive teaching' … suggest[ing that] professors 'make their course syllabus more inclusive' by including an 'Indigenous Land Acknowledgment Statement.'" FAC ¶ 30. The Allen School's suggested statement did not express an opinion on entitlement to the land; it simply acknowledged indigenous peoples. *Id.* ¶ 31. Nor did the Allen School require professors to include the statement; instead, it offered the statement as one of many ways that professors could choose to create a more inclusive environment. *Id.* ¶ 30. The University may espouse this position. Even if the Allen School's statement had taken a view on entitlement to indigenous land rather than make a factual statement, it could have done so. *Walker*, 576 U.S. at 208; *Downs*, 228 F.3d at 1014.

"Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422–23. "When the government is formulating and conveying its message, 'it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs*, 228 F.3d at 1013 (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995)). Again, this is exactly what the University did. After Reges included his version of the statement on the course syllabus, the University removed it— after Reges refused to do so himself (FAC ¶ 38)—because it garbled the factual message the school intended to convey. *Id.* ¶¶ 37, 40. Even accepting Reges's allegations as true, that would mean that the University acted within its authority in preventing the distortion of its messages. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC
15
Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

U.S. at 421–22 (citation omitted). Reges's viewpoint discrimination claim cannot survive.

**C.      Reges fails to plead that Exec. Order 31 is overbroad (Count IV).**

Reges also does not state an overbreadth claim. According to Reges, the University's Executive Order 31 is unconstitutionally overbroad. *See* FAC ¶¶ 150–60. But even if applying the Order in some cases might restrict expression, those applications reflect a fraction of the Order's applications that do *not* affect expression. Reges's challenge fails for three reasons. First, construing the Order shows that its language aims at conduct akin to discrimination, harassment, or retaliation—not protected speech. Second, even the applications of the Order that may restrict expression are permissible under the *Pickering* balance discussed above, which also governs overbreadth challenges in the public-employment context. And third, the Supreme Court and other courts have repeatedly blessed regulations like the Order.

A law or policy is overbroad only if "a substantial number of its applications are unconstitutional, judged in relation to [the law or policy's] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The overbreadth doctrine is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Nor do courts strike down laws as overbroad "when a limiting construction has been or could be placed on the challenged statute." *Id.* (citation omitted); *see also Arce v. Douglas*, 793 F.3d 968, 985 (9th Cir. 2015) ("It would be inappropriate for us to read the statute more broadly to find that this provision [is invalid,] . . . as the provision is readily susceptible to the more narrow construction we have identified."). Overbreadth challenges "in the public employment context" turn on a "modified *Pickering* balancing analysis that closely tracks the test used for First Amendment retaliation claims." *Hernandez v. City of Phoenix*, 43 F.4th 966, 980 (9th Cir. 2022).

Reges's overbreadth claim stumbles out of the gate. "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). But Reges misinterprets the Order. The FAC plucks a single clause from the Order to assert that it

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

16

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

is overbroad: "the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation." FAC ¶ 152 (quoting Exec. Order 31 § 1). But surgically extracting just the words "unacceptable" and "inappropriate" to claim that the Order sweeps in substantial protected conduct flouts basic principles of statutory interpretation.

Washington courts read laws as a whole and construe them to avoid constitutional infirmities. *See Arce*, 793 F.3d at 984 (applying state-law interpretive principles in considering overbreadth challenge to state law); *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 789, 432 P.3d 805 (2019) (holding that construction is necessary if more than one interpretation of plain language is reasonable and that the meaning of words in a statute is gleaned from "all the terms and provisions of the act in relation to the subject of the legislation, the nature of the act, the general object to be accomplished and consequences" of one construction over another (quotation omitted)); *Utter v. Building Ind. Ass'n of Wash.*, 182 Wn.2d 398, 434, 341 P.3d 953 (2015) ("We construe statutes to avoid constitutional doubt."). With those principles in mind, the Order addresses not all "inappropriate" conduct but only conduct closely resembling unlawful retaliation and discrimination, even if the conduct does not meet the test under those employment-law principles.

The Order's central concern is combatting discrimination, harassment, and retaliation:

> The University … is committed to providing equality of opportunity and an environment that fosters respect for all members of the University community. This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. ***To facilitate that goal***, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

Exec. Order 31 § 1 (emphasis added). Immediately after the language that Reges highlights, the Order lists specific policies aimed at discrimination, harassment, and retaliation. *Id.* And it defines key terms and explains that terms in the Order are meant "to have the meaning given to them by applicable federal or state laws and regulations." *Id.* § 4. The Order thus tethers the words

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC

17

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

"unacceptable" and "inappropriate"—to which Reges objects—to the concepts of unlawful discrimination and retaliation. *See State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d 196 (2005) (explaining that "a single word in a statute should not be read in isolation" and that the meaning of words "may be indicated or controlled" by other words with which they are associated (citation omitted)). The Order also commits the University to interpret it "in the context of academic freedom in the University environment." Exec. Order 31 § 5(A); *see Arce*, 793 F.3d at 985 (rejecting overbreadth challenge in part because policy stated that it would not be construed to prohibit instruction on historical oppression). Even the titles of the Order and of the relevant subsection refer to "Nondiscrimination" and "Nondiscrimination and Non-Retaliation." *See State v. Day*, 96 Wn.2d 646, 649 n.4, 638 P.2d 546 (1981) ("It is a well recognized rule of statutory construction that the title of the act may be resorted to as one means of ascertaining intent." (citation omitted)).

In short, the Order means that "unacceptable" or "inappropriate" conduct must resemble discrimination, harassment, or retaliation, even if it is not unlawful under the employment laws. The First Amendment does not limit employers to disciplining only illegal conduct. In any event, the Order does not sweep in substantial protected conduct relative to its total coverage. So, the Order is not overbroad.

Next, the same analysis that undermines Reges's retaliation claim precludes his overbreadth challenge. Just as under *Pickering*, courts ask whether the challenged restriction applies to employees' private speech and, if so, whether the restriction is justified. *See Hernandez*, 43 F.4th at 980. But unlike Reges's as-applied claims about purported retaliation, his facial challenge centers on a policy that does not target protected expression at all in most instances and will satisfy *Pickering* in almost every other. *See Broadrick*, 413 U.S. at 616 (identifying content and viewpoint neutrality as a factor weighing against facial invalidation based on overbreadth). The Order does not facially restrict what members of the University community say in private or post on social media. It instead prohibits conduct—rarely expressive in the first place—with no place in the university setting or that of any other employer. The Order is thus necessarily on firmer constitutional footing than policies that facially target expression.

*Hernandez* is instructive. There, the Ninth Circuit rejected an overbreadth challenge—with

18

1    two caveats[7]—to a police social-media policy restricting "a broad category of expression" when

2    the policy advanced the employer's interest in prohibiting speech "undermin[ing] the employer's

3    mission or hamper[ing] the effective functioning of the employer's operations." 43 F.4th at 980–

4    83. The policy, which restricted even off-duty social media posts "detrimental to the mission and

5    functions of the Department" or which undermined "the goals and mission of the Department or

6    City," closely "track[ed] interests that the Department may constitutionally pursue." *Id.* at 981. The

7    court therefore could not "say that a substantial number of the policy's applications are

8    unconstitutional." *Id.* (internal quotation marks and citation omitted). Here, prohibiting conduct,

9    much of it independently actionable, conflicting with the University's mission in combatting

10    discrimination and harassment should lead to the same result, especially where the policy sweeps

11    in far less presumptively protected expression.

12        Finally, other courts have rebuffed overbreadth challenges to similar policies. In *Arnett v.*

13    *Kennedy*, for instance, the Supreme Court rejected an overbreadth challenge to a civil-service

14    statute authorizing the dismissal of a government employee "for such cause as will promote the

15    efficiency of the service." 416 U.S. 134, 158 (1974). The Court explained that "the infinite variety

16    of factual situations in which public statements by Government employees might reasonably justify

17    dismissal" supported such a broad restriction. *Id.* at 161. The provision covered no more than was

18    needed to protect the reputation and efficiency of the employing agency. *See id.* at 162; *see also*

19    *Hernandez*, 43 F.4th at 981 (upholding police department's social media policy barring posts

20    "detrimental to the mission and functions of the Department") (citation omitted). And just last year,

21    a court in Texas rejected an overbreadth challenge to a university policy prohibiting conduct that

22    "adversely affects the mission or reputation of the university." *Hiers v. Bd. of Regents of the Univ.*

23    *of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 WL 748502, at \*18–19 (E.D. Tex. Mar. 11, 2022). So

24    too here.

25

---

26    [7] The Court did not reject the challenge for two specific clauses prohibiting social media activity
that would "embarrass or discredit" the Department or "divulge[] any information" gained while

27    performing official duties. *Id.* at 981–92. These clauses, the Court explained, were "entirely self-
regarding," "not constrained by any demonstrable impact on the Department or its ability to

28    function," and swept too broadly. *Id.*

MOTION TO DISMISS               19          Orrick Herrington & Sutcliffe LLP
Case No. 2:22-cv-00964-JHC                  401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

**D.  Reges fails to plead that Exec. Order 31 is unconstitutionally vague (Count V).**

Similar reasoning dooms Reges's second facial challenge: that Executive Order 31 is unconstitutionally vague. *See* FAC ¶¶ 161–71. Because the Order, properly construed, addresses conduct like discrimination, harassment, or retaliation—even if the conduct falls short of what is unlawful and legally actionable—reasonable members of the University community are on notice of what sort of conduct is "unacceptable" or "inappropriate" under the Order. Together with the greater leeway given for civil, rather than criminal, restrictions and for restrictions aimed at public employees, rather than the public at large, interpreting the Order sinks Reges's vagueness claim.

The vagueness doctrine flows from the Constitution's due process guarantee. A law is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But the law has never required "perfect clarity and precise guidance … even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (citation omitted). "[W]e can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. The vagueness doctrine incorporates two main requirements. First, the law or policy must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (quoting *Grayned*, 408 U.S. at 108).[8] Second, the policy must avoid arbitrary enforcement. *See id.* The vagueness doctrine applies with less force when, like the Order, the restriction imposes only civil consequences. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). And "policies governing public employee speech may be framed in language that might be deemed impermissibly vague if applied to the public at large." *Hernandez*, 43 F.4th at 982 (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).

The FAC's assertions that restrictions on "unacceptable" and "inappropriate" conduct are unconstitutionally vague fall flat. The Order relates to conduct closely resembling unlawful discrimination, harassment, and retaliation. The challenged language is in an executive order that promotes exactly those interests that are most vital to maintaining the University's community free

---

[8] This requirement is heightened in First Amendment cases. *See id.*

MOTION TO DISMISS
Case No. 2:22-cv-00964-JHC
20
Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1   of discrimination and restricts no more than needed. That language qualifies the references to

2   inappropriate conduct. *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005)

3   ("[O]therwise imprecise terms may avoid vagueness problems when used in combination with

4   terms that provide sufficient clarity." (citation omitted)). This narrowing construction puts a

5   member of the University community of reasonable intelligence on notice of the conduct the Order

6   prohibits. *See, e.g.*, *Arce*, 793 F.3d at 988 (statute prohibiting coursework promoting resentment

7   toward a race or class of people not void for vagueness "[f]or many of the same reasons" it was not

8   overbroad). In other words, the statutory construction underlying the overbreadth analysis also

9   shows that the Order is definite enough to be understood as applying to specific categories of

10  conduct that the law allows public employers to restrict.

11          Nor does the Order invite arbitrary enforcement. In fact, it must be interpreted "in the

12  context of academic freedom in the University environment." Exec. Order 31 § 5(A). Nothing

13  supports reading Reges's cherry-picked phrase and concluding that the statute is meaningless. *See*

14  *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (reasoning that a civil

15  law is void for vagueness only if its terms are "so vague and indefinite as really to be no rule or

16  standard at all" or if it is "substantially incomprehensible" (citation omitted)).

17          The Ninth Circuit's decision in *Tucson Women's Clinic v. Eden*—cited by the FAC—is not

18  to the contrary. *See* 379 F.3d 531 (9th Cir. 2004), *abrogated on other grounds by Dobbs v. Jackson*

19  *Women's Health Org.*, 142 S. Ct. 2228 (2022). There, the court held unconstitutionally vague the

20  provisions of a statute requiring licensees to treat medical patients with "consideration," "respect,"

21  and "dignity." *Id.* at 554–55. But nothing in that language tethered the proscribed conduct to a

22  reasonably specific context. Indeed, none of the terms in *Eden* was defined or tied to terms of art

23  within the relevant field, and the prohibition turned on subjective determinations. *See id.* at 555.

24  Not so with the Order here. Thus, its provisions "cannot be deemed unconstitutionally vague on

25  their face." *Hernandez*, 43 F.4th at 982.

26          Courts repeatedly have rejected vagueness challenges to provisions as broad as those in the

27  Order. In *Arnett*, the Supreme Court upheld a standard allowing the dismissal of government

28  employees for any cause "as will promote the efficiency of the service." *See* 416 U.S. at 159–60.

1    The Sixth Circuit ruled similarly in upholding an employment policy prohibiting "conduct

2    unbecoming a teacher." *Fowler v. Bd. of Educ. of Lincoln Cnty*, 819 F.2d 657, 664–66 (6th

3    Cir. 1987). So too with the Third Circuit's approving a regulation authorizing dismissal of

4    professors who failed to "maintain standards of sound scholarship and competent teaching." *San*

5    *Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992). This Court should do the same.

6                                    **V.    CONCLUSION**

7           For these reasons, and because any amendment would be futile, Defendants ask the Court

8    to dismiss the FAC with prejudice. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052

9    (9th Cir. 2003).

10

11          DATED this 31st day of August, 2023.

12                                          ORRICK, HERRINGTON & SUTCLIFFE LLP

13                                          By:   *s/Robert M. McKenna*
                                                 Robert M. McKenna (WSBA# 18327)
14                                               Aaron P. Brecher (WSBA# 47212)
                                                 401 Union Street, Suite 3300
15                                               Seattle, WA  98101
                                                 Telephone (206) 839-4300
16                                               Fax (206) 839-4301
                                                 rmckenna@orrick.com
17                                               abrecher@orrick.com

18                                               R. David Hosp (*Pro Hac Vice Admission*)
                                                 Kristina D. McKenna (*Pro Hac Vice Admission*)
19                                               222 Berkeley Street, Suite 2000
                                                 Boston, MA 02116
20                                               Telephone (617) 880-1802
                                                 Fax (617) 880-1801
21                                               dhosp@orrick.com
                                                 kmckenna@orrick.com

22                                               *Attorneys for Defendants Ana Mari Cauce, Magdalena*
                                                 *Balazinska, Dan Grossman, and Nancy Allbritton*
23
                                                 Counsel certifies that this memorandum contains 8392
24                                               words, in compliance with the Local Civil Rules.

25

26

27

28

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300