*Reges v. Cauce, et al.*

# Exhibit A
# to Declaration of
# Gabriel Walters

Page 1

1                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
2                          AT SEATTLE

3   _____

    STUART REGES,                )
4                                )
                   Plaintiff,    )
5                                )
    vs.                          ) No. 2:22-cv-00964-JHC
6                                )
    ANA MARI CAUCE, et al.,      )
7                                )
                   Defendants.   )
8   _____

9

            VIDEOCONFERENCE 30(B)(6) ZOOM DEPOSITION
10

                   UPON ORAL EXAMINATION OF
11

                   UNIVERSITY OF WASHINGTON
12

                   PROFESSOR CHADWICK ALLEN
13

    _____
14

15

16                        1:01 P.M.

17                 TUESDAY, NOVEMBER 7, 2023

18       (ALL PARTICIPANTS AT THEIR RESPECTIVE LOCATIONS)

19          WITNESS LOCATION:  SEATTLE, WASHINGTON

20

21

22

23   Reported by:  Tami Lynn Vondran, CRR, RMR, CCR/CSR

24   WA CCR #2157; OR CSR #20-0477; CA CSR #14435

25   Job Number 6301546

```
                          I N D E X
```

EXAMINATION BY:                              PAGE:LINE

     Mr. Walters ..............................4:19

     Mr. Brecher ..............................80:18

     Mr. Walters ..............................90: 4

EXHIBITS FOR IDENTIFICATION                       MARKED

Exhibit 60   Plaintiff's Amended Rule 30(b)(6) ...12:21
             Notice of Deposition to the
             Corporate Representative of the
             University of Washington

Exhibit 61   UW Office of Tribal Relations, ......58:18
             UW_Reges_0011482-483

Exhibit 62   Presidential Blog entitled ..........64: 1
             Recognizing Indigenous Peoples' Day

PREVIOUSLY MARKED EXHIBITS                        PAGE:LINE

Exhibit 3    Printout of UW web page entitled ....25:16
             About OMA&D

Exhibit 48   UW College of Engineering land ......56: 1
             acknowledgments:  Online training
             for staff and faculty

                                                      Page 13

1          Q.   (BY MR. WALTERS)  I think it's being shared on

2     the Zoom window too.

3               Do you see the document in front of you

4     labeled Plaintiff's Amended Rule 30(b)(6) Notice of

5     Deposition?

6          A.   Yes.

7          Q.   And did you receive this document to appear at

8     today's deposition?

9          A.   I don't believe so.

10         Q.   I'll represent that we sent this to counsel

11    for the University.

12              Could we scroll to the final page of this

13    document.

14              This is Schedule A of the notice.  And near

15    the bottom, it has three topics listed for examination.

16    And Topic Number 2 is, "The University's impetus,

17    development, implementation, and use of its land

18    acknowledgment statement, available at" -- and then

19    there's a URL which is

20    www.washington.edu/omad/about-omad.

21              Is that the topic that the University has

22    designated you to testify regarding today?

23         A.   Yes.

24         Q.   All right.  Professor Allen, what is a land

25    acknowledgment statement?

1       A.   So a land acknowledgment statement basically

2   acknowledges that an entity like the University of

3   Washington or another university is currently situated

4   on lands that were already in the possession of

5   indigenous people prior to the formation of that

6   institution.

7       Q.   When did the university first become aware of

8   land acknowledgments?

9       A.   I don't know.

10      Q.   Would you say there's a trend of universities

11  adopting land acknowledgment statements?

12      A.   I would say yes.  The trend has been going on

13  now for some time.

14      Q.   Do you know approximately when that trend

15  began?

16      A.   I would say about ten years ago you started

17  seeing it happening in the U.S. more.  I know my

18  previous institution did not have a land acknowledgment.

19      Q.   What was your previous institution?

20      A.   I was at Ohio State University.

21      Q.   What is the purpose of a land acknowledgment

22  statement?

23      A.   Well, I think the purpose can be multiple.

24  Depends on the institution, depends on the individuals

25  who are developing it and using it, but I think in

1    general the purpose of a land acknowledgment statement

2    is to acknowledge the indigenous peoples whose lands the

3    university or other institution sits on.

4         Q.   And so what message would you say a land

5    acknowledgment statement conveys?

6         A.   Well, land acknowledgment, as the term

7    "acknowledgment" suggests, it conveys a knowledge of --

8    that indigenous peoples were in that space and continue

9    often to be in that space.

10        Q.   Why is it desirable to have a land

11    acknowledgment statement?

12        A.   That's a complicated question, but I would say

13    briefly it's desirable to have a land acknowledgment as

14    a way to signal to American Indian, Alaska Native,

15    indigenous Hawaiian, other indigenous students that

16    they're welcome at the university.  And it's also a way

17    to indicate to our tribal partners that they -- their

18    community members, their students in particular are

19    welcome at the university.

20        Q.   Did I hear you correctly that you said it

21    was -- did you say it was a complicated question, or a

22    difficult question?

23        A.   No.  I said it's complex, just that it's

24    multifaceted.

25        Q.   What are the other facets that you're thinking

Page 16

1    of when you give that answer?

2         A.   Well, each land acknowledgment has its own

3    complexity dependent on the history of that specific

4    place.  So it's different in different parts of the

5    United States.  It's different in Canada, it's different

6    in Aotearoa, New Zealand or Australia.  The local

7    context affects how a land acknowledgment looks and how

8    it might be used.

9         Q.   Does the University have a land acknowledgment

10   statement?

11        A.   The University does --

12        Q.   Excuse me.  Does the University of

13   Washington -- to be clear, does the University of

14   Washington have a land acknowledgment statement?

15        A.   Yes.  The University of Washington has a land

16   acknowledgment statement, although I think it's

17   important to point out it's not a mandatory statement.

18        Q.   And for the record, when I refer to "the

19   University," from this point on, I'll be referring to

20   the University of Washington.

21             Is that clear?

22        A.   Yes.

23        Q.   When did the University adopt its land

24   acknowledgment statement?

25        A.   I believe the University adopted its land

1    acknowledgment statement around the time that I arrived

2    at the University, around 2015.  I'm not sure of the

3    exact date.

4         Q.   Was there anyone who advocated for the

5    University to adopt its land acknowledgment statement?

6         A.   Do you mean was there anyone advocating to

7    adopt an -- a land acknowledgment statement or this one

8    in particular?

9         Q.   Let's cover both grounds.  Let's start with a

10   land acknowledgment statement generally.

11             Was there anyone advocating for the University

12   to adopt a land acknowledge statement?

13        A.   Well, it's before I arrived at the University,

14   but I would imagine the answer is yes, there were many

15   people advocating for the University to adopt a land

16   acknowledgment.

17        Q.   Did you do anything to become knowledgeable

18   about that question prior to this deposition?

19        A.   Well, I did not do anything specific to

20   prepare for the deposition, but because my own field is

21   American Indian studies, and I'm very interested in

22   these issues myself, when I arrived at the University, I

23   certainly learned the local history and what was

24   happening then, and so I was -- became aware of what was

25   happening fairly soon after I arrived at the University.

Page 18

1      Q.   You said that it -- you would imagine that

2    there -- that, yes, there were people advocating for the

3    University to adopt a land acknowledgment statement.

4            Do you know that to be the case?

5      A.   Well, I'm making that assumption based on the

6    fact that we ended up having a land acknowledgment.  And

7    I know not from personal experience, but I have heard

8    the history of how the land acknowledgment came to be,

9    and so it's clear that there were not just one

10   individual, but many people involved.

11     Q.   Do you know who was involved?

12     A.   I know some of the people who were involved.

13   The former Tribal Liaison Iisaaksiichaa Ross Braine was

14   probably leading that effort in his role as tribal

15   liaison.

16     Q.   Could you spell his name for the court

17   reporter.

18     A.   Oh, yeah.  Iisaaksiichaa is a little hard, so

19   let me think if I can spell it.  Iisaaksiichaa,

20   I-i-s-a-a-k-s-i-c-h-a, I think.  Maybe two As at the

21   end.  And then Ross Braine, B-r-a-i-n-e.  Iisaaksiichaa

22   is his Crow name.

23     Q.   And is -- Ross and Braine, are those separate

24   names?  You're saying them as if they're combined, and

25   so I just want to be clear.

1      Q.   And to come back to an earlier question.  We

2    said you would cover both, and you answered whether

3    anyone advocated for the University to adopt a land

4    acknowledgment statement.

5           Do you know was there anyone who specifically

6    advocated for the University to adopt the land

7    acknowledgment statement that it ultimately did adopt?

8      A.   My understanding is that was a long

9    negotiation among many different individuals, as well as

10   different entities.  And Iisaaksiichaa in his role as

11   tribal liaison, one of his duties was organizing the

12   annual tribal leadership summit.  So as -- we host

13   every -- usually April or May, our president invites the

14   leaders of all of the federally recognized tribes in the

15   state of Washington, which is currently 29.  And I

16   believe they also invite other native communities that

17   are seeking recognition, to be as inclusive as possible.

18          And my understanding is that during those

19   meetings, there was discussion about what would the

20   tribes like to have as a land acknowledgment for the

21   University of Washington.  Office of Minority Affairs &

22   Diversity also has a Native American Advisory Board that

23   consists of community members.  And I believe they were

24   probably also consulted -- what would they like to see

25   as the University's land acknowledgment.

1          And then of course on campus, there are many

2     constituencies.  So there are native student

3     organizations, there are groups of native faculty and

4     staff, and then of course just other interested

5     individuals who may or may not be native but may be

6     interested in American Indian studies or just in our

7     obligations to our tribal partners.

8          Q.   How long did it take to develop that

9     statement?

10         A.   My understanding is it took two or

11    three years.  Again, it was before my arrival at the

12    University, but my understanding is it was a multiyear

13    process.

14         Q.   Was there a primary drafter of the language?

15         A.   I don't know for sure.

16         Q.   Were there draft versions?

17         A.   I don't know for sure.

18         Q.   Were any modifications made along the way?

19         A.   I don't know for sure.  I would assume there

20    were.

21         Q.   Who reviewed any draft versions there may have

22    been?

23         A.   There, too, I don't know for sure, but I would

24    imagine many people reviewed.

25         Q.   Who proposed edits?

```
 1    backgrounds.  And so wanting to be as welcoming as
 2    possible, not wanting to have a controversial statement
 3    that would in any way divide the community.
 4         Q.   Are land acknowledgment statements
 5    controversial?
 6         A.   Well, they can be.
 7         Q.   Is the University aware of controversy
 8    surrounding land acknowledgment statements?
 9         A.   Do you mean in general, or do you mean their
10    particular statement?
11         Q.   Let's start with in general.
12         A.   Well, it's hard to know what the University
13    knows, but those of us who work in the field of American
14    Indian studies are aware that there can be controversies
15    over land acknowledgments.
16         Q.   And how are land acknowledgment statements
17    controversial?
18         A.   Well, sometimes the controversy is over which
19    tribal nations get acknowledged and from which
20    historical periods.  I don't know how familiar you are
21    with U.S. history and the broad history of U.S. -- you
22    know, of colonialism and conquest, but indigenous people
23    have been forced to move sometimes, you know, through
24    the military.  There are other ways that people have
25    been relocated, forced to move.  People have changed
```

Page 25

1   their habitation because of the forces of settler
2   expansion, colonial governments.  And so it's not always
3   as simple as the land was always occupied by the exact
4   same group of people since time immemorial.
5        Q.   Let's look at the University's land
6   acknowledgment statement.
7             How is that controversial?
8        A.   Well, it's potentially controversial because
9   the Duwamish are not named explicitly.  And some people
10  think the Duwamish should be named explicitly, and other
11  people think that what we have is appropriate because
12  the language is all tribes and bands within the
13  Muckleshoot, Tulalip and Suquamish nations -- I don't
14  know how much of that history you want me to describe.
15            MR. WALTERS:  I would like to show Exhibit 3.
16            (Previously marked Exhibit Number 3.)
17       Q.   (BY MR. WALTERS)  Is this a printout -- oh,
18  pardon me.
19            Can you see Exhibit 3 on your screen,
20  Professor Allen?
21       A.   I can, but it's rather small.
22            Ah.  That's better.
23       Q.   And if you would go to the file share -- the
24  Exhibit Share site, I think it should be -- yes, it
25  should be in the marked exhibits folder, if you need to

Page 33

1   former tribal liaison, who I mentioned before,
2   Iisaaksiichaa Ross Braine.  That position has changed
3   since this.
4       Q.   Who currently holds that position?
5       A.   It's now called the Director of Tribal
6   Relations, and her name is Sherri Berdine.
7       Q.   What is the role of the UW Tribal Liaison or
8   now the Director of Tribal Relations?
9       A.   So the role has shifted a little bit.  The new
10  Director of Tribal Relations sits in the Office of
11  External Affairs and is part of the team that does all
12  of the University's government relations.  So people who
13  work with our Federal Government, people who work with
14  the state, local, regional government entities, and then
15  now with our tribal government partners.
16          And so the role of the Director of Tribal
17  Relations is to foster our relationships to, again, the
18  29 federally recognized tribes in Washington and other
19  indigenous communities, also to think about our urban
20  Indian communities and to make sure that we have really
21  good working relationships with those entities.
22          Sherri Berdine is relatively new in her role
23  and still fleshing out exactly what all the office will
24  do, but those are the main functions.
25      Q.   Why is that important to the University to

1      have those relations that you just described with the

2      local tribes?

3                     MR. BRECHER:  Objection.  Scope.

4                     You can answer.

5           A.    So that's also a complicated question because

6      it's -- there's a lot of reasons.  Any University that

7      does research that's relevant to native communities

8      should be building relationships with native

9      communities.  And so the University of Washington has a

10     lot of research relationships with tribal nations --

11     forestry, fisheries, oceanography, other aspects of sort

12     of resource development and resource management, as well

13     as through medicine, public health, social work,

14     education.  We have lots of sort of specific

15     disciplinary-specific relationships with tribes and

16     groups of tribes.

17                    As I mentioned before, the Centennial Accord,

18     we're sort of obligated as a state entity to consult the

19     tribal nations on issues that are relevant to them, that

20     they would have a relevant interest in.  And so that

21     covers a lot that the University actually does.

22          Q.    (BY MR. WALTERS)  And so does the University

23     consider the land acknowledgment statement to be part of

24     that relationship building effort?

25          A.    I would imagine so.  I think for many of us,

Page 35

1    you know, it's not the -- the statement is not the most

2    important part; the relationships are the important

3    part.  But that's why, in a sense, it taking several

4    years for it to create this land acknowledgment is so

5    important.

6              It's about building relationships with our

7    tribal partners.  Rather than just simply quickly

8    creating a statement and then slapping it on lots of

9    websites, it's really the relationships that matter.

10   And that's the part that people most care about.

11   Especially people in native communities and native

12   faculty, staff and students on campus care most about

13   the relationships and what those relationships can

14   foster rather than the statement itself.

15       Q.   What was the state of those relationships

16   prior to the development of the land acknowledgment

17   statement?

18       A.   Well, it's before my time in coming to the

19   University, but my understanding is that there is a long

20   history of distrust between tribal nations and the

21   University of Washington.  And that has -- it's a

22   complicated long history.  Some of it is specific to the

23   University of Washington, but other parts of it are

24   really just -- U.S. institutions of higher education and

25   their research arms have done a lot of damage

Page 36

```
 1    historically in native communities.
 2              I don't know how aware you are of that
 3    history, but there has been a lot of intrusive research
 4    that has gone into native communities, including work on
 5    human subjects, that has really been abusive and
 6    violated the trust of native communities.
 7              So people are understandably distrustful when
 8    a large institution like the University of Washington or
 9    another state institution comes in and says, "We want to
10    do research, we want to partner with you."  Tribal
11    nations are often wary of that given those specific
12    histories, as well as the larger history of U.S.
13    colonialism and how indigenous peoples have been treated
14    by the Federal Government, state governments, state
15    institutions, et cetera.
16              So building those relationships of trust takes
17    time.  And a land acknowledgment is a small part of
18    that.  But it is a way to open up a conversation and ask
19    the affected and relevant tribal nations, "How would you
20    like to be acknowledged by our institution?  How would
21    you like to be described?  How would you -- you know,
22    what name would you like us to use for you?"
23              So that's -- I think that's part of it.
24         Q.   And so did the development of this land
25    acknowledgment statement work toward building trust
```

Page 37

1    between the University of Washington and the local
2    tribes?
3         A.   I like to think so.  It is an ongoing project,
4    but, yes, I like to think so.
5         Q.   Did the development of the land acknowledgment
6    statement help to open that conversation between the
7    University of Washington and the local tribes?
8         A.   Again, it's before my time, and I don't know
9    about opening that conversation.  I think there were
10   already conversations, but I think it was a useful tool
11   for continuing to develop relationships with our local
12   tribal partners.
13        Q.   Who were the tribal elders who gave input to
14   the land acknowledgment statement?
15        A.   So I don't know them by name.  My
16   understanding is -- so when the Intellectual House was
17   being developed -- and that was the result of over
18   40 years of activism of trying to get native space on
19   the campus of the University of Washington, which
20   involved of course generations of students, faculty,
21   staff, as well as community partners.
22             When it was moving toward actually happening,
23   and the building was going to be completed, which would
24   happen in 2015, part of what was developed was kind of
25   an advisory board of elders.  So elders from tribes in

Page 43

1    about the land acknowledgment.  So that would have

2    included probably students, staff and faculty at the

3    University, as well as just other interested people,

4    like alumni and others who might have been around for

5    some of those meetings.

6         Q.   So then is it fair to say that several

7    individuals and groups gave input to the development of

8    the University's land acknowledgment statement?

9         A.   Yes.  Many.

10        Q.   Earlier, I believe you used the word

11   "constituencies."  Does the University consider these

12   individuals or groups to be constituencies in the

13   development of the land acknowledgment statement?

14        A.   I don't know if the University would use that

15   language.

16        Q.   Well, testifying for the University, you used

17   that language previously in your testimony.

18             Is that a fair word to use?

19        A.   I'm going to probably -- I don't know.  I'm

20   not sure if I would -- now that you're asking me, I'm

21   not sure if I would use that word "constituents" per se.

22   These are communities that the University engages with.

23        Q.   I'm trying to understand that question.  If

24   you would use that word in response to a prior question,

25   why would you not use that word in your words now that

Page 44

1    I'm asking you?  Could you explain that answer.

2         A.   Well, I like the word "constituencies," and I

3    probably just used it, you know, as my quick answer.

4    But if we went back and parsed it, I may or may not want

5    to use it on behalf of the University.

6         Q.   To be clear, all of your testimony here today

7    is on behalf of the University; correct?

8         A.   Yes.

9         Q.   Would "stakeholders" be a fair word to use in

10   the development of the land acknowledgment statement

11   with respect to the groups and individuals we've gone

12   through?

13        A.   Yes.  I think "stakeholders" would be a

14   good -- a good term.

15        Q.   Is there any other term that you would use to

16   describe those groups or individuals, stakeholders,

17   constituencies we've talked about -- any other terms?

18        A.   No.  I actually think stakeholders is a good

19   one.

20        Q.   What stake do you think these individuals or

21   groups have in the University's land acknowledgment

22   statement?

23        A.   Well, I think all of these individuals and

24   groups are concerned and interested in having the

25   University be a welcoming place for native students,

Page 72

1    is spoken by UW leadership during events to acknowledge

2    that our campus sits on occupied land"; correct?

3        A.   Yes.

4        Q.   Earlier you testified that the history is a

5    political one.  Is the land acknowledgment statement in

6    acknowledging that history a political statement?

7             MR. BRECHER:  Objection.  Legal conclusion.

8             You can answer.

9        A.   Well, I would say it's a political statement

10   in the sense that almost all discourse is political

11   because it's caught up in power.  You know, I think a

12   lot of us would say that to not have a land

13   acknowledgment in 2023 would be making a political

14   statement.  I don't know that you could say that there's

15   a place outside of politics when it comes to these

16   issues because of the long, complicated history of

17   American Indian sovereignty and U.S. federal

18   sovereignty, state sovereignty.  These are -- I know I'm

19   not telling you anything you don't know.  These are

20   complicated, messy histories that are difficult to

21   reduce to a single statement.

22       Q.   (BY MR. WALTERS)  And what you've just

23   described, this is a matter of great public import, is

24   it not?

25             MR. BRECHER:  Objection.  Foundation.

Page 74

1          (Break taken from 2:44 p.m. to 2:56 p.m.)

2     Q.   (BY MR. WALTERS)  Professor Allen, are there

3   disagreements with respect to using land acknowledgment

4   statements?

5          MR. BRECHER:  Objection.  Vague.  Foundation.

6          You can answer.

7     A.   I guess, yes.  I mean, there -- it would be

8   helpful to know what you mean more precisely by

9   disagreements, but I'll say yes.

10    Q.   (BY MR. WALTERS)  Well, what do you understand

11  disagreements about land acknowledgments to mean?

12    A.   Well, I think there's a wide range of

13  opinions, depending on people's subject position and

14  their sense of American Indian sovereignty, American

15  Indian history, U.S. sovereignty, U.S. history.

16  Depending on people's political views, some people think

17  we should absolutely be having land acknowledgments.

18  It's absolutely a thing we should do.  Others think

19  they're only performative, so they're not -- we

20  shouldn't be doing them, we should be doing other

21  things.  Other people think the U.S. should not be

22  acknowledging ongoing U.S. -- ongoing tribal sovereignty

23  within the United States.

24          So it depends on your kind of political

25  beliefs.  There's not a uniform agreement on those very

Page 75

1    broad and complicated issues.

2        Q.   And so the University has decided to use land

3    acknowledgment statements; correct?

4        A.   The University has decided to make a land

5    acknowledgment available.  It has not mandated the use

6    of a land acknowledgment.

7        Q.   But University leaders utter the land

8    acknowledgment statement; correct?

9        A.   University leaders sometimes use the land

10   acknowledgment.  It's very context specific, both to the

11   situation as well as to the specific leader.  You know,

12   in my roles, I attend many events.  Sometimes you hear a

13   land acknowledgment, sometimes you don't.  It really

14   depends.  But there is no uniform application of using a

15   land acknowledgment.

16       Q.   Earlier I used the word "disagreement" with

17   respect to the use of land acknowledgment statements.

18            Would you agree that there is a public debate

19   about the use of land acknowledgment statements as you

20   described?

21            MR. BRECHER:  Objection.  Scope.

22            You can answer.

23       A.   Yes.  There have been a number of public

24   discussions and disagreements in the press, certainly

25   online.  More locally, you know, comes up.  Again,

Page 76

1     highly contextualized depending on the situation.

2          Q.   (BY MR. WALTERS)  When did the University

3     first become aware of that debate with respect to the

4     use of land acknowledgment statements?

5               MR. BRECHER:  Same objection.

6               You can answer.

7          A.   I don't know when the University became aware

8     of controversy.  That said, I would assume the

9     University has been aware since those controversies

10    began because we have faculty in multiple disciplines

11    whose work intersects issues around tribal sovereignty,

12    U.S. history, you know, et cetera, that -- so people

13    would be aware of all those issues.

14         Q.   (BY MR. WALTERS)  Am I correct that you

15    testified earlier that in 2015 when you joined the

16    University, it had developed the land acknowledgment

17    statement, or was it in the process of developing?

18              Could you clarify that for me.

19         A.   I think it was in the process of developing in

20    2015.  I believe discussions had already begun and then

21    it was ongoing.  I don't know how much of the context is

22    relevant, about the role of the tribal liaison and

23    things, but there was a lot of shifting leadership that

24    was happening in 2015, so it's a little difficult to

25    know exactly -- President Cauce became president in

Page 77

1      2015.  There was a shift in provost, there was a shift
2      in the vice president of Minority Affairs & Diversity.
3      Also there was an interim in 2015, 2016.  The current
4      person came in 2016.
5              So there was a lot of shifting happening in
6      leadership as I was coming into the University.  The
7      tribal liaison position was reporting through the Office
8      of Minority Affairs & Diversity, and then had a dotted
9      line to the president, and then has since evolved where
10     now it's in the Office of External Affairs.
11             So part of this, there's a lot of shifting in
12     our -- in the University's sort of relationship to that
13     role.
14     Q.   And so is it fair to say that at least at that
15     time in 2015, the University was aware of the debate
16     surrounding the use of land acknowledgment statements?
17     A.   Yes.
18     Q.   Is the University familiar with an article
19     published in The Atlantic by the writer Graeme Wood
20     titled "'Land Acknowledgments' Are Just Moral
21     Exhibitionism"?
22             MR. BRECHER:  Objection.  Scope.
23             You can answer.
24     A.   So I'm not sure exactly how to answer that
25     when you say is the -- was the University aware.

Page 79

1    also choosing not to have a mandated land

2    acknowledgment.

3             MR. WALTERS:  Thank you, Professor Allen.

4             Why don't we just take five more minutes, and

5    I'll see if we can conclude.

6             THE WITNESS:  Okay.

7             THE COURT REPORTER:  I'm off the record.

8             (Break taken from 3:03 p.m. to 3:11 p.m.)

9        Q.   (BY MR. WALTERS)  Professor Allen, the

10   University is aware that the debate with respect to the

11   use of land acknowledgment statements is present and

12   ongoing; correct?

13            MR. BRECHER:  Objection.  Scope.

14            You can answer.

15       A.   Yes.

16            MR. WALTERS:  I have no further questions for

17   you at this time.

18            I'm going to hold this deposition open for a

19   few reasons.  The first one is that this is a 30(b)(6)

20   deposition of the University.  We have noticed

21   additional topics, and there will be further witnesses

22   to testify to those topics.

23            The second reason is that the witness today

24   has answered several questions with respect -- by saying

25   "I don't know" or "I believe" or "I would assume," and

Page 90

1          (Break taken from 3:25 p.m. to 3:36 p.m.)

2

3               EXAMINATION (continued)

4     BY MR. WALTERS:

5          Q.   Professor Allen, what was Professor Reges'

6     land acknowledgment statement?

7          A.   My memory is the statement was Coast Salish

8     people have no right to this land based on John Locke's

9     theory of labor.

10         Q.   I'll recite it.  And this is from memory, so

11    Aaron can double-check me in the records.

12              The statement that Professor Reges put in his

13    winter quarter 2022 syllabus read, "I acknowledge that

14    by the labor theory of property that Coast Salish people

15    can claim historical ownership of almost none of the

16    land currently occupied by the University of

17    Washington."

18              Does that match your recollection, Professor

19    Allen?

20         A.   Yes.

21         Q.   You testified that you counseled students

22    because they were upset by that statement; correct?

23         A.   Yes.

24         Q.   That was because of the content of the

25    statement; correct?

```
                                                Page 91

 1              MR. BRECHER:  Objection.  Foundation.

 2              You can answer.

 3      A.    Yes.

 4      Q.    (BY MR. WALTERS)  Did they tell you that it --

 5      they were upset by the content of the statement, the

 6      students?

 7      A.    Yes.

 8      Q.    Did you ever ask Professor Reges what he meant

 9      by the content of the statement?

10      A.    No.

11      Q.    Did you ever ask Professor Reges if he wanted

12      to cause a spectacle by his statement?

13      A.    No.

14      Q.    Did you ever ask Professor Reges if he wanted

15      conservative media to pay attention to his statement?

16      A.    Well, I did not ask him that, no.

17      Q.    Did you talk to him at all about his

18      statement?

19      A.    No.

20      Q.    Did you ever ask him what he wanted to come

21      about by his statement?

22      A.    No.

23      Q.    You testified that his statement was

24      dehumanizing.

25              Is that your personal opinion?
```

Page 92

1         A.   Yes.

2         Q.   Is that the opinion of the University of

3    Washington?

4              MR. BRECHER:  Objection.  Foundation.

5              You can answer.

6         A.   I'm going to say yes because I think it's

7    pretty baldly dehumanizing if you know anything about

8    John Locke's theory of property and what it's based on

9    and how it's been used as a justification for conquest

10   and slavery.

11             MR. WALTERS:  I have nothing further.

12             MR. BRECHER:  Nothing from me.

13             MR. WALTERS:  As I said before, we'll keep the

14   deposition open for the reasons I previously put on the

15   record.

16             Thank you, Professor Allen, for your time and

17   your answers.  I appreciate it.

18             MR. BRECHER:  Thank you, Gabe.

19             And, Tami, we'll review and sign.

20             THE COURT REPORTER:  Thank you.

21             Gabe, are you ordering the transcript?

22             MR. WALTERS:  Yes.  We have ordered a rough

23   and the -- I think the usual ten business days will be

24   fine for us.

25             THE COURT REPORTER:  Okay.  Aaron, do you also