*Reges v. Cauce, et al.*

# Exhibit G
# to Declaration of
# Gabriel Walters

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

-------------------------------------------------------

STUART REGES,                          )   No.

                 Plaintiff,      )   2:22-cv-00964-JHC

       vs.                              )

ANA MARI CAUCE, et al.,                )

               Defendants.      )


-------------------------------------------------------

Videotaped

Deposition Upon Oral Examination Of

MAGDALENA BALAZINSKA

-------------------------------------------------------

June 19, 2023

401 Union Street, Suite 3300, Seattle, Washington

Magna Legal Services

(866) 624-6221

www.MagnaLS.com




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704



Page 3

```
 1   E X H I B I T S

 2   NO.        DESCRIPTION                      MARKED

 3   1          January 13, 2023 email to Mark        46

 4              Richards from Magdalena Balazinska

 5   2          U.S. Department of Arts and Culture    52

 6              "Honor Native Land: A Guide and Call

 7              to Acknowledgment"

 8   3          Office of Minority Affairs &           58

 9              Diversity, "About OMA&D"

10   4          Email chain, top email, January 4,     62

11              2022 to Karentb, and others, from

12              Magdalena Balazinska

13   5          Email chain, top email to Magdalena    72

14              Balazinska from Shyam Gollakota

15   6          Computer Science & Engineering 143     90

16              Computer Programming II syllabus

17   7          January 7, 2022 email to exec -        96

18              Mailing List from Magdalena

19              Balazinska

20   8          Email chain, top email December 9,     102

21              2021 to Chloe Dolese Mandeville

22              from Elise deGoede Dorough

23   9          Reddit post, Stuart Reges Version      112

24              of the Land Acknowledgment

25
```



```
                                                     Page 4

 1    E X H I B I T S  CONT'D

 2   NO.      DESCRIPTION                        MARKED

 3   10       January 4, 2022 email to Daniel      116

 4            Ratner, Karentb from Magdalena

 5            Balazinska

 6   11       Email chain, top email to Dan        128

 7            Grossman, and others, from Magdalena

 8            Balazinska

 9   12       January 4, 2022 email to Aileen      146

10            Trilles from Magdalena Balazinska

11   13       Email chain, top email to Phillip    149

12            Reid from Magdalena Balazinska

13   14       Note about course syllabus           153

14   15       Email chain, top email January 5,    155

15            2022 to Daniel Ratner, and others,

16            from Magdalena Balazinska

17   16       January 5, 2022 email to             173

18            cse143a_wi22, and others, from

19            Magdalena Balazinska

20   17       Email chain, top email January 4,    175

21            2022 to Kristin Osborne, and others,

22            from Magdalena Balazinska

23   18       January 7, 2022 email to Magdalena   187

24            Balazinska from Sabrina Jahed

25
```



Page 5

```
 1   E X H I B I T S CONT'D

 2  NO.      DESCRIPTION                     MARKED

 3  19       February 23, 2022 email to          188

 4           diversity-allies from diversity-allies

 5           on behalf of Stuart Reges

 6  20       Email chain, top email to Magdalena  199

 7           Balazinska, and others, from Nancy

 8           Allbritton

 9  21       March 2, 2022 email to Stuart Reges  203

10           and Aileen Trilles from Magdalena

11           Balazinska

12  22       March 10, 2022 email to Stuart Reges 220

13           and Dan Grossman from Magdalena

14           Balazinska

15  23       March 21, 2022 email to Nancy        228

16           Allbritton from Magdalena Balazinska

17  24       July 11, 2022 letter to Associate    238

18           Professor Louisa Mackenzie, and others,

19           from Nancy Allbritton

20  25       August 24, 2022 email to Eric        241

21           Schnapper and Louisa Mackenzie

22           from Magdalena Balazinska

23  26       June 7, 2022 email to engr-chairs,   243

24           and others from Nancy Allbritton

25
```



```
                                                    Page 6
 1   E X H I B I T S CONT'D

 2  NO.      DESCRIPTION                         MARKED

 3  27       June 13, 2023 letter to Teaching      246

 4           Professor Stuart Reges from Nancy

 5           Allbritton

 6  28       April 5, 2022 email to Stuart Reges   260

 7           from Magdalena Balazinska

 8  29       Email chain, top email March 31,      264

 9           2022 to Chloe Dolese Mandeville, and

10           others, from Elise deGoede Dorough

11

12  E X A M I N A T I O N

13  BY                    PAGES

14  ATTORNEY DIAZ    8 - 275

15

16  *****  (*  Denotes phonetic spelling.)

17

18

19

20

21

22

23

24

25
```



Page 46

```
 1                    (Exhibit 1 marked.)

 2                    (Discussion off record.)

 3      Q.    So can you turn to the second page.

 4      A.    Okay.

 5      Q.    Are you familiar with this document?

 6      A.    I have looked at this document before.

 7      Q.    And what is it?

 8      A.    I mean, this document looks like the best

 9   practices for inclusive teaching.

10      Q.    At the top it says it was last updated

11   September 2020; is that right?

12      A.    That's what it says.

13      Q.    Can you turn to the second page -- excuse me.

14   Actually, before doing that.  Do you see where it

15   says, "Course planning and management" --

16      A.    Yes.

17      Q.    -- on the first page?

18      A.    Um-hum.

19      Q.    And below that, just below that, what does

20   that first bullet say?

21      A.    "The following can make a course syllabus

22   more inclusive."

23      Q.    And then going to the next page, that list of

24   bullets that can make a course more inclusive, it

25   includes a bullet that says, "An indigenous land
```



Page 51

1   in their syllabi?

2              ATTORNEY HOSP:  Object to the form.

3        A.   It's posted on the website.

4        Q.   Going back to -- I should have mentioned.

5   This document is labeled Bates-stamped

6   "UW_Reges_000165."

7              If you go to page 0001617, where it says,

8   "Indigenous Land Acknowledgment," you can see that

9   it's underlined and the color of the -- of it is blue;

10  correct?

11       A.   I see that.

12       Q.   And are you -- have you, have you ever gone

13  on the website and looked at this document?

14       A.   I have.

15       Q.   Have you -- and that looks like it's a, it's

16  link; right?

17       A.   It looks like it's a link.

18       Q.   To another website.  Have you ever clicked on

19  the link?

20       A.   I don't remember I have clicked -- if I have

21  clicked on the link.

22       Q.   Do you know where this link leads to?

23       A.   I'm actually --

24              ATTORNEY HOSP:  Object to the form.

25              You can answer.



Page 52

1       A.   So I don't know.  Yeah, I don't know.  I

2  would have to double-check.

3       Q.   So you said you don't remember if you have

4  ever clicked on this link; is that right?

5       A.   I just don't --

6            ATTORNEY HOSP:  Object to the form.

7            You can answer.

8       A.   I just don't remember if I have or not.

9       Q.   And is there anything that would help you

10 remember whether you --

11      A.   Well, if you know what the page is, I can

12 probably see if I have seen that page.

13      Q.   Okay.

14           ATTORNEY DIAZ:  And No. 6.  Thank you.

15           Can you mark this as Exhibit 2.

16           (Exhibit 2 marked.)

17           (Discussion off record.)

18      Q.   You have this document in front of you.

19 Would you mind just taking a look at it, reviewing it,

20 and letting me know when you had time, had time,

21 sufficient time to review it.

22      A.   Okay.  I didn't read the whole thing; but...

23      Q.   Have you seen this before?

24      A.   Honestly, it doesn't ring any bells.

25      Q.   After looking at Exhibit 2, you don't recall



Page 53

1   seeing this at all?

2        A.    I might have.  Looking at it, I don't -- it

3   just -- I don't recall.

4        Q.    If you can take my word for it for now --

5        A.    Um-hum.

6        Q.    -- this is the -- would you take my word for

7   it that this is the website that is linked to in the

8   best practices document?

9        A.    Really?  Okay.  I'm surprised.

10       Q.    And when you look at the document, Exhibit 2,

11  what is the title on the document?

12       A.    The title is "Honor Native Land:  A Guide and

13  Call to Acknowledgment."

14       Q.    And when you look at the second main

15  paragraph on the first page here, what does it say

16  there starting with "acknowledgment?

17       A.    "Acknowledgment is a simple," is this

18  paragraph?

19       Q.    Correct.

20       A.    It says, "Acknowledgment is a simple,

21  powerful way of showing respect and a step toward

22  correcting the stories and practices that erase

23  indigenous people's history and culture and toward

24  inviting and honoring the truth."  Do you want me to

25  read the rest?



Page 58

1   where it says an example land acknowledgment?

2        A.   I see that.

3        Q.   And you read the land acknowledgment

4   statement earlier.  Do you know where this land

5   acknowledgment statement originated?

6        A.   I mean, going from memory, this is the

7   example that's on the University of Washington

8   website, yeah.

9        Q.   And when you say it's on the University of

10  Washington website, do you know where on the website,

11  specifically?

12       A.   From memory, I'm not sure.  We can -- I'm

13  sure we can find it.

14       Q.   If I had a copy of the Washington, University

15  of Washington website, would that be helpful?

16       A.   Yes.

17            (Exhibit 3 marked.)

18       Q.   Let me know when you've had a chance to

19  review this, and we'll -- finish.

20       A.   Okay.  Yeah.

21       Q.   You have Exhibit 3 in front of you?

22       A.   I do.

23       Q.   What is this?

24       A.   This looks like the printout of a page from

25  the Office of Minority Affairs and Diversity website.



Page 59

1      Q.   For the University of Washington; correct?

2      A.   That's what this looks like.

3      Q.   And when you said it was -- the example land

4  acknowledgment statement from Exhibit 1 was on the

5  University of Washington website, is this the website

6  you were referring to?

7      A.   It's possibly this website, because I recall

8  that there was the land acknowledgment with the

9  asterisks, and the asterisk had the explanation.  I

10  don't remember if that's the correct website or the

11  correct explanation, but I recall that it looked

12  consistent with this.

13     Q.   So on here, on Exhibit 3, you see that it

14  says, "Honoring Place"?

15     A.   On Exhibit 3?  Oh, yeah, "Honoring Place,"

16  yes.

17     Q.   And underneath it, it has what you would call

18  a land acknowledgment statement?

19     A.   It says, "The University of Washington

20  acknowledges the Coastal Salish peoples of this land,

21  the land which touches the shared waters of all tribes

22  and bands with Suquamish, Tulalip, and Muckleshoot

23  Nation."

24     Q.   And that's same as the example statement --

25  on in Exhibit 3, or Exhibit 1?



Page 60

1     A.   I think so.  Yeah, I think so.

2     Q.   And you noted that there's an asterisk after

3     this statement.  What does the asterisk say?

4     A.   The asterisk says, "The language we use to

5     honor place was developed over the course of

6     several years by the UW Tribal Liaison with input from

7     tribal elders, elected tribal leaders, attendees of

8     the annual UW Tribal Leadership Summit, the Affiliated

9     Tribes of the Northwest Indians, UW Native American

10    Advisory Board, and others across our community.  This

11    language template is spoken by UW leadership during

12    events to acknowledge that our campus sits on occupied

13    land.  We recognize that this is a difficult, painful,

14    and long history, and we thank the original caretaker

15    of this land."

16    Q.   And you said you are familiar with the

17    language in the asterisk; correct?

18    A.   I mean, I don't, I don't remember the

19    language, exactly.  I just remember there was an

20    asterisk, and it did say that the UW developed this

21    over some course of time by talking with appropriate

22    people.

23    Q.   So when did you first become familiar with

24    this land acknowledgment?

25    A.   I mean, I don't know when I first heard the



Page 61

1  land acknowledgment.  It's just hard -- like you

2  attend events.  Someone might speak to land

3  acknowledgments, so I can't tell when the first time

4  I've heard it.

5       Q.   And is this the -- would you call this the

6  official land acknowledgment statement for the

7  University of Washington?

8            ATTORNEY HOSP:  Object to the form.

9       A.   I think it depends on the definition of

10  "official."  I mean, from my limited perspective,

11  that's the land acknowledgment that's written on the

12  university website, and I believe that's the one

13  that's typically used.  I don't know if people, you

14  know, have variance.

15            ATTORNEY DIAZ:  Can you give me No. 8.

16       Q.   You said you've seen this web page before;

17  right?

18       A.   (Witness nods head.)

19       Q.   And are you aware of any changes that have

20  been made since January 1, 2022 to the land

21  acknowledgment statement?

22       A.   I can't tell.  Like I said, I remember there

23  was a page, possibly on OMA&D website that had the

24  land acknowledgment, that had a land acknowledgment

25  and asterisk that described how it was created.



Page 62

1    That's what I recall.

2         Q.    Okay.

3               ATTORNEY DIAZ:  Can you mark that

4    Exhibit 4.

5               (Exhibit 4 marked.)

6         Q.    You have Exhibit 4 in front of you?

7         A.    Yes, I do.

8         Q.    And you can just take a look at the first

9    page.  Can you tell me what it is?

10        A.    This looks like a printout of a email

11   conversation.

12        Q.    And do you see the numbers on the bottom

13   right?

14        A.    I see the numbers.

15        Q.    It's Bates-stamped "UW_Reges_0000062"?

16        A.    Yes.

17        Q.    What's the date of this email?

18        A.    The date on this printout is January 4th,

19   2022.

20        Q.    And at the top, and what was the time it

21   says?

22        A.    6:17 p.m.

23        Q.    And the email is from you; correct?

24              ATTORNEY HOSP:  Object to the form.

25        A.    I mean, it says "From," and it has my name.



Page  63

```
 1        Q.   You wrote this email; right?
 2             ATTORNEY HOSP:  Object to the form.
 3        A.   I mean, the printout says it's from me.
 4   That's what I can tell here.
 5        Q.   Based on your name being in the "From" line,
 6   do you agree --
 7        A.   Um-hum.
 8        Q.   -- that you wrote this email?
 9             ATTORNEY HOSP:  Object to the form.
10        A.   I mean, unless someone played with dates or
11   times or "From," if this is a printout from an actual
12   email, then it does say it's from me.
13        Q.   Do you have any reason to believe that this
14   is anything but an actual printout of the email?
15        A.   No.
16        Q.   Do you see towards the bottom where it says,
17   "On Tuesday, 4 Jan 22, Magdalena Balazinska wrote"; do
18   you see that?
19        A.   Yes.
20        Q.   And below that, it's --
21             ATTORNEY HOSP:  Hold on.  I'm sorry.  Are
22   you talking about the first page?
23             ATTORNEY DIAZ:  Yes, on the first page of
24   Exhibit 4.
25        A.   Here when it says, "On Tuesday, January,"
```



Page 64

1   this one?

2       Q.   Yes.   And can you tell me, can you just tell

3   me what it says?

4       A.   The part that says, "Hi, Stuart, Here it is,"

5   and it has a link?

6       Q.   And what's that link to?

7       A.   It's a link to OMA&D page.

8       Q.   And that's the same document that we've

9   labeled Exhibit 3; correct?

10      A.   From my recollection, this would be

11  consistent.

12      Q.   And why did you send this link to Stuart?

13      A.   So before he send -- and, actually, you can

14  see in this here.  He says, "There is no UW land

15  acknowledgment, as far as I know."  And at that time,

16  actually, I think it was Yoshi, I believe from my

17  recollection that Yoshi had sent me a link to the

18  page, when I had that conversation with Stuart, so

19  then I sent the link to Stuart, saying that that's the

20  UW land acknowledgment.

21      Q.   So as far as you knew at that time, at least,

22  this was the UW land acknowledgment?

23      A.   Right.

24      Q.   Okay.  And it's also the same as -- and the

25  UW land acknowledgment in Exhibit 3 is also the same



Page 65

```
1   example land acknowledgment featured in Exhibit 1;
2   correct?
3      A.   Yes, based on what we've been looking at,
4   yes.
5            ATTORNEY DIAZ:  Just a few more minutes.
6   Is that okay?
7            ATTORNEY HOSP:  If we could take a break
8   relatively quick soon, that would be great.
9            ATTORNEY DIAZ:  Yes, we will be able to.
10     Q.   Looking at the Exhibit 3, going to the
11  language near the asterisk.  Is there anything in the
12  asterisk language that you disagree with?
13           ATTORNEY HOSP:  Object to the form.
14           You can answer.
15     A.   Let me read it slowly.  Well, I don't like
16  the, "our campus sits on occupied land" part?
17     Q.   Why not?
18     A.   I want to say this makes me feel
19  uncomfortable, and then you are going to say why, and
20  then I'll say I disagree with it.  I don't know.  I
21  don't know.  Maybe a first-generation immigrant, I
22  just don't have the same perspectives.  I just --
23  yeah.
24     Q.   So would you characterize -- so you wouldn't
25  characterize UW's land as, quote-unquote, occupied?
```



Page 90

```
 1       Q.   And do you remember it?

 2       A.   Not by heart.

 3       Q.   So if I gave you something to look at, would

 4  you be able to --

 5       A.   Yes.

 6       Q.   -- take a look and remember it?

 7            ATTORNEY DIAZ:   Number 14.

 8            (Exhibit 6 marked.)

 9       Q.   Do you have Exhibit 6 in front of you?

10       A.   I do.

11       Q.   What is it?

12       A.   It says, "Computer" -- it's a printout of

13  what looks like the course syllabus for the computer

14  science and engineering CSE 143 class that Stuart

15  taught.

16       Q.   And it was taught in the -- this is the

17  syllabus for the class that is starting in the winter

18  of 2022 quarter; correct?

19       A.   It doesn't say the dates.  The printout does

20  not have the year.

21       Q.   And you see the Bates stamp at the bottom?

22  It says, "UW_Reges_0001397"; right?

23       A.   I see it.

24       Q.   And are you aware that's the Bates stamp for

25  documents produced by your attorneys?
```



Page 93

```
 1      A.   It's hard to explain.  It just seems kind of
 2  obvious.  Maybe because the, I know the history is
 3  very sensitive, so I know this might be a sensitive
 4  topic for people.  So if this is something that's
 5  sensitive, especially to Native American people and
 6  how they feel about it, then stating it that way just
 7  seems to cause upset for them.
 8      Q.   Do you think the statement is offensive?
 9           ATTORNEY HOSP:  Object to the form.
10           You can answer.
11      A.   My opinion is that the statement is
12  offensive.
13      Q.   Why is it offensive?
14      A.   I mean, for the reasons that I would say,
15  like it's a -- I have never been able to explain in
16  any context I think "offensive."  It's just, like I
17  said, if I had a Native American colleague and someone
18  would read that statement to them, I would expect them
19  to feel upset by it.
20      Q.   And a moment ago you said you feel like it's
21  offensive.  I'm just asking, why is it offensive to
22  you?
23      A.   I mean, it's not offending me.  I just feel
24  the statement is offensive, especially to Native
25  American people.
```



Page 96

1              (Exhibit 7 marked.)

2      Q.    Do you have Exhibit 7 in front of you?

3      A.    I do.

4      Q.    What is it?

5      A.    Just looks like a printout of an email.  The

6   printout says it's from me to the faculty executive

7   committee.

8      Q.    And what's the date on it?

9      A.    It's January 7, 2022.

10     Q.    And what is the subject of the email?

11     A.    "Copy of response to reporters."

12     Q.    And the Bates stamp at the bottom says,

13  "UW_Reges_0001294"; right?

14     A.    Correct.

15     Q.    Do you see the -- are you familiar -- why

16  don't you read the statement to yourself, and just let

17  me know when you are done.

18     A.    Okay.

19     Q.    Do you recall who wrote this statement?

20     A.    I --

21             ATTORNEY HOSP:  Object to the form.

22             You can answer.

23     A.    So this is something, the actual writing

24  would have been done probably by Victor Balta, who is

25  the University of Washington communications lead



Page  97

1  person.  I forget his title.  I remember we worked on

2  this together, including Chadwick Allen in those

3  conversations.  And there are probably other people.

4  Like myself, Victor, Chad, and I don't remember who

5  else was there.

6       Q.   And did you -- and what was this statement --

7  what was this language used for?

8       A.   We did receive some questions from reporters,

9  and that's the, kind of the statement we put together,

10  in response to their questions.

11       Q.   So this was sent to reporters --

12       A.   Correct.

13       Q.   -- of --

14       A.   From what I recall, yes.

15       Q.   And who was it sent on behalf of?

16       A.   I mean, this was our response.  I guess, I

17  guess, I think this is right.  So this is kind of the

18  University of Washington response to reporters in

19  response to questions, that we have put together.

20       Q.   And do you see the second paragraph, in the

21  last line there -- or excuse me.  Do you see the

22  second paragraph -- I'm sorry.  Let's back up a

23  second.

24            Do you see the last sentence of the first

25  paragraph?



Page 98

```
 1      A.   I see it.

 2      Q.   And you see it says, "The invocation of

 3  Locke's labor theory of property dehumanizes and

 4  demeans indigenous people"?

 5      A.   Yes.

 6      Q.   And you said you had -- you took part in

 7  crafting this statement?

 8      A.   That's correct.

 9      Q.   Correct?

10           And in order to send it out to

11  reporters --

12      A.   Yes.

13      Q.   -- who were asking questions about what was

14  happening --

15      A.   Yes.

16      Q.   -- in early January 2022?  Sorry.  Yes?

17      A.   Yes.

18      Q.   Did you approve this statement?

19           ATTORNEY HOSP:  Object to the form.

20      A.   I mean, I sent it out, so in this sense I

21  approved; otherwise I would not have sent it out.

22      Q.   And you say you agree with it; correct?

23      A.   Yes.

24      Q.   So you agree -- so you are saying you agree

25  that Stuart's invocation of Locke's labor theory of
```



Page 99

1    property dehumanizes and demeans indigenous people?

2        A.    Yes.    So right.    And for context, right, when

3    I read Stuart's statement, it is just kind of

4    intuitively, you know, a statement that I view as

5    being upsetting to people on purpose, and that's kind

6    of intuitively for reasons that I explained a

7    few minutes ago.

8                  But it's -- as we see, it's kind of hard

9    to explain.    And we had this conversation, including

10   Chadwick Allen, and Chadwick kind of nicely phrased it

11   in that way.    So those would be -- as far as I recall,

12   those were kind of his words to explain why this is

13   actually -- why this can be viewed as an offensive

14   statement and --

15       Q.    And you sent them out -- but you sent out

16   those words, correct, to reporters?

17       A.    That's correct.

18                  ATTORNEY DIAZ:    Let's go off record for a

19   second.

20                  (Discussion off record.)

21                  THE VIDEOGRAPHER:    We are now going off

22   record.    The time is 11:24 a.m.

23                  (Recess.)

24                  THE VIDEOGRAPHER:    We are now back on the

25   record.    The time is 11:25 a.m.



1      A.    This email here?

2      Q.    Yes.

3      A.    So I mean, I can read it.  Yes.  So what's

4   the question?

5      Q.    What, what did Ed email about on December 8th

6   that -- in this email here?

7      A.    So Ed shared an article in the Atlantic on

8   land acknowledgment.

9      Q.    Did you read the article that Ed sent?

10     A.    I recall clicking and skimming the article.

11     Q.    Do you recall what it was about?

12     A.    I don't recall the details, honestly.  It was

13   a while ago.

14     Q.    But in general, you skimmed it.

15     A.    I skimmed it.

16     Q.    Do you remember what any of the topics were

17   of the article?

18     A.    Okay.  So trying to remember, and not

19   reliable memory because it's a year and a half ago, I

20   think it was complaining about, like, performative

21   nature of land acknowledgments.  That's my

22   recollection, but I don't know how reliable it is.

23     Q.    Okay.  Then let's go to -- we're going to go

24   back to January 4th.  Kind of go through the timeline

25   of what happened.  Before January 4th, had you had any



Page 111

1    conversations with Stuart Reges about his version of a

2    land acknowledgment statement?

3        A.   I don't recall having any conversations with

4    Stuart on that topic.

5        Q.   And before January 4th, had you communicated

6    anything to Stuart Reges about his land acknowledgment

7    statement?

8        A.   I don't recall communicating anything to

9    Stuart about his land acknowledgment.

10       Q.   So on January 4th, how did you first hear

11   that Stuart Reges had, in fact, included his version

12   of the land acknowledgment statement in his course

13   syllabi?

14       A.   So from what I recall, Dan Ratner forwarded

15   me a Reddit thread where students were discussing it.

16       Q.   And the Reddit thread, this was on

17   January 4th that you saw that?

18       A.   Correct.

19       Q.   And let's talk about the Reddit thread.  Is

20   that an official University of Washington Reddit

21   thread?

22           ATTORNEY HOSP:  Objection to the form.

23           You can answer.

24       A.   Okay.  I don't think -- okay.  Maybe I just

25   don't know the details.  Typically social media is



Page 116

1   the purpose of identifying the Reddit --

2                 ATTORNEY HOSP:  Okay.

3                 ATTORNEY DIAZ:  -- the Reddit post.

4        Q.   Are you -- and you are -- are you familiar

5   with Reddit?

6        A.   I don't use Reddit.

7        Q.   But are you familiar with it?

8        A.   I mean, yes.

9        Q.   And anyone can use it; right?

10       A.   Right.

11       Q.   Okay.  So after Dan Ratner sent you this

12  Reddit post, what, what did you do in response?

13                ATTORNEY HOSP:  Object to the form.

14                You can answer.

15       A.   Okay.  So it's hard to recall, exactly, and

16  in what order.  But typically when there's a

17  complaint, I share the information with other people.

18  So I recall that during that day, I talked with my

19  colleagues within the Allen School.  That would be Dan

20  Grossman, Ed, Yoshi, probably others.  And I also

21  talked to the dean's office.  That would be Dan

22  Ratner, and, you know, other people.

23                ATTORNEY DIAZ:  Can you mark that

24  Exhibit 10.

25                (Exhibit 10 marked.)



Page 117

```
 1      Q.   Is Exhibit 10 in front of you?
 2      A.   I see it.
 3      Q.   And what is it?
 4      A.   It's a printout of an email.  The printout
 5 says that it's an email from me on January 4th to Dan
 6 Ratner.
 7      Q.   And in this email --
 8      A.   The time seems wrong.
 9      Q.   So we should cover this.  So you see Dan
10 Ratner's email that says, "on Tuesday, January 4,
11 2022" below that?
12      A.   Yeah.
13      Q.   And that's Dan Ratner sending you the Reddit
14 post --
15      A.   Yeah.
16      Q.   -- we talked about; right?
17           And that's at 8:09 a.m.?
18      A.   Yes.
19      Q.   And from your understanding, you wouldn't
20 have responded at 5:05 p.m."
21      A.   That's correct.
22      Q.   Is that correct?
23           You would have responded much earlier;
24 right?
25      A.   Yes.
```



Page 118

```
 1      Q.   You would have probably responded within the
 2  hour; right?
 3      A.   Yes.
 4           ATTORNEY HOSP:  I'm going to object.
 5           But you can answer.
 6      Q.   You would have responded within the hour;
 7  right?
 8      A.   Yes.
 9      Q.   And in fact, you did respond within the hour;
10  right?
11           ATTORNEY HOSP:  Well, object.
12           You can answer, if you recall.
13      A.   I believe I did, from what I recall.
14      Q.   And is it your -- do you recall that the time
15  was probably more -- probably 9:05 a.m. as opposed to
16  5:05 p.m.?
17           ATTORNEY HOSP:  Object to the form.
18           You can answer if you recall.
19      A.   I mean, 9:05 would make more sense.  Is it
20  Dan received it and was in Europe?  I don't know if
21  maybe the email printout is from, from him and he was
22  in a different time zone.
23      Q.   So we talked to your counsel about this.
24  There was a bit of a mix-up.  But as long as your
25  recollection is you sent it in the morning on
```



Page 119

1    January 4th to Dan Ratner; is that correct?

2        A.    I recall sending -- I mean, I recall

3    responding in the morning, because then, as you saw

4    through the remaining communications throughout the

5    day.

6        Q.    Great.

7        A.    So there should be a copy of this email with

8    the correct time stamp somewhere.

9        Q.    You take my word for it, that there was a

10   technical --

11       A.    Yes.

12       Q.    -- issue with --

13             THE COURT REPORTER:  Wait.  You got to

14   wait till he's done.

15             "Take my word for it," what?

16       Q.    That there was a technical issue with the

17   documents that led to a time, the time being shifted

18   on the email?

19       A.    Right.  I think we agreed that this time does

20   not look like it was the actual time of that email.

21       Q.    Okay.  So as far as your recollection, within

22   one hour of Dan Ratner sending you a link to the

23   Reddit post we discussed, you responded to him by

24   saying, I find that this email is -- excuse me.  "I

25   find that this is an issue that we need to raise with



Page 120

1   HR and with OMA&D."

2       A.   Um-hum.

3       Q.   Why did you think it needed to be raised to

4   HR?

5       A.   Oh, honestly, in this, I don't know why I put

6   HR, specifically.  Reading the Reddit thread, reading

7   this post, it seemed clear that this is meant to upset

8   students.  Students are already expressing their

9   feelings of upset in the medium that they know, and it

10  just seems like I just -- this is, as you mentioned,

11  not the first time Stuart makes comments that upset

12  people.  So my initial reaction was, Okay, well, I

13  need to, you know, ask people above me for advice.

14      Q.   You wanted to ask people for advice on what?

15      A.   Right.  So when students start to express

16  feelings of being upset, that that becomes the

17  responsibility for us to make sure that we have an

18  environment conducive to learning.  And my experience

19  is, if one student expresses something, there's

20  typically many more students who also feel this same

21  kind of feeling of upset.

22      Q.   And when you read Stuart's post and you

23  interpreted it as something that would be upsetting to

24  students, you went to HR for advice.  Is that what you

25  are telling me?



Page 128

```
 1        Q.   Did you speak with Aileen on January 4th
 2   about Stuart's land acknowledgment statement?
 3        A.   I don't recall for sure.  It would make sense
 4   if I had.
 5             ATTORNEY DIAZ:  Let's just do this No. 11.
 6             (Exhibit 11 marked.)
 7        Q.   Do you have Exhibit 11 in front of you?
 8        A.   Yes.
 9        Q.   And what is it?
10        A.   It looks like a printout of an email.  It's
11   from me, sent on January 4th.  And at this point, I
12   don't know if the time is correct or incorrect.  And
13   it's to Dan Grossman and Kristi Osborne -- she's the
14   communications director in the Allen School -- Yoshi
15   Kohno, and Ed Lazowska.  The subject is "Re: Land
16   Acknowledgment."
17        Q.   And we can agree that in all likelihood, it
18   was -- this email was sent at 9:19 a.m.; right?
19        A.   It's possible.
20        Q.   You see the email below it is 9:17 a.m.?
21        A.   Yes.
22        Q.   You would have responded at least within the
23   hour to that email from Dan Grossman; correct?
24        A.   I agree that it's likely a nearby time.
25        Q.   And you see where it says this is an email
```



Page 129

1  from you, saying that you are taking -- "I'm taking

2  the package of both Stuart and Pedro's behaviors, and

3  I'm going to escalate it with the dean, to the

4  provost, and other UW-level authorities"; is that

5  right?

6                ATTORNEY HOSP:  Objection to the form.

7                You can answer.

8       A.   That's what the email says.

9       Q.   And this email is a little less than

10  15 minutes after -- this email in Exhibit 11 is about

11  15 minutes after your email to Dan Ratner at 9:05 that

12  morning, which we have as Exhibit 10?

13      A.   Yes.  Assuming that those are the time

14  stamps, yes.  But I agree the time stamps are probably

15  close.

16      Q.   Yeah.  So you were -- I mean, in your words,

17  you were escalating a package of Stuart's behaviors

18  with -- to the provost and other UW-level authorities;

19  correct?

20                ATTORNEY HOSP:  Objection to the form.

21                You can answer.

22      A.   Right.  I mean, the sentence says, "I'm

23  taking the package of both Stuart's and Pedro's,"

24  there's two people behaviors, "and I'm going to

25  escalate it with the dean, to the provost, and other



Page 146

1     Q.    Did you talk to anyone else before going to

2   that instructor?

3     A.    Honestly, I don't remember.  And actually I

4   don't remember if I was the director when that

5   happened, or if I just heard about it after.  That is

6   just kind of an example that came to my mind.  But I

7   don't remember if I was the director.  I don't

8   remember if I handled it, or I don't remember if it

9   was the previous director who handled it, and I heard

10  about it secondhand.

11    Q.    Fair enough.

12          ATTORNEY DIAZ:  25 for me, please.  And

13  15, when you get a chance.  Thank you.

14          (Exhibit 12 marked.)

15          ATTORNEY DIAZ:  I think we are 12.

16          THE COURT REPORTER:  Yep.

17          (Discussion off record.)

18    Q.    Ms. Balazinska, you have Exhibit 12 in front

19  of you?

20    A.    I do.

21    Q.    And what is it?

22    A.    It looks like it's a printout of an email

23  from me to Stuart, copying Karen Thomas Brown, Dan

24  Ratner, and Phil Reid.  And the subject is "Land

25  acknowledgment statement in your course syllabus."



Page 147

1      Q.   And what's the date on that email?

2      A.   The date on the printout within the body here

3  is Tuesday, January 4th at -- 2022 at 3:40 p.m.

4      Q.   And what is the Bates stamp on the bottom

5  right?

6      A.   It's "UW_Reges_0001424."

7      Q.   Do you remember sending this email?

8      A.   Yes, this looks consistent with the email

9  that I remember sending.

10      Q.   And in this email, you are asking -- in this

11  email, what are you asking Stuart to do?

12      A.   I asked, I asked Stuart to remove the

13  statement that he called his land acknowledgment from

14  his course syllabus.

15      Q.   How did you decide to ask Stuart to remove

16  the land acknowledgment statement from his course

17  syllabus?

18      A.   So how did I decide?  I mean, I talked with

19  kind of the people in the dean's office.  You see Dan

20  and Karen included here.  I probably also talked with,

21  you know, Ed, Dan, and others in the Allen School, so

22  that's how I decided.

23      Q.   And why did you want to remove the land

24  acknowledgment statement -- I'm sorry.  Why did you

25  want Stuart to remove the land acknowledgment



Page 148

1   statement from his syllabus?

2       A.   So students were voicing complaints about the

3   land acknowledgment and how it was making them feel in

4   the class, so I asked him to remove it.

5       Q.   How many students at that time, 3:40 p.m. on

6   January 4th, 2022, were complaining about the land

7   acknowledgment statement in the syllabus?

8       A.   So that's a good question.  I don't remember

9   exactly how many students.

10      Q.   How many students had you spoken to at that

11  time about Stuart's land acknowledgment statement?

12      A.   I'm trying to remember.  There was the thread

13  I received, and it's hard to remember, exactly, when

14  everything came.  There was a anonymous feedback that

15  we received.  There was one feedback that Karen told

16  me about.  By then, I had other conversation,

17  including with our staff.  They were also talking with

18  some students.

19           So I can't tell how many, but there were

20  definitely different channels of communication.  And

21  there were kind of complaints coming through,

22  definitely through emails, through Karen and the one

23  that she forwarded and through the anonymous

24  complaint, and people were also talking with each

25  other.



Page 152

1  statement, what did you do?

2            ATTORNEY HOSP:  Objection to the form.

3      A.   On January 4th, I think we just kind of left

4  it there.

5      Q.   You don't -- do you remember taking any

6  action to do anything with the syllabus on

7  January 4th?

8      A.   I believe on January 4th, if I recall

9  correctly, we, we took down the syllabus from the

10  website.

11      Q.   And how did you have the syllabus -- how was

12  the syllabus removed from the website?

13      A.   Oh, how was it -- I asked our IT team to do

14  it.

15      Q.   Is that Adam Timss that you --

16      A.   No, no.  We have -- in the Allen School, we

17  have our own team.  So I guess Aaron Timss.  That's

18  right.  Aaron Timss.

19      Q.   Aaron Timss.  Sorry.  That's my mistake.

20            At some point on January 4th, the syllabus

21  was taken off of Stuart's course website?

22      A.   Correct.

23      Q.   And it was inaccessible?

24      A.   Yes.

25      Q.   And so students in Stuart's course could not



Page 153

1    see the website?

2        A.    That's right.

3        Q.    What did they see, if they went to go look --

4              THE COURT REPORTER:  I'm sorry.  If they

5    went, what?

6        Q.    What did they see if they went to the course

7    website to look at the syllabus?

8        A.    We posted, like, a message that said that the

9    syllabus was taken down.

10             (Exhibit 14 marked.)

11       Q.    Do you see Exhibit 14 in front of you?

12       A.    I see it.

13             ATTORNEY DIAZ:  Oh, sorry about that.

14             ATTORNEY HOSP:  No worries.

15       Q.    And you see that it's Bates-stamped

16   "UW_Reges_0001802"?

17       A.    That's correct.

18       Q.    And you see where it says, "Note:"; right?

19       A.    I see it.

20       Q.    Is this the statement that students would

21   have seen when they went to go look at the course

22   website on January 4th, after the syllabus was

23   removed?

24       A.    Yes.  That looks consistent with what I

25   recall.



Page 154

1      Q.    And can you read the note?

2      A.    The note says, "The course syllabus has been

3   temporarily removed due to offensive statements.  We

4   apologize for the inconvenience."

5      Q.    Why did the -- did you direct the IT people

6   to put this note in the place of the syllabus?

7      A.    So yes, I would say anything the IT people

8   did, they did at my direction.

9      Q.    And so you told them to put something that

10  said -- you told them to put the page that said, "The

11  course syllabus has been temporarily removed due to

12  offensive statements"?

13     A.    Yes.

14     Q.    And again, during this time, nobody could

15  access the course syllabus?

16     A.    That's correct.

17     Q.    Did you ask for Nancy Allbritton's thoughts

18  before you removed the course syllabus?

19               ATTORNEY HOSP:  Object to the form.

20     A.    So from what I recall, during this whole

21  situation, I was always in close communication with

22  the dean's office, which would have been Dan Ratner,

23  Karen Thomas Brown, Nancy Allbritton, and also with

24  colleagues in the Allen School, which would have

25  included Dan Grossman, Ed Lazowska, and others.



Page 157

```
 1     A.   Right.  So in his email, Dan Ratner said,
 2  "I'm keen to find a solution that ensures students
 3  have access to the course syllabus"; right?  So that
 4  was his main goal was to find that solution, to have
 5  kind of a good learning environment again.
 6              And he says, "I don't have a perfect
 7  solution, but the syllabus serves as a contract with
 8  students for the class, which will be critical later
 9  this quarter as grading questions and student
10  misconduct cases arise.  If the instructor is
11  unwilling to remove the unnecessary and offensive
12  statement, Nancy and I suggest asking your IT team to
13  include a message on the course web page that the
14  department has asked the instructor to remove the
15  offensive language and they have refused."  So that's
16  what he was suggesting.
17     Q.   And in response to Nancy's -- what, his
18  statement, that "Nancy and I suggest asking IT team to
19  include a message on the course web page that the
20  department has asked the instructor to remove the
21  offensive language and they have refused," what was
22  your response in the following email?
23     A.   So I suggested a different idea, and I said,
24  "Another option is for us to remove the offending
25  section from the PDF and post the updated PDF."
```



Page 158

1      Q.    And that's what ended up happening; right?

2      A.    Correct, that's what we ended up doing.

3      Q.    And, and do you recall whether you asked

4   Nancy or Dan Ratner whether you should remove the

5   section?

6      A.    Yes.  After this, there definitely was a

7   discussion with Dan Ratner.  Dan was talking to Nancy.

8   We included Phil Reid in that conversation, regarding

9   those next steps, which is -- yeah.

10     Q.    And what was, what was the substance of the

11  conversation?

12     A.    So I don't remember all the details of the

13  conversations, but it would have been about what to do

14  with this syllabus, and the need to give students

15  access to the content that is relevant to the class,

16  and yet, make sure that the students, you know, have

17  kind of -- you know, have a good learning environment

18  in that class.

19     Q.    And so what did -- you said you had a

20  conversation with Phillip Reid, Nancy Allbritton,

21  and --

22     A.    Dan Ratner.

23     Q.    -- Dan Ratner.  What did you all decide to do

24  with Stuart's syllabus in the end?

25           ATTORNEY HOSP:  Objection to the form.



Page 159

1                    You can answer.

2        A.    Right, so just to clarify.  This probably

3    wasn't one conversation.  There were many

4    conversations with different groups of people,

5    including those people.

6                    Ultimately we did remove the -- that

7    section from the PDF.

8        Q.    Did Nancy Allbritton approve of removing

9    Stuart's land acknowledgment statement from his course

10   syllabus?

11       A.    My recollection is that I had approval from

12   the dean's office.  And I know you are speaking with

13   Nancy, so she can confirm on that.

14       Q.    And did Phillip Reid also approve of removing

15   the land acknowledgment statement from Stuart's course

16   syllabus?

17                   ATTORNEY HOSP:  Objection to form.

18       A.    Yes.  And this is where I was talking mostly

19   to Dan Ratner, and Dan Ratner was talking to Phil

20   Reid, and Dan got Phil's approval.

21       Q.    So going back to January 4th for a moment.

22   You mentioned that you had spoken with Aileen Trilles;

23   right?

24       A.    I believe I spoke with her that day.

25       Q.    Yeah.  And you all had some emails as well?



Page 165

```
 1        A.    Yeah.

 2        Q.    -- and by the time the land acknowledgment

 3   statement was removed from Stuart's syllabus, at that

 4   point you considered the issue resolved; is that

 5   right?

 6        A.    Right.  So that issue was resolved, except

 7   Stuart mentioned that he was going to do this again,

 8   and so then I was worried about any potential, like,

 9   you know, what would happen when that happens.

10        Q.    Right.

11        A.    But had he not advertised or wanted to do

12   anything after that, then in my mind, yeah, we were

13   done.

14        Q.    All right.  So as you mentioned, in a certain

15   point, Stuart said he was going to include the land

16   acknowledgment statement in his syllabus in the spring

17   quarter; right?

18        A.    (Witness nods head.)

19        Q.    And so what happened?  What was your response

20   to that?

21              ATTORNEY HOSP:  Object to the form.

22              You can answer.

23        A.    I definitely asked the dean's office -- I let

24   them know, and I asked them for advice on, okay, we

25   need to figure out how we're going to proceed.  What
```



Page 166

1  will happen when that happens.

2       Q.    And what were you concerned about happening,

3  as a result of Stuart putting the land acknowledgment

4  statement back in his syllabus?

5       A.    I mean, just the repeat of January.

6       Q.    You were concerned about getting, students

7  getting upset?

8       A.    Students getting upset and students

9  submitting complaints through all these different

10  channels.

11       Q.    And was there any other reason you were

12  concerned about Stuart including the land

13  acknowledgment statement in the spring syllabus?

14       A.    Not that I recall.

15       Q.    So it was just the fact the students might be

16  upset and that students might end up submitting

17  complaints of some kind?

18            ATTORNEY HOSP:  Object to the form.

19            You can respond.

20       A.    Yes.

21       Q.    Okay.  Were you ever concerned, as a result

22  of Stuart's land acknowledgment statement being in the

23  syllabus, that courses -- that the instruction of his

24  course would be disrupted?

25       A.    The instruction of, I mean --



Page 167

```
 1                ATTORNEY HOSP:  Objection to the form.
 2                You can answer.
 3       A.   I mean, if students are upset, then their
 4   learning is disrupted, because they, they are upset by
 5   what's happening.  So in that sense, this is causing a
 6   disruption that the students are, like, they're upset,
 7   they might choose to drop the class.  They might not
 8   perform as well.  I don't know.  But basically the
 9   students not having an environment where they feel,
10   you know, supported and where they feel like they can
11   learn is what I was worried about.
12       Q.   And did any student, did any student actually
13   tell you that their learning was interrupted by Stuart
14   including a land acknowledgment statement in his
15   syllabus?
16                ATTORNEY HOSP:  Objection to the form.
17       A.   So from, from what I recall, for example,
18   from one of the complaints, a student was
19   mentioning -- and I forget exactly the detailed words,
20   but that they were -- they didn't feel like they could
21   learn in the class or that they would be treated
22   fairly.  So students expressed those kinds of, of
23   feelings.
24       Q.   And are you aware of Stuart Reges ever
25   treating a student unfairly in his classroom?
```



Page 168

```
 1      A.   I'm not --
 2           ATTORNEY HOSP:  Object to the form.
 3           You can answer.
 4      A.   I'm not aware, and I did not expect Stuart to
 5  treat students unfairly independent of what he did
 6  with the land acknowledgment.
 7      Q.   So even after he put the land acknowledgment
 8  in his syllabus in January, you didn't expect that
 9  anybody in his classroom would be treated unfairly by
10  Stuart?
11      A.   Correct, I did not expect that.
12      Q.   Now, we talked about the word "disruption" a
13  little bit.  You were worried about students being
14  upset, and that might -- that that could disrupt their
15  ability to learn?
16      A.   Right.
17      Q.   But in terms of Stuart's actual class, was
18  there any time where he could not provide instruction
19  to students?
20      A.   I'm not --
21           ATTORNEY HOSP:  Object to the form.
22           You can go ahead.
23      A.   I'm not aware of any time where he couldn't
24  provide instruction to the class.
25      Q.   Nobody stood up in the class at one point
```



Page 169

1  after the land acknowledgment statement was in the

2  syllabus and said, you know, This is an outrage?

3  Anything like that?

4          ATTORNEY HOSP:  Objection to the form.

5          You can answer.

6      A.  Nothing like that came to my attention, so

7  I'm not aware of anything like that.

8      Q.  You are not aware that the class was ever

9  paused to manage student concerns in the middle of

10  class?

11     A.  Right.  I'm aware that Stuart paused the

12  class, I think, in fall to explain kind of his lawsuit

13  against the university, but I'm not aware of him

14  having to pause the class due to student behavior in

15  his class.

16     Q.  Were any other classes at the Allen School,

17  was there any -- had any other classes at the Allen

18  School, are you aware of a disruption like that, where

19  students were upset about the land acknowledgment

20  statement that Stuart wrote, and voiced it during the

21  classroom?

22     A.  So I'm not aware of students voicing a

23  disruption in other classrooms related to Stuart's

24  land acknowledgment.

25     Q.  So throughout your emailing with --


MAGNA
LEGAL SERVICES

Page 170

1      A.    Um-hum.

2      Q.    -- various colleagues, you did talk about how

3   Stuart's land acknowledgment caused a disruption;

4   right?

5      A.    Right.

6      Q.    And when you say that, you are talking about

7   just those two things of receiving that there would be

8   complaints and that students might be upset?

9            ATTORNEY HOSP:  Objection to form.

10     A.    Correct.  My worry is students being upset

11  and students, as a result of that, being affected in,

12  in learning in that classroom; the students

13  potentially dropping the class because of those strong

14  feelings of being upset, that was my concern.

15     Q.    So you were concerned about how the students

16  would react to Stuart's land acknowledgment statement?

17           ATTORNEY HOSP:  Objection to the form.

18     A.    I think that's accurate, yeah.

19     Q.    Is there any complaint that alleged that

20  Stuart treated a student unfairly --

21           ATTORNEY HOSP:  Objection to the form.

22     Q.    -- relating to the land acknowledgment

23  statement?

24     A.    I don't recall all complaints, and I might

25  not have heard all complaints.  I'm not aware of



Page 171

1 anyone saying that he treated someone unfairly.

2    Q.   Are you aware of any student that said that

3 Stuart discriminated against them?

4              ATTORNEY HOSP:  Objection to form.

5    A.   So students voiced different feelings in, in

6 the complaints.  I don't recall anyone saying

7 specifically that, you know, in that winter 2022 class

8 Stuart had discriminated against them, other than the

9 students complaining about how the posting of the

10 specific land acknowledgment statement was affecting

11 them and their feelings of about -- kind of their

12 feelings around how they could learn in that class.

13    Q.   And are you aware of any complaints from

14 Stuart -- sorry.

15              Are you aware of any complaints related to

16 Stuart's land acknowledgment that -- where the student

17 claimed that he was harassing them in somewhat?

18              ATTORNEY HOSP:  Objection to form.

19    A.   I just, I just don't remember all the words

20 people put in their complaints.

21    Q.   What about staff?  Did staff ever allege that

22 Stuart treated them unfairly?

23              ATTORNEY HOSP:  Objection to form.

24    A.   Let's see.  In the workplace, no.

25    Q.   And did -- are you aware of any staff, or did



Page 172

1  any staff tell you that Stuart had discriminated

2  against them?

3      A.   I'm not aware of staff members saying that

4  Stuart had discriminated against them in the

5  workplace.

6      Q.   And are you aware of any staff saying that

7  Stuart harassed them in some way in the workplace?

8      A.   This is where I pause, because people kind

9  of, including staff members, expressed a lot of strong

10  feelings around actions, such as posting the land

11  acknowledgment, emailing diversity-allies.  I forgot

12  all the words they were using in that.  But that could

13  be kind of a potential place where people could voice

14  that type of feeling, but you have to look back on

15  what people said, exactly.

16      Q.   Going back to early January.  In response

17  to -- sorry.  Put that on the back.

18           At some point, you sent an email to the

19  students in Stuart's class; right?

20      A.   Um-hum.

21      Q.   And do you remember what, generally what that

22  email says?

23      A.   So I sent, from what I recall, two emails to

24  the class.  Yeah, if you can look at the email, that

25  would be easier.



Page 173

1          ATTORNEY WALTERS:  34?

2          (Exhibit 16 marked.)

3          ATTORNEY DIAZ:  Where are we at?

4          THE COURT REPORTER:  16.

5          ATTORNEY DIAZ:  16, all right.

6     Q.   So, Ms. Balazinska, you have Exhibit 16 in

7   front of you?

8     A.   That's correct.

9     Q.   What is Exhibit 16?

10    A.   Exhibit 16 looks like a printout of an email,

11  and it says that it was from me to the CSE 143 class.

12    Q.   And what's the date?

13    A.   The date is January 5th, 2022.

14    Q.   And you see the Bates stamp at the bottom?

15    A.   Yes.  It's "UW_Reges_0000607."

16    Q.   And is this an accurate copy of what you sent

17  the students after --

18    A.   Let me just take a quick look.

19    Q.   Sure thing.  Take your time.

20    A.   Okay.

21    Q.   Is this an accurate, is this an accurate

22  representation, or an accurate copy of the email you

23  sent to students on January 5th?

24    A.   Yeah, this looks consistent with my

25  recollection.



Page 174

```
 1     Q.   And do you have any reason to believe this is
 2  not the email that you sent to students on
 3  January 5th?
 4     A.   No.
 5     Q.   And in the email on paragraph -- in paragraph
 6  3, you note, "I encourage you to submit a complaint
 7  through one of the following channels.  These
 8  complaints are taken very seriously," and you list
 9  three channels within --
10     A.   Um-hum.
11     Q.   -- the University of Washington for purposes
12  of complaints; right?
13              ATTORNEY HOSP:  Object to the form.
14              You can answer.
15     A.   Right.  So this is -- I mean, as we were
16  discussing, one of the complaints that a student had
17  voiced said that they were worried they would not be
18  treated fairly.  And as we discussed, I did not
19  expect -- I mean, I expected Reges to treat everyone
20  fairly.  I had no reason to believe otherwise.  So I
21  specified that I would like to assure everyone that
22  they can expect to be treated fairly, since that was
23  my expectation.
24              But since in the morning students took to
25  social media, and this has been something standard
```



Page 175

1    that I just conveyed to students the form of, like if

2    you do want to express feelings and express

3    complaints, like, don't go to social media.  Like, we

4    have official channels that will be -- yeah, official

5    channels.  That was all.

6        Q.    And so you encouraged students to submit a

7    complaint; is that correct?

8        A.    Well --

9        Q.    Yes.  Go ahead.  Don't let me interrupt you.

10   Go ahead.

11       A.    Sorry.  More like redirect.  So it's -- so

12   the first statement is to assure everyone that they

13   can expect to be treated fairly, because someone

14   voiced that I expected them to be treated fairly.

15              And second one is to just redirect

16   students, and if they wanted to express feelings, not

17   take that to social media, but instead, use one of

18   those official channels.  That was the intent of my

19   statement here.

20              ATTORNEY DIAZ:  34.

21              (Exhibit 17 marked.)

22       Q.    Do you have Exhibit 17 in front of you?

23       A.    Yes.

24       Q.    And what is it?

25       A.    It does look like a printout of some emails.



Page 176

1      Q.   And on the first page, you see the Bates

2   stamp "UW_Reges_0005997"?

3      A.   Yes.

4      Q.   And at the top, who is this email from?

5      A.   At the top, it's an email from me to Kristin,

6   copying Dan, Yoshi, Ed, and Jan Cuny, who's a staff

7   member in the Allen School.

8      Q.   And Dan Grossman; right?

9      A.   And Dan Grossman, yes.

10     Q.   And the time of the email -- or the date of

11  the email is January 4th, 2022; correct?

12     A.   Correct.  And I don't -- we would have to

13  check if the time was -- probably the time is correct,

14  and I don't know.

15     Q.   If you go down to where it says in the middle

16  of the page on 5997, it says, "On Tuesday January 4th,

17  2022 at 3:09 p.m."  Do you see that?

18     A.   I see that.

19     Q.   And there's a short email there.  Can you

20  tell me who wrote that email?

21     A.   Yes.  So just give me a second.  Let me just

22  remember the context.

23          All right.  I remember that.  Okay.  Oh, I

24  see.  Okay.  Yes.

25     Q.   So you had a chance to review the full chain?



Page 177

1        A.    Yes.

2        Q.    What is this email chain related to?

3        A.    So this is -- it starts with an email that

4   Yoshi Kohno received from students, kind of voicing

5   their concerns around the land acknowledgment in the

6   syllabus.

7        Q.    You received an email from the DEI student

8   committee; right?

9        A.    That's how the student signed it.

10       Q.    That's the one -- that's what you are

11  referring to, that email?

12       A.    That email, yes.

13       Q.    And who is the DEI student committee?

14       A.    I'm not actually sure if that's an official

15  committee.  We have a diversity and equity inclusion

16  committee that includes faculty, staff, and they meet

17  at some, you know, regular intervals, maybe monthly,

18  to discuss issues related to diversity.  I'm not aware

19  of a DEI student committee.  Maybe those are the

20  students that actually just attend the diversity

21  meetings, kind of calling themselves like that.

22       Q.    They're -- you are aware there are students

23  who are on the committee you spoke about?

24       A.    Yes.

25       Q.    And would it surprise you to learn that these



Page 180

1        A.    Um-hum.

2        Q.    -- if they wanted to, there was also a second

3    section of Stuart's course created; right?

4        A.    That's right.

5        Q.    And how did you come to the decision to

6    create a second section to Stuart's course?

7        A.    That's a good question.  So after we removed

8    the statement from the syllabus and notified the

9    students, I received follow-up communication from the

10   students in the class.  And what I try to do when

11   someone sends me communication is, in general, when

12   someone complains, I try to meet with them and talk

13   with them.  And I talked with one of the students, and

14   she, she told me, honestly, that she was unable to

15   continue in this class, and that she was going to drop

16   the class that Friday morning, even though she really

17   had to take this class, because she had, like, to

18   fulfill some requirements for that first year.

19            And that just really broke my heart,

20   knowing that students would, would really, I mean,

21   have such a big negative impact on their own

22   education.  So I wanted to find some kind of

23   accommodation for the students, and this is why I

24   recommended we create a new section, such as students

25   who felt that way and were going to drop the class,



Page 181

1   were actually able to finish taking the class.

2       Q.   So you heard -- you spoke with a student who

3   told you that she didn't want to take the class with

4   Stuart anymore?

5       A.   Right.  That she couldn't take the class with

6   Stuart anymore.

7       Q.   Did you -- at that time, did you speak with

8   any other students who said similar things, that they

9   couldn't take the class with Stuart anymore?

10      A.   At that point, that evening, I did not talk

11  with other students.  I also sometime received kind of

12  an email summary from Chloe, who's a -- I'm terrible

13  with titles.  She's, I think, the assistant director

14  for diversity and access, so she manages the diversity

15  and acces team.

16           And her staff were also speaking to a lot

17  of the students, and they also conveyed some feelings

18  of -- and I forgot exactly kind of when, but I

19  remember kind of also receiving that compilation of

20  thoughts from them.

21           And my experience, I'm also thinking, even

22  if there's one student who drops the class that way,

23  out of the size of the class, there's probably going

24  to be other students.  So it -- my opinion, it was

25  then worth trying to do something for those students.



Page 182

1    Q.   When you say that if you -- so you say --
2    first let's start with, you said Chloe sent you an
3    email that said, that had some students expressing
4    concerns about the land acknowledgment statement?
5    A.   So the email from Chloe was more a
6    compilation of the concerns expressed by her team, and
7    her team was also in that email.  And I forgot the
8    details.  We have that email in some of the documents.
9    They had also spoken to the students, and they were
10   conveying kind of similar of the feelings from the
11   students.
12        Between all those concerns reported
13   through that channel, through the staff concerns, and
14   talking to the one student, and knowing that typically
15   if there's one student who is going to do this and
16   who's feeling that strongly, there's most likely other
17   students who feel that way too, this is when I thought
18   that we kind of -- I don't know, one way to support
19   those students was to let them take a class in a
20   different way.
21   Q.   And is there any -- but you didn't speak to
22   any of the students that Chloe's staff spoke to?
23        ATTORNEY HOSP:  Object to the form.
24        You can answer.
25   Q.   Did you speak to any students that Chloe,



Page 183

1   that Chloe's staff spoke to?

2      A.   Not that -- I don't think.  I don't recall

3   speaking to them at that time.

4      Q.   And did you -- I'm sorry.  Do you know how

5   many students Chloe's staff spoke to?

6      A.   I don't know.

7      Q.   And you didn't hear from any other student

8   that said at that time they couldn't take Stuart's

9   class; right?

10           ATTORNEY HOSP:  Objection to the form.

11           You can answer.

12      A.   I will say that, I mean, I don't have perfect

13   recollection, so this is hard to say with certainty.

14   Yeah, it's hard to say precise, like, who spoke and

15   how many students and who.  But I know that the

16   decisive factor for me was when I had the discussion

17   with the student, that definitely was a decisive

18   factor.  I did hear from different people.  There were

19   many communications going on, so I cannot say with

20   certainty about others.

21      Q.   And so you have -- you get one student saying

22   to you that they felt like they couldn't continue in

23   Stuart's class because of his land acknowledgment

24   statement, and you extrapolated from that to thinking

25   that other students must feel the same way?



Page 184

```
 1              ATTORNEY HOSP:  Objection to form.
 2      A.    I would also bring kind of the whole context;
 3  right?  So since -- I think, actually, so I knew about
 4  it on Tuesday, but like the first complaint was
 5  actually submitted on Monday.  So since Monday we had
 6  complaints.  Students went on social media.  Students
 7  expressed strong feelings.  We received emails that
 8  can show it was another example.  I received emails
 9  through staff.
10              So there's a clear -- it's coming from all
11  these directions; right?  Just a lot of expression of
12  these very strong feelings around what's happening.
13  And then, right, so my initial thought was, Okay, we
14  remove the statement, maybe that's fine.  And then
15  people convey to me that actually, no.  The way they
16  feel so strongly, they are going to drop the class.
17              So given that context and just a message
18  from the student and the compilation of these concerns
19  from the staff, yes, I just extrapolated.  I didn't
20  know how many, and like maybe ten students feel that
21  way.  I really had no idea what to expect.
22              But even if it were for just, like, ten
23  students, I really didn't want students to, like, you
24  know, damage to education.  I really wanted to make
25  sure they can continue and complete the class.
```



Page 185

```
 1        Q.   And was there any -- just talking about the
 2   one student that you spoke to for the moment.
 3        A.   Um-hum.
 4        Q.   Was there any way, any other way to
 5   accommodate that student?
 6             ATTORNEY HOSP:  Objection to the form.
 7             You can answer.
 8        A.   That wasn't clear to me, because the problem
 9   is if the classes are like prerequisites to other
10   classes, and she already had, from what I recall, like
11   a full schedule for spring that she needed to complete
12   in that one year, so there isn't an easy way to take
13   the class next quarter.  Because sometimes that's an
14   easy -- that's a potential accommodation or
15   recommendations, just, you know, take the class the
16   next quarter with another instructor.  But in this
17   case, it wasn't possible.
18             So -- and typically, if there's one
19   student who starts to have this constraint, that means
20   there's -- out of a large class, there's going to be
21   other students in the same situation.
22        Q.   But as you said, you extrapolated from this
23   one story and the context to believe that other
24   students should be given the opportunity to have a
25   different section at the same time; right?
```



Page 186

```
 1      A.    That's correct.
 2      Q.    So let's fast forward to the spring, or
 3   sorry.   The spring quarter I want to talk about that.
 4      A.    Um-hum.
 5      Q.    Let's fast forward to February 2022.
 6      A.    Um-hum.
 7      Q.    You said, you noted that Stuart, you said he
 8   was gonna put the land acknowledgment statement back
 9   in his syllabus in spring quarter; right?
10      A.    That's right.
11      Q.    When you heard that, what did you, what did
12   you think?
13            ATTORNEY HOSP:  Objection to the form.
14      A.    I mean, at that point, I was pretty sure he
15   was going to do it.  The way he put it, that's what I
16   thought.
17      Q.    And what was your reaction to hearing that he
18   was gonna put it back in his syllabus?
19      A.    I definitely recall asking the dean's office
20   for advice on, Well, how are we going to proceed when
21   that happens again in, in spring quarter.
22      Q.    And do you remember when you first heard that
23   Stuart was going to put the land acknowledgment
24   statement back in his syllabus in the spring quarter?
25      A.    I'm not sure about the first time.  From what
```



Page 187

1    I recall, he sent an email -- I believe he sent an

2    email to the faculty mailing list.  I'm not sure.  He

3    did send an email to the diversity-allies mailing

4    list.  I recall there were a couple of -- I vaguely

5    recall there were a couple of emails.  I don't

6    remember the details.  I'd have to double-check.

7         Q.   One thing before I forget.

8              (Exhibit 18 marked.)

9         Q.   You have Exhibit 18 in front of you?

10        A.   Yes.

11        Q.   What is this?

12        A.   It's, again, some emails.  Let me just first

13   take a look.  This is pretty short, just one page.

14   Okay.

15        Q.   What is Exhibit 18?

16        A.   So again, it's a printout of the emails.

17        Q.   And you see a little, a little ways down on

18   this page, which is Bates-stamped "UW_Reges_0005255,"

19   that there's an email written by you?

20        A.   Yes, I see that.

21        Q.   And that's from January 7th, 2022?

22        A.   I see that.

23        Q.   And it says 9:52 a.m.?

24        A.   Um-hum, I see that.

25        Q.   This is the email you sent to students



Page 188

1   announcing the second section of Stuart's course;

2   right?

3       A.   Yes, that looks consistent with my

4   recollection.

5       Q.   And you have no reason to think that this is

6   not the email that you sent to students announcing the

7   second section?

8       A.   That's correct.

9       Q.   Because it is the email you sent to the

10  students; right?

11      A.   I assume it is, yes.

12      Q.   Okay.  Going back to, you said -- you were

13  talking about an email from Stuart announcing that he

14  was going to put the -- his land acknowledgment

15  statement back in the syllabus; right?

16      A.   That's correct.

17      Q.   And that was sometime in February?

18      A.   I believe so.

19           (Exhibit 19 marked.)

20      Q.   Is this is 19, Exhibit 19.  No, wait.  This

21  isn't -- no, that's fine.

22           Before we get to that document, I want to

23  ask you quickly about, do you remember -- maybe you

24  still do this.  Do you, do you remember doing kind of

25  town halls for the student body in the Allen School?



Page 190

```
 1      A.    That's right.
 2      Q.    Is it a specific group of students that come,
 3 or is it anyone can come?
 4      A.    It's open to everyone.
 5      Q.    And is there ever a recording of these
 6 meetings?
 7      A.    I don't believe we record those meetings.
 8      Q.    Is anyone taking notes, that you are aware
 9 of?
10      A.    I don't know if anyone is taking notes.
11      Q.    At the -- at these meetings, would you record
12 a list of the students that attended?
13      A.    No.  I mean, we -- there is an RSVP; so...
14 When we -- because we need to know how much food to
15 order.
16      Q.    Okay.  Looking at Exhibit 19.  Take a moment
17 to review it, and then just look up when you are
18 ready.
19      A.    Okay.
20      Q.    This -- what is this document?  What is
21 Exhibit 19?
22      A.    This is a printout of an email.  It says that
23 it's sent on behalf of -- so sent by Stuart Reges to
24 the diversity-allies mailing list.
25      Q.    And what's the date on the email?
```



Page 191

1       A.    February 23, 2022.

2       Q.    And what's the substance of the email?

3       A.    So Stuart talks about, shares a link to the

4    article, where some person called Josh Moody of Inside

5    Higher Education has taken a deep dive into the land

6    acknowledgment issue in a new article just released.

7    And he also shares kind of that, the article explores

8    the pros and cons of land acknowledgments, and

9    describes what happened this quarter when he included

10   his version of the land acknowledgment in the course

11   syllabus.  And also that he plans to continue, what in

12   this email he calls his protest, and kind of when he

13   teaches CSE 142 and will distribute the syllabus on

14   paper, which is more difficult to sensor, he says.

15      Q.    In this -- and on the bottom right, there's a

16   Bates stamp?

17      A.    Um-hum, yes.

18      Q.    And it says, "UW_Reges_0000974"; right?

19      A.    That's correct.

20      Q.    And you've seen this email before; right?

21      A.    Yes.

22      Q.    And because you are on the diversity-allies

23   listserv; right?

24      A.    Yes.

25      Q.    And when you got this email, what was your



Page 199

1  discussed with the Attorney General's Office, why did

2  you feel, before reaching out, that you needed to talk

3  to the Attorney General's Office about Stuart's email

4  on February 23rd?

5      A.   Why?  Oh.  I mean, at that time I was asking

6  input on --

7           ATTORNEY HOSP:  And I'm gonna --

8      A.   Yeah.

9           ATTORNEY HOSP:  -- instruct you not to

10  answer, because that does get into what it is that you

11  actually talked to them about.

12      Q.   So let's look at --

13           (Exhibit 20 marked.)

14      Q.   Do you see in front of you Exhibit 20; right?

15      A.   Yes, I see it.

16      Q.   What is Exhibit 20?

17      A.   It's a printout of some emails.

18      Q.   And looking at the first page, which is

19  Bates-Stamped "UW_Reges_0004330" --

20           ATTORNEY HOSP:  And by the way, just so

21  that, I'm not going to stop you from asking questions

22  about this document, generally, but when we're done

23  today, I'm just noticing that there is one line in

24  this that should have been redacted, that we will grab

25  back and redact.  My guess is you are not going to ask



Page 200

```
 1  questions about that particular sentence.  And I don't
 2  want to, I don't want to hold up the proceeding, so --
 3  because most of this is not privileged.  There is one
 4  particular sentence that I just noticed that is
 5  privileged.
 6              So I just want to put that on the record.
 7  You can go ahead and ask questions.  I mean,
 8  specifically it's the first phrase of the email from
 9  Director Balazinska on February 25th, 2022 at 9:40.
10  It should have been redacted.  Not a big deal.  I
11  don't want to waive any privilege.
12              ATTORNEY DIAZ:  Are you saying just the
13  first sentence, or just the first --
14              ATTORNEY HOSP:  Just, just the first
15  phrase.
16              ATTORNEY DIAZ:  And that's, "Following the
17  recommendation of the" --
18              ATTORNEY HOSP:  Well, yeah.
19              ATTORNEY DIAZ:  Sorry.  We should have
20  went off the record to have this conversation,
21  probably.
22              ATTORNEY HOSP:  Probably.  Why don't we go
23  off the record for a few seconds.
24              ATTORNEY DIAZ:  Yeah.
25              THE VIDEOGRAPHER:  We are now going off
```



Page 201

1    the record.  The time is 2:59 p.m.

2            (Discussion off record.)

3            THE VIDEOGRAPHER:  We're now back on the

4    record.  The time is 3 p.m.

5        Q.   You see the email from Friday, February 25th

6    at 9:40 a.m.?

7        A.   Yes.  Let me actually read this a little bit

8    more carefully.

9        Q.   Well, I actually just want to confirm

10   something with you about that one email.

11           ATTORNEY HOSP:  Well, you can take a

12   moment and just --

13       A.   Yeah.  Okay.

14       Q.   So just, now that you have -- to be clear,

15   you've read the email that's on Bates-stamped

16   "UW_Reges_0004330"?

17       A.   I have.

18       Q.   And at 9:40 a.m., February 25th, 2022,

19   letting Nancy Allbritton, Dan Ratner, and Karen Thomas

20   Brown and Aileen Trilles know that you allowed

21   Stuart's email to the diversity-allies listserv from

22   February 23rd through to the full diversity-allies

23   listserv; right?

24       A.   Right.

25       Q.   And you did that even knowing you would get



Page 202

1    complaints?

2        A.   Yes.  I expected -- like I said, since the

3    email, the way it was phrased and it was related to

4    the topic from January.  January, there had been a lot

5    of strong feelings, a lot of complaints, this is

6    related, so I expected that people would react, which

7    is why I paused on that email.

8              Upon reviewing the -- you know, there's

9    always for moderation guidelines, and I think it

10   should be at the bottom of the list.  Right.  I think

11   you have the guidelines here.  The email on face value

12   did not, so then I let it go through.  What else was I

13   supposed to do?

14       Q.   So even knowing that it would upset others,

15   or even expecting that it would upset others, you

16   allowed the email to go through?

17       A.   I did not see a way to prevent the upset.  I

18   had -- yeah, I didn't see a way to stop the upset from

19   happening.  On the face value, the email was following

20   the moderation guidelines.

21       Q.   Well, we've already talked about how

22   previously when Stuart put his land acknowledgment

23   statement in the winter 22 syllabus, you had the

24   syllabus removed; right?

25       A.   Right.



Page 203

1       Q.    Because you thought it would upset people?

2       A.    Well, that was different.  He put it.  People

3   expressed feelings of upset, and then I had to take

4   action.  Like here, I mean, honestly, I couldn't be

5   sure how people would react.  You asked me -- I mean,

6   I read the email.  I'm like, it doesn't upset me more

7   than anything that happened, so I don't know for sure

8   how people would react.  I worried.  But at face

9   value, it seemed fine, so I let it go through.

10      Q.    So after this email went through to

11  diversity-allies listserv, do you remember what

12  happened next?

13      A.    Right.  As the email says, I did receive some

14  complaints, including the email that's in this

15  Exhibit 20.

16            (Exhibit 21 marked.)

17      Q.    You have Exhibit 21 in front of you?

18      A.    I see it.

19      Q.    What is the first page of Exhibit 21?

20      A.    The first page is a printout of an email.

21      Q.    And who is the email from?

22      A.    The email, the printout says it's from me on

23  March 2nd to Stuart Reges, cc Aileen Trilles.

24      Q.    And turning to the next page, which is

25  "UW_Reges_0001019"; correct?



Page 204

 1      A.   Correct.

 2      Q.   What is this document?

 3      A.   So this document looks consistent with the

 4 25-71 letter that I emailed Stuart.

 5      Q.   And what's the date on this letter?

 6      A.   March 2nd, 2022.

 7      Q.   And do you have any reason to think that this

 8 isn't the -- an accurate copy of the letter that you

 9 sent to Stuart on March 2nd?

10      A.   I don't.

11      Q.   Because it is the letter you sent to Stuart;

12 right?

13      A.   I expect that it is.

14      Q.   Now, you sent this letter, was -- about one

15 week after his email went through; right?  To the

16 diversity-allies listserv?

17      A.   That's right.  The email was February 23rd,

18 20.  Something like that.

19      Q.   And before you sent him the March 2nd 25-71

20 letter, you had -- did you have conversations with

21 others about whether you should send such a letter?

22           ATTORNEY HOSP:  I'll just instruct you to

23 leave off any communications you had with attorneys or

24 anybody at the Attorney General's Office.

25           THE WITNESS:  Oh, sure.



Page 220

1    the in-person meeting.  So to under- -- to kind of go

2    through, Okay, how such a meeting works and what are

3    we supposed to say, and mostly saying that what we are

4    supposed to say in the content of the letter, and then

5    working on the resolution.

6         Q.   Did you talk about anything else at that

7    meeting?

8         A.   Not that I recall.

9              ATTORNEY HOSP:  While you think about that

10   other question, I forgot my pen in the other room.

11             THE VIDEOGRAPHER:  Stop?

12             ATTORNEY HOSP:  We don't need to go off

13   the record.

14             (Discussion off record.)

15             ATTORNEY DIAZ:  Can I have 59B, please.

16   We were just looking at it.  Thank you.

17             (Exhibit 22 marked.)

18        Q.   So you have in front of you Exhibit 22?

19        A.   Yes, I see it.

20        Q.   And turning to the second page of Exhibit 22,

21   you see on the bottom right it says, Bates-stamped

22   "UW_Reges_0001072"?

23        A.   I see that.

24        Q.   Why don't you take a minute to peruse the

25   letter --



Page 221

```
 1        A.    Okay.

 2        Q.    -- and then we can discuss it.

 3        A.    Okay.

 4        Q.    So you've reviewed the letter?

 5        A.    I've read the letter, yes.

 6        Q.    So Exhibit 22 is a letter describing the

 7   proposed resolution you came up with; right?

 8        A.    That's correct.

 9        Q.    And it was sent to Stuart, March 9th, 2022?

10        A.    That's correct.

11        Q.    And do you see where it says on

12   page Bates-Stamped 1072, "Under this proposed

13   agreement"?

14        A.    I see that.

15        Q.    What did you propose in order to resolve the

16   25-71 process?

17        A.    I mean, the key was the second bullet:  "You

18   agree not to include the statement that you have

19   called your version of the land acknowledgment that

20   was published in the CSE 143 winter 2022 online course

21   syllabus in the online and print copy of the CSE 142

22   spring 2022 syllabus, or in other future course

23   syllabi," that was the key point, and that was one

24   proposed resolution.

25                   As we indicated in the letter, we also
```



Page 226

1  statement, and he chooses to nevertheless include it,

2  I mean, that -- it's hard to say he's trying to be,

3  you know, creating an environment conducive to

4  learning, given that sequence.

5      Q.   And the last line of this letter, the final

6  paragraph, it asks Stuart to, if he accepts all terms

7  and conditions, to let you know no later than

8  March 14th -- March 15th, 2022; right?

9      A.   Yes.

10     Q.   And the last line of the letter reads, "If

11 you prefer not to accept this agreement by that date,

12 which is your decision, we will then proceed with next

13 steps in accordance with the Faculty Code"; right?

14     A.   That's right.

15     Q.   In your opinion, has Stuart ever shown a lack

16 of respect to his students?

17     A.   Stuart had previously made statements that

18 have upset students.

19     Q.   But did he show -- did he treat them in a way

20 that was disrespectful?

21          ATTORNEY HOSP:  Object to the form.

22     A.   I would say, honestly, I also don't know in

23 the sense that, like, I'm not in his classes.  I don't

24 see how he interacts with students, so this is a very

25 vague question.



Page 227

1      Q.   Do you have any reason to believe that he has

2   treated his students disrespectfully?

3           ATTORNEY HOSP:   Objection to the form.

4      A.   What I see is when someone submits a

5   complaint -- and definitely Stuart has made statements

6   and students have sent complaints, students have sent

7   letters.   Even before this incident, they have sent

8   letters.   That's what I see.

9      Q.   Did any of those letters say that Stuart

10  Reges treated them disrespectfully?

11     A.   I don't remember the content of all the

12  letters.

13          ATTORNEY HOSP:   And for the record, we

14  have produced the letters.

15     Q.   How did -- do you recall how Stuart responded

16  to this proposal?

17     A.   I recall that he sent me a short email saying

18  that he was declining that resolution.   I forgot the

19  exact wording.

20     Q.   And do you remember in the weeks that

21  followed, meeting with Nancy Allbritton to discuss the

22  proposed resolution meeting that you had with Stuart

23  Reges?

24     A.   That's correct.   So once Reges declined the

25  resolution, I must have -- I mean, Aileen was copied.



Page 228

1    I let her know.  And then Aileen takes the next step

2    to talk to the dean, and then I did speak with the

3    dean just to let her know.  I mean, she already knew.

4         Q.   And -- but you had a meeting with the dean?

5         A.   I did remember having a meeting with the

6    dean.

7         Q.   And how long did that meeting last, about?

8         A.   I did not have a separate meeting with the

9    dean.  I have, like, monthly meetings with the dean,

10   and this was one item that -- so it was part of that

11   longer meeting, where we moved on to other agenda

12   items.  We did not discuss this much.

13              ATTORNEY DIAZ:  73.

14              (Exhibit 23 marked.)

15        Q.   Do you have Exhibit 23 in front of you?

16        A.   Yes, I see Exhibit 23.

17        Q.   What is it?

18        A.   It, it looks like a printout of an email from

19   me to Nancy, entitled "25-71 Consultation."

20        Q.   And it's from March 21st, 2022?

21        A.   That's correct.

22        Q.   And the Bates stamp on the bottom reads

23   "UW_Reges_0000917"; right?

24        A.   That's correct.

25        Q.   And do you see where it says, "On March 21st,



Page 233

1    statement, we have started the process.  We were

2    unable to find a -- to achieve a resolution.  I was

3    worried students would be upset again.

4              I actually tried to notify some of the

5    students I knew had been upset and had complained that

6    we were following the process in the faculty code, and

7    that I had asked him to remove it, but I was unable to

8    prevent him from having it in, and that the process

9    was unfolding.

10             I did that and the quarter started.  We

11   received one letter from the Native American faculty

12   when that started, but I did not receive other

13   complaints from students at that time, so I did not

14   take any action.

15        Q.   And going forward since the spring 2022

16   quarter, Stuart has continued to include the land

17   acknowledgment statement in his syllabus; right?

18        A.   I believe that's the case.

19        Q.   And have you received complaints since,

20   starting with the fall 2022 quarter about Stuart's

21   syllabus?

22             ATTORNEY HOSP:  Object to the form.

23             You can answer.

24        A.   So in fall 2022, I believe that actually

25   Stuart took time in class to explain the -- like, you



Page 234

1   know, to explain his perspective on the whole

2   situation.  He actually posted the video online.

3   Someone pointed it at me.  That's how, that's how I

4   know.  And I did not receive any complaints, so I did

5   not take any action.

6       Q.   And did you receive any complaints about the

7   land acknowledgment statement in Stuart's syllabus

8   after fall 2022?

9       A.   I did not receive any complaints, so I did

10  not take any action.

11      Q.   But while -- going back to -- strike that.

12           And since fall 2022, are you aware of any

13  disruption in Stuart's classroom related to a land

14  acknowledgment statement?

15           ATTORNEY HOSP:  Object to the form.

16           You can answer.

17      A.   I'm not aware of disruptions.

18      Q.   And there haven't been any disruptions in

19  Stuart's class relating to his land acknowledgment

20  statement; right?

21           ATTORNEY HOSP:  Object to the form.

22      A.   I mean, when?

23      Q.   Since, at least since fall 2022, there

24  haven't been any disruptions to Stuart's -- in

25  Stuart's class?



Page 235

1          ATTORNEY HOSP:  Same objection.  Asked and

2     answered.

3     A.    Right.  So in fall 20- -- again, there's

4     context; right?  We notified students that a process

5     was in progress.  Of course students all talk to each

6     other.  Teaching assistants are one group of students,

7     so there's definitely awareness.  Stuart took the time

8     to explain what he was doing, and I have not -- I'm

9     not aware of any disruptions, and I have not taken any

10    action.

11    Q.    Stuart explained why he was filing a lawsuit,

12    believing that he had a first amendment right to

13    include the statement in his syllabus.  Students

14    didn't -- did any student respond during the class?

15    A.    I was not in class, so I don't know.

16    Q.    Well, you said you watched the video; right?

17    A.    I only saw those first minutes when he was

18    talking.

19    Q.    So he talked about the land acknowledgment

20    statement and his lawsuit for just a few minutes?

21    A.    I forget how many minutes.  The video is

22    online.

23    Q.    And you just watched those few minutes?

24    A.    That's right.

25    Q.    Okay.  In April, Dean Allbritton sent a



Page 243

```
 1              ATTORNEY DIAZ:  103.
 2     Q.   So as a part of Stuart -- after your
 3  March 2nd letter -- strike that.  I'll pause for a
 4  second.  I need that.
 5              I think earlier you said that Stuart, or
 6  that Dean Allbritton had sent Stuart a letter
 7  notifying him that she was forming a committee to
 8  investigate allegations against him; right?
 9     A.   I mean, I believe that is the step in the
10  faculty code.  I believe such letter should have been
11  sent.
12     Q.   And does it sound right that that was in late
13  April?
14              ATTORNEY HOSP:  Object to the form.
15     A.   It should have -- I expect there should have
16  been something in the spring, yes.
17     Q.   Do you remember in June of 2022 there was a
18  merit pay increase given to faculty?
19     A.   The merit pay increase is actually in the
20  September -- takes place in September 1st.
21     Q.   Okay.  Do you remember in June receiving
22  notification that there was going to be a merit pay
23  increase?
24     A.   That's correct, yes.
25              (Exhibit 26 marked.)
```



Page 244

```
 1        Q.    Do you have in front of you Exhibit 26?

 2        A.    I see it.

 3        Q.    And what is, looking at the first page of

 4   Exhibit 26, labeled Bates-stamped "UW_Reges_0004324,"

 5   what is this -- what is Exhibit 26?

 6        A.    This looks like a email printout from an

 7   email from Nancy Allbritton to the engineering chairs

 8   and engineering administrators.

 9        Q.    Are you on either of those listservs?

10        A.    Yes.  I'm on the engineering chairs listserv.

11        Q.    So you received this email?

12        A.    I should have received this email, yes.

13        Q.    Do you remember receiving the email?

14        A.    I don't remember receiving this email,

15   specifically, but I remember that there was a merit

16   increase last summer.

17        Q.    And going to the middle of the page, do you

18   see where it says -- there's a bullet, and it says,

19   "For any faculty cases that fall under Faculty Code

20   Section 25-71, please be sure to touch base with

21   Aileen Trilles" -- gives her email address -- "to

22   confirm whether or not a faculty member is deemed

23   nonmeritorious or whether their merit should be held

24   in abeyance."

25        A.    I see that.
```

