*Reges v. Cauce, et al.*

# Exhibit JJ
# to Declaration of
# Gabriel Walters

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

STUART REGES,                          )   No.

                Plaintiff,     )   2:22-cv-00964-JHC

      vs.                              )

ANA MARI CAUCE, et al.,                )

                Defendants.    )


--------------------------------------------------------

Videotaped

Deposition Upon Oral Examination Of

NANCY ALLBRITTON

--------------------------------------------------------

June 20, 2023

401 Union Street, Suite 3300, Seattle, Washington

Magna Legal Services

(866) 624-6221

www.MagnaLS.com




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704



Page 3

```
 1   APPEARANCES (Cont'd)

 2   And:                AARON P. BRECHER

 3                       Orrick

 4                       401 Union Street  Suite 3300

 5                       Seattle, Washington  98101

 6                       (206) 839-4332

 7                       Abrecher@orrick.com

 8   Also Present:      Tania Grant (videographer)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
                                                      Page 4
 1   E X H I B I T S

 2   NO.      DESCRIPTION                        MARKED

 3   30       December 8, 2021 email to Ed          38

 4            Lazowska and others from Stuart Reges

 5   31       Email chain, top email January 4,     50

 6            2022 to Aileen Trilles and others

 7            from Magdalena Balazinska

 8   32       January 5, 2022 email to Magdalena    77

 9            Balazinska, and others, from

10            Aileen Trilles

11   33       Email chain, top email January 4,     81

12            2022 to Aileen Trilles and others

13            from Magdalena Balazinska

14   34       Email chain, top email to Magdalena   82

15            Balazinska and others, from Nancy

16            Allbritton

17   35       Email chain, top email March 25,     154

18            2022 to Heather Hoeksema, and others,

19            from Lucia Ersfeld

20   36       June 7, 2022 email to engr-chairs and 180

21            others, from Nancy Allbritton

22   37       July 11, 2022 email to Louisa        183

23            Mackenzie, and others, from Nancy

24            Allbritton

25
```



```
                                                        Page 5
 1    E  X  H  I  B  I  T  S  CONT'D
 2   NO.      DESCRIPTION                       MARKED
 3   38       Letter from Kayla Marie Shuster        190
 4   39       March 2, 2022 letter to Teaching       192
 5            Professor Stuart Reges from Magdalena
 6            Balazinska
 7   40       March 9, 2022 letter to Teaching       193
 8            Professor Stuart Reges from Magdalena
 9            Balazinska
10   41       Email chain, top email to Rickey L.    193
11            Hall, and others, from Magdalena
12            Balazinska
13   42       Email chain, top email March 28,       198
14            2022 to Nancy Allbritton, and others,
15            from Heather Hoeksema
16
17    E  X  A  M  I  N  A  T  I  O  N
18   BY                      PAGES
19   ATTORNEY WALTERS        7 - 202
20
21
22   *****  (*  Denotes phonetic spelling.)
23
24
25
```



Page 50

```
 1        Q.    Might they have come up?

 2        A.    Anything is possible, but it's highly

 3   unlikely, because I don't recall it.

 4        Q.    Do you know what Ed Lazowska's opinion on

 5   land acknowledgments is?

 6              ATTORNEY HOSP:  Objection.  Asked and

 7   answered.

 8              You can answer.

 9        A.    No, I don't, I don't know what Ed's attitudes

10   are.

11        Q.    I don't believe I asked it this way:  Do you

12   know if Ed Lazowska has an opinion on land

13   acknowledgment statements?

14        A.    I don't recall ever knowing Ed's opinions.

15        Q.    Has Ed Lazowska ever been subject to a 25-71

16   faculty code process?

17        A.    I do not recall that during my tenure as

18   dean.

19        Q.    During your tenure as dean, you have never

20   been involved with a Faculty Code 25-71 process with

21   respect to Ed Lazowska; correct?

22        A.    That is correct, I do not recall being

23   involved in one.

24              (Exhibit 31 marked.)

25        Q.    Would the court reporter please let me know
```



Page 51

1    what the exhibit number is?

2              THE COURT REPORTER:   31.

3        Q.   Dean Allbritton, do you have Exhibit No. 31

4    in front of you?

5        A.   Yes.

6        Q.   I'll give you a moment to look it over.

7    Please indicate when you are ready to procedure.

8              The Bates stamp on the first page of this

9    exhibit is "UW_Reges_0000032."  Does that appear on

10   your copy as well?

11       A.   I'm not seeing that anywhere.

12       Q.   The lower right corner of the document.

13       A.   Oh, oh, yes.  Okay.  Yes, I see that.

14       Q.   Turning to the last page of this exhibit.

15   First of all, let me ask you:  What does this exhibit

16   appear to be?

17       A.   This exhibit appears to be an email chain

18   initiated by Dr. Balazinska.

19       Q.   And the date on top of the document on the

20   first page is January 4th, 2022, 5:56 and 14 seconds

21   p.m.; do you see that?

22       A.   Yes, I do.

23       Q.   And in the "To" field, we have the name

24   "Aileen Trilles"; do you see that?

25       A.   Yes.



Page 52

```
 1       Q.    And in the "cc" field, your name, "Nancy
 2   Allbritton" appears.  Do you see that?
 3       A.    Yes.
 4       Q.    Did you receive this document?
 5       A.    Yes.
 6       Q.    Do you recall seeing this document before?
 7       A.    I do recall having seen this document before.
 8       Q.    Did you review this document to prepare nor
 9   this deposition today?
10       A.    I saw this document, yes.
11       Q.    Turning to the third and final page of this
12   exhibit, it's an email chain, so it's probably helpful
13   to go in reverse chronological order.  And the last
14   email in the chain is dated January 4th, 2022, and it
15   appears to be from Magdalena Balazinska, or Magda
16   Balazinska, to Stuart Reges.  Do you agree?
17       A.    Yes.
18       Q.    Have you seen the content of this email
19   message in this chain before?
20       A.    Yes, I believe so.
21       Q.    The first sentence says, "I ask that you
22   remove the land acknowledgment statement from your
23   course syllabus immediately," and "land
24   acknowledgment" is in quotes.  Do you know what that
25   land acknowledgment statement refers to?
```



Page 53

```
 1      A.   I did not write this email, so I don't know

 2  what Magda was referring to.

 3      Q.   And again, the document is dated January 4th,

 4  2022.  Do you believe that this document refers to the

 5  statement we reviewed earlier in the winter 2022

 6  quarter that Stuart Reges placed in his CSE 143

 7  syllabus?

 8      A.   Yes, based on what I'm reading.

 9      Q.   And you have no reason to believe otherwise;

10  correct?

11      A.   Yes.

12      Q.   The next sentence says, "It is offensive and

13  it creates a toxic environment in your course, which

14  is a required course in our major."  Do you believe

15  that Stuart's statement is offensive?

16      A.   Yes.

17      Q.   Why?

18      A.   I think it dehumanizes Native Americans.

19      Q.   How does it dehumanize Native Americans?

20      A.   Just my opinion, but it seems to not

21  acknowledge their existence.  Others may feel

22  differently, but that's how I read that statement.

23      Q.   And the statement, again, is, "I acknowledge

24  that...the Coast Salish people can claim historical

25  ownership of almost none of the lands currently
```



Page 54

1    occupied by the University of Washington."

2                Do we agree that that's the statement

3    we're presently discussing?

4        A.   I don't think that's the exact wording --

5        Q.   Excuse me.  I apologize for interrupting you,

6    but you are correct.  Let me read you the statement.

7    I'll state it again, and then I'll ask again.

8                "I acknowledge that by the labor theory of

9    property, the Coast Salish people can claim historical

10   ownership of almost none of the land currently

11   occupied by the University of Washington."  Do we

12   agree that that is the statement that we're presently

13   discussing?

14       A.   Yes, I believe that's the statement.

15       Q.   Thank you for the correction.  I didn't mean

16   to misspeak.

17               What is it about those words that denies

18   the existence of the Coast Salish people?

19       A.   I just think the way the whole sentence flows

20   denies it.  This is just my personal opinion.

21       Q.   And what is it about the way that the

22   sentence flows that denies the existence of the Coast

23   Salish people?

24       A.   I think -- I don't -- again, this is my

25   opinion and my reaction to it.  Other people may have



Page 55

1    a different reaction.  I can't explain how other

2    people feel.

3         Q.   Can you explain how you feel?

4         A.   I feel that it's offensive and it dehumanizes

5    Native Americans.

6         Q.   And so what I'm trying to do is probe why

7    that is.  Why do you feel that it's offensive and

8    dehumanizes Native Americans?

9         A.   That's my reaction to it.

10        Q.   Why do you suppose you have that reaction to

11   it?

12        A.   I don't really know.

13        Q.   It strikes you as offensive; is that correct?

14             ATTORNEY HOSP:  Objection to the form.

15        A.   Yes, I find it offensive.

16        Q.   And you've testified "that's just my

17   opinion"; is that correct?

18        A.   That is correct.

19        Q.   And I believe you testified that other people

20   can have different opinions in reaction to this

21   statement; is that correct?

22        A.   I don't know about other people's reactions.

23        Q.   Would you say that Stuart's statement

24   expresses a viewpoint?

25        A.   In my opinion, yes, it does.



Page 89

1    question?

2                    (Reporter read back as requested the

3                     question that was pending.)

4                    ATTORNEY HOSP:  Object to the form.

5                    You can answer.

6        A.   We just discussed -- that assumes that it

7    went out, and we just discussed that I was not clear

8    whether it actually went out, so I can't answer that

9    question.

10                   ATTORNEY WALTERS:  40, please.  I'm sorry.

11   This exhibit has been marked.

12       Q.   Dean Allbritton, do you have Exhibit No. 27

13   in front of you?

14       A.   Yes, I do.

15       Q.   What is this document?

16       A.   This appears to be the document that I sent

17   to Dr. Reges, notifying him of the conclusion of the

18   25-71 process.

19       Q.   And you've seen this document before;

20   correct?

21       A.   Yes, I have.

22       Q.   Your signature is on this document; correct?

23       A.   Yes, it is.

24       Q.   Did you review the content of this document

25   before signing it?



Page 90

```
 1      A.   Yes, I did.

 2      Q.   Did you make any edits to any draft of this

 3 document?

 4      A.   Yes, I did.

 5      Q.   As signator, are you responsible for the

 6 content of this document?

 7      A.   Yes.

 8           ATTORNEY HOSP:   Objection to the form.

 9           But you can answer.

10      A.   Yes.

11      Q.   I'll rephrase, just to see if I can clean it

12 up.

13           Do you take responsibility for the content

14 of this document as a signatory?

15      A.   Yes.

16      Q.   And Director Balazinska and Aileen Trilles

17 are copied on this document; is that correct?

18      A.   Yes, that's correct.

19      Q.   And what's the date on the document?

20      A.   June 13.

21      Q.   What's the year?

22      A.   2023.

23      Q.   Thank you.  And that's a week ago today;

24 isn't it?

25      A.   Yes.
```



Page 92

1      Q.   And what did those -- strike that.

2           Did those complaints follow from Stuart's

3   statement in his course syllabus that we reviewed

4   earlier in this deposition?

5      A.   Yes.

6      Q.   The third paragraph of this letter says that,

7   "The SIC's investigation established the following

8   facts and provisional conclusions, based on multiple

9   interviews with directly affected parties, including

10  staff and students, and on review of contemporaneous

11  documents and of your public statements about this

12  matter"; do you see that?

13     A.   I do.

14     Q.   And by "your public statements," you are

15  referencing Stuart himself; correct?

16     A.   Yes, that is correct.

17     Q.   Do you know how many interviews the special

18  investigating committee conducted?

19     A.   I do not know how many interviews they

20  conducted.

21     Q.   Did they give it -- did they give you any

22  record of those interviews?

23     A.   I received an oral report out, but I received

24  no written record.

25     Q.   You didn't receive any work product on paper



Page 93

```
 1   or electronic documents from the special investigating
 2   committee; is that correct?
 3       A.   No, I did not.
 4       Q.   Other than the oral report that they gave
 5   you; correct?
 6       A.   That is correct.
 7       Q.   Did you ask them to report to you orally?
 8       A.   Yes.
 9       Q.   Why is that?
10            ATTORNEY HOSP:  Just to be clear.  To the
11   extent that your answer would indicate any discussions
12   with counsel, I instruct you not to respond.  But
13   beyond that, you can respond.
14       A.   It's a seemingly fine, reasonable way to
15   report out.
16       Q.   I'm trying to recall your prior testimony as
17   to whether you have overseen Faculty Code Section
18   25-71 investigations on prior occasions.  I don't
19   recall if I asked you that.  Have you seen, have you
20   overseen Faculty Code Section 25-71 investigations on
21   occasions, other than Stuart Reges?
22       A.   Yes, I have.
23       Q.   Has it been your practice on those other
24   occasions to ask for oral reports from the special
25   investigating committees?
```



Page 146

```
1              And so this sentence begins "You agree,"
2    and is it your understanding that Stuart did not agree
3    to this?
4         A.   Yes, that is my understanding.
5         Q.   And that's part of what you mean when you
6    testified earlier, that this was at a dead end; is
7    that correct?
8         A.   That -- yes, that no resolution could be
9    reached.
10        Q.   What if Stuart had, as a result of this
11   meeting, agreed to remove the statement from his
12   course syllabi, would that have been progress?
13        A.   Yes.
14        Q.   And there are other items here, too, that
15   constitute some of the material terms of that proposal
16   as you describe it in this letter.  What if Stuart had
17   agreed to remove the land acknowledgment statement
18   from his syllabus, would that have satisfied the other
19   terms listed here?
20             ATTORNEY HOSP:  Object to the form.
21             You can answer.
22        A.   I think the other terms could be satisfied,
23   unless he did something new.
24        Q.   "Something new," meaning putting the same
25   statement or similar statement back into a syllabus in
```



Page 147

1    the future, or meaning something else?

2        A.   Or some other behavior.

3        Q.   And as to "some other behavior," you are

4    saying it's possible he could have violated these

5    other things by doing something else, but that's

6    speculative inherently.  Would you agree with that?

7        A.   Right.  The intent was that we had a good

8    learning environment going forward.

9        Q.   So if Stuart had agreed to all of these

10   material terms and removed the statement from his

11   syllabus, would that have resolved the 25-71 matter?

12       A.   Yes.  It would never have come to me.

13       Q.   And the other terms, let's just look at them

14   as quickly but also as thoroughly as we can.  It says,

15   "You acknowledge and agree that as an Allen School

16   faculty member you will interact with peers, staff,

17   and students in a way that," and there's a colon and a

18   subbullet.  The first subbullet says, "Demonstrates

19   respect toward all and encourages a spirit of respect

20   in all interactions and forums."  Do you know what

21   that means?

22       A.   Yes.  It means treat people well.  Engage in

23   a positive way.  Have constructive discussions.  Those

24   are just examples.

25       Q.   Was it Stuart's land acknowledgment statement



Page 148

1   in his course syllabi that did not treat people well,

2   in your words?

3          ATTORNEY HOSP:  Object to the form.

4      A.   I believe, as I said earlier, that it

5   denigrated people that, that's not treating people

6   well.

7      Q.   And the next subbullet says, "Creates and

8   maintains a professional, positive, and welcoming

9   environment that is conducive to learning, teaching,

10  research, and service."  If Stuart had removed the

11  land acknowledgment statement from his syllabus, and

12  done nothing else to violate this subbullet point,

13  would this bullet point be resolved, in your opinion?

14         ATTORNEY HOSP:  Object to the form.

15     A.   If he did nothing else to violate this

16  subbullet, then that would have been wonderful.

17     Q.   Would that have been the end of it?

18         ATTORNEY HOSP:  Object to the form.

19     Q.   Would that be -- would that have resolved the

20  25-71 process?

21     A.   If he agreed to the entire resolution, or if

22  he just agreed to a subpart of?

23     Q.   Well, the entire resolution here.

24     A.   Yes.  It would have completely terminated at

25  that point.



Page 149

1      Q.   And this subbullet point is a part of the

2   entire resolution; correct?

3      A.   Yes.

4      Q.   The next subbullet says, "If expressing

5   dissent or attempting to produce change in the

6   workplace, does so while remaining respectful to all,

7   and in a way that maintains a professional, positive,

8   welcoming, and supportive environment."

9           Just talking about this instance, the land

10  acknowledgment statement, what you've called the

11  disruption to the learning environment and the 25-71

12  process that followed from it, is it Stuart's land

13  acknowledgment and those other items I just mentioned

14  that constitutes -- well, is it not remaining

15  respectful to all and in a way that maintains a

16  professional, positive, welcoming, and supportive

17  environment, in these words?

18     A.   Could you start from the beginning --

19          (Crosstalk.)

20     Q.   I understand that came out in a confusing

21  fashion.

22          You testified earlier that there are

23  possible ways Stuart might have violated some of these

24  subbullet points, and I said that's inherently

25  speculative, and I think we agreed on that.  You



Page 150

1    recall that; correct?

2        A.   Yes.

3        Q.   If Stuart had done none of those, what I'll

4    call them, "colloquially bad behaviors" and removed

5    the land acknowledgment statement, would that have

6    satisfied this third subbullet point that we're

7    looking at now?

8        A.   Yes.

9        Q.   And the last bullet point on this page says

10   that, "You agree that you will avoid any retaliation."

11   You see where I am; correct?

12       A.   Yes.

13       Q.   "Even the appearance of same"; correct?

14       A.   Yes.

15       Q.   Did you ever have any reason to believe that

16   Stuart Reges did retaliate against persons who

17   complained about his land acknowledgment statement?

18       A.   No, I did not.

19       Q.   Did you have any reason to believe that he

20   might retaliate against anyone who complained?

21       A.   Not specifically, no.

22       Q.   Did you have any reason to believe that

23   Stuart Reges would have created the appearance of

24   retaliation because of complaints?

25       A.   No, I do not.



Page 178

```
 1        A.    Oh.

 2        Q.    I'll ask my next question.

 3              Looking at page 5 of this letter,

 4   Exhibit 27.  Within the second-to-last paragraph on

 5   this page, there's a sentence that begins, "Therefore

 6   your merit, which has been automatically held in

 7   abeyance pending this investigation in accordance with

 8   university policy, will be reinstated and you will

 9   receive merit for academic year 2021 to 2022 and

10   academic year 2022 to '23."  Are you with me?

11        A.    Yes, I am.

12        Q.    What university policy does that sentence

13   refer to?

14        A.    I don't know the exact code policy number.

15        Q.    So if I were to ask you where I can read

16   that, you wouldn't be able to point me to a citation;

17   is that correct?

18              ATTORNEY HOSP:  Objection to form.

19              You can answer.

20        A.    At the current time, at this very moment, I

21   could not.

22        Q.    Do you know if it's -- do you know if it's a

23   written policy?

24        A.    I think this is the discussion of merit, and

25   the review process for merit I do believe is a written
```



Page 179

1   policy.

2      Q.   When did you first learn that merit pay would

3   be automatically held in abeyance pending a Faculty

4   Code Section 25-71 investigation?

5      A.   This was typical practice at the university.

6   When there's a 25-71, merit is held in abeyance.

7      Q.   How do you know that it's typical practice?

8      A.   All of the 20- -- all of the 25-71s that I

9   can remember have had merit held in abeyance.

10     Q.   And that dates back to when you arrived in

11  2019, if I remember correctly; is that right?

12     A.   That's correct.

13     Q.   In your capacity as dean of the college of

14  engineering; correct?

15     A.   That's correct.

16     Q.   How many Faculty Code Section 25-71

17  investigations have you seen during that time, where

18  merit pay was held in abeyance for the pendency of the

19  investigation?

20     A.   I would say the majority.

21     Q.   How many total Faculty Code Section 25-71

22  investigations have you ever seen?  And I think you

23  testified to this earlier, but I just want to recall

24  that information with reference to this conversation

25  now.  So the question is:  How many total?



Page 183

1  reporter please read back the previous question and

2  answer.

3              (Reporter read back as requested.)

4              ATTORNEY WALTERS:  Let's take a ten-minute

5  break.  We'll check the time, and see where we are.

6              THE VIDEOGRAPHER:  We're now going off the

7  record.  The time is 2:58 p.m.

8              (Recess.)

9              THE VIDEOGRAPHER:  We're now back on the

10 record.  The time is 3:13 p.m.

11             (Exhibit 37 marked.)

12    Q.    Dean Allbritton, do you have Exhibit No. 37

13 in front of you?

14    A.    Yes, I do.

15    Q.    What is this -- before I ask that question,

16 apologies, let me ask you:  Is this document stamped

17 at the lower right "UW_Reges_0000884"?

18    A.    Yes.

19    Q.    What is this document?

20    A.    This appears to be an email to the members of

21 the SIC, basically with a -- with the charge letter.

22    Q.    The charge letter, which tasks the committee

23 with investigating Stuart Reges under Faculty Code

24 Section 25-71; is that correct?

25    A.    That is correct.



Page 184

```
 1      Q.   And you sent this email; correct?

 2      A.   Yes, I did.

 3      Q.   On July 11th, 2022; correct?

 4      A.   Yes.

 5      Q.   Do you remember sending this email?

 6      A.   I don't, specifically, remember hitting the

 7 button to send, no.

 8      Q.   Do you remember sending this message to the

 9 special investigating committee?

10      A.   I know that I sent this message to the

11 special investigating committee.

12      Q.   And there are bullet points here on this

13 email under the sentence, "Attached is the confident

14 shall charge letter and corresponding documentation."

15 And those bullets say, "Bias incident report, Email

16 from Native faculty and staff, 25-71 Notification, and

17 25-71 Resolution Agreement"; is that correct?

18      A.   Yes, that's correct.

19      Q.   And do you recall attaching those documents

20 to this email?

21      A.   Yes.

22      Q.   The following sentence says, "I request that

23 the investigation be completed by August 16th, 2022 if

24 possible."  Why did you make that request to the

25 committee?
```



Page 185

```
 1      A.   We were -- I was trying to have the committee
 2  finish in a timely fashion, if it were possible.
 3      Q.   Other than finishing their work in timely
 4  fashion, is there any significance to the August 16th,
 5  2022 date?
 6      A.   No.
 7      Q.   Was August 16th, 2022 prior to the start of
 8  the fall '22 quarter?
 9      A.   Yes, it was.
10      Q.   Did you wish to reach a conclusion with
11  respect to Stuart Reges and this process prior to the
12  start of the fall 2022 quarter?
13      A.   I don't recall having that as a specific
14  goal.
15      Q.   Do you have Exhibit No. 24 in front of you?
16      A.   Yes.
17      Q.   And the stamp at the bottom right, is that
18  "UW_Reges_0000887"?
19      A.   Yes.
20      Q.   Is this the July 11th charge letter to the
21  special investigative committee?
22      A.   Yes.
23      Q.   Near the bottom of the second page, there's a
24  sentence that reads, "Teaching Professor Reges has
25  expressed that he believes the allegations concern
```



Page 190

1    now.  Is it accurate to say that you couldn't remember

2    whether it was in the first quarter of this year?

3        A.    That is accurate.

4        Q.    Might it have been in the second quarter of

5    this year?

6        A.    Of 2023, you are talking about?

7        Q.    For the oral report, specifically, yes.

8        A.    I don't think so.

9        Q.    So then is it likely that it was during the

10   first quarter of 2023?

11       A.    I don't know.

12       Q.    Was it in the fourth quarter of 2022?

13       A.    It could have been.  I just don't recall the

14   date.

15              (Exhibit 38 marked.)

16       Q.    Dean Allbritton, do you have Exhibit 38 in

17   front of you?

18       A.    Yes.

19       Q.    Is this the document stamped

20   "UW_Reges_0000885"?

21       A.    Yes.

22       Q.    What is this document?

23       A.    This appears to be a document from Kayla

24   Shuster, the recruiter for diversity and access in the

25   Allen School.



Page 191

```
 1        Q.   Is she an Allen School staffer?

 2        A.   I believe she is.

 3        Q.   Have you seen this document before?

 4        A.   Yes, I have.

 5        Q.   Was this an attachment to your charge

 6   communication to the special investigating committee?

 7        A.   I believe it was, yes.

 8        Q.   Was this the statement that was labeled "bias

 9   incident report" in your charge communication to the

10   committee?

11        A.   I believe it was, but I would have to go back

12   and pull that email.

13             (Discussion off record.)

14             ATTORNEY WALTERS:  Dave, this is

15   Exhibit 21 from yesterday.

16             ATTORNEY HOSP:  All right.

17             ATTORNEY WALTERS:  Aaron, if you want to

18   follow along.

19             ATTORNEY BRECHER:  Sure.

20             ATTORNEY WALTERS:  This is the attachment

21   that's included within Exhibit 21 from yesterday.

22        Q.   Dean Allbritton, do you have Exhibit 21 in

23   front of you?

24        A.   Yes.

25        Q.   And the stamp on that document, is it
```



Page 192

1    "UW_Reges_0000898"?

2         A.    No.  It's 1018.

3         Q.    I apologize.  Could you turn to the second

4    page of the document, please.  What is the stamp on

5    the second page?

6         A.    "UW_Reges_00001019."

7         Q.    I'll give you a different exhibit.

8               (Exhibit 39 marked.)

9         Q.    In the course of these productions, we get

10   multiple copies of these.

11              ATTORNEY HOSP:  This is Exhibit 39?

12              ATTORNEY WALTERS:  39, that is correct.

13        Q.    Dean Allbritton, do you have Exhibit No. 39

14   in front of you?

15        A.    Yes, I do.

16        Q.    And is that the document stamped

17   "UW_Reges_0000898"?

18        A.    Yes, it is.

19        Q.    And what is this document?

20        A.    It appears to be Dr. Balazinska's

21   notification to initiate the 25-71 process.

22        Q.    And is this letter also included as an

23   attachment to your charge communication to the

24   committee?

25        A.    Yes, I believe it is.



Page 193

1              (Exhibit 40 marked.)

2              ATTORNEY HOSP:  Are we remarking this?

3              ATTORNEY WALTERS:  I believe we are.

4     Q.   I believe this is Exhibit No. 40.  Do you

5  have Exhibit 40 in front of you?

6     A.   Yes.

7     Q.   Is Exhibit 40 stamped "UW_Reges_0000896"?

8     A.   Yes, it is.

9     Q.   What is this document?

10    A.   This appears to be a letter from

11 Dr. Balazinska describing the proposed agreement or

12 resolution to the 25-71 process.

13    Q.   And was this included as an attachment to

14 your charge communication to the special investigating

15 committee?

16    A.   Yes, it was.

17             ATTORNEY WALTERS:  42, please.

18             Exhibit 41?

19             THE COURT REPORTER:  Yep.

20             (Exhibit 41 marked.)

21    Q.   Dean Allbritton, do you have Exhibit 41 in

22 front of you?

23    A.   Yes, I do.

24    Q.   And is that document stamped

25 "UW_Reges_0004945"?

