*Reges v. Cauce, et al.*

# Exhibit RR
# to Declaration of
# Gabriel Walters

Special Investigatory Committee for Stuart Reges

## Introduction and scope of activities

On July 11th 2022, pursuant to section 25-71.D.3 of the Faculty Code of the University of Washington, Dean Nancy Allbritton of the College of Engineering charged a special investigatory committee (SIC) to assist her in the "informational and confidential gathering of information and documentation" related to specific conduct of Teaching Professor Stuart Reges of the Allen School of Computer Science and Engineering, and subsequent complaints by UW community members. The SIC members are: Associate Professor Louisa Mackenzie (French and Italian Studies), Professor Steve Muench (Civil and Environmental Engineering), and Professor Eric Schnapper (School of Law). Together, we respectfully submit this report, and are solely responsible for its content.

None of us were personally or professionally impacted by or involved in the events and conduct under investigation. We were able to execute our charge in a spirit of neutrality. In addition to information-gathering, the committee was tasked with "advis[ing] the dean in its interpretation." The committee was neither asked nor authorized to decide upon a particular course of action by the UW administration. It is important to emphasize this because of a potential misunderstanding of the language used to describe the SIC's role to Professor Reges himself: Dean Allbritton wrote in an e-mail to Professor Reges on April 21st that she was working to "identify the faculty who will comprise the committee and then prepare the charge."[1] The meaning of "prepare the charge" was *not* that the SIC itself would issue Professor Reges with formal charges of misconduct, but that Dean Allbritton would describe the SIC's tasks ("charge") in a letter prepared for that purpose. In other words, it was the SIC that was being charged, not Professor Reges. The SIC from the beginning understood the parameters and limits of our task.

The committee worked together gathering and interpreting information, identifying and interviewing stakeholders, and generating internal reports. We invited Professor Reges to talk with us (by e-mail on August 12). He declined this invitation via e-mail on August 16th as was his right. On August 24th, 2022, we received an e-mail from Nancy Allbritton which informed us that our activities had been put on hold. We immediately ceased our work. The work resumed on September 28th, authorized by an e-mail from Director of Human Resources Aileen Trilles, with a focus on preparing a report.

Our research pertained to a specific conduct complaint brought against Professor Stuart Reges (SR) by the Dean of the College of Engineering, Nancy Allbritton (NA), under section 25.71 of the Faculty Code. The conduct in question is Professor Reges's use of course material and UW e-mail to express opinions (related to indigenous land acknowledgments) in a way that may have violated UW and College rules. The conduct took place between December 2021 and March 2022. While our findings relate to this particular conduct, we also provide context to aid in interpretation where appropriate. *Context* includes detailed timelines of events, the history of Reges's seeking out of political controversy, his media interviews, the issue of land acknowledgements at UW and in national debate. We assess *impact on pedagogy* (effects on student learning and morale; degree of alignment with best practices); and *impact on relations* between UW and Native community. We provide additional information we have found informative. In addition to

---

[1] Reges- 25-71 Consultation.eml

information-gathering, in the spirit of "assisting … in interpretation", we offer in the final section some more subjective thoughts on the question of rights (rights of instructor, rights of students, rights of UW to assert professional standards), and the political nature of this conduct, as well as possible conclusions about *compliance with Faculty Code*. The timeline in the Appendix summarizes the events we investigated and documented, as well as our work from July 11-August 24. Some key quotations from documents are footnoted.

Context: Land acknowledgments

Events: Facts

Events: Important additional information

      Allen School political neutrality

      Definition of "disruption"

Events: media attention, political culture wars

Impacts: Overview

Impacts: Students

      Awareness of Student Complaints

      Function of a Syllabus

Impacts: Native community

SIC Interpretations Informed by Faculty Code

Appendix (p.16-22)

## Context: Land acknowledgments

Land acknowledgements are increasingly used in cultural, professional and academic settings in North America as a small signal of commitment to recognizing the history and presence of Indigenous peoples on the land. [2] They are usually developed in coalition with Native advisory groups. There is debate, including in Native communities, about their use and the limits of something that can be seen as performative. [3] It is understood that they are not equivalent to working to repair injustice. However, if presented with willingness to enter into dialogue on the part of a non-Indigenous individual, a land acknowledgement can make Native and Indigenous people feel a little more included within a given space. The Burke Museum defines its own land acknowledgement as a "living statement" that changes over time, reflecting changing understanding between peoples. [4]

The University of Washington does not have a standard land acknowledgment on web pages, but does have a template spoken by leadership during events. [5] It is the same used by the Tribal Relations Office: **"The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations."[6]** The UW considers this a statement of fact and not a political position on land rights, ownership, or US history. [7] It

[2] https://nativegov.org/news/a-guide-to-indigenous-land-acknowledgment

[3] https://www.cherokeephoenix.org/opinion/opinion-land-acknowledgments-fall-short-in-honoring-indigenous-people/article_cdf8233f-f107-5cb6-a9c5-e89823a10e2d.html

[4] https://www.burkemuseum.org/news/acknowledging-land-building-deeper-relationships

[5] https://www.washington.edu/omad/about-omad/

[6] https://www.washington.edu/tribalrelations/

[7] Victor Balta, E-mail to Fox News. "Commonly utilized land acknowledgments are not politicized statements

UW_Reges_0008752

was developed with guidance from the Governor's Office and federal regulations and adheres to tribal sovereignty. However, the UW does not require any employee to use a land acknowledgement, nor does it prescribe language for those who do. It does provide resources--centrally and at the unit level--to employees so they can learn and consider using the practice in their own work.[8] Some units recommend language based on that used by the UW's Tribal Relations Office. Chad Allen explained to the SIC that best practice is to include one if it comes from a place of reflection and willingness to dialogue and educate (and be educated).

Land acknowledgements are suggested by teaching and learning experts at the UW,[9] as one of many tools an instructor might use to create an inclusive environment where Native students feel welcome. In September 2020, the Allen School circulated a 6-page document of suggested best teaching practices "worth considering"; the document included land acknowledgements as one suggestion among many, providing the UW's Tribal Relations statement as a suggestion.[10] The context in which the Allen School suggested inclusion of a land acknowledgment in a syllabus was thus pedagogical, as one way in which an instructor might help Native students feel included.

## Events: Facts

(Please see Timeline in Appendix, for table overview with references to relevant documentation in SIC's Teams drive.)

On December 8, 2021, Professor Ed Lazowska of the UW's Allen School of Computer Science forwarded an Atlantic article to two listservs (faculty and diversity_allies). The article argued that land acknowledgements are "just moral exhibitionism".[11] Professor Magda Balazinska, Director of the Allen School, replied with a request that discussion happen in-person rather than on-list. Teaching Professor Stuart Reges replied, stating that he was thinking about including "[his] version" of a land acknowledgment on his CSE 143 syllabus in Winter 2022, offering to facilitate a discussion in person, and including his statement below his signature.[12] At the time, no-one responded to Reges's stated intent to include this statement, or his invitation to in-person discussion. The SIC heard two explanations for this silence: 1) it was a deliberate choice on the part of SR's colleagues, because he has a history of trying to start controversy and other instructors had no interest in amplifying the fight; and 2) some colleagues did not really believe he would include his statement in his syllabus[13].

about land claims or ownership nor expressions of personal viewpoints about land ownership, but are rather statements of fact — the purpose being to acknowledge that the university sits on the historical ancestral lands of the Coast Salish people." https://www.foxnews.com/us/university-washington-professor-toxic-environment-indigenous-land-acknowledgement

[8] for example: https://www.washington.edu/uwra/about/board/committees/acknowledgments/
[9] E.g. The Center for Teaching and Learning: https://teaching.washington.edu/topics/inclusive-teaching/inclusive-teaching-strategies/supporting-indigenous-students-in-the-classroom/
[10] Allen-School-Best-Practices .. .pdf
[11] https://www.theatlantic.com/ideas/archive/2021/11/against-land-acknowledgements-native-american/620820/
[12] 1-email on Faculty Mailing List Dec 8th.pdf
 "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."
[13] Crystal Eney Interview Notes by Steve.doc

Stuart Reges (SR) included the statement on his CSE 143 syllabus for Winter 2022, which started in the first week of January 2022. Students shared screenshots on social media[14][15] and over the next week, many complained to the Allen School and to the Bias Incident committee.[16] On January 4 2022, Magda Balazinska (MB) asked SR by e-mail to remove the language from the syllabus but recognized his right to oppose land acknowledgements elsewhere. SR stated that no-one had replied to his December 8 message; MB replied that she had "missed" that SR truly intended to include the statement and repeated her request; SR stated that he would only comply if every instructor was told to remove their land acknowledgement. MB said she would ask all instructors using a land acknowledgement to only use the UW's version. SR replied "That expresses a particular political viewpoint. If you're going to allow people to include that, then you need to allow me to include mine."[17]

On January 5th, MB e-mailed SR stating that she had removed the statement from SR's syllabus and asked IT to remove it from the document in his course web site. The exchange is as follows: MB: "Because the current text under "Indigenous Land Acknowledgement" in your CSE143 syllabus is causing a disruption to instruction in your class and because it is not related to the course content, it needs to be removed. Since you are not willing to make the change yourself, I have removed that section from the syllabus. I have also asked our IT team to update the syllabus on your course website. SR "You have silenced me while not silencing others because you don't approve of my political beliefs. That is a violation of my first amendment rights."[18]

MB sent two e-mails to students in CS 143 during this first week. On January 5th, she apologized on behalf of the Allen School for the statement in SR's syllabus and alerted students to three ways in which they could voice their opinions, including anonymous means.[19] Complaints were received, including from Native students, one of whom took a leave of absence.[20] On January 7th, MB informed students that a shadow section had been set up for students who preferred not to work with SR.[21] 157 of SR's enrolled students made the switch, out of 440. Some students may have switched for reasons not related to the statement, but MB heard directly from many students for whom that was the primary motivator. MB and other student-facing personnel of the Allen School met with and/or corresponded personally with many students during this period, including Teaching Assistants.[22]

Balazinska notes-1.doc

[15] https://www.reddit.com/r/udub/comments/rvjw5m/stuart_reges_version_of_the_land_acknowledgement/
[16] Student Concerns USST reporting Committee Version - Winter 2022.pdf
Bias reports BIAC.doc (not in Team drive)
Crystal Eney Interview Notes by Steve.doc
[17] 3-email thread with instructor.pdf
[18] 3-email thread with instructor.pdf, 4-email to students on Jan 5.pdf
[19] 5-email to students on Jan 7th.pdf
[20] Student Concerns USST reporting Committee Version - Winter 2022.pdf
CAIIS meeting summary.doc
EMAIL_Native faculty and staff statement.pdf
[21] 5-email to students on Jan 7th.pdf
[22] 8b - Details regarding exchange with UAW students.pdf
12 - Initial Set of Complaints.pdf
Student Concerns USST reporting Committee Version - Winter 2022.pdf

UW_Reges_0008754

On February 24 2022, SR posted a link to an Inside Higher Ed article to the CS listserv diversity_allies.[23] The article was critical of land acknowledgements and mentioned SR's "protest". SR announced his intention to continue to use his own statement in CS 142 in the Spring quarter, on paper as it's "harder to censor". He did so, and a shadow section was again offered with robust enrolment (178, with denials because of classroom size). On February 24th and 25th, multiple complaints were submitted to leadership and staff members of the Allen School in response to the diversity_allies post. The complaints were from undergraduates, ASEs, and UW community members at large.[24] The Recruiter for Diversity and Access, Kayla Shuster, submitted an extensive Bias Incident Report.[25]

In late February there was a lot of communication about how to proceed. Associate Dean for DEI, Karen Thomas-Brown, said she would forward complaints to UCIRO, but then the Allen School was informed (by the AG office?) that the 25-71 process should be followed instead.[26] The reasons for UCIRO not taking this on were not clear to the SIC. Had we continued our work, we would have interviewed Dean Thomas-Brown.

On March 2 2022, Dean Nancy Allbritton (NA) notified SR by e-mail of a formal "25-71" meeting to discuss possible violations of Faculty Code 25-71, 24-33, Executive Order 31, and UAW's collective bargaining agreement for ASEs.

The meeting took place on March 8, 2022. Stuart Reges brought legal counsel. NA was joined by Human Resources Director Aileen Trilles, and Professor and Vice Director Dan Grossman. NA's suggested resolution was rejected by SR by e-mail on March 19.[27][28] On March 28, over 20 Native faculty and staff sent a letter to the Allen School protesting alienation and harm to the Native community.[29]

NA informed SR on April 21 that she was charging a Special Investigatory Committee to assist her, as per faculty code.[30] She did *not* inform SR that a formal misconduct charge was being prepared against him. The SIC notes the potential for misinterpretation of this language, and notes that FIRE appears to have misinterpreted it in this way (article 78 of their Complaint states: "On April 21, 2022, Dean Allbritton notified Professor Reges she intended to proceed with formal charges against him"[31].. She then formed the SIC, charged on July 11.[32] The SIC worked through August 24th gathering information and interviewing

---

[23] 7-email to Diversity Allies.pdf

[24] 8 - Text of reports and comments following diversity-allies email.pdf
8b - Details regarding exchange with UAW students.pdf

[25] Bias Incident Report.pdf
[26] 8b - Details regarding exchange with UAW students.pdf
[27] Reges_25-71_Resolution Agreement_2022_03_09.pdf
[28] 9 - Reges response to letter of March 9th.pdf
[29] EMAIL_Native faculty and staff statement.pdf
[30] e-mail from NA to SR on April 21:" Stuart, Thank you for following up.
After my consultation with you and the director, I have decided to
form a committee of three UW faculty members to look into this matter
pursuant to Section 25-71.D. I am working to identify the faculty who
will comprise the committee and then prepare the charge.
Thank you,Nancy"
Reges- 25-71 Consultation.eml
[31] Complaint.pdf
[32] FINAL_Charge Letter to SIC for SR_2022_07_11.pdf

affected parties as described in the "impact" section and summarized in the timeline. We note that Professor Reges declined an invitation to speak with us. We have drawn no conclusions from this choice. We resumed work on September 28, preparing an oral report based on this written one.

## Events: Important additional information

### Allen School political neutrality

SR claims that all other land acknowledgements on CS syllabi were allowed, except his. This is not entirely accurate. Kevin Lin and Lauren Bricker had land acknowledgements in their syllabus which appeared to veer into progressive political statements. MB suggested that they modify their wording in order not to alienate conservative students.[33] Both instructors did so and taught their classes without incident. (The SIC would have likely interviewed these instructors if we had continued our work). SR was likewise given the option to cooperate in order not to alienate students, but he chose not to.

### Definition of "disruption"

SR claimed that there was no disruption *in* his class due to his statement. The SIC heard evidence of severe disruption for his students and TAs, Allen School staff, peer mentors, and advisors, staff and advisors from other units, and the UW Native community, and that it lasted for weeks. The reason SR believes there was no disruption is because students did not speak up in the moment as the syllabus was presented during class time. They did not have the chance: SR glossed over the statement when presenting the syllabus to students live. A Redditor claiming to be a student in 143 (supported by their including a screen shot from the actual syllabus) wrote this: "he just breezed over this in the syllabus and I had to look at it a few times because I just assumed it would be the same as all the other UW land acknowledgments. While whipping through the later part of the syllabus he goes "religious accommodations, my version of the land acknowledgment, and then the software you will need"."[34] He did not invite discussion of the statement in class.                  , a student with whom the SIC talked directly, confirmed this, and said she would not have been made aware of the statement if it had not been protested on social media. Students in CSE143 are mostly young, in their first year, not used to university classes, and not used to speaking up in class about difficult issues. They don't necessarily know how or when to complain, or feel comfortable articulating any opinion even outside class. Students may not have reacted in the moment, during class time (especially since SR offered no invitation to discuss his statement). Rather, the disruptions happened outside class. We repeatedly heard that students felt too intimidated to bring it up with SR himself, and instead brought it up with TAs, or in some cases with Allen School student services or administrators. There were many long and difficult conversations happening.

## Events: media attention, political culture wars

---

[33] Balazinska-notes1

[34] https://www.reddit.com/r/udub/comments/rvjw5m/stuart_reges_version_of_the_land_acknowledgement/

It is impossible to detach these events from broader political debates taking place nationally. Indeed, SR himself has repeatedly sought to place his own actions firmly within this context. Since January 2022, SR has given many interviews with partisan media outlets about these events.[35] In most interviews, he emphasizes that his intention was to provoke a reaction from the UW administration in order to make a broader point about his objection to what he calls "the equity agenda" in higher education.[36] He has said "this was an experiment on my part"[37] He reminds readers and viewers that he has a long history of defending supposedly controversial viewpoints and he presents himself as something of a free speech crusader.[38]

In addition, during media interviews, SR has misrepresented the UW's land acknowledgement as "a particular view of American history that they wanted you to affirm, you know, that the United States is evil and that we stole land from native tribes and so forth."[39] The UW does not affirm, or require employees to affirm, that the USA is evil, and they are very careful to avoid saying that land was stolen. (They do affirm the fact that it is occupied.[40]) From the Native perspective in fact, the UW is far too conservative in this regard.

As confirmed by staff in the Allen School,[41] SR has a long history of taking public stances on controversial issues. He reminds the public of these stances in media interviews, including being fired from Stanford in 1991 for what he claims was "protesting the war on drugs". The specifics of his conduct[42] at Stanford complicate this picture: his actionable behavior was bringing drugs onto campus and purchasing alcohol for underage students, *not* the fact that he held or had expressed a viewpoint opposed to university policy (and the law). The Dean of Stanford's School of Engineering made this clear: "My determination of professional misconduct is not based on the fact that you hold or state your opinion regarding this University policy [on illegal substances]. There are many acceptable ways to object to a policy with which you disagree. However, violating the policy is not an acceptable form of objection, especially in a community such as ours that promotes full and free discussion of opposing views."

Since arriving at the UW, SR has for the most part expressed political opinions using his own, rather than university, resources, for example publishing on his own blog or the opinion web site Quillette.[43] The committee notes that his right to do so has not been called into question. We also note that he removed the Allen School logo from a personal web page when asked to do so. [44] His opinions expressed outside the university context-- in particular articles on women in coding and land acknowledgements--are known to some of his students from word of mouth and social media. Some female students and BIPOC students

---

[35] some oral interviews in "video audio files" folder in Teams; written interviews in "outside correspondence-stories" folder.
[36] https://www.youtube.com/watch?v=iHyabeTDlUI_@ 4:30. "I took the opportunity to make a political statement I knew they wouldn't be happy with"
[37] Ratnz interview 8.10: "This was an experiment on my part"

[38] FIRE video 3.49 "a lifetime exploration" of free speech issues
[39] https://www.foxnews.com/us/university-washington-professor-sues-school-alleging-school-free-speech-violation
[40] https://www.washington.edu/omad/about-omad/
[41] Crystal Eney Interview Notes by Steve.doc
[42] https://news.stanford.edu/pr/91/910510Arc1386.html
[43] Quick links can be found on his personal web page https://www.stuartreges.com/
[44] Reges-censorshipclaims.doc

have expressed discomfort at having to take a gateway class with an individual who they believe to be prejudiced against their ability to succeed in computer science, or against their lived identities more generally. In 2019, a petition and compilation of student complaints requested that SR's teaching contract not be renewed based on his article "Why Women Don't Code."[45]  However, the UW has not sanctioned SR for expressing these opinions.

## Impacts: Overview

At the time of cessation of activities by the SIC, we were still in the process of gathering more details about who complained and the exact number of complaints, but we have already gathered and read many. Most that we are aware of have been compiled into collective documents, with the identifying information removed if complainants requested. We interviewed a member of the UW's Bias Incident Advisory Committee, a student in SR's 143 class, four Native faculty and staff who had worked with and for Native students during these events, the Director of Student Services at the Allen School, the Director of the Allen School, the Assistant Director of the Intellectual House, and the interim director of OMAD and board member of the Intellectual House. The ASEs of CSE submitted written responses to our questions. SR declined an invitation to present his perspective to the SIC (invitation sent by e-mail on August 12, rejected by SR on August 16th). The Timeline provides dates and overviews of interviews.

The overall impression is of serious disruption to student (undergraduate and graduate) experience and well-being in CS143 and the Allen School, harmful ripple effects throughout the Native UW community, and a challenge to the trust between Native people in the region and the UW more generally. We heard concern about lasting harm to the UW's reputation as a supportive space for Native people, and harm to the UW's ability to recruit and retain Native students in STEM, and in general.  ASEs in the Allen School who had to work with SR charged that they were experiencing a discriminatory work environment. In addition, there was significant workload escalation for many in the Allen School as student-facing staff dealt with complaints and met with affected students, administrators figured out how to respond (they could not choose to ignore it since there had been student complaints), a faculty colleague overloaded to teach the shadow class, TAs had to be reassigned and had to process events with students in their sections, and staff working to ensure that the Allen School  can support diverse students felt like any progress they made was compromised by these events.

## Impacts: Students

MB told us that "The number of complaints about the "land acknowledgement" was unprecedented, the largest number ever about a class."[46] This was confirmed by Lincoln Johnson (Bias committee) and Crystal Eney (student services). Casey Wynecoop (Intellectual House) also forwarded student e-mails to Rickey Hall: "The students that brought this to my attention are both appalled and bewildered by it."[47]

---

[45] Letter_complaints2019.pdf

[46] Balazinska-1-notes.doc
[47] 12- Initial Set of Complaints.pdf

Confidential

The impact on students is summarized by ███████████, who was in SR's 143 class in Winter 2022 and switched to the shadow section: "[Reges] was playing games with my education."[48] ████ is the one student from CSE 143 in Winter 2022 with whom we spoke directly; she wanted to talk with us to represent other, younger students in the class who felt less confident speaking up (████ is a non-traditional student in her ██; most CS143 students are 18-20 years old). We e-mailed other students whose identifying information we could find in the complaint reports, but none replied. ██████████ felt that the Allen School did right by students as much as it could, and she liked the shadow class. She reported that she felt disgust at the idea she might have to take a class with SR next quarter: "I feel that it costs me a small part of my dignity to have to interact with him on a daily basis and it does feel gross that this man is in a position of power over me while I am a student in his class.  I would give absolutely anything to be able to take this course with a different professor next quarter".[49] ███████ assessment in her conversation with the SIC was that SR was compromising undergraduate learning in order to perform a political stunt, and stated this was not only harmful, but also meant students were not getting their money's worth for tuition paid.

Native students were very negatively impacted. Minorities in Tech were contacted by three Indigenous students who felt alienated in SR's class in the first week of January.[50] Native faculty reported meeting and working with Native students a lot during this period.[51] They, and students, expressed frustration that SR has not been held accountable for the impact on students.

One Native student took a leave of absence. ██████████████████ communicated with SIC via the CAIIS faculty: "They are taking a leave of absence for the Spring quarter due to the continued impacts of alienation from this event, a lack of communication around this experience from the Allen school and wider community, and a lack of academic support."[52] In their initial communication with the Allen School, they said "this whole incident has made me feel so directly despised and unsafe". Their friend ████████████ wrote "the statement itself and the placement within the syllabus are openly alienating of Indigenous students. A syllabus is one of the first things new students see when coming into a class – this syllabus sends a clear message that Indigenous students are not welcome in Professor Reges' classroom".[53]

The redacted summary of complaints to student services provided to the SIC shows 2 pages of complaints and concerns, mostly from the first two weeks of January alone; more complaints were compiled and submitted by Lincoln Johnson of BIAC[54]. The summary of initial complaints is 14 pages long.[55] Both indicate that staff were significantly impacted, too, as they tried to respond to students. We provide just a few selected quotations.

---

[48] ██████████ SIC meeting summary.doc

[49] Student Concerns USST reporting Committee Version - Winter 2022.pdf

[50] Student Concerns USST reporting Committee Version - Winter 2022.pdf (written complaints from students in 143, compiled by Allen School student services)

[51] CAIIS meeting notes.doc

[52] CAIIS meeting notes.doc

[53] Student Concerns USST reporting Committee Version - Winter 2022.pdf

[54] Student Concerns USST reporting Committee Version - Winter 2022.pdf
bias reports BIAC.doc

[55] 12-Initial Set of Complaints.pdf

"…the impact that this incident is having on my team. In these situations, I think the first instinct is to think about our students (which is right) but I think it's important to also mention that Stuart's words have a very real negative impact on our entire community including staff." (Chloe Mandeville, Assistant Director for Diversity and Access)

"staff are feeling disillusioned about the DEI&A work we are charged to do given Stuart's negative impact on our community & prospective students." (anon. staff, via Chloe)
"We are currently forcing students to delay or change their academic plans OR choose to take a course with someone that has been openly hostile" (anon. staff, via Chloe)

"I feel very uncomfortable" (Jan 13); "I am very uncomfortable with staying in Stuart Reges' class." (Jan 8); "I feel very uncomfortable with Stuart's statements as well as being in his class" (Jan 10); "wanting to be excused from any duties of their job that would involve potential interaction with Professor Reges" (Jan 8) "being uncomfortable in the class and that the situation was exacerbated" (Jan 7); "My indigenous friend in your program is devastated, I'm disappointed in my major…do something." (Jan 28)

"The actions like those from Stuart (and Perdo) [sic] often overshadow the DEIA work we're doing especially from an external/prospective student perspective."

These concerns extended to affect Spring enrolments:
""I really want to take and learn CSE 142, but I don't know how comfortable I would be with attending Stuart Reges' section" (Feb 7); "a 1st year STARS student asked how the Allen School is handing Stuart's land acknowledgment in the CSE 143 syllabus and Pedro's tweet"

"This sort of factually wrong, intentionally inflammatory, and trauma-mocking statement tarnishes the reputation of the Allen School. …Having a professor like this, with a history of misogynistic and racist statements, and who places statements like this in their course policies, signals an environment in our department which I do not think aligns with our department's goals of being inclusive."

"I was hopeful that something would come of his most recent stunt, but apparently he knows better than I that he would get away with it."

The DEI student committee reported having heard from 6 students.
"he has formally and publicly expressed his unsubstantiated perspective into a UW class syllabus, thus harming students in the course and beyond (note that by emboldening the few biased students the harm goes on beyond the course) ….This clearly contradicts the Allen School's promise for creating an inclusive environment."

There was an extensive college-level complaint from Kayla Shuster, Recruiter for Diversity and Access, concluding that her job had become more difficult as it related to recruiting and retaining underrepresented students [56]:

---

[56] Bias Incident Report.pdf

"Between the work put into creating the second section option for students and the efforts to support students who were upset by the statement, the Undergraduate Student Services Team lost nearly two weeks of time for our regular duties."

"With the creation of my position we are seeking to increase our recruitment of native students. How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?"

"Mr. Reges was made aware that his language caused significant emotional harm to students. As a lecturer, he is responsible for creating an environment that is conducive to learning. Once he saw the hurtful impact of his words, demonstrated by students opting out of being in a classroom with him and reporting their concerns to the university, he should have stopped and found another forum for his views outside of the classroom. Mr. Reges has stated his intentions to repeat the action again next quarter. … I do not believe that Stuart Reges is capable of performing his job duties as a lecturer. Too many of our students will be alienated and unfocused in his courses and he has shown no remorse for the disruptions to learning that he has created. He has expressed intentions to cause further learning loss in future courses."

The impact on ASEs was conveyed in written response to the SIC's questions over e-mail:[57]
UAW representatives claimed that events violated Article 20 of their contract, as well as Allen School commitment to inclusion.

"Professor Reges' statement made us realize that there are senior and influential people in our workplace environment who are working against a diverse, equitable, and inclusive workplace environment."
"increased workload throughout the quarter"
"TAs observed widespread discontent from students regarding Stuart Reges' actions. They received several oral complaints from students who felt uneasy or unwelcome in Stuart Reges' classroom environment. TAs not only had to respond to those student concerns, but they further had to struggle with the fact that Stuart Reges' actions significantly derailed their attempts at the start of the quarter to build an inclusive environment for students from all backgrounds.
"TAs work very hard to dispel concerns and reservations that students have about joining the CS field."

TA concerns were also transmitted via anonymous channels, e.g. "As long as he is allowed to teach classes with TAs, all TA applicants must be offered a clear and safe way (hidden from Stuart and free from the possibility of retaliation by him) to opt out of being assigned to his class."[58]

## Awareness of Student Complaints

SR was informed that undergraduate and graduate students, including some of his Teaching Assistants, had complained. The UW is obliged to respond to formal student complaints, and instructors should do so too. SR's response to complaints was to repeat the offending action rather than address it. In media interviews, SR has been somewhat inconsistent with regards to when he was informed about student complaints,

---

[57] ASE Response to Special Investigative Committee Regarding Stuart Reges
[58] bias reports BIAC.doc
[59] Balazinska-notes-1.doc

however MB informed him on Jan 4 by e-mail that students had complained,[59] and he was made formally aware during the March 8 25-71 meeting.

## Function of a Syllabus

A syllabus is a university document even though it is created by individual instructors. It presents the course and the instructor to students, often for the first time, and students must read and consult the syllabus which becomes a de facto contract between them and the instructor.

While instructors have great freedom in deciding what to include in the syllabus, it is ultimately a document for which the UW is responsible and to which it is answerable. The UW does have the authority to intervene where a syllabus may contradict legal requirements, for example all faculty are obliged to include specific language related to religious accommodation.[60] If faculty omit or even slightly change this language, the UW has the right to demand that we change the language in the syllabus. This is true whatever the instructor's sincerely held religious or moral beliefs may be. An atheist instructor could not refuse to include religious accommodation language. This illustrates the principle that a syllabus is a UW document, not a personal one, and that the UW's legal and professional interests trump individual beliefs.

Unlike religious accommodation, a land acknowledgement is not required by the UW, and the UW cannot force an instructor to include one on a syllabus. However, the UW can force an instructor to remove or change content according to the Faculty Code. Language considered offensive can be sanctioned if it is found not to meet the standards of the faculty *collectively* responsible for curriculum. The faculty code balances instructors' freedom of expression with the need for some collective approval of content and presentation: "It is the responsibility of the faculty members to present the subject matter of their courses *as approved by the faculty* in their *collective* responsibility for the curriculum. *Within the approved curriculum*, faculty members are free to express ideas and teach as they see fit" (our emphasis).[61] SR has claimed that "faculty have the right to control course content and content of syllabus"[62]. This right is not absolute, however, as the Faculty Code clearly states: course content must be *approved* by faculty who have *collective* responsibility for curriculum. This collective faculty includes program directors and department chairs.

**Impacts: Native community**

The overwhelming sentiment among our interviewees was summed up by Chad Allen: "This was about denigrating Native people"[63]

On March 28, Chad Allen forwarded a list-serv posting signed by 20 Native faculty and staff, to MB and NA. The message stated that the UW was not honoring the terms of the MOU between Native Northwest regional tribes and the UW from 2010. In this MOU, the UW agrees, among other items, to "enhance efforts to recruit, retain, and successfully graduate more American Indian undergraduate, graduate and

---

[59] Stuart-Reges-and-Madgalena-Balazinska-Email-Exchange-January-4-2022_Redacted.pdf
[60] https://registrar.washington.edu/staffandfaculty/religious-accommodations-policy/
[61] UW Faculty Code 24-33
[62] https://www.youtube.com/watch?v=iHyabeTDlUI_ @ 10:06
[63] ChadAllenSICMeetingNotes.doc

professional students", and to "expand and integrate American Indian culture, knowledge, and history into the academic curriculum, institutional programs and university community". The letter argued that the first of these terms is directly compromised by SR's actions.[64] It pointed out the emotional impact on Native UW community members, and the negative impact on learning. It further made the point that violations of Native dignity run counter to Faculty Code 24-33 which enjoins all speaking in UW contexts to respect the dignity of others.

To get a more complete picture of impact on Native community members, the SIC met with staff and faculty of the CAIIS, Casey Wynecoop, and Chad Allen, and this paragraph sums up some of the main points we heard.[65] All conversations indicate an overall existing lack of trust between Native UW community members and the institution. SR's words caused great harm to people already vulnerable. "this signals to Native community that STEM is not for them … Also sends message that UW is not a safe place to go. The UW claims that it's a safe space for all; Reges is overtly working against that."

Stereotypes of Native people as backward and lazy, are reinforced by SR's statement. These stereotypes do direct harm to Native people trying to navigate systems dominated by people whose biases are influenced by them.

With his deliberately offensive throw-away comment, SR was ignoring the actual expertise of specialists of Native history and continued presence on land. He was not seeking to engage in scholarly conversation, it was a stunt. The "labor theory of property" is not a serious contribution to Native history, to the debates about land acknowledgements, or even to studies of Locke himself.[66] It is not clear that SR himself believes in the Lockean theories of property embedded in his statement; he has called himself a "Georgist" with respect to claims to land[67].

Native students are not well-supported in the state and outcomes are worse for Native students due to systemic inequities, generational trauma. There is the sense that any progress is fragile, and easily undone by this kind of event. The Native student who took a leave of absence after SR's stunt should have been a success story, exactly the kind of student the UW is trying to support and promote. SR is not being held accountable in a proportionate way for these huge impacts on students' learning and lives.

Native faculty and staff from the CAIIS and the Intellectual House worked closely with Native students to support their well-being during Winter and Spring. This was a significant time commitment and emotionally draining for all. When it was clear that SR intended to include his statement again in the Spring syllabus, Native faculty and staff encouraged students to try not to engage him. The sense was that SR was trying to provoke and bring a fight which they had no interest in giving him, on his terms.[68]

---

[64] e.g. Kayla Shuster, Recruiter for Diversity and Access: "How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?" Bias Incident Report.pdf
[65] CAIIS meeting summary.doc
ChadAllenSICMeetingNotes.doc
[66] https://www.tandfonline.com/doi/full/10.1080/10848770.2017.1416766
[67] https://www.stuartreges.com/miscellaneous/land.shtml
[68] Casey Wynecoop SIC meeting.doc
CAIIS meeting summary.doc

UW_Reges_0008763

## SIC Interpretations and Findings

The preceding pages established facts and represented the viewpoints of impacted parties. In this final section, the SIC executes its charge to "assist ... in interpretation" of this information informed where appropriate by the Faculty Code.

The SIC believes that SR's statement violates the dignity of Native people and thus **violates Faculty Code 24-33 "an obligation to respect the dignity of others".** Inasmuch as his statement perpetuates a harmful stereotype, ignores or ridicules Native history and culture, and reduces Native issues to a soundbite in a political culture war, the SIC further finds that if UW were to allow this to continue, it would run counter to the article of the Tribal MOU (2010) by which the UW agrees to "expand and integrate American Indian culture, knowledge, and history into the academic curriculum, institutional programs and university community".[69]

SR claims that the UW is forcing a political viewpoint by requiring only certain versions of land acknowledgements. However, the UW, and the Allen School, specifically avoid politicizing land acknowledgements; the **recommended language is a statement of fact not of partisan allegiance**. The one term about which there might be debate is OMAD's explanation of their land acknowledgement template: "This language template is spoken by UW leadership during events to acknowledge that our campus sits on occupied land."[70] However the acknowledgement itself does not use the word "occupied", and it is also a historical fact that non-Native populations in North America were occupiers. We note that the UW does not use "stolen", which could be interpreted as a political position.

The SIC finds, rather, that **SR is the one actor in these events who has consistently sought to politicize the debate.** The multiple interviews SR has given with partisan media outlets, and his own statements about his intentions to provoke the UW administration, back this up. We concur with CSE 143 student
who felt that SR was "playing games" with her education.

SR's use of a course syllabus **exposed students to a politicized fight which they had no hand in creating.** As an instructor, he chose to include this language; students could not choose to avoid it. By blurring the boundaries between instructional and personal speech, SR indicated to students that his **political campaign against the "equity agenda" was more important than students' learning.**

In addition, we find that the **Allen School director has acted in a fair and balanced way** by asking two other instructors to change their land acknowledgements, which might have been alienating for conservative students. The SIC feels this is important information that complicates the notion of CS administrators as supporting one political agenda. In our view, administrators and staff acted in the interests of the students and to minimize disruption in their learning; **their objection to SR's statement was not political but**

---

[69] reges—tribalMOU.pdf

[70] https://www.washington.edu/omad/about-omad/

**professional and pedagogical**, and they acted to make as many students as possible feel included, including conservative students.

The recommendation to include a land acknowledgement in a syllabus is not an attempt to politicize course materials; rather, these are evidence-based suggestions made by people with expertise in how people learn. Students are motivated to learn when they feel included, and land acknowledgements are suggested simply as a way to *help Native students feel a little more recognized in class.* **It is a pedagogical recommendation**. Best practices in teaching and learning are the result of scholarly research and real results obtained by experts in the field, not political grandstanding, and the events are best understood as a debate about teaching and learning.

One of the basic principles of effective teaching is to listen to and take seriously student complaints, particularly if there are many and they are made over time about the same issue. SR's refusal to consider adapting his behavior based on student feedback indicates **a lack of commitment to best teaching practices**.

We believe that SR's statement **violates Faculty Code 24-33 by trying to promote his viewpoint over and above the collective approval of the facult**y responsible for CS curriculum: "It is the responsibility of the faculty members to present the subject matter of their courses *as approved by the faculty* in their *collective* responsibility for the curriculum" (our emphasis).

We believe that **SR's statement further violates Faculty Code 24-33 because it caused sustained and serious disruption**. The Code states: "The expression of dissent and the attempt to produce change, therefore, may not be carried out in ways that injure individuals and damage institutional facilities or disrupt the classes of one's instructors or colleagues." SR's claim that there was "no disruption" is demonstrably false as it relies on a limited definition of "disrupt" to mean: speaking up in the moment. Students not only did not have the chance to engage with SR's statement in the moment (in class), they would very likely not have felt comfortable doing so even if invited. The disruption took place everywhere but in the class session itself.

We find that **UW's responses to SR's statement were consistent with Faculty Code 25-71** : "the University also has the obligation to maintain conditions which are conducive to freedom of inquiry and expression in the maximum degree *compatible with the orderly conduct of its function*s" (our emphasis). Inasmuch as the orderly conduct of functions was seriously disrupted, the UW had the right to insist that SR remove his statement, and to create another class for students to mitigate damage to learning.

The SIC finds that the **UW has not sought to sanction SR for any opinions expressed strictly outside the university** and classroom context, despite the protests of some female students who feel that he discourages women from learning coding. **His right to free speech outside the campus context has not been violated.** The UW has the right to challenge speech made within the context of its own mission (in this case, teaching), and using UW resources, in this case, e-mail, course syllabus, the classroom itself, and the Learning Management System. The line between UW and non-UW contexts was clearly crossed the moment SR used a course syllabus to make a political point. Our impression is that SR crossed this line deliberately, while also creating confusion in his interviews about the line itself. He has said he's "not

allowed to" say what he believes; however he is not making the distinction in his public statements between his personal free speech, which the UW is not supressing, and the syllabus, which is a UW document. For example, interviewed on the Jason Rantz show he said: "And if you're not willing to say their version of it, they won't let you say anything at all." This disregards the many forums in which SR has made his opinion clear, with no suppression from the UW.

It is the SIC's impression (backed up by SR's own interviews with partisan media) that SR included the statement as a deliberate **political stunt**, not a sincerely held belief. His intention was to escalate beyond the UW and become a figurehead for partisan politics; he was using UW resources because he knew the UW would be forced to respond. Since he had not been sanctioned by the UW for exercising his right to free speech off-campus, he escalated by involving UW students, resources, and documents. Rather than being coerced or a victim, he **created the conditions under which he knew he would be reprimanded**. Just as he did at Stanford, he **violated a policy as a way of objecting to that policy.** The Stanford events are relevant for the case under consideration at the UW, since the conduct by SR that is potentially actionable is not his expressing of a viewpoint, but his potential violation of university policy as a form of protest.

Genuine debate about land acknowledgements was not the main point. SR's statement is not a sincerely-held belief he holds, but language crafted to provoke a response which he can politicize. His mention of the "labor theory of property" is not an academic intervention he can defend with any expertise (or that he seems to believe in himself), and it has in fact been debunked by people with real knowledge of 17th-century political theory[71], indigenous land use,[72] and Native histories in the Pacific Northwest. In sum, **to present SR's one-sentence statement as a serious attempt to engage in debate is a denial of actual expertise**, the expertise of Native scholars and community members at the UW and beyond.

Ultimately, students and Native UW community members paid the price; Native well-being and student learning were, if not intended targets, at least collateral damage. SR's intention may not have been to alienate anyone; however this does not diminish the impact. It was not unreasonable for Native students to take this statement as an expression of hostility, or for non-Native students concerned about inclusion to be concerned about SR's ability to serve students from diverse backgrounds. This would have been the case whatever the course taught; the impact was even greater given that the courses, CSE 142 and 143, are gateway courses into one of the most challenging, but also professionally beneficial, majors on campus. A computer science degree is a great tool for social mobility; CS students often land six-figure salary jobs right after graduating.[73] The UW has a responsibility to the state of Washington to be an engine for social mobility for all residents. Instructors thus have a responsibility to make students of all backgrounds feel welcome and included. Computer Science already has a reputation as being unwelcoming to women and underrepresented minorities, a fact recognized by Apple CEO Tim Cook. Inasmuch as SR's statement made Native students feel "despised" (in one Native student's words), it directly works against several aspects of the UW's and the Allen School's missions[74].

---

[71] https://www.tandfonline.com/doi/full/10.1080/10848770.2017.1416766
[72] https://nfu.org/2020/10/12/the-indigenous-origins-of-regenerative-
agriculture/#:~:text=Indigenous%20Americans%20practiced%20agroforestry%2C%20or,wildlife%20populations%
20and%20improve%20hunting.

[73] Balazinska-notes1.doc
[74] https://www.cs.washington.edu/diversity/

Appendix: Timeline

| Date | Type | Details | Document in Team drive |
|------|------|---------|------------------------|
| | | | |
| Sept 2010 | Background | MOU UW and NW regional tribes | Reges--tribalMOU |
| 2019 | Background | Compiled messages to NA re. SR's conduct and impact on student learning, esp. re. gender. Impact attributed to opinions expressed by SR *outside of UW context* as well as in class[75] | Letter_complaints2019 |
| | | | |
| Sept. 2020 | Background | Allen School best practices for inclusive teaching. LA one of a list of recommendations in spirit of inclusivity to students of multiple backgrounds[76] | Allen-School-Best-Practices... |
| Dec. 8 2021 | List-serv exchange | Ed Lazowska forwarded Atlantic article to CS listservs, critiquing LAs. MB replied requesting in-person discussions rather than on-list. SR replied w intent to include his LA in syllabus, offered to help arrange in-person discussion (no response)[77] | 1-email on Faculty Mailing List Dec 8th |
| Jan 4-5, 2022 | e-mails between MB and SR re LA in CSE143 syllabus | MB demands SR remove LA from PDF syllabus[78] SR refuses, asks why no-one wanted to discuss, asks why other LAs stay on other syllabi[79] | |

[75] "Reges' position as a Principal Lecturer impacts student experiences and learning….While Reges is in a position of great influence, his teaching directly makes engineering less accessible. ….we ask that the College not renew his position".

[76] "These are best practices worth considering as you prepare and deliver your course, so that your teaching is as effective as possible for all types of students. They have been compiled and reviewed by the Allen School Diversity Committee with input from others, including significant contributions from the Allen School Student Advisory Council. … The following can make a course syllabus more inclusive. A statement that your class welcomes all students of all backgrounds

■    An example statement: This course welcomes all students of all backgrounds. The computer science and computer engineering industries have significant lack of diversity. …

○    An Indigenous Land Acknowledgement.

■    An example statement: The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations."
https://usdac.us/nativeland/

[77] "I'm glad that Ed posted this because I have been thinking a lot about land acknowledgments. I was going to include my version (see below) on my cse143 syllabus next quarter because the Allen School lists this as a diversity best practice. But I have my doubts about whether it really is a good idea to do so. Magda doesn't want us to use these email lists to discuss topics like this and I'm happy to oblige. I would be willing to help organize an opportunity for people to get together to discuss this in person if others are interested. – Stuart. I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."

[78] "I ask that you remove the "land acknowledgment" statement from your course syllabus immediately. It is offensive and it creates a toxic environment in your course, which is a required course in our major. You are welcome to voice your opinion and opposition to land acknowledgments, as you have, in other settings. The current statement in your course syllabus is inappropriate and must be removed."

[79] "I'm disappointed that you did not discuss this with me last month when I emailed the faculty mailing list and said that I planned to include my version of the land acknowledgment on my winter syllabus for cse143. I thought it was best to get feedback before the quarter began. I mentioned that it is listed as a best practice on our diversity resource page. You had said that you didn't want to have any email discussion of it. I said that I would be happy to discuss it in person with anyone who was interested and I

| | | MB states all LAs that are not UW's LA will be removed[80] | |
|---|---|---|---|
| Jan 5, 2022 | email from MB to SR explaining her actions; SR responds<br><br>e-mail from MB to CSE143 students re LA in SR's syllabus. | MB explains actions to SR[81]<br><br>MB apologizes to students for LA in SR's syllabus, says it's been removed digitally, and invites students to submit complaints online via 3 options | 3-email thread with instructor<br><br>4-email to students on Jan 5 |
| Jan 7, 2022 | e-mail from MB to CSE143 students explaining shadow course | MB presents shadow course option [82] | 5-email to students on Jan 7th |
| Jan 6, 2022 | e-mail to news media | Copy of statement generated by Allen School , Victor Balta, Chad Allen, sent to multiple media sources. Focuses on SR's use of *syllabus* as inappropriate for political commentary; insists it's not aligned with Allen School and UW values[83] | 6-email to news media on Jan 6 |
| Jan 9 2022 | Article in mynorthwest.com | Calls SR's LA a "hilarious joke". First media article on this issue?[84] | https://mynorthwest.com/3301858/rantz-uw-admin-war-seattle-professors-land-joke/ |

even offered to help organize a meeting, but nobody responded. I have been encouraged to include a land acknowledgment. I have done that.  Now you want me to remove it because you find it offensive.  I think you need to have a consistent policy on this. Other CSE instructors have included land acknowledgments.  Are you asking them to remove theirs as well?  If not, then I don't understand the

justification for treating me differently because I have a different viewpoint on this subject." MB "I'm sorry if I missed that you actually planned to include this offensive statement in your course syllabus this quarter." SR " If you instruct all of the winter CSE instructors to remove any land acknowledgment from their  syllabus then I will comply.  But if you are asking me and only me to remove my land acknowledgment, then the answer is no"

[80] MB "I will ask any instructor who uses a land acknowledgment other than the UW land acknowledgment to remove or replace it." SR "That expresses a particular political viewpoint. If you're going to allow people to include that, then you need to allow me to include mine.MB "The statements you used are offensive and students have raised complaints. I ask you to please update your syllabus."

[81] MB: "Because the current text under "Indigenous Land Acknowledgement" in your CSE143 syllabus is causing a disruption to instruction in your class and because it is not related to the course content, it needs to be removed. Since you are not willing to make the change yourself, I have removed that section from the syllabus. I have also asked our IT team to update the syllabus on your course website. SR "You have silenced me while not silencing others because you don't approv e of my political beliefs.  That is a violation of my first amendment rights."

[82] preface to e-mail "The evening of January 6th, I spoke with a student on zoom who indicated that she was going to drop the class the next day even though that was going to have very bad ramifications for her own education" "This course offering will have one lecture section, meeting 2:30-3:20 on MWF on the time schedule. However, lectures will be pre-recorded (from Fall 2021) with the lecture time being used for synchronous Q&A."

[83] The statement Stuart Reges included in his syllabus was inappropriate, offensive and not relevant to the content of the course he teaches. The invocation of Locke's labor theory of property dehumanizes and demeans Indigenous people and is contrary to the long-standing relationship and respect the UW has with and for the Coast Salish peoples and the federally recognized tribes within the state of Washington. The Allen School and the UW reserve the right to amend academic materials in this way, as the syllabus for an intro to computer programming course is not the appropriate place or manner for a debate about land acknowledgements. Reges' statement, in fact, is not a land acknowledgement — and neither the UW nor the Allen School require a land acknowledgement to be included in a course syllabus. It first came to our attention due to student complaints and has already created a significant disruption to the academic purpose of the course.

[84] "Reges said he added his snarky land acknowledgment to make a point about the lack of ideological diversity at the UW. …' For example, one of the questions I keep asking is, 'Do you want to include conservatives? Do you want to include people who have different ideas than your own?' And they keep saying that what inclusion means is that people like me have to be silenced so that we don't upset people that they care more about."

UW_Reges_0008768

| Jan 11 2022 | FIRE letter to AMC | Argues that UW must be bound to First Amendment rights above all[85] | Reges_FIREletter[72748] |
|---|---|---|---|
| January-March 2022 | Complaints submitted to Allen School, College of Engineering, and BIAC | Multiple complaints, most by students, many by Engineering students, some by Native students, describing negative impact | Student Concerns USST reporting Committee Version - Winter 2022.pdf<br><br>Bias reports BIAC.doc (not in Team drive)<br><br>8 - Text of reports and comments following diversity-allies email.pdf |
| Feb 24, 2022 | e-mail from SR to diversity-allies listserv | SR forwards IHE article critical of LA, mentions plan to continue to use his own LA in Spring, on paper as harder to censor[86] | 7-email to Diversity Allies |
| Feb 25, 2022 | MB indicates that ▮▮▮ to post SR's e-mail | Some complaints wondered why SR's message was posted [87] | 8b – Details regarding …<br><br>Reges-censorship claims |
| c.Feb24, 2022 | Emails in response to SR post to diversity-allies | Compiled messages from ASEs, staff, and students, some anonymous, complaining about SR's post and reporting multiple bias report submissions[88] | 8-text of reports and comments … |
| Feb 25, 2022 | Bias incident report | Kayla Shuster, recruiter for Allen School, indicates recruiting Native students is harder to do due to SR's known position[89] | Bias Incident Report |
| Feb 25, 2022 | Allen School ASEs complaint | Submitted by UAW reps, claim Article 20 of their contract is violated, demand (non-specific) action[90] | |

[85] "UW Requires Faculty to Include the University-Selected Land Acknowledgment Statement, and No Other Statement on the Topic, in Their Syllabi" "the Allen School's requirement that faculty must use the university's chosen land acknowledgment statement or refrain from speaking on this topic in their syllabi is an impermissible viewpoint-based regulation, violating the First Amendment rights of all faculty. Second, UW's censorship of Reges's syllabus and creation of an alternative course section are retaliatory actions taken against Reges due to his views, violating his First Amendment rights."

[86] "The article explores the pros and cons of land acknowledgments and describes what happened this quarter when I included a version of the land acknowledgment on my course syllabus that the university found offensive. He also mentions my plans to continue this protest when I teach the CSE142 course in spring and will have the opportunity to distribute a syllabus on paper (more difficult to censor)."

[87] ▮▮▮ ▮▮▮, I let Stuart's email through on the diversity-allies@ mailing list (first email below)."

[88] "If this man has an issue he should not force others to be apart of it while also hiding behind the UW name." – ▮▮▮. "I had to unsubscribe from the Diversity-Allies list … announced his plans to harass more students next quarter with his inflammatory land acknowledgement. I know this person to be racist from past personal interactions" (anon). "an attack that harasses Indigenous individuals" "Mr. Reges' Land Acknowledgment Statement is reasonably attributable to the university as it is being forced on students in a required course taught by a faculty member that we are paying to teach there." (anon, compiled by Mara Stevens).

[89] "This statement caused significant disruption to the daily functioning of the Allen School. The statement had a profound emotional impact on students, as evidenced by the fact that 30% of the students in the class opted to join an additional section …the Undergraduate Student Services Team lost nearly two weeks of time for our regular duties. … by posting this in a public forum, Mr. Reges displayed a deliberate attempt to cause further disruption .. Mr. Reges was made aware that his language caused significant emotional harm to students…my primary concern is the result of these statements: his creation of a classroom where students feel unwelcome and concerned about their professor's grading integrity …I do not feel comfortable bringing students into a school where their introductory courses are taught in a way that is not conducive to learning."

[90] "We have heard from TAs who no longer feel comfortable mentioning their own views on topics related to land acknowledgements and DEI, for fear of retaliation from Stuart Reges. We have heard from other ASEs whose feelings of belonging in the Allen School have been negatively impacted by the fact that Stuart Reges' behavior has been allowed to continue." article 20: "A discrimination or harassment complaint may be filed with the University Complaint Investigation and Resolution Office (UCIRO) and/or as a grievance in accordance with Article 8 of this Agreement.  Employees may also

| | | SIC received written feedback from ASEs on Aug 10[91] | |
|---|---|---|---|
| Feb 25, 2022 | MB response to ASEs | Suggests meeting.<br>UCIRO possible route, abandoned in favor of 25-71 | 8b-details regarding… |
| Late Feb. 2022 | Associate Dean for DEI notified: Karen Thomas-Brown | Associate Dean suggests UCIRO;<br>UCIRO abandoned [92] | 8b-details regarding… |
| March 2 | Email from MB to SR | Notification of 25-71 , possible violations by SR (LA, posting to listserv, ASE complaint). Invite to meeting March 8. Notified of attendees, and right to counsel [93]<br>Faculty code [94] | Reges_25-71_Notification<br><br>Reges-faculty code 24-33<br><br>Reges-faculty code 25-71<br><br>RegesExecOrder31 |
| March 8, 2022 | 25-71 meeting with SR | With MB. Aileen Trilles and Dan Grossman also attended[95] | Reges-24-71 Resolution Agreement |

file discrimination complaints with appropriate federal or state agencies.  The parties agree to encourage the filing of discrimination complaints through the University Complaint Investigation and Resolution Office. … When a grievance or complaint is filed, the University will implement interim measures as appropriate. Such measures shall be designed to allow the ASE to learn and work in an environment free from discrimination. … The parties agree that all employees should be free from everyday exchanges—including words and actions—that denigrate or exclude individuals based on their membership in a group or class. – article 20"

[91] "Professor Reges' statement made us realize that there are senior and influential people in our workplace environment who are working against a diverse, equitable, and inclusive workplace environment." "Stuart Reges' actions significantly derailed [TAs'] attempts at the start of the quarter to build an inclusive environment for students from all backgrounds" "Another significant impact was increased workload throughout the quarter."

[92] "The Associate Dean for Diversity, Equity, and Inclusion in the College of Engineering, Dr. Karen Thomas-Brown, plans to forward the contact information of those who submitted complaints last week to UCIRO" "First, the associate dean for DEI said that she was going to send all the complaints to UCIRO. Then I learned that we were supposed to go with the 25-71 process instead, so the UCIRO piece was canceled."

[93] "your conduct in course instruction and in email communications using university resources which may be a violation of University policies.  The allegations, if true, may constitute a violation of Executive Order 31, which prohibits discrimination or harassment against a member of the University community.  The allegations, if true, may also constitute a violation of Faculty Code Sections 24-33 and 25-71A and UW's policy on providing a safe workplace.  The possibility of an unwelcome, hostile or offensive academic environment may also arise if the faculty member fails to separate clearly personal interests from his or her professional decision-making. In addition, these actions may also constitute a violation of the collective bargaining agreement, Article 20: Non-Discrimination and Harassment, between the University of Washington and the United Auto Workers….Unwelcome and unsolicited language or conduct that is of a personal/non-technical nature and that is sufficiently severe, persistent, and pervasive that it could reasonably be expected to create an intimidating, hostile, or offensive working or learning environment. …I have asked CoE Human Resources Director Aileen Trilles and Professor and Vice Director Dan Grossman to attend.  Due to the nature of these allegations, it is imperative that we hold this meeting as soon as possible.
Under Section 25-71.B of the Faculty Code, you have the right to bring one person with you to this meeting.  "

[94] "the right to academic freedom and the right to examine and communicate ideas by any lawful means even should such activities generate hostility or pressure against the faculty member or the University. Their exercise of constitutionally protected freedom of association, assembly, and expression, including participation in political activities, does not constitute a violation of duties to the University, to their profession, or to students and may not result in disciplinary action or adverse merit evaluation. … make it clear that when one is speaking on matters of public interest, one is not speaking for the institution … an obligation to respect the dignity of others .. The expression of dissent and the attempt to produce change, therefore, may not be carried out in ways that injure individuals and damage institutional facilities or disrupt the classes of one's instructors or colleagues. .. to present the subject matter of their courses as approved by the faculty in their collective responsibility for the curriculum. Within the approved curriculum, faculty members are free to express ideas" 24-33
University also has the obligation to maintain conditions which are conducive to freedom of inquiry and expression in the maximum degree compatible with the orderly conduct of its functions 25-71

[95] the department chair or the dean in a non-departmentalized school or college shall fully inform the faculty member of the nature and specific content of the alleged violation and shall offer to discuss the alleged violation with the faculty member and

| | | | Reges-faculty code 25-71 |
|---|---|---|---|
| March 9, 2022 | Email from MB to SR following March 8 25-71 meeting; | MB attaches a written summary of the meeting; Proposals: SR act respectfully, remove LA from syllabus, refrain from retaliation [96] | Reges_25-71_ResolutionAgreement |
| March 10, 2022 | SR's response to MB (DG and AT copied) | SR responds declining the resolution proposed.[97] | 9-Reges response to letter .. |
| March 28, 2022 | Email from Native faculty and staff | 20 signatories, point out larger context of alienation of Native people at UW, ask that UW honor MOU (e.g. hiring)[98] | EMAIL_Native faculty and staff statement |
| March 31, 2022 | Email from SR to diversity_allies | Compilation of LAs on CSE syllabi E-mail was rejected MB noted that SR used Allen School letterhead, SR agreed to change[99] | Reges-censorshipclaims |
| April 21, 2022 | NA informs SR that formal charges will be brought | (information gathered from FIRE Complaint) | Complaint |
| | | | |
| July 11, 2022 | Charge letter to SIC | Per faculty code 25-71.D.3, for information gathering and advising dean on interpretation [100] | FINAL_Charge letter to SIC... |
| July 11-Aug 24 | Activity of SIC | Reading initial materials, research into context, requesting and reviewing additional documentation, interviewing affected parties, writing reports | All documentation in Teams Drive |
| July 13, 2022 | FIRE lawsuit filed | For SR, suing AMC, NA, MB and DG Claims: free speech violated, EO31 impermissibly vague | Complaint |
| July 20, 2022 | First (teams) meeting of SIC | Subsequent meetings July 26, Aug 3, 17, 19 | |

with the party raising the issue. The faculty member and the party raising the issue may each be accompanied by one person." 25-71

[96] "Demonstrates respect toward all … If expressing dissent or attempting to produce change in the workplace, do so in a way that remains respectful to all, .. You agree not to include the statement that you have called your version of the land acknowledgment that was published in the CSE 143 Winter 2022 online course syllabus in the online and print copy of the CSE 142 Spring 2022 syllabus or in other future course syllabi. .. You agree that you will avoid any retaliation. .. If you prefer not to accept this agreement by that date, which is your decision, we will then proceed with next steps in accordance with the Faculty Code".

[97] "Thank you for taking the time to put your proposed resolution in writing. I respectfully decline the offer."

[98] "..alienates Indigenous students from his classes. .. is not conducive to learning; at least one of the Native CSE students has taken a leave of absence because of the alienation experienced related to Reges' statement. Students in and beyond Engineering have confided in us during our classes and at events on campus that they are deeply upset and emotionally impacted by Reges' statement." "The MOU states that priorities include enhancing "efforts to recruit, retain, and successfully graduate more American Indian undergraduate, graduate, and professional students." Both Reges' original action and the silence of the UW are negatively impacting our ability to recruit, retain, and successfully graduate these students. This instructor's actions take place in a larger context of UW campus alienation of our Native community, which continues to manifest in myriad ways."

[99] MB: "Additionally, we noted that the page you created is formatted differently  from your website. It is designed to appear as an official Allen School  page. It is not. I ask you to remove the UW and Allen School logos from that  page." SR: "I agreed with the desire not to include the Allen School logos, so I immediately changed the form of the web page to make it clear that it comes from me personally and not from the Allen School."

[100] "Because meetings held in accordance with Faculty Code Sections 25-71.B and 25-71.D have failed to result in a mutually agreeable resolution, I am initiating Faculty Code Section 25-71.D.3." "a special investigating committee of three faculty members who are not directly involved in the matter being considered. The committee shall assist the dean in the informal and confidential gathering of information and documentation and shall advise the dean in its interpretation."

| Aug 2022 | Series of interviews | between SIC and affected parties (identified from written documentation). Interviewing suspended on Aug 24 | Interviews.docx |
|---|---|---|---|
| Aug 9, 2022 | SIC meeting with Lincoln Johnson | Associate VP, Student Life, and Co-Chair of UW Bias Incident Advisory Committee (BIAC). | SICmeetingsummary_Lincoln Johnson |
| Aug 12 | SIC invitation to Reges to interview | e-mail from SIC sent by Steve Muench | |
| (Aug 16) | (Reges declined to interview) | Reply to e-mail by SR | |
| Aug 12 | SIC meeting with ▮▮▮ | Student in CS143 in Winter 2022[101] | SICmeetingsummary_▮▮▮ |
| Aug 12 | SIC meeting with Crystal Eney | Director of Student Services, CSE[102] | CrystalEneyInterviewNotes |
| Aug 17 | SIC meeting with Casey Wynecoop | Assistant Director of Intellectual House, Office of Minority Affairs & Diversity | CaseyWynecoop_SICmeetingsumm ary |
| Aug 19 | SIC meeting with Magdalena Balazinska | Director of CSE[103] | Balazinska notes-1 (not uploaded to Teams before suspension of activity) |
| Aug 19 | SIC meeting with faculty and staff of CAIIS | Center for American Indian & Indigenous Studies, 4 interviewees [104] | CAIIS meeting summary |
| Aug 23 | SIC meeting with Chad Allen | Associate Vice Provost for Faculty Advancement [105] | ChadAllenSICInterviewnotes (not uploaded to Teams before suspension of activity) |

---

[101] Reges's behavior shows an "an inability to accept opposing points of view and therefore be an effective instructor for all." "Reges was 'playing games with [her] education', 'trying to start something'."

[102] "objects to the sheer number of hours her team has to spend every time Stuart writes an article or does something in his class. Her team must address the fallout. Essentially, her team must respond to Stuart's behavior on behalf of the department. Despite all the productive work they can do to make students feel more included and to create a climate of acceptance, one comment from Stuart can undo the whole thing."

[103] "The number of complaints about the "land acknowledgement" was unprecedented, the largest number ever about a class." "CS 142 is a key class, it is taken when students are still deciding on their major. It is important that all students feel … supported in it." "There were two incidents in winter 2022 in which faculty did their own land acknowledgements the content of which she felt were over the top. She suggested that the wording be changed and toned down, so that conservative students would not take offense. She raised the issue, talked to the instructors in question, and they toned down their wording. The instructors were Kevin Lin and Lauren Bricker." "she got a threatening call at home about this matter, and contacted the police."

[104] "… events happened in general context of navigating discrimination on daily basis, and doing the work of healing. … They are also trying to create a healthy space for Native students to be scholars and thrive. Even having one Native student in engineering is a big success, given the structural and other obstacles against them. Fragile progress which can be undone by events like this. There are severe ripple effect in science and STEM, and UW broadly. In general, this signals to Native community that STEM is not for them (Reges's classes are gateway/"culling" classes for most engineers). Also sends message that  UW is not a safe place to go. The UW claims that it's a safe space for all; Reges is overtly working against that." "[They] Wanted not to give SR more power by responding, but still required a lot of time and emotional labor." "SR was not only being deliberately racist and offensive,  but also denying the actual expertise and scholarship of Native scholars. (Dismissing them both as people with lived experience, and with academic knowledge). Land rights, stewardship etc. are things that are engaged in a critical way, and SR was advancing a view that was not even a substantial academic claim. It's disinformation and propaganda; a political posture that shouldn't be masquerading as critical thinking. Also, his definitions of "labor" amplify racist definitions of Native cultures and histories, shoring up stereotypes that inflict harm on Native people today  - including their exclusion from academic spaces." "If [students'] only option is to take a class with someone who has gone to the trouble of including hateful statements about their very identity, this will of course compromise their education and their future."

[105] "It was a stunt." "Stuart Reges doesn't know what he's talking about, he's creating violent environment for Native students." "issue about denigrating Native people … already hard to recruit Native students … generational trauma, getting to college is a huge deal" "one of criteria of teaching is creating welcoming environment – he's not meeting criteria if he can't do that."

Confidential

UW_Reges_0008772

| Aug 24, 2022 | SIC activities put on hold | e-mail from NA to SIC members | |
|---|---|---|---|
| Sept 28 | SIC activities resumed | e-mail from Aileen Trilles to SIC members | |

NA     Nancy Albritton, Dean of Allen School

MB     Magdalena (Magda) Balazinska, DIrector of Allen School

SR      Stuart Reges, Teaching Professor of Computer Science and Engineering

LA      Land Acknowledgement

AMC   Ana Mari Cauce, UW President

DG     Dan Grossman, Vice-Director of Allen School

Confidential