IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| STUART REGES,<br><br>*Plaintiff,*<br><br>v.<br><br>ANA MARI CAUCE, et al.,<br><br>*Defendants.* | CASE NO.   2:22–cv–00964–JHC |

## DECLARATION OF STUART REGES

Pursuant to 28 U.S.C. § 1746(2), I, Stuart Reges, declare the following:

1. I am a citizen of the United States. I am over 18 years of age and fully competent to make this declaration. I knowingly and voluntarily make this declaration in support of Plaintiff's Motion for Summary Judgment. If called as a witness, I could and would testify competently under oath to the following facts based on my personal knowledge.

2. I am the plaintiff in the above-captioned action challenging the University of Washington's violations of my First Amendment rights.

***I Am an Award-Winning Teaching Professor of Computer Science and a Vocal Defender of the Freedom of Speech.***

3. I began working as a computer science professor at the University of Washington Paul G. Allen School of Computer Science and Engineering (Allen School) in 2004. I have focused on introductory instruction in computer science and on programming, developing, and running introductory programs for the last four decades. The Allen School hired me to redesign and teach its introductory courses:

1

Computer Programming I (CSE 142) and Computer Programming II (CSE 143). During my time at UW, I have taught several other courses in computer science as well. My title at UW during the times relevant to this litigation was Principal Lecturer or Teaching Professor.

4. Before my hiring at UW, I designed introductory computer science courses and taught at the University of Arizona for eight years, and before that, I taught similar courses at Stanford University for ten years. I began teaching at Stanford at the age of 22.

5. I have a long history as an advocate for the freedom of speech, especially for the right to express dissenting viewpoints. I have spoken publicly in local and national media about my struggle with my identity and mental health as a gay man since the 1980s. As a senior lecturer at Stanford in the early 1990s, I publicly criticized and protested the War on Drugs, which resulted in Stanford firing me.

6. My reason for being a vocal defender of the freedom of speech, even at risk of my employment, is deeply rooted in my identity, and advocacy of my own and others' liberty. As a graduate student at Stanford in 1982, I published an op-ed in the Stanford Daily regarding my experience as a gay man. I then applied for a position within Stanford's computer science department. The department chair selected me as the finalist for the position, but he was embarrassed by my op-ed and openly gay identity. He told me the position was mine, but I had to promise not to publish anything regarding my gay identity again. As a 23-year-old who needed that job, and believed I had little power to reject the ultimatum, I accepted it. For the next three

years I stayed silent publicly regarding my gay identity. When the department chair retired, I published an article regarding the self-censorship I undertook in exchange for the job, and I promised myself I would never stay silent again. This began a lifelong commitment to the freedom of speech and exploration of what it means to practice free speech as a value, even when there are personal and professional consequences.

7. In 2011, UW honored me with its Distinguished Teaching Award. This award is given to only seven professors each year based on their subject matter expertise, enthusiasm and innovation in teaching and learning, ability to inspire independent and original thinking in students, innovations in course and curriculum design, and mentoring. I am the only current Allen School faculty member out of 99 who has won this award.

8. At all times relevant to this litigation, I received very positive reviews from my students, averaging above four points of a possible five on every criterion in course evaluations, including creating a welcoming classroom environment.

9. In Winter Quarter 2022, I helped to mentor a group of UW students that won a national computer programming competition for the first time in several years.

***My Dissenting Land Acknowledgment Statement Parodies UW's Own.***

10. Beginning in 2019, the Allen School recommended that computer science faculty include a land acknowledgment in their syllabi, and they offered UW's land acknowledgment as a model statement:

> The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations.

11. I view UW's land acknowledgment—and the Allen School's recommendation to include it within syllabi as a "best practice for inclusive teaching"—as a political statement expressing the viewpoint that land acknowledgments are somehow appropriate to include on syllabi.

12. Generally, I oppose the introduction of political statements on syllabi.

13. Nevertheless, I included my own dissenting statement in my syllabi, beginning with Winter Quarter 2022. I intend my version of a land acknowledgment as a parody of UW's own.

14. My statement is as follows:

> I acknowledge that by the labor theory of property, the Coast Salish people can claim historical ownership of approximately none of the land currently occupied by the University of Washington.

15. I believe that land acknowledgments are part and parcel of an ideological trend sweeping across United States universities and beyond—an agenda of "diversity, equity, and inclusion" that treats some groups of students as more deserving of recognition and welcome than others on account of their race or other immutable characteristic. I welcome all students in my classes without regard to their race or other characteristics, and I evaluate them according to their classroom performance.

16. I believe that UW's land acknowledgment is factually incorrect. My understanding is that most of the land currently occupied by UW was densely forested before the land was cleared to make way for the campus.

17.   I also view UW's land acknowledgment as expressing the viewpoint that UW sits on land that colonizers stole and occupy, and that UW's presence is somehow illegitimate, shameful, morally wrong, or unlawful. I believe that the recitation of land acknowledgments is an empty, performative act of moralism. Land acknowledgments absolve white people of their collective guilt at occupying space that indigenous peoples occupied before them; by reciting land acknowledgments, they demonstrate their correct moral beliefs and wash the stain of the original sin of genocide and displacement from themselves. I do not believe this is particularly useful, and I see it as hypocritical.

18.   Because I believe land acknowledgments are political, sanctimonious, and hypocritical, I believe they are ripe targets for parody. My intention in adding my parody land acknowledgment to my course syllabi was to cast UW's land acknowledgment into sharp relief—to hold it up to ridicule and scorn, as parody does.

***When Defendant Magdalena Balazinska Demanded I Remove My Land Acknowledgment Parody, I Declined.***

19.   On January 4, 2022, Director Balazinska demanded that I remove my land acknowledgment from my syllabi.

20.   I declined because I view my and UW's land acknowledgments as political statements. I strongly believe that if the Allen School can recommend that faculty adopt a land acknowledgment statement that expresses a political viewpoint in syllabi, then it cannot discriminate against the inclusion of my own viewpoint in my syllabi on the same topic.

21. The inclusion of my land acknowledgment parody in my syllabi never caused any disruption within my classes. I am unaware of any disruption outside my classes.

22. I am aware that some students, faculty, and staff disagreed with or complained about my statement. Though I asked for the details of those complaints, so that I might consider and respond to them, and though I asked whether any of my own students had complained, I was never given any of that information before discovery in this litigation.

23. The few student, faculty, and staff complaints that have been produced in this litigation are all related to the content and viewpoint of my land acknowledgment parody. Based on their emails, the complainants appear upset that I expressed what they believe to be an incorrect and offensive viewpoint. I nevertheless believed that it was important to contribute to the public debate regarding land acknowledgments and to encourage faculty and students to reconsider the placement of these political statements in syllabi. That is what I believe the inclusion of my land acknowledgment parody in my syllabi has done and is doing, and I intend to continue including my land acknowledgment in my syllabi to continue contributing to that public debate.

### *Defendants Balazinska and Daniel Grossman Created Competing Versions of My Classes.*

24. In Winter Quarter 2022, Director Balazinska and Vice Director Daniel Grossman created a competing, or "shadow," section of my introductory computer science course, taught by another instructor by pre-recorded lectures and meeting at

6

the same time as my sections, because of my land acknowledgment parody. (They again created a shadow course in Spring 2022.)

25. In my nearly 20 years of teaching at UW, there has ever only been one offering of CSE 142 or 143 per quarter, until Winter Quarter 2022. Creating competing sections of those courses and giving students and teaching assistants the option of competing sections had never been done before the Allen School and UW reacted to my land acknowledgment parody.

26. By the time Defendants Balazinska and Grossman, with Defendant Nancy Allbritton's approval, created the first shadow class, the 2022 Winter Quarter had already begun. Approximately 170 students out of over 500 students, or around 30 percent of the class, switched to the new shadow section. (In Spring Quarter 2022, students had the option to enroll in either my class or the shadow class from the quarter's outset.)

27. I continued to teach the other approximately 70 percent of students who remained in my Winter Quarter CSE 143 class without disruption or any incident. I administered the final exam, distributed grades, and received very positive student reviews. (Likewise, there was no disruption to my ability to instruct my CSE 142 students in Spring Quarter 2022 or since.)

***Defendants Balazinska and Allbritton Undertook Disciplinary Proceedings to Punish Me for My Land Acknowledgment Parody.***

28. In early March 2022, Director Balazinska called me to a meeting on March 8, 2022, to begin a disciplinary process under UW Faculty Code § 25-71, because of my land acknowledgment parody.

7

29. During that meeting, she told me that if I continued to put my land acknowledgment parody in my syllabi, then she expected to receive more complaints, and that she considered those complaints to be a disruption to my ability to deliver instruction to my classes.

30. I asked Director Balazinska to confirm that if I used UW's own land acknowledgment in my syllabus, I would not be in violation of UW policy. She would not confirm that understanding, saying it would depend on whether students complained. I also asked her whether any of my students had complained, or whether students from other programs had complained. She was unable or unwilling to answer that question during that meeting and never provided me an answer to that question. I asked Director Balazinska why professor Lauren Bricker was allowed to include a land acknowledgment on her syllabus in which she claimed that UW "acknowledges that we are on sacred land of the first peoples of Seattle," and that, "We honor, with gratitude, the land." Director Balazinska responded that no action was taken because no students complained about Professor Bricker's version.

31. Director Balazinska sent me a proposed resolution of the matter on March 9, 2022. Her proposal would have required me to remove my land acknowledgment parody from my syllabi, among other things. I, therefore, declined it—rejecting the ultimatum instead of, as I had regretfully done at Stanford in 1982, accepting it.

32. Director Balazinska then elevated the matter to Dean Nancy Allbritton, who called me to a meeting on March 25, 2022. During the meeting, she asked me to

speculate how students felt about my land acknowledgment parody, and she asked me why students who moved to the Winter Quarter 2022 shadow class chose to do so.

33.  I responded that I did not know and to my knowledge no one has ever sought to find out. As stated above, perhaps some students were offended by my statement, but I believe students are more concerned with grading policies, whether student performance is evaluated by final exam or by other assignments, whether professors allow for homework correction and resubmission to improve grades, and compatibility with the rest of their schedules, among other similar concerns.

34.  Though the Winter Quarter 2022 shadow class instructor, Hunter Schafer, ultimately decided to mirror my CSE 143 policies that quarter, he had a preexisting reputation among students for having more lenient grading and homework resubmission policies. He also taught classes that quarter by prerecorded lectures that students could watch on their own time; his class time was spent on question-and-answer sessions. This differs from my lecture style, and so this was an additional variable that could have contributed to students' choice to switch sections.

35.  In the Spring Quarter 2022, Miya Natsuhara taught CSE 142 with grading and homework-resubmission policies that differ from my own, giving students additional reasons to choose between my class and her class.

36.  On April 21, 2022, Dean Allbritton told me that she intended to convene a UW Faculty Code § 25-71 special investigating committee to investigate me because of my land acknowledgment parody and reactions to it.

37. I commenced this litigation on July 13, 2022, knowing that Dean Allbritton was to convene the special investigating committee, but without knowing that she already had.

38. On July 15, 2022, Dean Allbritton responded to an email I sent her on June 30, 2022, informing me that she had charged the special investigating committee on July 11, 2022, to begin its work.

39. I learned during this litigation, via Dean Allbritton's June 13, 2023, letter to me that Dean Allbritton and Director Balazinska withheld a merit increase that I was otherwise eligible to receive. If not for the investigation into me, I would have received that increase as of September 1, 2022. That pay was withheld from me during the pendency of the investigation. I received it on July 21, 2023, after I moved the Court for leave to file an amended complaint to address the merit pay issue, among other issues learned during discovery. Had I received my merit increase on time, I could have put it to use, including by placing it in an interest-bearing account.

40. Dean Allbritton concluded her June 13, 2023, letter by threatening me with future adverse employment actions if I should continue to include my land acknowledgment parody in my syllabi and if "disruption" results from that. The only disruption she cites in her June 13 letter relates to student, faculty, and staff reactions to my land acknowledgment parody.

41. I cannot predict whether any student, faculty member, UW staffer, or UW administrator will complain about my land acknowledgment in the future, though it stands to reason that at least one will, given that some did before. Therefore,

the only way I can avoid future adverse employment actions is to remove the statement from my syllabi, which I have no intention of doing so long as the Allen School recommends that professors include UW's own political statement in their syllabi.

### *Despite No Disruption to My Ability to Instruct My Courses, Defendants Have Made Me a Pariah on Campus and Within the Allen School of Computer Science and Engineering.*

42. I taught CSE 142 or 143 in Spring 2022, Fall 2022, Winter 2023, Spring 2023, and Fall 2023 without a single disruption to my instruction. I included my land acknowledgment parody in the syllabus for each of those classes. I am scheduled to teach introductory computer science in Spring 2024, as well as other classes, and I intend to include my land acknowledgment parody in the syllabi for those classes.

43. Because of the Defendants' adverse employment actions—censoring my speech, apologizing to my students for it, repudiating it to the media, creating two shadow sections, subjecting me to a prolonged disciplinary process and investigation, withholding my merit increase, and threatening me with future adverse employment actions—I have suffered injuries.

44. My speech and that of other professors has been censored or chilled. I have been deprived of pay I otherwise would have received months earlier. My professional reputation has been tarnished. My status on campus, and my relationship with students and teaching assistants, has suffered.

45. I feel that I have been made a pariah on campus, because of the Defendants' censorship and repudiation of my speech; their creation of class sections

that give students the choice not to learn from me and teaching assistants the option not to work with me; and their nearly yearlong investigation of me for my speech. Other faculty members, including longtime colleagues in my own department, no longer include me in planning meetings, or even greet me in the hallways.

46.     Though I was hired in 2004 in large part to redesign and teach introductory computer science courses, the Allen School in the past year has again redesigned them, this time without my input.

47.     Now students are permitted to enroll in the newly created CSE 121, 122 and 123 courses and avoid enrolling in 142 and 143, which I teach. The Allen School has never permitted me to teach 121, 122, or 123. Those classes are taught under a pedagogical approach that differs from my own, spending less time on lectures. I recognize that the Allen School may change its pedagogical approach, but I was surprised that the school redesigned its introductory courses without seeking my input—and seeming to avoid it for no reason other than my dissenting view on land acknowledgments.

48.     Defendants have discriminated and retaliated against me for expressing a viewpoint on land acknowledgments that may depart from the local majority view. Some may view this as a natural consequence of sharing a view that they find repugnant. But at a university—especially there—we should remain free to challenge ideas, including those that a majority believes to be morally correct.

49.     I have reviewed the Declaration of Gabriel Walters and its exhibits that have been filed in support of my Motion for Summary Judgment.

50. Walters Declaration Exhibit B is a true and correct copy of the "About OMA&D" page to which Director Balazinska directed my attention on January 4, 2022.

51. Walters Declaration Exhibit D, at pages UW_Reges_0001616–1621, is a true and correct copy of the Allen School's Best Practices for Inclusive Teaching document, with which I am familiar as an Allen School professor.

52. Walters Declaration Exhibit E is a true and correct copy of my Winter Quarter 2022 CSE 143 syllabus.

53. Walters Declaration Exhibit F includes a true and correct copy of an email exchange between me and Director Balazinska that we had on January 4, 2022.

54. Walters Declaration Exhibit J includes a true and correct copy of an email exchange between me and Director Balazinska that we had on January 4, 2022.

55. Walters Declaration Exhibit K is a true and correct copy of UW Faculty Code § 25-71, with which I became familiar during the disciplinary process that the Defendants in this litigation pursued against me.

56. Walters Declaration Exhibit L includes a true and correct copy of an email that Director Balazinska sent me on January 4, 2022.

57. Walters Declaration Exhibit M is a true and correct copy of the statement that Allen School staff posted to my Winter Quarter 2022 CSE 143 course portal after removing my syllabus.

58. Walters Declaration Exhibit O is a true and correct copy of a statement that the Allen School posted to Twitter from its official account on January 4, 2022,

regarding my land acknowledgment parody appearing in my Winter Quarter 2022 CSE 143 syllabus. I reviewed the Twitter post that day.

59. Walters Declaration Exhibit CC is a true and correct copy of an email I sent to the Allen School faculty and diversity-allies listservs on February 23, 2022.

60. Walters Declaration Exhibit EE is a true and correct copy of an email, with letter attachment, I received from Director Balazinska on March 2, 2022.

61. Walters Declaration Exhibit FF is a true and correct copy of the letter attached to Director Balazinska's March 2, 2022, email to me.

62. Walters Declaration Exhibit GG is a true and correct copy of UW Executive Order 31, with which I became familiar during the disciplinary process that the Defendants in this litigation pursued against me.

63. Walters Declaration Exhibit HH is a true and correct copy of an email, with letter attachment, I received from Director Balazinska on March 9, 2022.

64. Walters Declaration Exhibit II is a true and correct copy of the letter attached to Director Balazinska's March 9, 2022, email to me.

65. Walters Declaration Exhibit KK includes a true and correct copy of an email exchange between me and Dean Allbritton, dated from March 18, 2022, to April 21, 2022.

66. Walters Declaration Exhibit QQ is a true and correct copy of Dean Allbritton's June 13, 2023, letter to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Executed on December 18, 2023

s/ *Stuart Reges*  
Stuart Reges