Honorable John H. Chun

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STUART REGES,

Plaintiff,

v.

ANA MARI CAUCE, et al.,

Defendants.

Case No. 2:22-cv-00964-JHC

**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Noted for Hearing: January 12, 2024

**ORAL ARGUMENT REQUESTED**

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1

**TABLE OF CONTENTS**

2

3    TABLE OF AUTHORITIES ...............................................................................................ii

4    I.      INTRODUCTION.................................................................................................1

5    II.     FACTS ...................................................................................................................2

6            A.      The University aims to foster an inclusive learning environment, especially for
                     Native students ..........................................................................................2

7            B.      Reges crafts a land acknowledgment to mock inclusivity efforts ............................2

8            C.      Reges' land acknowledgment disrupts the learning environment........................3

             D.      The University acts based on the disruption—not Reges's viewpoint....................4

9            E.      The University does not punish Reges .....................................................5

10   III.    LEGAL STANDARD .............................................................................................6

11   IV.     ARGUMENT .........................................................................................................7

12           A.      The University's interest in avoiding disruption to the learning environment
                     outweighs Reges's expressive rights, especially given the minimal restriction.......7

13
             B.      Reges did not speak as a citizen in attaching his land acknowledgment to the
14                   University's syllabus for his course .........................................................11

15           C.      Reges's viewpoint-discrimination claim collapses into his retaliation claims,
                     and the University did not target his speech based on viewpoint in any event......16

16           D.      Reges's facial challenges to Executive Order 31 fail.............................................18

     V.      CONCLUSION ....................................................................................................21
17

18

19

20

21

22

23

24

25

26

27

28

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abcarian v. McDonald,*
  617 F.3d 931 (7th Cir. 2010) ................................................................. 14

*Adams v. Trustees of the University of North Carolina-Wilmington,*
  640 F.3d 550 (4th Cir. 2011) ................................................................. 14

*Battle v. Bd. of Regents for Ga.,*
  468 F.3d 755 (11th Cir. 2006) ............................................................... 17

*Berry v. Dep't of Soc. Servs.,*
  447 F.3d 642 (9th Cir. 2006) ................................................................. 17

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) .............................................................................. 19

*Cochran v. City of Atlanta,*
  289 F. Supp. 3d 1276 (N.D. Ga. 2017) ................................................. 17

*Connick v. Myers,*
  461 U.S. 138 (1983) ................................................................. 7, 9, 10, 11

*Demers v. Austin,*
  746 F.3d 402 (9th Cir. 2014) ..................................................... 11, 13, 14

*Downs v. Los Angeles Unified School District,*
  228 F.3d 1003 (9th Cir. 2000) ................................................... 12, 15, 16

*Edge v. City of Everett,*
  929 F.3d 657 (9th Cir. 2019) ................................................................. 20

*Ford Motor Co. v. Tex. Dep't of Transp.,*
  264 F.3d 493 (5th Cir. 2001) ................................................................. 20

*Gammoh v. City of La Habra,*
  395 F.3d 1114 (9th Cir. 2005) ............................................................... 20

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ........................................................................ passim

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .............................................................................. 20

*Hernandez v. City of Phoenix,*
  43 F.4th 966 (9th Cir. 2022) ........................................................... 19, 20

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

ii

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

*Johnson v. Poway Unified School District*,
   658 F.3d 954 (9th Cir. 2011) ............................................................... 15, 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................... 6

*Pickering v. Bd. of Educ. Tp. High Sch. Dist. 205*,
   391 U.S. 563 (1968) ......................................................................*passim*

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ......................................................................... 7, 8, 9

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) ............................................................................. 12

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   803 F.3d 1084 (9th Cir. 2015) ................................................................ 6

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................................. 18

*United States v. Williams*, 553 U.S. 285 (2008) ........................................ 20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ............................................................................. 20

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ............................................................................. 12

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ............................................................................. 18

*Waters v. Churchill*,
   511 U.S. 661 (1994) ............................................................................. 20

**Statutes & Constitutional Provisions**

First Amendment ...................................................................................*passim*

RCW 28B.137.010 .................................................................................. 12

**Other Authorities**

University of Washington Executive Order 31 ............................... 18, 19, 20

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

iii

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

## I.    INTRODUCTION

"I am trolling on purpose." This is Stuart Reges's own account of his purported effort to criticize diversity practices and indigenous land acknowledgments at the University of Washington. Reges was "causing trouble on purpose"—again, his words—and it worked. He included an incendiary claim on a University course syllabus that, "by the labor theory of property," Native people can claim "historical ownership of almost none of the land currently occupied by the University of Washington." As a result of his stunt, faculty, staff, and students at the University's Paul G. Allen School of Computer Science & Engineering saw their learning environment disrupted.

In response to the disruption that Reges's conduct had caused to the learning environment, to the work of teaching assistants, and to the work of staff responsible for inclusion initiatives, the University acted. But that action was limited. Defendants—University administrators and faculty—removed Reges's inflammatory statement from the University syllabus for his Winter 2022 introductory course, and offered an alternative section of the course that quarter. Reges announced two months later that he intended to repeat the actions that had caused the disruption. That announcement drew a formal complaint from elected leaders of the union representing the University's student-employees (teaching assistants) that their collective-bargaining agreement had been violated, along with complaints from other stakeholders. In response, the University launched, consistent with standard practices, an investigation into whether Reges had violated University policy or the Faculty Code and created another alternative class section for the Spring 2022 quarter. That is all. Reges was not fired, suspended, or docked pay. He continued to post his purported land acknowledgment next to the door to his faculty office, at the bottom of his University emails, on his website, and to discuss it with others. He also included it on every other syllabus for courses he taught after Winter 2022, with no interference by the University. The University's response was balanced and did not interfere with Reges's ability to express his views; indeed, it was so mild that Reges himself acknowledges his wish that the response had been more robust to gain him more attention.

Rather than commit himself to treating others in the University community with respect,

1   Reges filed suit. But his claims—for retaliation and viewpoint discrimination and to invalidate a

2   University anti-discrimination policy—lack factual and legal support. Because the law supports

3   judgment as a matter of law for the University officials, Defendants ask the Court to grant this

4   motion for summary judgment.

## II.   FACTS

### A.   The University aims to foster an inclusive learning environment, especially for Native students.

8   The University of Washington acknowledges that the Coast Salish peoples remain part of

9   the community in the Puget Sound region. Allen Decl. ¶ 5. The University also seeks to provide a

10   welcoming environment for indigenous people—particularly Native students who would attend

11   the University. *Id*. ¶ 4. To that end, it crafted a land acknowledgment—a statement to

12   acknowledge that the University is situated on lands that were already in the possession of

13   indigenous people before the University's formation. *Id*. The University's land acknowledgment

14   reads: "The University of Washington acknowledges the Coast Salish peoples of this land, the

15   land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and

16   Muckleshoot nations." *Id*. ¶ 5.

17   The University's land acknowledgment grew out of a years-long process in which

18   University officials worked with the Office of the Governor, Tribal leaders from throughout the

19   state and region, and other stakeholders. Allen Decl. ¶ 6; *see also* McKenna Decl., Ex. 2.

20   Within the Allen School, in its "Best Practices for Inclusive Teaching" document, the

21   Allen School Diversity Committee suggests including a welcoming land acknowledgment

22   statement (using the University's statement as an example) to create a more inclusive

23   environment—identifying the nature of the message the University is trying to convey. Grossman

24   Decl. ¶ 4 & Ex. 1. The Best Practices document contains no mandatory provisions. *Id*.; *see also*

25   McKenna Decl., Ex. 1 (Reges Dep.) at 47:4–48:5.

### B.   Reges crafts a land acknowledgment to mock inclusivity efforts.

27   Stuart Reges is an instructor in the Allen School. The Allen School in turn is led by

28   Director Magda Balazinska, with Professor Dan Grossman serving as Vice Director. Balazinska

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

2

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1  Decl. ¶ 3; Grossman Decl. ¶ 3. The Allen School sits within the University's College of

2  Engineering, led by Dean Nancy Allbritton. Allbritton Decl. ¶ 3.

3       Reges has a history of stirring controversy, having been the subject of complaints within

4  the University system "many times." McKenna Dep., Ex. 1 at 16:18–17:3; *see also id.*at 22:3–

5  24:24, 26:10–20, 28:17–31:5, 269:5–270:2. To highlight his objection to what he calls "the equity

6  agenda," Reges crafted his own "parody" land acknowledgment. *Id.* at 67:12–68:7, 70:4–15,

7  122:3–10.

8       Reges first circulated his version of a land acknowledgment to Allen School faculty in

9  December 2021: "I acknowledge that by the labor theory of property the Coast Salish people can

10  claim historical ownership of almost none of the land currently occupied by the University of

11  Washington." Balazinska Decl., Ex. 1. Weeks later, Reges included his alternative land

12  acknowledgment in the Winter 2022 syllabus for his course, CSE 143—Computer

13  Programming II. *See* McKenna Decl., Ex. 3; *id.*, Ex. 1 at 81:13–22. Reges included his purported

14  land acknowledgment on the University syllabus for his course even though he knew that, far

15  from advancing the purpose of the University's suggested land acknowledgement—creating a

16  more welcoming environment—it would instead have the opposite effect and likely offend a

17  significant segment of the University's community, including his students. *See id.*, Ex. 1 at

18  36:10–38:17, 53:5–54:18, 70:4–71:5, 73:11–22, 74:17–75:10, 78:9, 80:6–10, 98:6–11.

19       **C.**     **Reges's land acknowledgment disrupts the learning environment.**

20       Reges's land acknowledgment prompted an immediate and substantial disruption. The

21  statement garnered a "significant amount of attention" on Reddit, "almost all [of it] negative. *See*

22  *id.*, Ex. 1 at 92:4–13; 101:1–7.

23       Over the following days and weeks, Balazinska learned about the significant level of

24  disruption caused by Reges's actions. First, the disruption interfered with University staff.

25  Director Balazinska learned that staff were "at a loss for how to best express their concern and

26  frustration about this situation," and worried about the effect on prospective students. Balazinska

27  Decl., Ex. 4 at UW_Reges_0008851. The Allen School's recruiter for diversity and access

28  complained that Reges had undermined her function within the School. *Id.*, Ex. 5.

3

Teaching assistants also experienced disruption. Representatives of the University's union for academic student-employees informed Director Balazinska that some teaching assistants felt "fear of retaliation from Stuart Reges" and that other student employees' "feelings of belonging in the Allen School have been negatively impacted by the fact that Stuart Reges' behavior has been allowed to continue." *Id.*, Ex. 6.

She also learned that Reges's mock land acknowledgment had, predictably, not only failed to advance the University's goal of creating a welcoming environment for Native students, but had the opposite effect. At least one student in the class felt "intimidated" in a required course for her program. Balazinska Decl., Ex. 4. Another said that Reges's statement "tarnishes the reputation of the Allen School." *Id.* Student members of the Allen School Diversity Committee complained. *Id.* A Native student at the Allen School felt "despised" and ultimately took a leave of absence. *Id.*; *see also* Allbritton Decl., Ex. 3 at 2.

**D.      The University acts based on the disruption—not Reges's viewpoint.**

Director Balazinska told Reges to remove his land acknowledgment from the CSE 143 syllabus, assuring him that he could "voice [his] opinion and opposition to land acknowledgments … in other settings." Balazinska Decl., Ex. 2. After Reges refused, she removed Reges's land acknowledgment from the online version of his syllabus, leaving untouched the video recording of Reges's lecture, in which he noted his land acknowledgement statement. McKenna Decl., Ex. 1 at 98:20–99:5. Director Balazinska also apologized to the CSE 143 students. Balazinska Decl., Ex. 3. Balazinska and Grossman created alternative sections for Reges's introductory courses in Winter and Spring 2022 to accommodate any students who felt that they could not take the class from Reges. *Id.* ¶¶ 9, 19; Grossman Decl. ¶ 6.  One hundred and seventy students (nearly one-third of Reges's students) switched to the alternative class section in Winter 2022. McKenna Decl., Ex. 1 at 115:6–11.

By late January, Reges was upset that protest was being "ignore[ed]" by the University, which had taken no further action to prevent him from publicizing his purported land acknowledgment. *See id.* at 145:21–24; *see generally id.* at 142:20–147:16. As a result, he emailed the Allen School's diversity-allies listserv in February 2022, detailing his plans to repeat

1   his land acknowledgment on the course syllabus for Spring 2022. Balazinska Decl. ¶ 11. Because

2   of this action, the Allen School received a formal complaint from the union representing student

3   workers at the University, asserting that Reges's actions violated the union's collective-

4   bargaining agreement with the University. *Id.*, Ex. 6. In response to this and other complaints,

5   Balazinska initiated the Faculty Code Section 25-71 process, arranging a meeting with Reges to

6   discuss his potential violations of University policy. *Id.* ¶¶ 14–15 & Exs. 7–8. When Reges

7   refused any proposal to revise his land acknowledgment statement or remove it from course

8   syllabi, and offered no proposed resolution of his own, Balazinska continued the Faculty Code

9   Section 25-71 process, which referred the matter to Dean Allbritton. *Id.* ¶ 18 & Ex. 9. After a

10  meeting between Reges and Dean Albritton also failed to yield resolution, Dean Albritton

11  convened a special investigating committee in accordance with the Faculty Code Section 25-71

12  process to assist the Dean in confidentially gathering information and documentation and to

13  advise her on interpreting the Faculty Code. Allbritton Decl., ¶¶ 4–6 & Exs. 1–2; McKenna Decl.

14  Ex. 4.

15          **E.      The University does not punish Reges.**

16          In October 2022, the special investigating committee reported orally to Dean Allbritton

17  about its investigation. Allbritton Decl.  ¶ 8; Trilles Declaration ¶ 4 & Ex. 1. In a June 2023 letter

18  to Reges, Dean Allbritton summarized what she had learned from the committee and shared her

19  own conclusions. Allbritton Decl. ¶ 9 & Ex. 3. The committee found, "based on multiple

20  interviews with directly affected parties … and on review of contemporaneous documents and

21  [Reges's] public statements," that Reges's inclusion of his land acknowledgment on the

22  University syllabus "created an immediate and significant disruption to the University teaching

23  environment." *Id.*, Ex. 3 at 1–2. The committee also found that Reges's refusal to acknowledge

24  the disruption he had caused exacerbated the situation. *Id.* at 3–4.

25          Despite these findings, Dean Allbritton "decline[d] to impose any sanction at [that] time"

26  and reinstated Reges's merit pay increase which, per established University practice, had been

27  held in abeyance during the Faculty Code Section 25-71 process. *Id.* at 5; Trilles Decl. ¶ 5.

28  Dean Allbritton explained that, if Reges continued to include his land acknowledgment on

1     University syllabi "*and* if that inclusion leads to further disruption," she would conclude that

2     Reges intended the disruption, and the University would proceed according to the Faculty Code.

3     *Id.* at 5–6.

4          In short, Reges suffered no sanctions. He was not fired. He was not suspended. He was

5     not demoted. His salary was not reduced. While his 2022 discretionary merit pay increase was

6     held in abeyance pending the outcome of the special investigating committee investigation, it was

7     reinstated upon its conclusion and Reges was awarded that pay raise retroactively. Moreover, the

8     University did not prevent him from expressing his views and publishing his land

9     acknowledgement statement. He put it on his email signature block. He posted it next to the door

10    to his faculty office. He put it on a page he created on his University website. *See* McKenna

11    Decl., Ex. 1 at 60:25–61:15, 64:2–7, 77:8–25, 105:7–25, 99:16–100:1. Reges has even included

12    his land acknowledgment on all syllabi after Winter 2022, and the University never again

13    removed it. McKenna Decl., Ex. 1 at 201:24–202:5, 216:15–218:4.

14                 **III.  LEGAL STANDARD**

15          Summary judgment is appropriate when "there is no genuine dispute as to any material

16    fact and the movant is entitled to judgment as a matter of law." *Stanislaus Food Prods. Co. v.*

17    *USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015) (citation omitted). While the Court

18    must "view the facts and draw factual inferences in favor of … the non-moving party," Reges

19    must "establish a 'genuine' factual dispute, which involves 'more than … some metaphysical

20    doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

21    *Corp.*, 475 U.S. 574, 586 (1986)).

22          "[T]wo inquiries … guide interpretation of the constitutional protections accorded to

23    public employee speech. The first requires determining whether the employee spoke as a citizen

24    on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If the answer is

25    yes, and "the possibility of a First Amendment claim arises," *id.*, courts "balance … the interests

26    of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the

27    State, as an employer, in promoting the efficiency of the public services it performs, *Pickering v.*

28    *Bd. of Educ. Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    ARGUMENT

Defendants have a right to summary judgment on all Reges's claims. First, his retaliation and viewpoint-discrimination claims fail because the University's interest in its orderly operations outweighs any minimal burden on Reges's expressive rights. § IV.A. Second, those same claims fail because Reges's course syllabus is a University document reflecting the University's views, and his land acknowledgment does not reflect speech in Reges's capacity as a citizen. § IV.B. Third, any freestanding viewpoint-discrimination claim fails because the University did not punish Reges based on his viewpoint. § IV.C. Last, Reges's facial challenges to University policy fail as well. § IV.D.

### A.    The University's interest in avoiding disruption to the learning environment outweighs Reges's expressive rights, especially given the minimal restriction.

Reges's claims fail because he cannot satisfy the *Pickering* balancing test. The University took modest action—so modest in fact that Reges was disappointed not to have prompted a more robust response from the University—to cure the disruption Reges's conduct caused. But Reges was always free to voice his views,[1] including to utter, publish, discuss, and disseminate his land acknowledgment. The slight restrictions he faced are outweighed by the University's interests.

Under *Pickering*, a retaliation claim cannot succeed when "the interest[s] of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweigh "the interests of the teacher, as a citizen, in commenting upon matters of public concern." *Pickering*, 391 U.S. at 568. Relevant here is the time, place, and manner in which the speech was made as well as the context in which the dispute arose. *Connick v. Myers*, 461 U.S. 138, 152–53 (1983). When weighing the interests, "pertinent considerations [include] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

---

[1] And did so repeatedly. *See infra* at 10.

***The University's interests.*** The disruption here—both actual and anticipated—justifies the University's actions. The undisputed record highlights the harm to the University's interests due to Reges's conduct. When Director Balazinska removed Reges's land acknowledgment from the University syllabus for his course in Winter 2022 and decided—in consultation with other administrators—to create alternative class sections for that course in Winter and Spring 2022, she acted against a background of considerable disruption to the learning environment.

For instance, the disruption caused by Reges's actions interfered with University staff functions. Director Balazinska became aware that staff were "at a loss for how to best express their concern and frustration about this situation," and worried about the effect on prospective students. Balazinska Decl., Ex. 4 at UW_Reges_0008851. The Allen School's recruiter for diversity and access expressed frustration that Reges had undermined her function within the School: "How am I supposed to recruit students into an environment where their history is questioned and their rights are denied?" *Id.*, Ex. 5 at UW_Reges_0008914. Reges's actions thus "impair[ed] … harmony among co-workers" and "interfere[d] with the regular operation of" the Allen School. *Rankin*, 483 U.S. at 388.

Teaching assistants, who wear two hats as both students and instructors, also experienced the disruption Reges caused. Representatives of the University's student-employee union informed Director Balazinska that some teaching assistants felt a "fear of retaliation from Stuart Reges" and that other student employees' "feelings of belonging in the Allen School have been negatively impacted by the fact that Stuart Reges' behavior has been allowed to continue." Balazinska Decl., Ex. 6 at UW_Reges_0008887. Reges admits that some teaching assistants "were offended" by his land acknowledgment, and that the situation damages the cohesiveness of the teaching assistant program. McKenna Decl., Ex. 1 (Reges Dep.) at 124:7–14.

Reges's statement also caused a disruption for his students and the University environment generally. The statement immediately went viral on Reddit, drawing enormous negative attention. *See* McKenna Decl., Ex. 1 at 92:4–13; 101:1–7. As a result, Director Balazinska learned that at least one student in the class felt "intimidated" and not "welcome" in a required course for the major. Balazinska Decl., Ex. 4 at UW_Reges_0008840. Another student

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

8

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1  opined that Reges's statement "tarnishes the reputation of the Allen School." *Id.* at

2  UW_Reges_0008842. Six student members of the Allen School Diversity Committee

3  complained. *Id.* A Native student at the Allen School felt "despised" and ultimately took a leave

4  of absence. *Id.* at UW_Reges_0008845; *see also* Allbritton Decl., Ex. 3 at 2. In other words,

5  Reges's actions had a "detrimental impact" on the student–faculty relationship for which

6  "confidence" is necessary. *Rankin*, 483 U.S. at 388. Ultimately, 170 students switched to the

7  alternative class section in Winter 2022. McKenna Decl., Ex. 1 at 115:6–11.

8       Months later, after the special investigating committee completed its investigation, it

9  informed Dean Allbritton that Reges's conduct led to an "extraordinary" level of disruption.

10  Trilles Decl., Ex. 1. According to notes of the Committee's discussion with Dean Allbritton,

11  Reges's actions made an "impact across campus to students in the class and to the greater student

12  population … and the Native American community" and there "was an overwhelming sense that

13  [Reges] violated [community members'] dignity" through a "bad faith attempt to spark

14  discussion." *Id.*; *see also* Allbritton Decl., Ex. 3 at 1–4.

15       And while Reges's actions in fact caused a significant disruption, the University need not

16  "allow events to unfold to the extent that the disruption of the [classroom or the school] … [wa]s

17  manifest before taking action." *Connick*, 461 U.S. at 152. Employers can take proactive steps to

18  safeguard their interests, even when there is some effect on an employee's speech interests.

19       Reges, for his part, cannot show a genuine dispute over the disruption he caused. He knew

20  that "people might complain" and find his statement offensive. McKenna Decl., Ex. 1 at 70:4–

21  8,98:6–11. Indeed, he knew that he was "trolling" and "causing trouble on purpose." *Id.* at 73:11–

22  17, 127:19–23. His statement generated a "significant amount of attention" online, and Reges

23  described himself as "shaking all over" because of the reaction to his statement: "now it's getting

24  very real." *Id.* at 90:5–18, 101:1–7. Case law makes clear that the University was more than

25  justified in taking the (very mild) action it did.

26       In *Connick*, for example, an assistant district attorney (Myers), sued her boss the New

27  Orleans District Attorney (Connick), alleging that, after she refused an office transfer, she was

28  wrongfully terminated for distributing a questionnaire concerning office policies and behaviors,

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC
9
Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1   including the office transfer policy. 461 U.S. at 140–41. The Court found no free-speech violation

2   after weighing "the manner, time, and place in which the questionnaire was distributed." *Id.* at

3   152. The Court explained that Connick had a valid interest in maintaining close working

4   relationships at the office and avoiding insubordination, and "the fact that Myers . . . exercised

5   her rights to speech at the office support[ed] Connick's fears that the functioning of his office was

6   endangered." *Id.* at 153. Myers's limited First Amendment interest was thus far outweighed by

7   Connick's interests, and her claim failed. Here, not only is the evidence of actual disruption

8   substantially more compelling, but Reges was not fired and his ability to express his views faced

9   no interference except for his including it on the University syllabus for his course.

10      ***Reges's interests.*** In contrast with the damage Reges caused to the University's interests,

11   Reges's speech interests were not affected in any material way. While he alleges that the

12   University required him to repeat the University's viewpoint "or to remain silent," Dkt. 46 ¶ 127,

13   the record cements that Reges has remained free to express his views in a variety of ways even

14   after his statement was removed from the online version of the University's Winter 2022 syllabus

15   for his course:

16   • Reges can append his land acknowledgment to the bottom of his emails—and he has.

17      McKenna Decl., Ex. 1at 60:25–61:15, 64:2–7.

18   • He can send it to colleagues—and he has. *Id.* at 77:8–25.

19   • He can post it outside his office—and he has. *Id.* at 105:7–25.

20   • He can give interviews to the media about his statement—and he has. *E.g.*, *id.*

21      at 111:3–114:22, 161:1–18.

22   • He can discuss his statements with colleagues, and he has. *Id.* at 99:16–100:1.

23      Nor has the University done anything to stop him from writing books, or staging a public

24   protest on University grounds, or organizing discussions with interested students, faculty, and

25   staff. The de minimis nature of the University's actions undermines any suggestion that Reges

26   has been silenced.

27      In fact, the University's response was so muted that Reges admits he was disappointed:

28   He has lamented that, by late January 2022, "interest in [his] case seems to have dropped to

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

10

1    nearly zero." McKenna Decl., Ex. 1 at 128:5–14; *see also id.* at 182:12–183:11 (Reges describing

2    plan to "make people pay attention" in April 2022 because he is "not happy that [colleagues] are

3    just ignoring" him). The University removed his land acknowledgment from one syllabus in

4    Winter 2022 and created alternative sections for his introductory course that quarter and the next.

5    That's it. The investigation by the special investigating committee and Dean Allbritton's

6    conclusions based on that investigation led to no discipline.

7         Reges even admits that although he included his land acknowledgment on all syllabi after

8    Winter 2022, the University never again removed it. *See id.* at 201:24–202:5, 216:15–218:4.

9    Reges was not docked pay. *See id.* at 123:3–5. And while his 2022 merit raise was held in

10   abeyance, University officials confirm that this is standard practice while a Faculty Code

11   investigation is pending, since merit-based salary increases are not an entitlement and the

12   outcome of the investigation may affect the final determination of merit. Trilles Decl. ¶ 5. In any

13   event, Reges has now been fully paid. McKenna Decl., Ex. 1 at 215:15–20.

14        The balance between the University's interest and Reges's is not close. *Cf.*

15   *Connick*, 461 U.S. at 142 (noting that plaintiff had been terminated). Reges can provide no

16   evidence to contradict these facts. Put simply, Reges's interest in inserting a mocking land

17   acknowledgment in a University course syllabus is outweighed by the University's legitimate

18   interest in the efficient functioning of its school and maintaining an environment conducive to

19   learning.

20        **B.        Reges did not speak as a citizen in attaching his land acknowledgment to the**
               **University's syllabus for his course.**

21

22        "[W]hen public employees make statements pursuant to their official duties, the

23   employees are not speaking as citizens for First Amendment purposes, and the Constitution does

24   not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. That's

25   what Reges did by including land acknowledgments in University course syllabi that undermined

26   the University's message welcoming Native students in circumstances in which his statement

27   could be understood as the University's. Nor is Reges's speech protected under *Demers v. Austin*,

28   746 F.3d 402 (9th Cir. 2014).

"[A]s a general matter, when the government speaks, it is entitled to promote a program, to espouse a policy, or to take a position" and that, "[i]n doing so, it represents its citizens and it carries out its duties on their behalf." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). "Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422–23. "When the government is formulating and conveying its message, 'it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995)).

Here, the University's land acknowledgment grew out of a years-long process in which University officials collaborated with the Office of the Governor, Tribal leaders from throughout the state and region, and other stakeholders. Allen Decl. ¶ 6. The purpose of the land acknowledgment is to create a welcoming environment for Native students. The University's drive to welcome Native students and faculty—and help ensure that they remain part of the University community—aims to remediate a long history in which the University excluded Native people. And it tracks the University's formal understanding with Tribes throughout the Pacific Northwest and the training University leadership receives in communicating with Tribal officials on a government–to–government basis. *Id.* ¶¶ 4–7; McKenna Decl., Ex. 5. The University's land acknowledgment thus represents an effort to achieve the important University goals.

The University also prescribes specific guidelines for course syllabi, detailing their purpose and format and the policies and content they should contain. *See id.*, Ex. 6. Washington law also requires public universities to include certain content—including the institution's policy on religious accommodations—in "course or program syllabi." RCW 28B.137.010. In its "Best Practices for Inclusive Teaching" document, the Allen School Diversity Committee suggests including a welcoming land acknowledgment statement (using the University's statement as an

example) to create a more inclusive environment—identifying the nature of the message the University is trying to convey. *See* Grossman Decl., Ex. 1.

Here, Reges included his land acknowledgment in the University syllabus for his introductory course and mentioned it on the first day of class in Winter 2022 deliberately to convey a message antithetical to the University's message—he intended to create a less welcoming environment. *See* McKenna Decl., Ex. 1 at 85:5–18. And Reges admits he knew this would be the result of the language in his statement. Indeed, he acknowledges that he recognized that many students would find his language offensive. For instance, he elected not to include the land acknowledgment in emails directly with students because "that's class business" and "sometimes [students are] asking important questions, disability accommodation, for example, so it didn't seem … that that was an appropriate place." *Id.* at 144:12–21; *see also id.* at 189:12–22 (discussing his voluntary removal of Allen School logos from a webpage to avoid implying that the School endorsed Reges's message).

The same principles that Reges acknowledges prove the point: a document describing course and program policy, including required accommodations disclosures, is "class business" too. The University is free to ensure that Reges did not garble its message with an offensive land acknowledgment that can only undermine the University's mission to welcome all people, and its particular interest in welcoming Native people. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421–22.

As Defendants explained in moving to dismiss, *Demers* does not help Reges. *See* Dkt. 50 at 6–10. In *Demers*, a Washington State University professor alleged that university administrators retaliated against him for distributing (1) a pamphlet he wrote about the faculty structure and the need for increased influence from "professionals"—i.e., faculty with professional experience—and reduced influence from faculty with Ph.Ds., and (2) draft chapters from his book critical of the University. *Demers*, 746 F.3d at 406–07, 414–15. The University argued that, because Demers spoke pursuant to his official duty as a university professor in each

13

1    instance, his speech was not protected under *Garcetti*. *Id.* at 408–09. The Ninth Circuit disagreed,

2    holding that Demers's speech was protected under an exception to *Garcetti* for "speech related to

3    scholarship or teaching." *Id.* at 411, 414–15. The Court cautioned, however, that "[i]t may in

4    some cases be difficult to distinguish between what qualifies as speech 'related to scholarship or

5    teaching' within the meaning of *Garcetti*." *Id.* at 415. In other words, not *all* academic speech is

6    speech "related to scholarship or teaching" under *Garcetti*. *Id.*

7          Other courts have recognized that *Garcetti*'s academic-freedom exception has limits. For

8    example, in *Abcarian v. McDonald*, the Seventh Circuit rejected a medical school department

9    head's argument that his speech—on issues including risk management, fees charged to

10   physicians, and surgeon abuse of prescription medications—was "'expression related to academic

11   scholarship or classroom instruction' possibly exempt from *Garcetti*." 617 F.3d 931, 938 n.5 (7th

12   Cir. 2010) (citation omitted). The court explained that the department head's "speech involved

13   administrative policies that were much more prosaic than would be covered by principles of

14   academic freedom." *Id.* Similarly, in *Adams v. Trustees of the University of North Carolina-*

15   *Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011), the Fourth Circuit explained that, at times, "a

16   public university faculty member's assigned duties include a specific role in declaring or

17   administering university policy, as opposed to scholarship or teaching. In that circumstance,

18   *Garcetti* may apply to the specific instances of the faculty member's speech carrying out those

19   duties." When speech is "undertaken at the direction of [the university]," it falls within *Garcetti*'s

20   scope. *Id.* at 563–564.

21         As in these cases, Reges's syllabus statements are not the type of "scholarship" or

22   "teaching" that the Supreme Court envisioned protecting as "academic freedom." *See Garcetti*,

23   547 U.S. at 425. Reges can point to no evidence showing that his one-sentence statement at the

24   bottom of his course syllabi is "related to scholarship or teaching" under *Garcetti*. Far from the

25   independently published pamphlet in *Demers* or the external publications in *Adams*, Reges's

26   speech was in an official University document required to be distributed. Indeed, it is precisely

27   the type of university-directed policy administration that *Adams* recognized would *not* constitute

28   "scholarship or teaching" under *Garcetti*. *Adams*, 640 F.3d at 563–34.

---

DEFENDANTS' MOTION FOR SUMMARY              14          Orrick Herrington & Sutcliffe LLP
JUDGMENT - Case No. 2:22-cv-00964-JHC                    401 Union Street, Suite 3300
                                                         Seattle, Washington 98101
                                                         tel+1-206-839-4300

1    Reges's speech is more like the speech addressed in *Johnson v. Poway Unified School*

2  *District*, 658 F.3d 954 (9th Cir. 2011) and *Downs v. Los Angeles Unified School District*, 228

3  F.3d 1003 (9th Cir. 2000).[2] In *Johnson*, a high school math teacher hung two banners in his

4  classroom referring to God or a "creator." 658 F.3d at 958. After the school required Johnson to

5  remove the banners because they could make students feel unwelcome or ostracized, Johnson

6  sued the school. *Id.* at 959. The court held that the school did not violate Johnson's constitutional

7  rights because he had not spoken "as a private citizen." *Id.* at 966–70. That context controlled the

8  outcome:

9        Johnson did not make his speech while performing a function not squarely within
         the scope of his position. He was not running errands for the school in a car adorned
10       with sectarian bumper stickers or praying with people sheltering in the school after
         an earthquake. Rather, Johnson hung his banners pursuant to a long-standing
11       [school] policy, practice, and custom of permitting teachers to decorate their
         classrooms subject to specific limitations and the satisfaction of the principal or a
12       District administrator.

13  *Id.* at 967 (internal quotation marks and citations omitted). Just as Johnson "did not act as a

14  citizen when he went to school and taught class, took attendance, supervised students, or

15  regulated their comings-and-goings; he acted as a teacher—a government employee," he "did not

16  act as an ordinary citizen when espousing God as opposed to no God in his classroom." *Id.*

17  (internal quotation marks and citation omitted). The court contrasted Johnson's speech with that

18  at issue in *Pickering*: "Unlike Pickering, who wrote a letter to his local newspaper as any citizen

19  might, … Johnson took advantage of his position to press his particular views upon the

20  impressionable and 'captive' minds before him." *Id.* at 968 (internal citation omitted). Nothing

21  "prevent[ed] Johnson from himself propounding his *own opinion* on 'the religious heritage and

22  nature of our nation' or how 'God places prominently in our Nation's history' … on the

23  sidewalks, in the parks, through the chatrooms, at his dinner table, and in countless other

24  locations. He may not do so, however, when he is speaking as the government, unless the

25  ─────────────

26  [2] That Johnson and Downs were high school, not college, teachers did not affect the analysis. In
    each case, the contested speech was made at the school by a government employee. *See Johnson*,
27  658 F.3d at 958–59; *Downs*, 228 F.3d at 1011–12. While the Ninth Circuit has acknowledged a
    distinction between speech related to scholarship and teaching in a university setting, that
28  distinction does not save Reges's claims because his speech is not scholarship or teaching under
    *Garcetti*.

1  government allows him to be its voice." *Id.* at 970 (internal quotation marks and citation omitted).

2  Similarly, in *Downs*, a high school teacher objected to his school's recognition of Gay and

3  Lesbian Awareness month by installing a bulletin board across from his classroom—competing

4  with the school's own bulletin board—on which he posted materials describing homosexuality as

5  immoral and illegal. *Downs*, 228 F.3d at 1006–07. Downs sued the school district after it required

6  him to remove the materials. *Id.* at 1008. The court held that the district did not violate Downs's

7  constitutional rights because his speech constituted government speech subject to regulation. *Id.*

8  at 1011, 1013. The court explained that "[a]n arm of local government—such as a school board—

9  may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to

10  advocate such tolerance if it so decides, and restrict the contrary speech of one of its

11  representatives." *Id.* at 1014. As in *Johnson*, the court acknowledged that Downs could express

12  his own views when speaking on his own behalf, but not when speaking in his government

13  capacity, unless the government allowed him to be its voice. *Id.* at 1016.

14  Just as in *Johnson* and *Downs*, nothing prevents Reges from propounding his opinion on

15  land acknowledgements "on the sidewalks, in the parks, through the chat-rooms, at his dinner

16  table, and in countless other locations." *Johnson*, 658 F.3d at 970; *Downs*, 228 F.3d at 1016. As

17  discussed above, the University never tried to prevent Reges from debating this topic on

18  University grounds in appropriate fora. But Reges cannot do so "when he is speaking as the

19  government." *Johnson*, 658 F.3d at 970 (citation omitted); *Downs*, 228 F.3d at 1016. The

20  University acted within constitutional limits in responding to that act. *See Downs*, 228 F.3d

21  at 1014.

22  **C.**   **Reges's viewpoint-discrimination claim collapses into his retaliation claims, and the University did not target his speech based on viewpoint in any event.**

23

24  Reges's viewpoint-discrimination claim cannot survive. First, it is not viable separate

25  from Reges's retaliation claims, so analysis above under *Pickering* and *Garcetti* yields the same

26  result for the viewpoint-discrimination claim. Second, the undisputed facts jibe with just one

27  interpretation: the University did not single out Reges's land acknowledge based on the

28

1   viewpoint it reflects; it merely responded to an undeniable disruption caused to the learning

2   environment.

3          First, no matter how Reges styles his claim, as a government employee, his First

4   Amendment rights must outweigh the University's interests under *Pickering* for his claim to

5   succeed. *Pickering* "applies regardless of the reason an employee believes his or her speech is

6   constitutionally protected." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 650 (9th Cir. 2006).

7   "[T]he Supreme Court has established the test to evaluate a city's firing *of an employee* based on

8   speech—*Pickering*—and that test is the most appropriate for any of Plaintiff's claims based upon

9   his alleged speech-based firing"—whether classified as viewpoint discrimination or retaliation.

10  *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1293–94 (N.D. Ga. 2017) (granting summary

11  judgment). Whether a plaintiff spoke as a citizen or spoke as an employee also controls whether

12  the speech at issue is protected in the first place. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755,

13  760 (11th Cir. 2006) (cited in *Cochran*, 289 F. Supp. 3d at 1293). Thus, the same analysis above

14  (§§ IV.A–IV.B) dooms any separate viewpoint-discrimination claim.

15         Nor did the University discriminate based on Reges's viewpoint. To start, nothing

16  suggests that Defendants took action based on Reges's opposition to land acknowledgments or

17  based on the content of that message. When Reges announced his intention to include his

18  statement on the University syllabus for his introductory course, the University took no action.

19  When Reges included his statement in his email signature block and outside his faculty office, the

20  University took no action. When Reges announced his desire to discuss his views in a forum with

21  other faculty, the University took no action. *See supra* at 3, 10. The University acted only in

22  response to a significant disruption to the learning environment that it could not ignore. Indeed, in

23  later quarters when Reges put his statement back on the syllabus for his courses and no disruption

24  ensued, the University did not remove the statement—making clear that the objection was not to

25  the statement's content, but to the disruption it had caused when he first introduced it on a

26  University syllabus. *See supra* at 11.

27         Nor does the University force faculty to parrot the position reflected in the University's

28  recommended land acknowledgment. Another faculty member circulated an article opposing such

1    statements, and faced no sanction. *See* Balazinska Decl. ¶ 5 & Ex. 1 at 3. No faculty member has

2    been disciplined for not using the Allen School's recommended land acknowledgment: Reges

3    acknowledges that the statement was advisory, and one of the Defendants—

4    Professor Grossman—does not himself include a separate land acknowledgment on the syllabi for

5    his courses. McKenna Decl., Ex. 1 at 44:5–16; Grossman Decl. ¶ 5. Director Balazinska also

6    asked two other faculty members—whose alternative land acknowledgments may have been

7    insensitive to more conservative students—to change the syllabi. *See* Balazinska Decl. ¶ 16;

8    Allbritton Decl., Ex. 3 at 3. Thus, the facts do not suggest any discrimination based on partisan or

9    ideological perspective. Indeed, and as discussed above, the University left Reges free to

10    disseminate by other means the same message it removed from his Winter 2022 syllabus: affixing

11    it to his email signature, hanging it outside his faculty office, discussing it with students, and so

12    on. *See supra* at 10. So the claim that Reges's specific views led to the University's removal of

13    his land acknowledgment from one course syllabus lacks support in the record.

14        The only explanation that matches the evidence is that the University took limited action

15    based solely on the disruption to the learning environment that Reges caused—not his viewpoint.

16    Any claim for viewpoint discrimination therefore fails on the merits, too.

17        **D.**      **Reges's facial challenges to Executive Order 31 fail.**

18        Reges claims that the University's Executive Order 31 (attached for the Court's

19    convenience as Exhibit A to this motion) is facially overbroad under the First Amendment and

20    unconstitutionally vague in violation of due process. Dkt. 46 ¶¶ 150–71. Both claims lack merit.

21    Defendants explained why, in moving to dismiss the First Amended Complaint. *See* Dkt. 50

22    at 16–19 (overbreadth), 20–22 (vagueness); Dkt. 54 at 8–9 (overbreadth), 10–11 (vagueness).

23    Discovery has uncovered nothing to alter those arguments. Thus, Defendants adopt them here,

24    presenting them below only in summary.

25        ***Overbreadth.*** A law or policy is overbroad only if "a substantial number of its

26    applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United*

27    *States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State*

28    *Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The overbreadth doctrine is "strong medicine"

DEFENDANTS' MOTION FOR SUMMARY       18       Orrick Herrington & Sutcliffe LLP
JUDGMENT - Case No. 2:22-cv-00964-JHC               401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1  to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613

2  (1973). Nor do courts strike down laws as overbroad "when a limiting construction has been or

3  could be placed on the challenged statute." *Id.* (citation omitted). Overbreadth challenges "in the

4  public employment context" turn on a "modified *Pickering* balancing analysis that closely tracks

5  the test used for First Amendment retaliation claims." *Hernandez v. City of Phoenix*, 43

6  F.4th 966, 980 (9th Cir. 2022).

7        Here, construing Executive Order 31 as a whole and to avoid constitutional infirmities, its

8  language reaches only conduct closely resembling unlawful retaliation and discrimination, even if

9  the conduct does not meet the test under those employment-law principles. The Order states its

10  purpose upfront: "promoting an environment that is free of discrimination, harassment, and

11  retaliation." Exec. Order 31 § 1. The Order anchors the University's disciplinary authority to

12  "facilitat[ing] that goal." *Id.* It likewise tethers its terms to "the meaning given to them by

13  applicable federal or state laws and regulations." *Id.* § 4. The Order also commits the University

14  to interpret it "in the context of academic freedom in the University environment." *Id.* § 5(A); *see*

15  *also* Dkt. 50 at 17–18 (collecting authorities on construing state policies). In short,

16  "unacceptable" or "inappropriate" conduct must resemble discrimination, harassment, or

17  retaliation to justify "corrective action," even if it is not unlawful under the employment laws.

18        In *Hernandez*, the Ninth Circuit largely rejected an overbreadth challenge to a police

19  social-media policy restricting "a broad category of expression" when the policy advanced the

20  employer's interest in prohibiting speech "undermin[ing] the employer's mission or hamper[ing]

21  the effective functioning of the employer's operations." 43 F.4th at 980–83. The policy, which

22  restricted even off-duty social media posts "detrimental to the mission and functions of the

23  Department" or which undermined "the goals and mission of the Department or City," closely

24  "track[ed] interests that the Department may constitutionally pursue." *Id.* at 981. The court

25  therefore could not "say that a substantial number of the policy's applications are

26  unconstitutional." *Id.* Here, prohibiting conduct, much of it independently actionable, conflicting

27  with the University's mission in combatting discrimination and harassment, supports the same

28  outcome. *See also* Dkt. 50 at 19 (collecting authorities).

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1    ***Vagueness.*** A law is void for vagueness "if its prohibitions are not clearly defined."

2    *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But the law has never required "perfect

3    clarity and precise guidance … even of regulations that restrict expressive activity." *United States*

4    *v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). The vagueness doctrine incorporates

5    two main requirements. First, the law or policy must give a "person of ordinary intelligence a

6    reasonable opportunity to know what is prohibited." *Edge v. City of Everett*, 929 F.3d 657, 664

7    (9th Cir. 2019) (quoting *Grayned*, 408 U.S. at 108). Second, the policy must avoid arbitrary

8    enforcement. *See id.* The vagueness doctrine applies with less force when, like the Order, the

9    restriction imposes only civil consequences. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.,*

10   *Inc.*, 455 U.S. 489, 498–99 (1982). And "policies governing public employee speech may be

11   framed in language that might be deemed impermissibly vague if applied to the public at large."

12   *Hernandez*, 43 F.4th at 982 (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).

13       The Order here relates to conduct closely resembling unlawful discrimination,

14   harassment, and retaliation. And its stated aim to promote an environment free of those evils

15   qualifies the references to inappropriate conduct. *See Gammoh v. City of La Habra*, 395

16   F.3d 1114, 1120 (9th Cir. 2005) ("[O]therwise imprecise terms may avoid vagueness problems

17   when used in combination with terms that provide sufficient clarity."). A member of the

18   University community of reasonable intelligence is thus on notice of the conduct the Order

19   prohibits.

20       Nor does the Order invite arbitrary enforcement. In fact, it must be interpreted "in the

21   context of academic freedom in the University environment." Exec. Order 31 § 5(A). Nothing

22   supports concluding that the statute is meaningless. *See Ford Motor Co. v. Tex. Dep't of Transp.*,

23   264 F.3d 493, 507 (5th Cir. 2001) (reasoning that a civil law is void for vagueness only if its

24   terms are "so vague and indefinite as really to be no rule or standard at all" or if it is

25   "substantially incomprehensible" (citation omitted)); *see also* Dkt. 50 at 21–22 (collecting

26   authorities).

27

28

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.    CONCLUSION

For these reasons, the Court should grant Defendants' motion for summary judgment and dismiss Reges's claims with prejudice.

DATED: December 18, 2023.

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  *s/Robert M. McKenna*
Robert M. McKenna (WSBA# 18327)
Aaron Brecher (WSBA# 47212)
401 Union Street, Suite 3300
Seattle, WA  98101
Telephone (206) 839-4300
Fax (206) 839-4301
rmckenna@orrick.com
abrecher@orrick.com

R. David Hosp (*Pro Hac Vice Admission*)
222 Berkeley Street, Suite 2000
Boston, MA 02116
Telephone (617) 880-1802
Fax (617) 880-1801
dhosp@orrick.com

*Attorneys for Defendants Ana Mari Cauce, Magdalena Balazinska, Dan Grossman, and Nancy Allbritton*

Counsel certifies that this memorandum contains 7,550 words, in compliance with the Local Civil Rules.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT - Case No. 2:22-cv-00964-JHC

21

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

# EXHIBIT A

Case 2:22-cv-00964-JHC    Document 64    Filed 12/18/23    Page 27 of 32

Policy Directory > PO Home > Executive Orders

## Presidential Orders

**Executive Order**          **No. 31**

### Nondiscrimination and Affirmative Action

[ Table of Contents ▾ ]

**1. Nondiscrimination and Non-Retaliation**

The University of Washington, as an institution established and maintained by the people of the state, is committed to providing equality of opportunity and an environment that fosters respect for all members of the University community. This policy has the goal of promoting an environment that is free of discrimination, harassment, and retaliation. To facilitate that goal, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

University policy:

- Prohibits discrimination or harassment against a member of the University community because of race, color, creed, religion, national origin, citizenship, sex, pregnancy, age, marital status, sexual orientation, gender identity or expression, genetic information, disability, or veteran status.

- Prohibits any member of the University community, including, but not limited to, academic personnel, staff, temporary staff, academic student employees, student employees, and students at all University campuses and locations, from discriminating against or unlawfully harassing a member of the public on any of the above grounds while engaged in activities directly related to the nature of their University affiliation.

- Prohibits retaliation against any individual who reports concerns regarding discrimination or harassment, or who cooperates with or participates in any investigation of allegations of discrimination, harassment, or retaliation under this policy, or any individual who is perceived to have engaged in any of these actions.

This policy is adopted in compliance with Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq) and the Pregnancy Discrimination Act, Title IX of the Education Amendments of 1972 (20 USC § 1681), Title I and II of the Americans with Disabilities Act (ADA) of 1990 as amended, the Rehabilitation Act of 1973 (P.L. 93-11) and 45 CFR Part 84, Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq), Title IV of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq), Chapter 49.60 RCW, and Gender Equality in Higher Education (Chapter 28B.110 RCW).

**Notice Regarding Impact of 2020 Education Department Federal Regulations:**

In compliance with the recent federal regulations implementing Title IX of the Education Amendments of 1972, 34 CFR Part 106, the University published Executive Order No. 70, Compliance with Education Department Sexual Harassment

ADMINISTRATIVE POLICY STATEMENTS (APS)

BOARD OF REGENTS GOVERNANCE (BRG)*

EMPLOYMENT AND ADMINISTRATIVE POLICIES (EAP)*

FACULTY CODE AND GOVERNANCE (FCG)*

PRESIDENTIAL ORDERS (PO)*

STUDENT GOVERNANCE AND POLICIES (SGP)*

WASHINGTON ADMINISTRATIVE CODE: TITLE 478 WAC - UW RULES (WAC)

PRINT THIS PAGE

*Formerly part of the University Handbook

Document title: PO, Executive Order No. 31, Nondiscrimination and Affirmative Action
Capture URL: https://www.washington.edu/admin/rules/policies/PO/EO31.html?_ga=2.18807546.279011675.1684180064-554659468.1684180064
Capture timestamp (UTC): Wed, 17 May 2023 18:28:28 GMT
Page 1 of 6
UW_Reges_0004209

Disabilities Act (ADA) of 1990, as amended, the Rehabilitation Act of 1973 (P.L. 93-112, 29 U.S.C. § 701 et seq.), Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.) and 45 CFR Part 84; Title IX of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), Title IV of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq), Chapter 49.60 RCW, and Gender Equality in Higher Education (Chapter 28B.110 RCW).

**Notice Regarding Impact of 2020 Education Department Federal Regulations:**

In compliance with the recent federal regulations implementing Title IX of the Education Amendments of 1972, 34 CFR Part 106, the University published Executive Order No. 70, Compliance with Education Department Sexual Harassment Regulations. In addition to other requirements, the Education Department's federal regulations define prohibited conduct and set forth grievance procedures for "formal complaints" of such conduct. To address those "formal complaints," the University will incorporate the grievance procedures set forth in Executive Order No. 70 into applicable University processes, including this order. Where there are conflicts, those grievance procedures will control. If the allegations that form the basis of a "formal complaint" involve alleged conduct that would potentially fall under the federal regulations and other University policies, then the University may, in its discretion, initiate a combined proceeding, and responsible personnel will apply the policies and procedures that correspond to each.

For the purposes of complying with federal regulations and Executive Order No. 70, the University has designated the University Complaint Investigation and Resolution Office (UCIRO) and Title IX Investigation Office (TIXIO) as the offices to receive complaints of sexual harassment, sexual assault, and other sexual misconduct and to determine whether Executive Order No. 70 applies.

Individuals with questions should contact the Office of the Title IX Coordinator.

## 2. Affirmative Action

In accordance with Executive Order 11246, as amended, and other applicable federal and state laws and regulations, the University, as a federal contractor, takes affirmative action to ensure equality of opportunity in all aspects of employment without regard to race, color, religion, sex, and national origin, and to employ and advance individuals with disabilities and protected veterans.

## 3. Access for Individuals with Disabilities

In accordance with the Americans with Disabilities Act (ADA), as amended, the Rehabilitation Act of 1973, and applicable federal and state laws, the University is committed to providing access and reasonable accommodation in its services, programs, activities, education, and employment for individuals with disabilities.

## 4. Definitions

Terms used in this policy are intended to have the meaning given to them by applicable federal or state laws and regulations.

A. **Discrimination** is conduct that treats a person less favorably because of the person's race, color, creed, religion, national origin, citizenship, sex, pregnancy, age, marital status, sexual orientation, gender identity of expression, disability or veteran status.

B. **Harassment** is conduct directed at a person because of the person's race, color, creed, religion, national origin, citizenship, sex, pregnancy, age, marital status, sexual orientation, gender identity or expression, disability, or veteran status that is unwelcome and sufficiently severe, persistent, or pervasive that:

   1) It could reasonably be expected to create an intimidating, hostile, or offensive work or learning environment, or

   2) It has the purpose or effect of unreasonably interfering with an individual's work or academic performance. Harassment is a form of discrimination.

C. **Retaliation** means to take adverse action against individuals because they have (or are perceived to have) reported concerns under this policy or cooperated with or participated in any investigation related to this policy.

could reasonably be expected to create an intimidating, hostile, or offensive work or learning environment; or

2)   It has the purpose or effect of unreasonably interfering with an individual's work or academic performance. Harassment is a form of discrimination.

**C.   Retaliation** means to take adverse action against individuals because they have (or are perceived to have) reported concerns under this policy or cooperated with or participated in any investigation related to this policy.

**D.   Sexual harassment** is a form of harassment characterized by:

1)   Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature by a person who has authority over the recipient when:

   a)   Submission to such conduct is made either an implicit or explicit condition of the individual's employment, academic status, or ability to use University facilities and services, or

   b)   Submission to or rejection of the conduct is used as the basis for a decision that affects tangible aspects of the individual's employment, academic status, or use of University facilities; or

2)   Unwelcome and unsolicited language or conduct that is of a sexual nature and that is sufficiently severe, persistent, or pervasive that it could reasonably be expected to create an intimidating, hostile, or offensive working or learning environment, or has the purpose or effect of unreasonably interfering with an individual's academic or work performance. This also includes acts of sexual violence, such as sexual assault and sexual exploitation.

Domestic violence, relationship violence, stalking, and sexual assault are addressed in Executive Order No. 51, Sexual Violence Elimination. and Chapter 478-121 WAC, Student Conduct Code for the University of Washington. Depending on the circumstances, each or all policies may apply.

**E.   Veteran status** includes protected veterans as defined by current federal and state laws. It also includes individuals affiliated with the United States armed forces as defined by any federal or state law establishing protection for veteran service, including the Uniformed Services Employment and Reemployment Rights Act (USERRA), Executive Order 11246, and Chapter 49.60 RCW.

## 5.  Application of Policy

**A.   Academic Freedom**

The University will interpret this policy on nondiscrimination and non-retaliation in the context of academic freedom in the University environment.

**B.   Selective Admissions**

The University's admission policy provides for a selective admission process with the objective of attracting students who demonstrate the strongest prospects for high quality academic work. This selective admission process shall assure that the University's educational opportunities shall be open to all qualified applicants without regard to race, color, creed, religion, national origin, sex, pregnancy, age, marital status, sexual orientation, gender identity or expression, disability, or veteran status. The process of admission shall be mindful of the need for diversity in the student body and for highly-trained individuals from all segments of the population.

**C.   Employment**

with the objective of attracting students who demonstrate the strongest
prospect for intellectual and academic value. Such need for admission process
shall assure that the University's educational opportunities shall be open to all
qualified applicants without regard to race, color, creed, religion, national origin,
sex, pregnancy, age, marital status, sexual orientation, gender identity or
expression, disability, or veteran status. The process of admission shall be
mindful of the need for diversity in the student body and for highly-trained
individuals from all segments of the population.

**C.   Employment**

The University will recruit, hire, train, and promote individuals without regard to
race, color, creed, religion, national origin, sex, pregnancy, age, marital status,
sexual orientation, gender identity or expression, disability, or veteran status
and based upon their qualifications and ability to do the job. Except as required
by law, all personnel-related decisions or provisions such as compensation,
benefits, layoffs, return from layoff, University-sponsored training, education,
tuition assistance, and social and recreational programs will be administered
without regard to race, color, creed, religion, national origin, citizenship, sex,
pregnancy, age, marital status, sexual orientation, gender identity or
expression, disability, or veteran status. Additionally, in accordance with Title II
of the Genetic Information Nondiscrimination Act of 2008 (GINA), the University
prohibits discrimination and harassment in any aspect of employment on the
basis of genetic information. The University will also not request or require
genetic information of an employee or family member of the employee, except
as specifically allowed by GINA.

**D.   Recruitment**

The University seeks affirmatively to recruit qualified minority group members,
women, protected veterans, and individuals with disabilities in all levels of
employment as part of its commitment as a federal contractor.

**E.   Nondiscrimination**

Except as otherwise required by law and as provided in Section 6 below:

1)   The University will operate its programs, services, and facilities without
regard to race, color, creed, religion, national origin, sex, pregnancy, age,
marital status, sexual orientation, gender identity or expression, disability,
or veteran status, and

2)   The University will make its programs, services, and facilities available
only to organizations or government agencies that assure the University
that they do not discriminate against any person because of race, color,
creed, religion, national origin, sex, pregnancy, age, marital status, sexual
orientation, gender identity or expression, disability, or veteran status.

**F.   University Housing**

Except as required by law, assignments to University residence halls and other
housing facilities provided for students are made without regard to race, color,
creed, religion, national origin, age, disability, sexual orientation, gender identity
or expression, or veteran status.

**G.   Contracting**

The University will make reasonable efforts to lease, contract, subcontract,
purchase and enter into cooperative agreements only with those firms and
organizations that comply with all applicable federal and state
nondiscrimination laws, including, but not limited to: Executive Order 11246,
Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e et seq.; the Americans
with Disabilities Act (ADA), 42 U.S.C. Sec. 12101 et seq.; and Washington

G. **Contracting**

The University will make reasonable efforts to lease, contract, subcontract, purchase and enter into cooperative agreements only with those firms and organizations that comply with all applicable federal and state nondiscrimination laws, including, but not limited to: Executive Order 11246, Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e et seq.; the Americans with Disabilities Act (ADA), 42 U.S.C. Sec. 12101 et seq.; and Washington State's Law Against Discrimination, Chapter 49.60 RCW.

6. **Exceptions**

A. **Organizations Not Subject to Applicable Laws**

This policy does not apply to organizations and government agencies that are not subject to otherwise applicable state or federal laws or regulations concerning nondiscrimination and non-retaliation.

B. **University Housing**

In accordance with RCW 49.60.222, the University may consider sex, marital status, or families with children status in assignments to residence halls and other student housing.

C. **Citizenship Status**

It is not a violation of this policy to discriminate because of citizenship status which is otherwise required in order to comply with law, regulation, or executive order, or required by federal, state, or local government contract, or which the State Attorney General determines to be essential for an employer to do business with an agency or department of the federal, state, or local government.

7. **Complaint Procedures**

The University provides internal procedures for the investigation and resolution of complaints alleging discrimination, harassment, or retaliation under this policy. The process for bringing a complaint against a University employee is described in Administrative Policy Statement 46.3, Resolution of Complaints Against University Employees. The process for bringing a complaint against a University student is described in Chapter 478-121 WAC, Student Conduct Code for the University of Washington.

8. **Responsibility to Report and Cooperate**

All University employees, including academic personnel, staff, temporary staff, academic student employees, and student employees are required to report to their supervisors or the administrative heads of their organizations any complaints of discrimination, harassment or sexual harassment and/or retaliation they receive. In addition, all University employees are encouraged to inform their supervisors or the administrative heads of their units (and their Academic Human Resources Consultant or Human Resources Consultant), of inappropriate or discriminatory or retaliatory workplace behavior they observe. Supervisors and administrative heads who receive such reports have the responsibility to initiate a response by contacting an appropriate office as indicated in Administrative Policy Statement 46.3.

All University employees are also required to participate, provide information as requested, including personnel or student files and records and other materials recorded in any form, and otherwise fully cooperate with the processes described in Administrative Policy Statement 46.3.

9. **Consequences of Violation of Policy**

Any member of the University community who violates any aspect of this policy is subject to corrective or disciplinary action, including, but not limited to, termination of

process for bringing a complaint against a University employee is described in Administrative Policy Statement 46.3, "Resolution of Complaints Against University Employees. The process for bringing a complaint against a University student is described in Chapter 478-121 WAC, Student Conduct Code for the University of Washington.

## 8. Responsibility to Report and Cooperate

All University employees, including academic personnel, staff, temporary staff, academic student employees, and student employees are required to report to their supervisors or the administrative heads of their organizations any complaints of discrimination, harassment or sexual harassment and/or retaliation they receive. In addition, all University employees are encouraged to inform their supervisors or the administrative heads of their units (and their Academic Human Resources Consultant or Human Resources Consultant), of inappropriate or discriminatory or retaliatory workplace behavior they observe. Supervisors and administrative heads who receive such reports have the responsibility to initiate a response by contacting an appropriate office as indicated in Administrative Policy Statement 46.3.

All University employees are also required to participate, provide information as requested, including personnel or student files and records and other materials recorded in any form, and otherwise fully cooperate with the processes described in Administrative Policy Statement 46.3.

## 9. Consequences of Violation of Policy

Any member of the University community who violates any aspect of this policy is subject to corrective or disciplinary action, including, but not limited to, termination of employment or termination from educational programs.

## 10. History

June 1972; October 24, 1974; April 1975; October 26, 1976; March 12, 1978; April 20, 1979; December 5, 1983; July 20, 1998; June 25, 2008; August 17, 2012; June 21, 2016; August 14, 2020.

For related information, see:

- Executive Order No. 51, "Sexual Violence Elimination"
- Executive Order No. 56, "Reporting Suspected Child Abuse or Neglect"
- Executive Order No. 70, "Compliance with Education Department Sexual Harassment Regulations
- Administrative Policy Statement 46.2, "Affirmative Action Program"
- Administrative Policy Statement 46.3, "Resolution of Complaints Against University Employees"
- Administrative Policy Statement 46.5, "Reasonable Accommodation of Employees With Disabilities"
- *Student Governance and Policies*, Chapter 208, "Reasonable Accommodation of Students with Disabilities"
- *Student Governance and Policies*, Chapter 210, "Student Conduct Policy for Discriminatory and Sexual Harassment, Intimate Partner Violence, Sexual Misconduct, Stalking, and Retaliation"

University Policy and Rules Office    Back to Top
rules@uw.edu
Last Modified: 08/14/2020 16:28:29