1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Honorable John H. Chun

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STUART REGES,

                Plaintiff,

    v.

ANA MARI CAUCE, et al.,

                Defendants.

Case No. 2:22-cv-00964-JHC

**DECLARATION OF ROBERT M.
McKENNA RE: DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

McKENNA DECL. RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1      I, Robert M. McKenna, declare as follows:

2      1.    I am over the age of 18 and competent to testify.

3      2.    This Declaration is in connection with the Motion for Summary Judgment of

4   Defendants Ana Mari Cauce, Magdalena Balazinska, Daniel Grossman, and Nancy Allbritton in

5   the above-captioned matter.

6      3.    I am a partner at Orrick, Herrington & Sutcliffe LLP, counsel for Defendants in

7   this action.

8      4.    Attached as **Exhibit 1** are excerpts from the transcript of the August 22–23, 2023

9   deposition of Stuart Reges.

10     5.    Attached as **Exhibit 2** is a copy of the webpage for the University of

11  Washington's Office of Tribal Relations, marked as Exhibit 61 to the Rule 30(b)(6) deposition of

12  Chadwick Allen.

13     6.    Attached as **Exhibit 3** is a copy of a document bearing production numbers

14  UW_Reges_0000399–400, marked as Exhibit 8 to the deposition of Stuart Reges.

15     7.    Attached as **Exhibit 4** is a copy of the University's webpage containing Faculty

16  Code Section 25-71, marked as Exhibit 21 to the deposition of Stuart Reges.

17     8.    Attached as **Exhibit 5** is a copy of the September 11, 2010 Memorandum of

18  Understanding Between Northwest Regional Tribes and the University of Washington, bearing

19  production numbers UW_Reges_0009047–49.

20     9.    Attached as **Exhibit 6** is a copy of the University's Syllabus Guidelines and

21  Resources, maintained by the Office of the University Registrar, bearing production numbers

22  UW_Reges_0003266–77.

23     I declare under penalty of perjury under the laws of the United States that the foregoing is

24  true and correct.

25     Signed this 18th day of December, 2023 at Seattle, Washington.

26                      *s/Robert M. McKenna*

27                      Robert M. McKenna

28

McKENNA DECL. RE: DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
Case No. 2:22-cv-00964-JHC

1

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

# EXHIBIT 1

```
            UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
                    AT SEATTLE
_____
                                 )
STUART REGES,                    ) No. 2:22-cv-00964-JHC
                                 )
            Plaintiff,           )
                                 )
       v.                        )
                                 )
ANA MARI CAUCE, in her           )
official capacity as             )
President of the University      )
of Washington; MAGDALENA         )
BALAZINKSKA, in her official     )
and individual capacities as     )
Director of the Paul G. Allen    )
School of Computer Science &     )
Engineering; DANIEL GROSSMAN,    )
in his official and individual)
capacities as Vice Director      )
of the Paul G. Allen School      )
of Computer Science &            )
Engineering; and NANCY           )
ALLBRITTON, in her official      )
and individual capacities as     )
Dean of the College of           )
Engineering,                     )
                                 )
            Defendants.          )
                                 )
_____

        DEPOSITION UPON ORAL EXAMINATION OF

                  STUART REGES

_____



REPORTED BY:  Thad Byrd, CCR
REPORTED ON:  August 22, 2023
```


MAGNA
LEGAL SERVICES

Page 2

```
 1                    A P P E A R A N C E S
 2
     For the Plaintiff:
 3
           GABRIEL WALTERS
 4         ADAM TRAGONE
           Foundation for Individual
 5         Rights and Expression
           5700 Pennsylvania Avenue SE
 6         Washington, D.C. 20003
           (215) 717-3473
 7         gabe.walters@thefire.org
 8
     For the Defendant:
 9
           R. DAVID HOSP
10         KRISSY MCKENNA
           Orrick, Herrington & Sutcliffe, LLP
11         222 Berkeley Street
           Suite 2000
12         Boston, Massachusetts 02116
           (617) 880-1886
13         dhosp@orrick.com
14
     Also Present:
15
           TANIA GRANT, Videographer
16
17
18
19
20
21
22
23
24
25
```



Page 16

1   Q.    And is that still the title and position that you

2   hold today?

3   A.    I'm considered a professor of teaching.

4   Q.    Okay.

5   A.    Actually, teaching professor is what they tend to

6   say.

7   Q.    Okay.  In your time at the University of Washington,

8   prior to 2022 were you ever subject to any disciplinary

9   action?

10  A.    Can you be more specific about disciplinary action?

11  It could mean anything.

12  Q.    Sure.  Are you aware of any instance in which you

13  were disciplined in any manner by the university?

14  A.    No.

15  Q.    Were you subject to any investigations that you're

16  aware of?

17  A.    No.

18  Q.    Were there any instances in which you were aware

19  that you were the subject of complaints by individuals

20  within the community?

21            MR. WALTERS:  Object to form.  You can

22  answer.

23  A.    Yes.

24  Q.    Okay.  How many times would you say that it happened

25  prior to 2022?



1            MR. WALTERS:  Object to form.  You can

2    answer.

3    A.   It's hard to put a number on it, many times.

4    Q.   Many times?  Okay.  Can you recall the first time

5    that you recall being subject to complaints by

6    individuals within the University of Washington

7    community?

8            MR. WALTERS:  Object to form.  You can

9    answer.

10   A.   Yes.

11   Q.   When was that?

12   A.   In 2017.  Well, I don't -- this wasn't so much

13   complaints, but I had a -- I explored issues with some

14   staff members who were responsible for a workshop, a

15   diversity workshop that we were starting to offer.

16        And I don't -- I don't think any students were aware

17   of it, so I don't think that actually generated

18   complaints.

19        The incident that I remember first was that there

20   was a workshop on feminist theory that was -- it took

21   place in The Commons, what's known as The Commons, so

22   it's a sixth floor conference room for the -- for the

23   school.

24        And I posted a message in response to that event,

25   and the documents that were posted, that went along with



Page 22

1   later that actually occurred before 2017?

2   A.   No.

3   Q.   Okay.  So what were the nature of the complaints

4   that you became aware of following 2017?

5   A.   There are many.  Do you -- I can describe one as an

6   example.

7   Q.   Sure.

8   A.   If you want more, I can give you move.  I was very

9   interested in knowing what these individuals thought

10  about the -- about James Damore.

11       James Damore was a Google employee who had written a

12  10-page essay about why he thought there might be not as

13  many women interested in computer science working at

14  Google.

15       He was fired for it.  The question that I asked was

16  does our commitment to diversity mean that we would want

17  to have a James Damore student, you know, so a student

18  with similar opinions?  Would our notion of inclusion

19  mean that we would want to include an individual who has

20  opinions like that?

21  Q.   And I think you started out by saying you wanted to

22  know what these individuals felt about James Damore.

23  When you say these individuals, who are you referring to?

24  A.   The people in the Computer Science Department who

25  are most interested in diversity, equity and inclusion



Page 23

1   issues, and who were pushing for changes along those

2   lines.

3   Q.    And how did you go about trying to determine what

4   those individuals felt about James Damore?

5   A.    I asked.

6   Q.    In what form?

7   A.    I asked the two questions I just mentioned a moment

8   ago, that would our commitment to diversity mean that we

9   would want to have a diversity of opinions and have --

10  you know, if there were a student who happened to have

11  the same ideas as James Damore, would we -- would we want

12  that student to be part of our diversity?

13        There's -- there was a lot of discussion of a

14  commitment to diversity, and I wanted to know whether

15  that commitment would extend to an individual like James

16  Damore, and I wanted to know about the notion of

17  inclusion.

18        Does that mean that we would want to make efforts to

19  make someone like a James Damore student feel included?

20  Q.    And when you say you asked those questions, did you

21  ask those questions in a written form or --

22  A.    No, at the tea.

23  Q.    At the tea?  Okay.  And you said that that generated

24  complaints?

25  A.    Yes.



Page 24

1  Q.   Do you have an understanding of what the form of

2  those complaints took?

3  A.   Of the form or the substance?

4  Q.   Well, let's start with the form.  Were they

5  complaints to administrators?  Were they complaints to

6  the bias reporting system?

7  A.   As I said, I believe the graduate students went

8  through their union in order to lodge the complaint.  I

9  became aware of it also because they published a document

10 with their complaints later.

11 Q.   Okay.  Going back to the incident in 2017, other

12 than encouraging you to meet with students, what, if any,

13 disciplinary action did the university take?

14          MR. WALTERS:  Object to form.  You can

15 answer.

16 A.   The director met with me to discuss the situation.

17 He had some ideas he wanted me to consider.  I don't

18 believe there were any formal actions taken.

19 Q.   Okay.  And with respect to the issue related to

20 James Damore, were there any disciplinary actions taken

21 by the university at that point?

22          MR. WALTERS:  Object to form.  You can

23 answer.

24 A.   No.

25 Q.   I know you've said that there were a number of



1        The response was we will hurt him.  A female faculty

2   member made that as a joke that was semi serious.  They

3   were not interested in having James Damore come to campus

4   and tell us his side of the story.

5   Q.   Okay.  And when you said that that lead to

6   additional issues, what were the -- or additional

7   complaints?

8   A.   No.  They -- the graduate students claimed that

9   asking the question constituted sexual harassment.

10  Q.   Okay.  Can you give me another example of a

11  situation where you're aware that there were complaints

12  lodged against you from members of the University of

13  Washington community?

14           MR. WALTERS:  Object to form.  You can

15  answer.

16  A.   There were complaints in -- let me get the year

17  straight -- 2019, the spring of 2019.  The College

18  Republican Group had an event that they called an

19  Affirmative Action Bake Sale.  I attended the event, and

20  that lead to complaints.

21  Q.   What was the nature of the bake sale event?

22  A.   A political stunt.  They had a sign up that

23  basically said something like if you're Native American,

24  the cookie only costs 20 cents.  If you're Black, the

25  cookie costs 40 cents.



Page 28

1    Q.    What was the nature of those complaints?

2    A.    Form or substance?

3    Q.    Why don't we start with the form?

4    A.    I don't entirely know.  I mean, I know that the

5    director of the school again contacted me.  He had been

6    contacted by students.

7          There's -- I've seen some documents through a FOIA

8    request that it seemed clear that there was some

9    discussion among the staff and faculty who ran the

10   department, you know, about it, but I don't know the

11   details of that, but students complained to them.

12   Q.    Okay.  And did the university take any action at

13   that point in terms of discipline directed at you?

14             MR. WALTERS:  Object to form.  You can

15   answer.

16   A.    No.

17   Q.    What's the next instance that you recall where there

18   were complaints lodged against you?

19   A.    There are many.  I mean, it's a -- the next major

20   one that I recall came about in late November, early

21   December of that year.  There were students who wanted to

22   prevent me from being offered an extension to my teaching

23   contract.

24   Q.    And do you recall what the nature of their

25   complaints were in terms of substance?



```
1   A.    Part of it was a fishing expedition.  They had a
2   flier that, if I recall correctly, said do you have
3   complaints against Stuart Reges?  Go to this URL.
4         They distributed that flier all over campus and
5   tried to distribute it in various classrooms, and on that
6   site individuals were allowed to post their own freeform
7   complaint.
8   Q.    And did you ever see a document that resulted from
9   the gathering of those complaints?
10  A.    I saw their document, yes.
11  Q.    Okay.  And just generally speaking, can you describe
12  what the nature of the document was?
13  A.    Students were talking about their experiences in my
14  class, talking about things that they didn't like.
15  Q.    And are you aware of -- well, did the university
16  impose any discipline based on those complaints?
17              MR. WALTERS:  Object to form.  You can
18  answer.
19  A.    Yes and no.  The decision had already been made
20  about the extension to my contract.  The students could
21  have no effect because the decision had already been
22  made, but I believe that complaints like that did affect
23  the decision that they made in terms of extending my
24  contract.
25  Q.    And what was the nature of the contract extension at
```



Page 30

1  that point?

2  A.    I was offered a one-year extension.

3  Q.    And is that different from what is often offered?

4             MR. WALTERS:   Object to form.  You can

5  answer.

6  A.    A one-year contract is sometimes offered to someone

7  who's going to be a temporary lecturer or someone where

8  we'll give you a year to prove yourself, and then we'll

9  decide whether to do an extension.

10     The usual extension was a three-year extension.  As

11  far as I know, I am the only lecturer who has ever been

12  given less than a three-year extension.

13  Q.    Okay.  And that was in 2019?

14  A.    That was in 2019.

15  Q.    So -- and so you -- that extension expired at the

16  end of 2020; is that right?

17  A.    Yes.

18  Q.    Okay.  And were you given an extension in 2020?

19  A.    Yes.

20  Q.    What was the nature of the extension you were given

21  in 2020?

22  A.    A three-year extension.

23  Q.    Other than your view that the one-year extension

24  impacted -- was at some level impacted by the nature of

25  the complaints that had been lodged against you, prior to



1   2022, did the University of Washington take any

2   disciplinary action against you?

3           MR. WALTERS:  Object to form.  You can

4   answer.

5   A.   No.

6   Q.   When did you become aware of -- well, let me start

7   -- I'm going to refer to land acknowledgment statements.

8       Can we agree what when I refer to land

9   acknowledgment statements, you'll understand that that is

10  referring to generally statements that acknowledge in

11  some way or form the connection between Native Americans

12  and various different land?

13          MR. WALTERS:  Object to form.  You can

14  answer.

15  A.   I don't think there is an agreed upon definition of

16  what a land acknowledgment is, so I would not accept your

17  -- I mean, I've not seen that written down anywhere.

18  Q.   Well, and just to be clear, I'm trying to come up

19  with a -- are you aware that there are -- that some

20  people use various different language to acknowledge a

21  relationship between Native American Tribes and certain

22  areas of land?

23  A.   Yeah, I would also -- I mean, the other thing about

24  the land acknowledgment is that it should be something

25  about that particular land where a course is being



Page 36

1    A.    The committee?

2    Q.    The committee.

3    A.    No.

4    Q.    If you see, again going back to that first

5    paragraph, it indicates that the suggestions are worth

6    considering as you prepare and deliver your course so

7    that your teaching is as effective as possible for all

8    types of students.  Do you see that?

9    A.    I do.

10   Q.    Generally speaking, do you disagree with that as a

11   goal to make teaching as effective as possible for all

12   types of students?

13              MR. WALTERS:  Object to form.  You can

14   answer.

15   A.    It depends a lot on how you define certain terms,

16   you know, that I mentioned to you that I had had

17   discussions with individuals about what they mean by

18   diversity, and what they mean by inclusion.

19        Does this include James Damore?  Do they want me to

20   make my course friendly to James Damore?  I suspect,

21   based on what they told me at the tea, that they would

22   say no.

23        So I don't know what they mean when they say this.

24   They seem to have a different sense of what diversity

25   should mean and what inclusion should mean, so I can't



Page 37

1  say that I agree with this statement because I don't know

2  what they had in mind.

3  Q.   Okay.  So you think that there are times when it

4  shouldn't be a goal to be as effective as possible in

5  teaching all types of students?

6            MR. WALTERS:  Object to form.  You can

7  answer.

8  A.   I don't think in terms of types of students.  I

9  think that it is my responsibility as an instructor to

10  try to be as effective as I can be for all of my

11  students.

12  Q.   Right, which would include all types of students as

13  well, wouldn't it?

14  A.   This is part of the disagreement is that there's an

15  issue of whether or not one should specifically focus on

16  specific groups of students and trying to plan one's

17  teaching around those specific groups of students.

18  Q.   Okay.  Looking down where it says course planning

19  and management, do you see that?

20  A.   Yes.

21  Q.   And the first bullet says, the following can make a

22  course syllabus more inclusive.  Do you see that?

23  A.   Yes.

24  Q.   And looking at the first suggestion, it's a

25  suggestion to include a statement that your class



Page  38

1  welcomes all students of all backgrounds.  Do you see

2  that?

3  A.   Yes.

4  Q.   Do you disagree with the goal of welcoming all

5  students of all backgrounds?

6             MR. WALTERS:  Object to form.  You can

7  answer.

8  A.   This says a lot more than just that, but that

9  particular -- well, I've already answered your question

10  that I think that a course should be made as effective as

11  possible for all students.  I don't believe in trying to

12  adapt the course for specific types of students.

13  Q.   Okay.  And did you include a statement along these

14  lines in your syllabus beginning in winter of 2022?

15            MR. WALTERS:  Object to form.  You can

16  answer.

17  A.   No.

18  Q.   Was any disciplinary action taken against you for

19  not including a statement like this in your syllabus in

20  2022?

21            MR. WALTERS:  Object to form.  You can

22  answer.

23  A.   No.

24  Q.   Did you include a counter statement to this in your

25  syllabus of 2022?



Page 44

```
 1    include that statement in your syllabus?
 2              MR. WALTERS:  Object to form.  You can
 3    answer.
 4    A.   No.
 5    Q.   Okay.  Looking at the seventh bullet point, an
 6    indigenous land acknowledgment, do you see that?
 7    A.   Yes.
 8    Q.   Okay.  And then it gives an example statement; is
 9    that right?
10    A.   Yes.
11    Q.   And there's nothing about this document that
12    requires the inclusion of this statement on a syllabus;
13    is that right?
14              MR. WALTERS:  Object to form.  You can
15    answer.
16    A.   Yes.
17    Q.   And looking just purely at the language of the
18    example statement, is there anything in this that says
19    anything about land ownership?
20    A.   It depends upon how you interpret the words.
21    Q.   So you think that there is something in here that
22    says something about land ownership?
23    A.   The university has a web page that includes this
24    land acknowledgment, and then an asterisk.  And if you
25    follow the asterisk, it describes how this version was
```



Page 47

1  acknowledgment statement?

2  A.   No.

3  Q.   Why not?

4  A.   My initial reaction was that I have two choices of

5  how to respond to this.  I can choose to include a land

6  acknowledgment like this or I can not include one, and I

7  was -- I preferred not including one.

8  Q.   Okay.

9            MR. WALTERS:  Gabe, we've been going roughly

10 an hour.  Can we come to a break soon?

11           MR. HOSP:  Sure, absolutely.  Now is fine.

12           THE VIDEOGRAPHER:  We're now going off

13 record.  The time is 11:12 a.m.

14                     (Recess taken.)

15           THE VIDEOGRAPHER:  We're now back on the

16 record.  The time is 11:23 a.m.

17           MR. HOSP:  Okay.  And just for the record,

18 Krissy McKenna, who's also co-counsel and at Orrick, is

19 on the phone line as well.

20 Q.   Professor Reges, I think when we were just -- just

21 before the break, you testified that you didn't put

22 anything related to a land acknowledgment statement on

23 your fall 2021 syllabus because when you first looked at

24 the best practices document, you had the reaction that

25 you could either include the exact language that was in



1  the document or not say anything at all; is that right?

2  A.   Almost right.  I felt that I could include a land

3  acknowledgment along the lines of that one, and it is

4  listed as an example, that I could do a land

5  acknowledgment like that or none at all.

6  Q.   Okay.  And at some point, did you decide that you

7  had the option of -- well, had a third option?

8  A.   Yes.

9  Q.   And when did you begin to have that idea?

10 A.   I think it -- I started thinking about it in

11 September, if I remember correctly.  I thought about it a

12 long time.  I realized that -- anyway, you wanted to ask

13 when, September.

14 Q.   Okay.  And can you describe that process, your

15 thought process as you considered the notion of a third

16 option?

17 A.   The third option is -- well, so this to me is a

18 political statement, and the third option is that I could

19 give a political statement that represented a different

20 perspective.

21 Q.   Okay.  And did you go through different iterations

22 of what you might say?

23 A.   Yes.  I thought about different ways of wording it.

24 Q.   Okay.  And we'll get to the statement you ultimately

25 included in the syllabus.  Can you recall any other



Page 53

1    pronouns was really a thought as to how to provoke

2    people; is that right?

3            MR. WALTERS:  Object to form.  You can

4    answer.

5    A.   I was exploring is there a way for me to participate

6    in the pronoun, you know, suggestion that I thought was

7    appropriate, and I was considering the possibility of

8    saying His Majesty.  That would be not what they were

9    expecting.

10   Q.   And did you anticipate that if you did that, it

11   would provoke people to anger?

12   A.   Yes.

13   Q.   In the second paragraph you say, but then I

14   remembered that Magda also includes a land acknowledgment

15   at the end of her email.

16   A.   Mm-hmm.

17   Q.   And you say, our best practices document for DEI

18   suggested including one on the course syllabus.  Do you

19   see that?

20   A.   Yes.

21   Q.   And you say, I thought of a lot of alternative

22   things I could use for land acknowledgment, and you

23   indicate the one I like best so far is, quote, I

24   acknowledge that by the labor theory of property, the

25   Coast Salish people have a historical claim of ownership



Page 54

1   to almost none of the land currently occupied by the

2   University of Washington.  Do you see that?

3   A.   Yes.

4   Q.   And I don't know whether it's word for word, but

5   that is essentially the land acknowledgment statement

6   that you ultimately included on your syllabus; correct?

7   A.   Yes.

8   Q.   And then in the paragraph after that -- this is

9   going back to the third paragraph.  You said, the more I

10  thought about it, the more it seemed like the land

11  acknowledgment is a better thing to push back on than the

12  pronouns.  Do you see that?

13  A.   Yes.

14  Q.   Okay.  So what did you mean when you said that?

15  A.   I explain it I believe in the next -- in the next

16  couple of sentences.  The -- it wasn't honest to say that

17  I wanted people to call me His Majesty.  That's why the

18  land acknowledgment was better.  It was honest.

19  Q.   You've been given a document that's been marked as

20  Exhibit 3, and it has Bates number Reges 001866 at the

21  bottom, and again I'll ask you to take a moment and just

22  review this briefly so that you can identify what it is.

23  A.   It's a -- it's a -- one of my journal entries.

24  Q.   Okay.  And this is a journal entry dated October

25  25th, 2021; is that right?



Page 60

```
 1   A.   There's an organization known as the American
 2   Association of University Professors.  It has a mailing
 3   list on campus.
 4   Q.   Okay.  And is -- so is this a mailing list that
 5   includes professors outside of the University of
 6   Washington?
 7   A.   I don't know whether they allow others outside the
 8   university to do it.  I mean, it's intended to be for the
 9   -- for the university specifically, for the University of
10   Washington, but they might allow people from the outside
11   to be on it.  I don't know.
12   Q.   Okay.  So what is your understanding of who is
13   included on the mailing list as recipients?
14   A.   Anyone who asked to be added to the mailing list.
15   Q.   Okay.  So there isn't an organization that you have
16   to belong to?
17   A.   There is an organization, but you're not required to
18   be a member to be on the Listserv.
19   Q.   Okay.  And is the Listserv administered by the
20   university?
21   A.   No.
22   Q.   Who is it administered by?
23   A.   There are -- there's a local AAUP chapter, and there
24   are moderators that they have chosen.
25   Q.   Okay.  Other than this, are you aware of any other
```



Page 61

1  reaction that has -- that people have had to your land

2  acknowledgment as used in your email signature block?

3  A.   No.  I don't think so.

4  Q.   Okay.  And has the university ever instructed you to

5  take that off your email signature block?

6  A.   No.

7  Q.   And this is an email signature block that is

8  associated with your university email; correct?

9  A.   It's something that could be added to any email from

10 any account.  It's more a matter of what you choose to

11 do.

12 Q.   But you include it on your university email, emails

13 sent from your university email account; is that right?

14 A.   I believe that the only times I have used it in my

15 email signature has been from my university account.

16 Q.   Okay.  And looking at the next sentence, it says, at

17 a minimum, I had a chance to say something snarky.

18 A.   Yeah.

19 Q.   Do you see that?

20 A.   Yeah.

21 Q.   So does that refresh your recollection that part of

22 your goal in the body of the email was to say something

23 snarky?

24        MR. WALTERS:  Object to form.  You can

25 answer.



Page 64

1   A.   No.

2   Q.   And did the university take any disciplinary action

3   based on your inclusion again of the land acknowledgment

4   statement in your signature block of your email?

5            MR. WALTERS:   Object to form.   You can

6   answer.

7   A.   No.

8   Q.   If you look over on the next page Bates labeled

9   Reges 001872, in the third paragraph down it says, I'd be

10   curious to know whether I'm making people angry, and what

11   they're saying about it when I'm not around.   Do you see

12   that?

13   A.   Yes.

14   Q.   When you say you're curious to know whether I'm

15   being -- making people angry, what they're saying about

16   it, are you referring there to the land acknowledgment

17   statement?

18   A.   I don't remember exactly, but I think more than just

19   the land acknowledgment.

20   Q.   Okay.   Do you recall what else you were referring

21   to?

22   A.   My criticism of the workshop.

23   Q.   Okay.   And then you say, it seems like they have a

24   strategy of ignoring me.   Do you see that?

25   A.   Yes.



Page  67

1  A.   Yes.

2  Q.   And that's the mailing list that we discussed

3  before?  It's not university moderated; right?

4  A.   Yes.

5  Q.   You say, I was thinking that I could have some fun

6  saying things like I've used it at CSE and nobody

7  complained, and then you say, I don't think that will be

8  true of the AAUP mailing list.  Do you see that?

9  A.   Yes.

10  Q.   What did you mean when you said I don't think that

11  will be true of the AAUP mailing list?

12  A.   The AAUP mailing list has many members who are

13  activists who support this ideology, pushing this

14  ideology.

15  Q.   When you say this ideology, what are you referring

16  to?

17  A.   It goes by many names.  On my personal web page,

18  I've described it as the equity agenda.  I've also

19  mentioned that in some of the articles I've written.

20  Q.   And so did you believe that your land acknowledgment

21  statement would offend some of the people on the AAUP

22  mailing list?

23  A.   Yes.

24  Q.   And that would include members of the UW staff and

25  students?



Page 68

1              MR. WALTERS:  Object to form.  You can

2    answer.

3    A.   I don't believe students are on the mailing list,

4    mostly faculty.  There were some staff probably.

5    Q.   Okay.  But you thought that it would offend some of

6    the people on the list?

7    A.   Yes.

8    Q.   You've been given a document that's been marked as

9    Exhibit 5, and it is Bates stamped Reges 001875.  Do you

10   recognize what this document is?

11   A.   Yes.  It's another of my journal entries.

12   Q.   Okay.  And this is a journal entry from November

13   5th, 2021?

14   A.   Yes.

15   Q.   Okay.  It starts out below the redacted portion

16   where you say, I posted a message to the Heterodox

17   Academy list about the censorship, and people seem

18   sympathetic.  Do you see that?

19   A.   Yes.

20   Q.   What is the Heterodox Academy list?

21   A.   There's a -- the Heterodox Academy is an

22   organization set up to allow faculty who are interested

23   in viewpoint diversity to interact with each other, and

24   there is a local version of the Heterodox Academy.

25   Q.   And when you say a local version, so that's -- is



Page 70

1    already talked to William about this, and he thinks I

2    shouldn't do that.  Do you see that?

3    A.    Yes.

4    Q.    You say that you might include the land

5    acknowledgment on your syllabus next quarter to see if

6    anyone complains.  Were you anticipating that people

7    might complain?

8    A.    Yes.

9    Q.    Okay.  And why did you feel that people might

10   complain?

11   A.    My land acknowledgment is a parody.  I intended to

12   make fun of land acknowledgments.

13   Q.    And you felt that some people might find that

14   offensive?

15   A.    Yes.

16   Q.    You say, I've already talked to William about this,

17   and he doesn't think I should do that.  Who is William?

18   A.    William is my boyfriend.

19   Q.    He says, I think -- pardon me.  You say, he thinks I

20   shouldn't purposely offend my students, and I understand

21   that and agree to a certain extent.  Do you see that?

22   A.    Yes.

23   Q.    Okay.  So William believed that including it on the

24   syllabus would offend your students?

25   A.    Yes.



1   already talked to William about this, and he thinks I

2   shouldn't do that.  Do you see that?

3   A.   Yes.

4   Q.   You say that you might include the land

5   acknowledgment on your syllabus next quarter to see if

6   anyone complains.  Were you anticipating that people

7   might complain?

8   A.   Yes.

9   Q.   Okay.  And why did you feel that people might

10  complain?

11  A.   My land acknowledgment is a parody.  I intended to

12  make fun of land acknowledgments.

13  Q.   And you felt that some people might find that

14  offensive?

15  A.   Yes.

16  Q.   You say, I've already talked to William about this,

17  and he doesn't think I should do that.  Who is William?

18  A.   William is my boyfriend.

19  Q.   He says, I think -- pardon me.  You say, he thinks I

20  shouldn't purposely offend my students, and I understand

21  that and agree to a certain extent.  Do you see that?

22  A.   Yes.

23  Q.   Okay.  So William believed that including it on the

24  syllabus would offend your students?

25  A.   Yes.



Page 71

1  Q.   Okay.  And you agreed that it would offend your

2  students?

3           MR. WALTERS:  Object to form.  You can

4  answer.

5  A.   I agreed that it could, sure, yes.

6  Q.   If you see down at the paragraph at the bottom of

7  the page, it looks like -- well, you say, now I have to

8  try to remember what I wrote that got wiped out.  Do you

9  see where it says that?

10  A.   Yes.

11  Q.   Do you know what you're referring to when you said

12  that?

13  A.   Can you give me a moment to read the paragraph about

14  it?

15  Q.   Yes.

16  A.   Well, what I seem to be describing in that paragraph

17  is that my computer restarted, and so I believe I had

18  written some things in a journal entry that was lost, and

19  I was trying to recover some of the ideas.

20  Q.   Yeah, no.  That's what it looked like to me too.  I

21  wanted to make sure, and then you say, I mentioned that

22  some people who would normally support me probably won't

23  do so over the land acknowledgment.  Do you see that?

24  A.   Yes.

25  Q.   Okay.  What were you -- what did you mean by that?



Page 73

1   A.    Mm-hmm.

2   Q.    Underneath the redacted portion it says, the more I

3   think about the land acknowledgment, the more I like the

4   idea of harping on that.  Do you see that?

5   A.    Yes.

6   Q.    Okay.  And when you say you like the idea of harping

7   on that, what did you mean by that?

8   A.    Pushing the land acknowledgment issue.

9   Q.    And did that include including it on your syllabus?

10  A.    Yes.

11  Q.    Okay.  In the next sentence you say, I'm sure many

12  people will find that upsetting because it will be clear

13  that I am trolling.  Do you see that?

14  A.    Yes.

15  Q.    What'd you mean by that?

16  A.    The same thing I said before.  It's a parody.

17  That's a form of trolling.

18  Q.    Okay.  And you were aware that many people would

19  find it upsetting?

20            MR. WALTERS:  Object to form.  You can

21  answer.

22  A.    Yes.

23  Q.    You've been given a document that's been marked as

24  Exhibit 6, and it is Bates labeled Reges 001909 through

25  1911.  If you would, just take a brief look at that so



Page 74

1   you can identify it.

2   A.   It's a journal entry of mine.

3   Q.   Okay.  And this is a journal entry from December 8th

4   of 2021; is that right?

5   A.   Yes.

6   Q.   Okay.  And in the entry at 2:23 p.m. you say, very

7   interesting.  I have been working on wording a message to

8   the faculty about my plan to include my version of the

9   land acknowledgment for my 143 syllabus.  Do you see

10   that?

11   A.   Yes.

12   Q.   And can you tell me what you're referring to in that

13   sentence?

14   A.   Well, I was contemplating sending a message to the

15   faculty that I do intend to include this on my syllabus,

16   and I was thinking of different ways of wording that.

17   Q.   And when you say, at first I was going to be

18   pretending to be naive or perhaps being sarcastic, do you

19   see that?

20   A.   Yes.

21   Q.   And why did you -- what did you mean by that?

22   A.   The form that my message might take.  It might be in

23   the form of me not being naive or sarcastic.

24   Q.   Okay.  But you would be pretending to be naive;

25   correct?



Page 75

1   A.    I was considering that.

2   Q.    Okay.  And what did you mean by pretending to be

3   naive?

4   A.    Well, not being clear that I understand people's

5   objections to the land acknowledgment.

6   Q.    Does it mean in some sense pretending to not be

7   aware that many people would find the land acknowledgment

8   offensive?

9   A.    That's probably what I had in mind, but I, frankly,

10  don't remember exactly what I had in mind.

11  Q.    Okay.

12  A.    I did not do that.

13  Q.    You say, I had come up with wording I liked more

14  earlier today in which I quote Ed as saying he doesn't

15  like them, but now Ed has sent a message with a link to

16  an article from The Atlantic where they apparently

17  criticize them.  Do you see that?

18  A.    Yes.

19  Q.    You say, Ed even sent it to Diversity-Allies.  What

20  is a Diversity, dash, Allies?  What does Diversity-Allies

21  refer to?

22  A.    It's a mailing list within The Allen School that

23  focuses on diversity issues.

24  Q.    Okay.  And who is on the Diversity-Allies mailing

25  list to your knowledge?



Page 77

1    A.   Yes.

2    Q.   So you sent the message that's posted there even

3    after Director Balazinska asked people not to respond to

4    Ed's message; is that right?

5            MR. WALTERS:  Object to form.  You can

6    answer.

7    A.   Yeah.

8    Q.   Okay.  And the message that you sent included a

9    statement that I'm glad Ed posted this because I have

10   been thinking a lot about land acknowledgments.

11       I'm going to include my version, parens, see below,

12   on my CSE 143 syllabus next quarter because The Allen

13   School lists this as a diversity best practice.  Do you

14   see that?

15   A.   Yes.

16   Q.   Okay.  Did anyone indicate at that point that you

17   were not permitted to put that statement on the syllabus

18   based on its content?

19   A.   No.

20   Q.   Did anyone suggest that you would face disciplinary

21   action if you put that statement on your syllabus based

22   on the nature of its content?

23           MR. WALTERS:  Object to form.  You can

24   answer.

25   A.   No.



Page 78

1    Q.    In the next sentence you say, but I have my doubts

2    about whether it is really a good idea to do so.  Do you

3    see that?

4    A.    Yes.

5    Q.    Why did you indicate that you had doubts about

6    whether it was really a good idea to do so?

7    A.    I really wanted to have to explore this issue with

8    the faculty rather than bringing my students into it.

9    That was my strong preference, and so it was a way of

10   saying I'd like to hear from all of you.

11        I'd like you to let me know what you think.  I would

12   have preferred to have a faculty discussion of the issue

13   before winter quarter.

14   Q.    Why did you want to have the conversation with the

15   faculty before bringing your students into it?

16   A.    It would be an opportunity to bring up the issue of

17   land acknowledgments.  I think that the idea -- I think

18   that it was a novel idea to include a conservative

19   version of a land acknowledgment.

20        And I think it allowed many people to perhaps

21   question the value of land acknowledgments on the

22   syllabus.  I would have preferred to have that discussion

23   in December before the winter quarter.

24   Q.    Was your hesitation also based on the fact that you

25   understood that there would be potentially many students



1   you were initiating something that could turn into an

2   argument?

3   A.   I felt it was a better thing to do to do it in

4   response to someone else, that it wasn't just me who was

5   interested in that.

6   Q.   But you were aware that you were initiating

7   something that could turn into an argument?

8                MR. WALTERS:  Object to form.  You can

9   answer.

10  A.   Yes.

11  Q.   Professor, you've been given a document that's been

12  marked as Exhibit 7.  This is an email chain, so it

13  starts chronologically from the bottom up.  Are you

14  familiar with how emails print out?

15  A.   Yes.

16  Q.   Okay.  And the first part of this is an email

17  exchange that was your email exchange with the faculty

18  list.  Do you see that?

19  A.   Yes.

20  Q.   Okay.

21                MR. WALTERS:  Object to form.

22  Q.   So this is the email, and again there are -- there's

23  an email chain above where you were not involved, but up

24  to the point at -- close to the top of the portion marked

25  UW Reges 0003253, this is the email chain that you were



Page 81

1  referring to?

2  A.   Yes.

3  Q.   Okay.  And were you -- well, you indicate in your

4  email, Magda doesn't want us to use these email lists to

5  discuss topics like this, and I'm happy to oblige.

6       I'd be willing to help organize an opportunity for

7  people to get together to discuss this in person if

8  others are interested.  Do you see that?

9  A.   Yes.

10  Q.   And did anyone respond to you to take you up on

11  helping to organize an opportunity to discuss this?

12  A.   I don't think so.

13  Q.   You've been given a document that's been marked as

14  Exhibit 8, and it's Bates labeled UW Reges 0000399, if

15  you would just take a look at this so you can identify

16  it.

17  A.   It's a syllabus for my course.  I think this is my

18  winter 2022 syllabus, but I don't know for sure.

19  Q.   Okay.  Well, do you see anything in this that is

20  inconsistent with what you recall from your syllabus of

21  winter of 2022?

22  A.   No.

23            MR. WALTERS:  Hey, David, we've been another

24  hour now, so if we could take a break at some point soon,

25  that'd be great.



Page 85

1   Q.   Okay.  And this one is dated Tuesday, January 4th,

2   2022, and the first entry is at 8:53 a.m.  Do you see

3   that?

4   A.   Yes.

5   Q.   Okay.  And there's a fair amount that's redacted,

6   but then on page 1627 there's a paragraph that reads, I

7   included my land acknowledgment on my syllabus, and I

8   mentioned it briefly as I skimmed through the topics.  Do

9   you see that?

10   A.   Yes.

11   Q.   Okay.  And it says, I got one question from a

12   student in the Google doc asking what the labor theory of

13   land is.  Otherwise, students don't seem to have noticed

14   it.  Do you see that?

15   A.   Yes.

16   Q.   Okay.  So you're referring to the first day of

17   class, which was Monday at this point; correct?

18   A.   Yes.

19   Q.   And this was a class that was given entirely online?

20   A.   The first week was online.

21   Q.   Okay.  So the Monday class session was online as

22   well?

23   A.   Yes.

24   Q.   Okay.  Can you describe for me, when you deliver a

25   fully online class, what is it that you are able to



Page 90

1   Q.   Okay.  And then if you go to page 1629, the Bates

2   label, there's another entry the same day that is 5:09.

3   Do you see that?

4   A.   Yes.

5   Q.   And you say, I'm shaking all over.  It's partly

6   because it's cold, but it's more because the shit has hit

7   the fan over my land acknowledgement and now it's getting

8   very real.  Do you see that?

9   A.   Yes.

10  Q.   Can you tell me what you meant by that?

11  A.   Can I take a moment to read some of the other

12  parts of it --

13  Q.   Sure.

14  A.   (Continuing) -- that follow that?

15  Q.   Sure.

16  A.   I was referring to the fact that there was a lot of

17  attention being paid to my land acknowledgment by various

18  people.

19  Q.   Okay.  And you indicate at the bottom of that first

20  paragraph that you had learned this because a student had

21  emailed you and said that he'd heard about you on Reddit

22  because people were discussing the land acknowledgment;

23  is that right?

24  A.   That's where I heard about that particular aspect of

25  it, that a student let me know that there was a



Page 92

1    Q.    Okay.  And do you remember what your impression was
2    the first time you went to look at the Reddit thread?
3    A.    What do you mean by my impression?
4    Q.    Do you remember what the nature of the Reddit thread
5    was?
6    A.    There were people who were upset about my land
7    acknowledgment.
8    Q.    Do you remember -- well, you see it says here in the
9    second paragraph, the Reddit thread is interesting.  It's
10   almost all negative.  There are over 80 comments, and it
11   has been upvoted something like 240 times.  Do you see
12   that?
13   A.    Yes.
14   Q.    Can you explain what upvoted means?
15   A.    People who read the thread have an option of
16   clicking a certain button that says I think this article
17   is important and should be moved up in the feed for this
18   sub-Reddit.
19   Q.    And what is a sub-Reddit?
20   A.    It's an area that has a specific theme.  In this
21   case, it was -- it's known as the UW thread Reddit.  It's
22   a -- focused on University of Washington issues.
23   Q.    Okay.  So in your experience, do you follow the UW
24   Reddit at times?
25   A.    At times, yeah.



Page 98

1   Q.   Yes.

2   A.   And which paragraph?

3   Q.   This is in the second paragraph at the top of the

4   page labeled -- Bates labeled 34.

5   A.   Yes.  I do see what you're saying.

6   Q.   Okay.  When you said that she finds it offensive,

7   you were aware that others would find it offensive as

8   well; correct?

9            MR. WALTERS:   Object to form.  You can

10  answer.

11  A.   Yes.

12  Q.   Okay.  And you indicate at the bottom, it isn't

13  really possible to eliminate it at this point, and the it

14  refers to the land acknowledgment statement; correct?

15  A.   Yes.

16  Q.   Okay.  You go on to say, the syllabus is shown in

17  the first recorded lecture for the course, so I'm going

18  to leave it in place for now.  Do you see that?

19  A.   Yes.

20  Q.   And in response, she indicates that I'm not asking

21  you to change the recording of your first lecture.  I'm

22  asking you to change the PDF of the course syllabus that

23  is posted on the course website; is that right?

24  A.   Yes.

25  Q.   Okay.  And was the -- the recording of the first



Page 99

1  lecture, was that -- did that remain available for some

2  time after the date on which the lecture was given?

3  A.   Yes.

4  Q.   For how long did that remain available to students?

5  A.   It's available today.

6  Q.   Okay.  So did anyone at the university ever suggest

7  that that video needed to be edited to take out the

8  reference to the land acknowledgment statement that you

9  made in your first lecture?

10  A.   No.

11  Q.   She also indicates in her email that she recalls

12  that you wanted to discuss land acknowledgment.  An

13  in-person discussion with colleagues is certainly a good

14  place to have these conversations.  Do you see that?

15  A.   Yes.

16  Q.   So at this point, she wasn't suggesting that there

17  would be anything inappropriate about you expressing your

18  views or using the land acknowledgment statement in

19  discussions with colleagues about this issue; is that

20  right?

21  A.   Yes.

22  Q.   Has anyone at the university ever expressed the view

23  that it would be inappropriate for you to use your land

24  acknowledgment statement or discuss these issues in

25  person with colleagues?



Page 100

1  A.   No.

2  Q.   You've been given a document that's been marked as

3  Exhibit 11, and it's Bates labeled UW Reges 0002050

4  through 2054.

5       And, again, this appears to be a continuation of the

6  email exchange between you and Director Balazinska.  Do

7  you see that?

8  A.   Yes.

9  Q.   Okay.  If you see on the first page of this, the

10  page that's marked 0002050, Ms. Balazinska emails you and

11  says the statements you used are offensive, and students

12  have raised complaints.  Do you see that?

13  A.   We are on which page?

14  Q.   This is on the top page.

15  A.   50?

16  Q.   Exactly, 2050.

17  A.   And which part of the --

18  Q.   It's down -- it's the second to last on the page.

19  A.   I see, at 7:06 on January 4th?

20  Q.   Exactly.  She informs you that students have raised

21  complaints; is that right?

22  A.   Yes.

23  Q.   Okay.  And at this point, you had seen the Reddit

24  postings; correct?

25  A.   Yes.



1   Q.   So you realized that this was generating a

2   significant -- that this was generating a significant

3   amount of attention, at least on the Reddit thread;

4   correct?

5               MR. WALTERS:  Object to form.  You can

6   answer.

7   A.   Yes.

8   Q.   When she said students have raised complaints, did

9   you have any reason not to believe that students in your

10  class, at least some students in your class, had raised

11  complaints?

12              MR. WALTERS:  Object to form.  You can

13  answer.

14  A.   I believe that students had complained.  I didn't

15  know if they were students in my course.

16  Q.   Did you have reason to believe that there were no

17  students in your course who have raised complaints?

18              MR. WALTERS:  Object to form.  You can

19  answer.

20  A.   I didn't know one way or another.

21  Q.   Well, before you posted it to -- before you posted

22  the land acknowledgment statement to your syllabus, you

23  were aware that there was a likelihood that some people

24  would find it offensive; correct?

25  A.   Yes.



Page 105

1    Q.   You had used it on your email signature block;

2    correct?

3    A.   Yes.

4    Q.   And the university had never suggested that you were

5    not free to do that; is that right?

6    A.   Yes.

7    Q.   And you had posted the land acknowledgment statement

8    near the entryway to your faculty office; is that right?

9              MR. WALTERS:   Object to form.   You can

10   answer.

11   A.   I don't believe I had done it at that point in time.

12   Q.   Okay.   Do you recall when you -- when did you do

13   that?

14   A.   I don't recall exactly.   My best guess is that it

15   was in something like March.

16   Q.   Okay.

17   A.   I don't believe it was in early January.

18   Q.   Okay.   And when you posted that outside of your

19   office, were there any demands that you take that down?

20   A.   No.

21   Q.   Did the university take any disciplinary action

22   based on that?

23             MR. WALTERS:   Object to form.   You can

24   answer.

25   A.   No.



Page 111

1  10th, 2022 at 10:49 a.m.; is that right?

2  A.   Yes.

3  Q.   And it starts out -- it says, okay, maybe I'll talk

4  about other developments quickly.  I still haven't heard

5  anything from Quillette.  I think I'll ping them at noon

6  today if I still haven't heard anything.  Do you see

7  that?

8  A.   Yes.

9  Q.   And what's that referring to?

10 A.   Quillette is an online magazine that I often write

11 for.

12 Q.   Okay.  When you say I still haven't heard anything

13 from Quillette, were you anticipating hearing something

14 from Quillette?

15 A.   I contacted them about the situation.  I don't

16 remember what stage we were in at this point.  You know,

17 there's kind of are you interested or what do you think

18 of a draft or et cetera?  I don't remember exactly what

19 stage we were at here, but I did intend to publish an

20 article with Quillette.

21 Q.   Okay.  So you intended to publish an article about

22 the situation regarding your land acknowledgment?

23 A.   About the censorship, yes.

24 Q.   Okay.  So you were looking to publicize what was

25 happening; correct?



Page 112

1  A.   I was looking to publicize the censorship, yes.

2  Q.   Okay.  And when you refer to censorship, the only

3  thing you're referring to is the removal of the land

4  acknowledgment statement from the syllabus; correct?

5            MR. WALTERS:  Object to form.  You can

6  answer.

7  A.   Well, I was also -- I think the shadow course also,

8  and the apology to my students.  You know, those are --

9  those are also things that I wanted to mention or those

10  are things that I could have included in an article.

11  Q.   Okay.  But when you refer to censorship --

12  A.   Yeah.

13  Q.   (Continuing) -- the only thing you're referring to

14  is the removal of the land acknowledgment statement from

15  the online version of your syllabus; correct?

16            MR. WALTERS:  Object to form.  You can

17  answer.

18  A.   Yes.

19  Q.   It then says, Jason Rantz published an interesting

20  article.  Who's Jason Rantz?

21  A.   Jason Rantz is a conservative talk show host based

22  here in Seattle.

23  Q.   And did you talk -- when you say Jason Rantz

24  publishing an interesting article, are you referring to

25  an interesting article related to the land acknowledgment



Page 113

1  situation?

2  A.    Yes.

3  Q.    Okay.  And how did Mr. Rantz come to know about the

4  land acknowledgment statement issue?

5  A.    Probably from the UW Reddit.  Jason follows pretty

6  closely what's happening at UW.  My recollection is that

7  he contacted me on Wednesday, January 5th and wanted to

8  get me on his show.

9  Q.    Okay.  And did you go on his show?

10  A.    Yes.

11  Q.    When did you go on his show?

12  A.    Thursday, January 6th.

13  Q.    Okay.  And was that to publicize the situation?

14  A.    To publicize the censorship, yeah.

15  Q.    And, again, just to be clear, the censorship that

16  you were talking about is limited to the removal of the

17  land acknowledgment statement from the online version of

18  the syllabus; correct?

19          MR. WALTERS:  Object to form.  You can

20  answer.

21  A.    Yes.

22  Q.    Okay.  You say, I emphasized the idea that I was

23  joking.  Do you see that?

24  A.    Yes.

25  Q.    What did you mean by that?



Page 114

1   A.   My land acknowledgment is a parody.  Parody isn't

2   quite the same thing as a joke.  I think Jason wanted to

3   describe it as he made a joke, and they got upset.

4   Anyway, it's kind of splitting hairs about the use of a

5   word.  It isn't exactly a joke.

6   Q.   Okay.  You indicate further down in this paragraph,

7   I did a Zoom call with a student reporter this morning

8   from Campus Reform, so hopefully they'll put something up

9   before too long.  Do you see that?

10  A.   Yes.

11  Q.   And, again, that was to publicize the situation

12  involving the land acknowledgment statement; correct?

13  A.   Yes.

14  Q.   You say, Katie talked about my case for maybe 10

15  minutes at the beginning of their podcast yesterday, and

16  she got it mostly right.  Do you see that?

17  A.   Yes.

18  Q.   Okay.  And who's Katie?

19  A.   Katie Herzog.

20  Q.   She's the -- she's the freelance reporter that you

21  mentioned earlier?

22  A.   Yes.

23  Q.   Then you see there is another entry that you made at

24  6:05 p.m.

25  A.   Yes.



Page 115

1   Q.   And you say that on Sunday, you heard that 170

2   students have decided to switch out of my class to take

3   Hunter's version where they are showing his old videos.

4   Do you see that?

5   A.   Yes.

6   Q.   Okay.  So it was -- was that the first you had heard

7   that there were 170 students who had switched out of your

8   class into the newly-formed section?

9   A.   Yes.  I believe that that was the first I'd ever

10  heard of it.  That was the deadline for filling out the

11  form if I remember correctly.

12  Q.   Okay.  And you say, I'm convinced that most of those

13  people switched because of the policies of the course.

14  They prefer to take an easier course where there is no

15  midterm and final, and where you can resubmit homework

16  for a regrade.  Do you see that?

17  A.   Yes.

18  Q.   Is it your understanding that the other version had

19  different policies than your version ultimately?

20  A.   Hunter had taught the course in fall with different

21  policies, and they were using his videos from the fall,

22  so it seems reasonable to me that students would expect

23  that Hunter would have the same policies again in this

24  version he was going to teach in winter.

25  Q.   But, in fact, that wasn't the case; correct?



Page 122

1   A.   No.

2   Q.   Why not?

3   A.   I felt that the university had overreacted to my

4   land acknowledgment, and I thought this was exactly the

5   kind of situation I would want people to pay attention to

6   to think about what I call the equity agenda.

7   Q.   So you wanted people to be aware of this situation?

8   A.   I wanted people to be aware of the censorship, the

9   comment that I was -- the apology from Magda and the

10  shadow course.

11          MR. HOSP:  Why don't we go off the record for

12  just a second?

13          THE VIDEOGRAPHER:  We're now going off the

14  record.  The time is 1:56 p.m.

15                  (Recess taken.)

16          THE VIDEOGRAPHER:  We're now back on the

17  record.  The time is 2:09 p.m.

18  Q.   Professor Reges, going back to the additional

19  section of CSE 143 that was added, did the addition of

20  that section create more work for you?

21  A.   They took some of my TAs away.  I -- Hunter chose to

22  coordinate with me, so there was a little bit of extra

23  work there, but not a lot of extra work.

24  Q.   Okay.  And you had fewer students to grade as a

25  result; correct?



Page 123

1   A.   I don't grade the students, so it's a -- it really

2   doesn't change my workload.

3   Q.   Okay.  And did the creation of the additional

4   section impact your pay at all?

5   A.   No.

6   Q.   Okay.  In what way, if any, did the creation of the

7   additional section cause any harm for you?

8   A.   Well, we -- it was an unprecedented thing to have.

9   You're calling it a third section.  It wasn't a third

10  section.  It was an independent course.  I mean, it was

11  run separately.

12       In the 18 years that I had taught at the University

13  of Washington, that was the first time we had ever done

14  that, the first time ever.

15       It created some controversy within the TA community.

16  You know, these TAs were going to work for Hunter.  These

17  TAs were working for Stuart.  Those are -- those are

18  problems that I had to deal with.

19  Q.   When you say that those were problems that you had

20  to deal with, in what way did that harm you?

21  A.   The TA community is like my life's work.  It's the

22  thing that I'm most known for in the computer science

23  education community.

24       At all three schools where I've taught, I've set up

25  TA programs that continue to this day in pretty much the



Page 124

1    same form that I created them, and there's a sense of

2    unity to the community.

3        So to split the 143 TAs harmed the community.  It's

4    difficult to explain how much this would bother me

5    because this is what's special about the work that I've

6    done.

7    Q.   Are you aware of any -- whether any TAs were

8    offended by the land acknowledgment statement?

9    A.   Some were, yes.

10   Q.   So was it the splitting of the class or the offense

11   caused by the land acknowledgment statement that caused

12   the split in the community?

13   A.   It could be some of both, but, you know -- yeah, it

14   could be some of both.

15   Q.   And other than that, what other harm directly to you

16   was caused as a result of the creation of the second or

17   the additional course, the additional section?

18   A.   I think -- I don't think there was other harm.

19   Q.   Okay.  You've been given a document marked as

20   Exhibit 16 which is Bates labeled Reges 001647 through

21   1649.  It appears to be an additional journal entry of

22   yours.  Do you see that?

23   A.   Yes.

24   Q.   Okay.  And this is a journal entry dated January 14,

25   2022 at 11:08, at least that's the first entry; correct?



Page 127

1   done what I did because he thinks my actions were

2   gratuitous and peevish.  Do you see that?

3   A.   Yes.

4   Q.   You indicate, but I can live with that criticism.  I

5   was causing trouble on purpose, so it's fair to point

6   that out.  Do you see that?

7   A.   Yes.

8   Q.   What did you mean by that, I was causing trouble on

9   purpose?

10  A.   I mentioned before the idea of two options versus

11  three options.  One of the options is to not have a land

12  acknowledgment.  I interpreted Jonathan's comments to

13  mean that he considered it rude to take the third option

14  that I did.

15       I think his preference would have been to be silent.

16  That's what I interpreted, but I don't -- you know, I

17  don't speak to Jonathan, so I don't know, but that was

18  what I believe he meant.

19  Q.   Right, but what I'm referring to is you say I was

20  causing trouble on purpose.  What did you mean by that?

21            MR. WALTERS:  Objection, asked and answered.

22  A.   I knew that people would be upset by what I was

23  doing.

24  Q.   Okay.  You've been given a document marked as

25  Exhibit 17.  It is Bates labeled Reges 001650 through



Page 128

1   1652, and again appears to be another journal entry, this

2   one dated January 1 -- pardon me, January 18, 2022.  Do

3   you see that?

4   A.   Yes.

5   Q.   Okay.  And the first journal entry is at 12:48 p.m.,

6   and in the second paragraph you indicate the interest in

7   my case seems to have dropped to nearly zero.

8        My op ed and video interview have been in various

9   spots among the top six viewed items on the Campus Reform

10  site, but that doesn't necessarily mean much at all.

11       What did you mean by the interest in my case seems

12  to have dropped nearly to zero?

13  A.   There was a flurry of media attention that seemed to

14  be waning.

15  Q.   Okay.  And you indicate at the end of that second

16  paragraph, I talked to the reporter from the Washington

17  Free Beacon, so that will probably be one more article

18  that will come out, but otherwise there have been no new

19  inquiries from the media.  Do you see that?

20  A.   Yes.

21  Q.   And how did you feel about the fact that there were

22  no new inquiries from the media?

23  A.   Well, I mean, I describe later if I -- if I had read

24  this correctly, that this is part of a process.  We were

25  in a waiting phase, but it would have been -- I would



```
1                    C E R T I F I C A T E

2

3

4        STATE OF WASHINGTON )
                             )    ss.
5        COUNTY OF KING      )

6

7               I, the undersigned Washington Certified
         Court Reporter hereby certify that the foregoing
8        deposition upon oral examination of each witness
         named herein was taken stenographically before me
9        and transcribed under my direction;

10              that the witness was duly sworn by me
         pursuant to RCW 5.28.010 to testify truthfully; that
11       the transcript of the deposition is a full, true and
         correct transcript to the best of my ability; that I
12       am neither attorney for, nor a relative or employee
         of any of the parties to the action or any attorney
13       or counsel employed by the parties hereto, nor
         financially interested in its outcome.

14

15              I further certify that in accordance with
         CR 30(e), the witness was given the opportunity to
16       examine, read, and sign the deposition within 30 days
         upon its completion and submission, unless waiver of
17       signature was indicated in the record.

18              IN WITNESS WHEREOF, I have hereunto set my

19       hand this_____day of_____, 2023.

20

21

22

23

24       _____

25       Washington Certified Court Reporter
         No. 2052
```

56

```
                   UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
                          AT SEATTLE
_____
                                 )
STUART REGES,                    ) No. 2:22-cv-00964-JHC
                                 )
          Plaintiff,             )
                                 )
     v.                          )
                                 )
ANA MARI CAUCE, in her           )
official capacity as             )
President of the University      )
of Washington; MAGDALENA         )
BALAZINKSKA, in her official     )
and individual capacities as     )
Director of the Paul G. Allen    )
School of Computer Science &     )
Engineering; DANIEL GROSSMAN,    )
in his official and individual   )
capacities as Vice Director      )
of the Paul G. Allen School      )
of Computer Science &            )
Engineering; and NANCY           )
ALLBRITTON, in her official      )
and individual capacities as     )
Dean of the College of           )
Engineering,                     )
                                 )
          Defendants.            )
                                 )
_____

          DEPOSITION UPON ORAL EXAMINATION OF

                  STUART REGES, Vol. 2

_____



     REPORTED BY:  Thad Byrd, CCR
     REPORTED ON:  August 23, 2023
```



```
 1                    A P P E A R A N C E S
 2
    For the Plaintiff:
 3
         GABRIEL WALTERS
 4       ADAM TRAGONE
         Foundation for Individual
 5       Rights and Expression
         5700 Pennsylvania Avenue SE
 6       Washington, D.C. 20003
         (215) 717-3473
 7       gabe.walters@thefire.org
 8
    For the Defendant:
 9
         R. DAVID HOSP
10       KATIE KERRICK
         KRISSY MCKENNA
11       Orrick, Herrington & Sutcliffe, LLP
         222 Berkeley Street
12       Suite 2000
         Boston, Massachusetts 02116
13       (617) 880-1886
         dhosp@orrick.com
14
15  Also Present:
16       TANIA GRANT, Videographer
17
18
19
20
21
22
23
24
25
```



Page 142

1          SEATTLE, WASHINGTON; WEDNESDAY, AUGUST 23, 2023

2                         9:12 a.m.

3                      -- oo 0 oo --

4

5          THE VIDEOGRAPHER:  Good morning.  We're now

6     on the record.  Today's date is August 23rd, 2023.  The

7     time is now 9:12 a.m.  This is Volume 2 in the continuing

8     deposition of Stuart Reges.

9          All aspects as indicated on media 1, volume 1 will

10    be the same.  All appearances will appear on the written

11    transcript.  The witness remains sworn in.  You may now

12    proceed.

13    STUART REGES,                    having been duly sworn,

14                                     testified under oath

15                                     as follows:

16                     EXAMINATION CONTINUED

17    BY MR. HOSP:

18    Q.    Good morning, Professor Reges.

19    A.    Good morning.

20    Q.    We're going to try to pick up essentially where we

21    left off yesterday.  You've been given a document that's

22    been marked as Exhibit 18.

23          It is Bates labeled Reges 001657 through 1660 and

24    appears to be another journal entry of yours; is that

25    right?



Page 143

1   A.    Yes.

2   Q.    Okay.  And this one is from January 21st, 2022?

3   A.    Yes.

4   Q.    And the first -- the first post -- pardon me.  The

5   first section was posted -- it was entered at 11:03 a.m.;

6   is that right?

7   A.    Yes.

8   Q.    Looking at the second paragraph under the redacted

9   portion, you said, I also heard from a reporter who works

10  for a place called Just The News.  He said that he's a

11  former reporter for Campus Fix.  Do you see that?

12  A.    Yes.

13  Q.    And then a sentence later you say, I gave him some

14  information that hasn't been in any other articles, so

15  that might be interesting to see if anyone notices.

16        I mentioned that I plan to use the land

17  acknowledgment again in the spring when I teach the first

18  intro course.  Do you see that?

19  A.    Yes.

20  Q.    Okay.  And at this point, had you notified anybody

21  at the university that you intended to do that?

22  A.    I don't remember for sure, but I don't think so.

23  Q.    Okay.  Looking at the paragraph that's in between

24  the two redacted portions on page 1658, you say, Dan

25  Eisenberg has suggested that I include my land



Page 144

1  acknowledgment as part of my email signature.  Do you see
2  that?
3  A.   Yes.
4  Q.   Okay.  Who's Dan Eisenberg?
5  A.   Dan Eisenberg is a faculty member at the University
6  of Washington.  He's the person who founded our local
7  Heterodox Academy.
8  Q.   Got you.  And the next sentence says, I don't want
9  to do that for routine messages I have with my students,
10  but I've been doing it for the faculty.  Do you see that?
11  A.   Yes.
12  Q.   And why didn't you want to do -- to include the land
13  acknowledgment as part of your signature for routine
14  messages you have with your students?
15  A.   Well, that's class business.  You know, there's -- I
16  didn't feel that -- you know, if there was a student who
17  was going to be potentially upset about it, it didn't
18  seem that through routine messages -- sometimes they're
19  asking important questions, disability accommodation, for
20  example, so it didn't seem to me that that was an
21  appropriate place for me to include it.
22  Q.   Okay.  And that's because students might be upset by
23  it?
24  A.   No.  If you look, for example, at Magda's behavior,
25  I was tending to copy Magda's behavior.  She did not



Page 145

1   include that in her routine emails, individual emails.

2   She included it in her kind of broadcast emails, so in a

3   way I was copying what Magda did.

4   Q.   Okay.  But you did include it with emails to

5   faculty?

6   A.   To the faculty mailing list.

7   Q.   Okay.  So you were only including it on emails to

8   the faculty mailing list at this point?

9   A.   And to the Diversity-Allies list and to the AAUP

10  list --

11  Q.   Okay.

12  A.   (Continuing) -- the broadcast emails.

13  Q.   Okay, all right.  If you look at the last page of

14  this journal entry, you say, I sent my message to the

15  faculty list about how I plan to give a paper exam in

16  person, and I included my land acknowledgment.

17       Two others posted about plans to give a paper exam

18  in person.  Nobody commented on my land acknowledgment.

19  I think they're just ignoring me.  Do you see that?

20  A.   Yes.

21  Q.   So at this point, was it your impression that those

22  at the university were ignoring the land acknowledgment?

23  A.   They were not making an issue of me including it as

24  an email signature to the faculty mailing list.

25  Q.   Okay.  You've been given a document that's been



Page 146

1    marked as Exhibit 19, Bates labeled Reges 000800.  Can

2    you identify what this document is?

3    A.    This seems to be an email that -- there's a message

4    that I sent to the AAUP mailing list.  That looks like I

5    might have forwarded it to my personal email account.

6    Q.    And then you set it on -- sent it on as well to the

7    Heterodox UW group as well?

8    A.    Yes.  That's what that is, yes.

9    Q.    Okay.  Looking at the first email to the AAUP

10   mailing list, you include an article by Josh Moody of

11   Inside Higher Education on the land acknowledgment issue.

12   Do you see that?

13   A.    Yes.

14   Q.    Okay.  And then you say in the next paragraph, he

15   also mentions my plans to continue this protest when I

16   teach the CSE 142 course in spring, and I'll have the

17   opportunity to distribute the syllabus on paper, parens,

18   more difficult to censor.  Do you see that?

19   A.    Yes.

20   Q.    Okay.  And was this the first time you notified

21   members of the faculty at the University of your

22   intention to include the land acknowledgment statement in

23   your spring syllabus?

24   A.    Well, this article was censored.  It did not go

25   through the mailing list, but my recollection -- but the



Page 147

```
1    one to the Heterodox Academy probably went through.
2         I frankly don't remember it, you know, but my
3    recollection is that this is the point in time when I was
4    informing people of those plans.
5    Q.   Okay.  And did you -- did you use other -- did you
6    use the faculty mailing list as well to inform faculty of
7    your plans?
8    A.   I know that I sent it to Diversity-Allies.  I don't
9    -- I don't remember whether I sent it to the faculty
10   mailing list.  I don't think so.
11   Q.   Okay, all right.  But this was -- this was around
12   the time on February 23rd and thereabouts that you
13   started letting the faculty and administration know that
14   you intended to do this; is that right?
15   A.   Yes.  It appeared in an article, so a public
16   article.
17   Q.   And this was after Director Balazinska had informed
18   you that there were students who had been offended by
19   this?
20   A.   She had said that there were student complaints,
21   yes.  This was after her informing me that there were
22   student complaints.
23   Q.   Okay.  And this was after the additional section of
24   the introductory course had been launched and roughly a
25   third of the student had switched into that course?
```



Page 161

1   Q.   And at this point, did some of those media outlets

2   include media that were associated with the university?

3   A.   There was an undergraduate.  Well, in one of the

4   exhibits we were looking at a moment ago, a Daily UW

5   reporter who was working on an article.

6   Q.   Okay.  And was there ultimately an article in the

7   student newspaper?

8   A.   Yes.  I believe there was, yes.

9   Q.   And did that article include your land

10  acknowledgment statement?

11  A.   Probably.  I don't remember for sure.

12  Q.   All right.  Did anybody suggest that your

13  publicizing your land acknowledgment statement in a

14  university newspaper would result in any sort of

15  discipline?

16              MR. WALTERS:  Object to form.  You can

17  answer.

18  A.   No.

19  Q.   You've been shown a document that's been marked as

20  Exhibit 22, Bates labeled UW -- pardon me, UW Reges

21  0000382.  Do you recognize this document?

22  A.   Yes.

23  Q.   Okay.  What is this document?

24  A.   This is the written description of the resolution

25  that The Allen School was proposing.



Page 182

```
 1              MR. WALTERS:  Okay, thanks.
 2              THE VIDEOGRAPHER:  We're now going off
 3    record.  The time is 10:22 a.m.
 4                      (Recess taken.)
 5              THE VIDEOGRAPHER:  We're now back on the
 6    record.  The time is 10:32 a.m.
 7    Q.   You've been given a document that's been marked as
 8    Exhibit 26 and is Bates labeled Reges 001724 through
 9    1725, and it appears to be another journal entry, this
10    one from April 1st, 2022; is that right?
11    A.   Yes.
12    Q.   Okay.  And it says at the top, I got an idea on
13    Wednesday night.  I'm not happy that they're just
14    ignoring me, so I thought of a way to make people pay
15    attention.  Do you see that?
16    A.   Yes.
17    Q.   And what are you referring to there?
18    A.   Well, this protest that I am participating in with
19    my land acknowledgment.
20    Q.   Okay.  And you said you're not happy that they're
21    just ignoring me.  Who are you referring to when you say
22    they there?
23    A.   Well, I believe in that case I'm referring to the
24    faculty.
25    Q.   Okay.  And at this point, your land acknowledgment
```



Page 183

1  statement was still up on the university hosted syllabus;

2  correct?

3  A.   Yes.

4  Q.   Okay.  And the administration hadn't taken any

5  action to correct that; is that right?

6            MR. WALTERS:  Object to form.  You can

7  answer.

8  A.   They'd taken no action about it.

9  Q.   Okay.  You say, I decided to put together a page

10 that has links to the winter and spring syllabi in CSE

11 that have a land acknowledgment.

12     Of course, at the top of that list is my 142 page

13 with my version of the land acknowledgment, but it

14 includes a lot of others.

15 A.   Mm-hmm.

16 Q.   You say, so the idea is to create a useful resource,

17 and that way they have to accept it for the

18 Diversity-Allies mailing list.  How can you claim that

19 this is inappropriate?  Do you see that?

20 A.   Yes.

21 Q.   Okay.  So you did this in order to provoke people;

22 is that right?

23            MR. WALTERS:  Object to form.  You can

24 answer.

25 A.   In order to provoke people?  This was another avenue



Page 189

```
1   do believe I misremembered, so just a -- it's a minor

2   point, but it was actually hosted on a UW page at that

3   time if I remember correctly.

4       I still have the ability to insert Google Analytics

5   codes into such a page, but I think I misspoke.  I think

6   that I had it at that time on my CS page, in my CS

7   directory.

8   Q.   Okay.  So it was on a university server?

9   A.   I believe that's correct.

10  Q.   Could anyone at the university access it at that

11  point?

12  A.   It was a publicly accessible web page if one knew

13  the URL.

14  Q.   Okay.  And did the university ever instruct you to

15  take that document down?

16  A.   Magda pointed out that I had used a -- that I had

17  logos that -- of The Allen School on that page, and she

18  thought that was inappropriate because it implied

19  endorsement from the school.

20      I immediately removed the logos and told her that I

21  was sorry that I had done that, and that -- anyway, I

22  removed them.

23  Q.   Okay.  And were you asked to take that resource down

24  at that point?

25  A.   No.
```



Page 201

1   Q.   Okay.  And had there been any further developments

2   regarding your land acknowledgment statement that took

3   place between May and July?

4   A.   I asked the dean at least one more time what was

5   going on.  I seem to remember that that time she said

6   that she'd identified one member of the committee, and

7   she was working on identifying the other two.

8        So there was that exchange that would have come

9   probably in June.  I was timing it at every three or four

10  weeks.  I don't remember other things that were happening

11  in that timeframe.

12  Q.   Okay.  So you can't recall any other material

13  developments in relation to the -- your land

14  acknowledgment statement?

15  A.   Not off the top of my --

16            MR. WALTERS:  Object to form.

17  A.   Not off the top of my head.  There might have been

18  something that I'm not remembering right at the moment.

19  Q.   Okay, all right.  And this was presumably -- July is

20  during the summer term for UW?

21  A.   Yes.

22  Q.   So the spring term had concluded; correct?

23  A.   Yes.

24  Q.   And throughout the entire spring term, your course

25  syllabus with the land acknowledgment statement was up on



Page 202

1    the university website; is that right?

2    A.    Yes.

3    Q.    Okay.  And the university hadn't done anything to

4    remove that land acknowledgment statement?

5    A.    That's correct.

6    Q.    Okay.  And other than taking the land acknowledgment

7    statement off of the online version of the website for

8    the winter term syllabus, had the university done

9    anything to prevent your use of the land acknowledgment

10   statement in the six months prior to the filing of this

11   lawsuit?

12             MR. WALTERS:  Object to form.  You can

13   answer.

14   A.    No.

15   Q.    Do you know whether the special investigative

16   committee had been formed at the time that this lawsuit

17   was filed?

18   A.    My recollection is that Dean Allbritton contacted me

19   soon after the filing of the lawsuit to inform me that

20   she had completed the identification of the members of

21   the committee, had -- they were beginning their work.

22         And I believe she claimed that that had occurred on

23   July 11th, something like that, you know, a few days

24   before the court filing.  That's my recollection.

25   Q.    Okay.  So when you -- when this was filed, at the



Page 215

1   that.

2   Q.   And have you come to have an understanding why you

3   didn't get -- that you hadn't been notified of a raise at

4   that point?

5   A.   I now know.  I was not informed for a very long

6   time.

7   Q.   And what's your understanding today?

8   A.   The dean sent me an email, and part of that email

9   mentioned that she was releasing the merit pay that they

10  had held in abeyance.

11       I had never heard that term before, but -- so

12  apparently she was holding it in abeyance and was now

13  releasing it, and that was an email that I got from her

14  perhaps a month ago.

15  Q.   Okay.  And have you now been paid all of the backpay

16  from the raise dating back to the beginning of the

17  2022-2023 academic year?

18            MR. WALTERS:  Object to form.  You can

19  answer.

20  A.   Yes.

21            MR. HOSP:  I think we've been going for about

22  an hour.  Do you want to --

23            MR. WALTERS:  Sure.

24            MR. HOSP:  Let's take 10 minutes.

25            THE WITNESS:  We'll do 10?  Yeah.



Page 216

```
 1              THE VIDEOGRAPHER:  We're now going off
 2    record.  The time is 11:28 a.m.
 3                    (Recess taken.)
 4              THE VIDEOGRAPHER:  We're now back on the
 5    record.  The time is 11:50 a.m.
 6              MR. HOSP:  Okay.  And just for the record,
 7    I'll put on the record that Katie Kerrick from Orrick is
 8    -- has been on the line this morning.
 9              MR. WALTERS:  And Adam Tragone for FIRE has
10    as well.
11              MR. HOSP:  And, actually, I should say I
12    think Krissy McKenna has been -- I don't believe that
13    she's on the line at the moment, but she has been on the
14    line for portions of this as well.
15    Q.   Professor Reges, you taught -- well, we've covered
16    the fact that you taught the introductory class in the
17    fall of 2022; correct?
18    A.   The 143 class.
19    Q.   Yes, and for that you did include a syllabus that
20    had your land acknowledgment statement on it; is that
21    right?
22    A.   Yes.
23    Q.   And university administration didn't take any action
24    to remove that statement from the syllabus; is that
25    correct?
```


MAGNA
LEGAL SERVICES

Page 217

```
 1   A.   Yes.

 2   Q.   Okay.  And did you teach an introductory course in

 3   the winter of 2023?

 4   A.   Yes.  I taught 143 again.

 5   Q.   Okay.  And did you include a syllabus that had your

 6   land acknowledgment statement on it?

 7   A.   Yes.

 8   Q.   Did you face any sort of disciplinary action because

 9   of that?

10            MR. WALTERS:  Object to form.  You can

11   answer.

12   A.   No.

13   Q.   And was the land acknowledgment statement taken off

14   any version of the syllabus?

15   A.   No.

16   Q.   Did you teach an introductory class in the spring of

17   2023?

18   A.   Yes.  I taught 143 again.

19   Q.   Okay.  And did you include a syllabus that had your

20   land acknowledgment statement on it?

21   A.   Yes.

22   Q.   Did you face any disciplinary action as a result of

23   that?

24   A.   No.

25            MR. WALTERS:  Object to form.
```



Page 218

1    Q.   Did the university take any steps to remove that

2    land acknowledgment statement from any version of your

3    syllabus?

4    A.   No.

5    Q.   Okay.  I'm showing you an exhibit that's been marked

6    as Exhibit 31.  Do you recognize what this document is?

7    A.   Yes.

8    Q.   What is this document?

9    A.   This was a letter that the -- that Dean Allbritton

10   sent me in June telling me various things as a result of

11   the special investigating committee, and the fact that

12   she was dropping the case for now, but that -- you know,

13   making a threat about the future.

14   Q.   With respect to -- well, the letter begins with a

15   number of recitations of fact.  Do you see that?

16            MR. WALTERS:  Object to form.  You can

17   answer.

18   Q.   What purport to be recitations of fact.

19   A.   You're talking about starting on the first page

20   where she's going to have the bullet items, that this is

21   what the special investigating committee found?

22   Q.   Yes, exactly.

23   A.   Yes.  I agree that's a recitation of supposed facts.

24   Q.   Okay.  Are there any factual recitations in here

25   that you disagree with?



Page 269

1    A.    Yes.

2    Q.    Okay.  And that obviously predated any dispute about

3    the land acknowledgment statement; correct?

4    A.    Yes.

5    Q.    So you don't assert that any exclusion that there

6    was of you from that committee was based on statements

7    that you later made in 2022; correct?

8              MR. WALTERS:   Object to form.  You can

9    answer.

10   A.    Yes.

11   Q.    And you indicated that there was a significant -- I

12   think you indicated that there was a significant

13   controversy in 2018 when you wrote an article.  I think

14   it was titled Why Women Don't Code; is that right?

15   A.    Yes.

16   Q.    Okay.  And there was a significant amount of protest

17   about that article; is that correct?

18   A.    Yes.

19   Q.    And, in fact, when you were up for renewal in 2019,

20   there was a petition asking that you not be renewed; is

21   that right?

22   A.    There was an effort by a group of students to

23   petition the dean not to remove -- not to renew my

24   contract.

25   Q.    Okay.  And none of that had anything to do with



Page 270

1    issues regarding land acknowledgment statements; correct?

2    A.    Yes.

3                MR. HOSP:  Okay, nothing further.

4                MR. WALTERS:  We'll read and sign.

5                THE VIDEOGRAPHER:  Okay.  This concludes the

6    deposition of Stuart Reges.  The time is 1:29 p.m.

7

8                     (Whereupon the deposition

9                      was concluded at 1:29 p.m.)

10                    (Signature was reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                        C E R T I F I C A T E

 2

 3

 4          STATE OF WASHINGTON )
                               )   ss.
 5          COUNTY OF KING     )

 6

 7               I, the undersigned Washington Certified
            Court Reporter hereby certify that the foregoing
 8          deposition upon oral examination of each witness
            named herein was taken stenographically before me
 9          and transcribed under my direction;

10               that the witness was duly sworn by me
            pursuant to RCW 5.28.010 to testify truthfully; that
11          the transcript of the deposition is a full, true and
            correct transcript to the best of my ability; that I
12          am neither attorney for, nor a relative or employee
            of any of the parties to the action or any attorney
13          or counsel employed by the parties hereto, nor
            financially interested in its outcome.

14

15               I further certify that in accordance with
            CR 30(e), the witness was given the opportunity to
16          examine, read, and sign the deposition within 30 days
            upon its completion and submission, unless waiver of
17          signature was indicated in the record.

18               IN WITNESS WHEREOF, I have hereunto set my

19          hand this_____day of_____, 2023.

20

21

22

23

24          _____
            Washington Certified Court Reporter
25          No. 2052
```

# EXHIBIT 2

# OFFICE OF TRIBAL RELATIONS

**Exhibit
PL 61**
11/7/2023
Allen

The University of Washington is proud to partner with many tribal nations, tribal citizens and descendants connected to Washington territories.

EXPLORE PARTNERSHIPS

**The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations.**

*Our acknowledgement of the tribes and bands within the Suquamish, Tulalip and Muckleshoot nations was crafted from consultation and guidance by the Governor's Office of Indian Affairs as well as Federal regulations and policies. In this phrasing, we are adhering to tribal sovereignty.*

The Office of Tribal Relations, located in the Seattle, coordinates the government to government relationship between the University of Washington and American Indian tribes across Washington state and northwest region.

The U.S. Constitution recognizes Indian tribes as entities distinct from states and foreign nations. There are 574 federally recognized tribes in the United States. Twenty nine of those tribes are in the state of Washington, three in the state of Idaho, four in the state of Oregon, and one in the state of Montana with historical ties to the Washington territory. Each of these independent nations is governed by their own laws, rules, regulations, policy, traditions, and languages.

Washington state is comprised of tribal lands or co-managed public lands, therefore it is important for the University of Washington to work together to develop strong working relationships with tribal citizens and leaders. Existing relationships between the UW and certain tribal communities have demonstrated benefits for both sides including sharing knowledge, research opportunities, and educational opportunities for tribal members and descendants.



UW_Reges_0011482





## MEET THE DIRECTOR

The University of Washington is excited to welcome Sherri Berdine as the Director of the Office of Tribal Relations.

Read full bio

## INDIGENOUS PEOPLE'S DAY

Indigenous People's Day is a day to celebrate and lift up native peoples; past, present and future. It is also a day to take action to demonstrate support for and solidarity with Tribal Nations and indigenous communities.

Learn More

## CONTACT THE OFFICE

Connect with the Office of Tribal Relations.

Contact us

## LEARN MORE

| |
| --- |
| **Student Resources** |
| **University Partnerships** |
| **Government Resources** |
| **Indigenous Peoples' Day Resources** |

Connect with us:

Accessibility / Contact Us / Jobs / Campus Safety / My UW / Rules Docket / Privacy / Terms / Newsletter

© 2023 University of Washington | Seattle, WA

80

UW_Reges_0011483

# EXHIBIT 3

handout #1

# Computer Science & Engineering 143
# Computer Programming II

| | |
|---|---|
| **Instructor: Stuart Reges**<br>Email: reges@cs.washington.edu<br>Phone: 206-685-9138<br>Office: Gates Center (CSE2), room 305<br>Office hours: Tuesdays 1:30-3:30 | **Course Administrator**<br>**Pim Lustig**<br>Email: cse143@uw.edu<br>(email for registration issues)<br>**Lecture Times**<br>A: MWF 12:30-1:20, Kane 120<br>B: MWF 2:30-3:20, Kane 120 |

## Textbook
*Building Java Programs, 5th edition*, Reges & Stepp, required.

## Course Overview
This course is a continuation of CSE142. While CSE142 focused on control issues (loops, conditionals, methods, parameter passing, etc), CSE143 focuses on data issues. Topics include: ADTs (abstract data types), stacks, queues, linked lists, binary trees, recursion, interfaces, inheritance and encapsulation. The course also introduces the notion of complexity and performance tradeoffs in examining classic algorithms such as sorting and searching and classic data structures such as lists, sets and maps. The course will include a mixture of data structure implementation as well as using off-the-shelf components from the Java Collections Framework. The prerequisite is CSE142 or equivalent.

## Lecture Policy
In the lecture room students should keep talking to a minimum and are limited in their use of electronic equipment. Students who want to use cell phones or laptops will be required to sit in the last four rows of the classroom. If it is important to you to use your laptop during lecture, email Stuart to describe your situation and request an exception. TAs will periodically enforce this policy during lecture.

## Discussion Sections
You will be expected to participate in two weekly 50-minute discussion sections. The TA who runs your discussion section will grade your homework assignments. In section we will answer questions, go over common errors in homework solutions and discuss sample problems in more detail than we can in lecture.

## Grading
You will be expected to complete a variety of programming assignments for this course and to take two exams. The resulting scores will be combined according to the following weightings:

> 40%    weekly homework assignments (generally graded on a 20-point scale)
> 20%    midterm (Friday, 2/11/22)
> 40%    final exam (date and time not yet determined)

Using the weightings above, each student's scores will be turned into an overall score ranging from 0 to 100 percent. These will be turned into grades as follows:

> 90%    at least 3.5          70%    at least 1.5
> 80%    at least 2.5          60%    at least 0.7

The exams will be closed-book and closed-note. If you need to miss an exam, you must contact Stuart *prior* to the exam to get permission. Even if you are sick, you should be able to call your instructor's office phone and leave a message that you need to be contacted. Students wishing to take an exam at the DRS testing facility must schedule their exam at least three weeks in advance of the exam or they may not be accommodated.

## Course Registration
To add the class or switch sections, email cse143@uw.edu.



EXHIBIT
8
Reges 8/22/22

UW_Reges_0000399

## Course Web Page

Information about the course will be kept at https://cs.uw.edu/143. Links to course handouts will be kept on this page along with useful links to other class resources.

## Religious Accommodations

See Religious Accommodations Policy (https://registrar.washington.edu/staffandfaculty/religious-accommodations-policy/).

## Indigenous Land Acknowledgement

I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington..

## Computer Access/Software

The school operates an Introductory Programming Lab (IPL) that is located on the third floor of Mary Gates Hall. TAs will be available at the lab to help students with problems. You can use any Java environment you want although the recommended software for this course is the Java Development Kit (JDK) version 8 or higher and the jGRASP editor. More information can be found on the class web page under the "Java software" link.

## Late Policy

Each assignment will list its due date. Most will be due on Thursdays at 11 pm. Each student in the class will have a total of eight "free" late days (a late day is 24 hours of lateness). There are no partial days, so assignments are either on time, 1 day late, 2 days late, etc. Because of this generous late policy, students will not be granted extensions for assignments unless they have some highly extenuating circumstances. Once a student has used up all of his or her late days, each successive late day will result in a loss of 1 point. No assignment will be accepted more than 4 days after its due-date. If you are experiencing a problem that makes it difficult for you to complete an assignment on time, you should contact Stuart by email as early as possible to request an extension.

We will grade only one version of any given program. If you make multiple submissions for an assignment, we will grade the last version submitted. If you submit a version that you later decide you do not want to have graded, you must warn your TA not to grade that version and to wait for a later submission from you.

## Policy on Collaboration

You are to complete programming assignments individually. You may discuss the assignment in general terms with other students including a discussion of how to approach the problem, but the code you write must be your own. The intent is to allow you to get some help when you are stuck, but this help should be limited and should never involve details of how to code a solution. **You must abide by the following:**

- You may **not** work as a partner with another student on an assignment.
- You may **not** show another student your solution to an assignment.
- You may **not** have another person (current student, former student, tutor, friend, anyone) "walk you through" how to solve an assignment.
- You may **not** post your homework solution code online to ask others for help. This includes public message boards, forums, file sharing sites and services, or any other online system
- You are **not** to examine online solutions that you might find on the web.

Under our policy, a student who gives inappropriate help is equally guilty with one who receives it. Instead of providing such help, refer other students to class resources (lecture examples, the textbook, TA office hours, or emailing a TA or instructor). You must also ensure that your work is not copied by others by not leaving it in public places, emailing it others, posting it on the web, etc.

If you are taking the course a second time, you are allowed to submit a previous solution that you authored unless that program was involved in a case of academic misconduct. For any assignment where academic misconduct was involved, you have to write a new version of the program. We enforce this policy by running similarity-detection software over all submitted student programs, including programs from past quarters.

UW_Reges_0000400

# EXHIBIT 4

# UW Policy Directory

CHOOSE A RESOURCE

Policy Directory > FCG Home > Faculty Code

# Faculty Code and Governance

ADMINISTRATIVE POLICY STATEMENTS (APS)

BOARD OF REGENTS GOVERNANCE (BRG)

EMPLOYMENT AND ADMINISTRATIVE POLICIES (EAP)*

FACULTY CODE AND GOVERNANCE (FCG)*

PRESIDENTIAL ORDERS (PO)*

STUDENT GOVERNANCE AND POLICIES (SGP)*

WASHINGTON ADMINISTRATIVE CODE: TITLE 478 WAC* UW RULES (WAC)

PRINT THIS PAGE

*Formerly part of the University Handbook

## Faculty Code                          Chapter 25

## Tenure of the Faculty

Table of Contents                                    ⌄

### Section 25-01    Statute Relating to Tenure

[For a statute relating to tenure, see RCW 28B.20.130 (1)(2).]

### Section 25-11    Statement of Policy by the Board of Regents

[See *Board of Regents Governance*, Regent Policy No. 20.]

### Section 25-31    Definition of Tenure

Tenure is the right of a faculty member to hold the faculty member's position without discriminatory reduction of salary, and not to suffer loss of such position, or discriminatory reduction of salary, except for the reasons and in the manner provided in the *Faculty Code*.

*Section 25-31, April 16, 1956; S-A 73, May 24, 1985: both with Presidential approval.*

### Section 25-32    Criteria for Tenure

**A.**  Unless the faculty member is disqualified under any other provision of this section, a full-time member of the faculty has tenure if:

1.  The faculty member is a professor or associate professor; or

2.  The faculty member has held full-time rank as assistant professor in the University for seven or more years and has not had the term of appointment extended by the Provost or received notice terminating the appointment.



EXHIBIT
21
Reyes 8/23/23

### Section 25-63   Dismissal of a Nontenured Faculty Member

A nontenured faculty member may be dismissed prior to the expiration of the period for which the nontenured faculty member was appointed for the grounds stated in Section 25-51, and in such cases the procedure described in Section 25-71 shall be followed, or for reasons of program elimination, and in such cases the procedure described in Section 25-52 shall be followed; or for reasons of financial emergency, in which cases the procedure described in Chapter 26, Section 26-31 shall be followed.

*S-A 39, June 8, 1971; S-A 67, December 5, 1983; S-A 73, May 24, 1985; S-A 164, May 9, 2023: all with Presidential approval.*

### Section 25-64   Discriminatory Reduction in Pay or Improper Non-Reappointment

**A.**  In a case in which a tenured or non-tenured faculty member alleges that the faculty member has suffered discriminatory reduction in pay, or in which a non-tenured faculty member alleges violation of the *Faculty Code* in connection with the faculty member's non-reappointment, including denial of tenure, the faculty member making the allegation may engage in the administrative and conciliatory proceedings of Chapter 27. The faculty member may file a petition for review with the Chair of the Adjudication Panel and the Secretary of the Faculty, in which case the procedures set forth in Chapter 28 shall be followed. The petition for review may include allegations of unlawful discrimination because of race, religion, color, sex, national origin, age, handicap, sexual orientation, or status as a disabled or Vietnam era veteran.

**B.**  The procedures set forth in Section 25-62 shall be followed. The burden of proof shall rest with the faculty member making the allegation.

*S-A 39, June 8, 1971; S-A 55, May 25, 1977; S-A 73, May 24, 1985: all with Presidential approval.*

### Section 25-71   Standard of Conduct

**A.**  The University is an institution having special public responsibility for providing instruction in higher education, for advancing knowledge through scholarship and research, and for providing related services to the community. As a center of learning, the University also has the obligation to maintain conditions which are conducive to freedom of inquiry and expression in the maximum degree compatible with the orderly conduct of its functions. For these purposes the University is governed by rules and regulations which safeguard its functions, and which, at the same time, protect the rights and freedoms of all members of the academic community. All members of the academic community, including members of the faculty, have an obligation to comply with the rules and regulations of the University and its schools, colleges, and departments.



**B.** If a member of the faculty is alleged to have violated a rule or regulation of the University, its schools, colleges, or departments, the department chair or the dean in a non-departmentalized school or college shall fully inform the faculty member of the nature and specific content of the alleged violation and shall offer to discuss the alleged violation with the faculty member and with the party raising the issue. The faculty member and the party raising the issue may each be accompanied by one person. The matter may be concluded at this point by the mutual consent of all parties.

**C.** If the department chair, the dean, or the faculty member so wishes, the department chair, the dean, or the faculty member may initiate conciliatory proceedings at any time by contacting the University Ombud as provided in Chapter 27, Section 27-42.

**D.** If a mutually agreeable resolution is not achieved under Subsection B or C of this section, and if the dean (after consultation in the case of a departmentalized school or college with the department chair and the faculty member) determines that the alleged violation is of sufficient seriousness to justify consideration of the filing of a formal statement of charges that might lead to dismissal, reduction of salary, or suspension for more than one quarter, the dean shall follow one of the following procedures:

    **1.** In cases concerning allegations of unlawful discrimination or sexual harassment, the dean shall request an investigation by the University Complaint Investigation and Resolution Office (UCIRO) as provided in Administrative Policy Statement 46.3.

    **2.** In cases concerning allegations of scientific and scholarly misconduct as defined in Section 25-51, the dean shall proceed as provided in Executive Order No. 61, "Policy for Addressing Allegations of Scientific and Scholarly Misconduct."

    **3.** In all other kinds of cases the dean shall appoint a special investigating committee of three faculty members who are not directly involved in the matter being considered. The committee shall assist the dean in the informal and confidential gathering of information and documentation and shall advise the dean in its interpretation. If as a result of the foregoing investigation the dean concludes that further action is not merited, then the matter shall be dropped (although a faculty member aggrieved as a result of these activities has recourse to the conciliatory proceedings of Chapter 27 and to the adjudicative proceedings described in Chapter 28, Section 28-32, Subsection A.)

**E.** If, after engaging in the procedures specified in Subsection D.2 or D.3 above, the dean concludes that further action is warranted, the dean shall deliver to the Provost a written record stating that reasonable cause



exists to adjudicate charges of wrongdoing brought against the faculty member, with enough of the underlying facts to inform the Provost of the reasons for this conclusion. Upon filing of the written report with the Provost, the case shall be decided in the manner prescribed in <u>Chapter 28</u>.

*S-A 36, June 17, 1970; S-A 73, May 24, 1985; S-A 86, December 8, 1992; S-A 91, July 11, 1994: all with Presidential approval; RC, June 28, 2010; RC, March 3, 2013; RC, January 22, 2016; RC, February 12, 2016; October 17, 2018 with Presidential approval.*



For related information, see:

- *Board of Regents Governance*, Regent Policy <u>No. 20</u>, "Tenure of the Faculty Statement of Policy"



<u>University Policy and Rules Office</u>     <u>Back to Top</u>
rules@uw.edu
Last Modified: 07/18/2023 17:31:48

https://www.washington.edu/admin/rules/policies/FCG/FCCH25.html          88                                                    10/10

# EXHIBIT 5



# UNIVERSITY *of* WASHINGTON

### Memorandum of Understanding Between
### Northwest Regional Tribes and the University of Washington

This Memorandum of Understanding (MOU) is entered into by the University of Washington (UW) and the several tribal governments listed and signed below (Signatory Tribes), with reference to the following:

This MOU is being enacted for the purpose of enhancing and sustaining the government-to-government relationship between the participating tribes and the UW, a state agency, within the protocol outlined in the Washington State Centennial Accord, and with regional tribes who maintain an ongoing relationship with the UW.

UW recognizes and affirms established policies under which tribal governments are treated as distinct legal, political, and historic entities with their own powers of self-governance and self-determination.

UW and the Signatory Tribes wish to formalize and sustain a structure that strengthens and advances the relationships between them, and enhances the UW's educational, research and service partnerships and programs involving tribes, American Indian students, and the broader American Indian community.

**Based on this MOU, the following will occur to sustain and advance relationships between the UW and the Signatory Tribes:**

- Annual Tribal Leadership Summit: A government-to-government meeting attended by elected tribal leaders and the UW president in which priority initiatives are identified, discussed, and advanced.
- Quarterly Native American Advisory Board Meetings: Attended by tribal representatives, the UW Vice President for Minority Affairs and Vice Provost for Diversity, relevant UW students, staff and faculty. This group will help address the priorities and issues identified at the UW Tribal Leadership Summit.

**Initial priorities and focus will include, but are not limited to, the following items previously outlined by the UW Native American Advisory Board and at the UW Tribal Leadership Summit meetings:**

- Enhance efforts to recruit, retain and successfully graduate more American Indian undergraduate, graduate and professional students.
- Recruit, retain, and promote qualified American Indian faculty and staff at the University in academic and administrative departments to aid the UW in its mission and delivery of services to tribal communities and American Indian students.
- Plan and construct a longhouse-style facility on campus that enhances the recruitment and success of American Indian students, acknowledges and honors the region's tribes, and serves as a place for cultural learning and exchange for the entire community.
- Expand and integrate American Indian culture, knowledge and history into the academic curriculum, institutional programs and university community.
- Strengthen relevant campus departments and programs such as American Indian Studies and grow research partnerships between campus units and tribal communities by utilizing the framework of community based and tribal participatory research models presented at the 2009 UW Tribal Leadership Summit.

Through this MOU, the preceding priorities will receive sustained attention from the UW and the Signatory Tribes to strengthen the ability to address shared objectives. This MOU will institutionalize, formalize and sustain these important relationships, ensuring that changes in leadership will not diminish the university's commitment to working with the tribes, or the tribes' commitment to working with the university.

*Memorandum of Understanding* - September 11, 2010

UW_Reges_0009047

**Terms and Working Principles**

The parties entering into this Memorandum of Understanding agree to the following terms and principles, which will aid in creating mutual understanding and productive relationships:

A. Unique Legal Status of Tribes

The unique legal status of tribes, rights reserved through treaties, agreements, historic and cultural interests, create a unique relationship between tribes and state agencies, including the UW. Tribes maintain sovereign rights that predate the formation of the United States and the State of Washington and are guaranteed under treaties and federal laws.

B. Government-to-Government

Federally Recognized Indian Tribes have a special government-to-government relationship with the United States government. Government-to-government is also used to describe the relationship and protocols between tribes and other governments such as states. State agencies and tribes work directly with each other in a government-to-government fashion, rather than as subdivisions of other governments.

C. 1989 Centennial Accord

This Memorandum of Understanding is guided by the *Centennial Accord Between the Federally Recognized Indian Tribes in Washington State and the State of Washington* of 1989. The *Centennial Accord* is published on the internet by the Governor's Office of Indian Affairs at www.goia.wa.gov/Government-to-Government/CentennialAgreement.html. A corresponding accord between the out-of-state tribes with treaty reserved rights in Washington State can be found at www.goia.wa.gov/Relations/OutOfStateAccord.pdf.

D. Implementation of MOU

This Memorandum of Understanding will become effective upon the signatures of the parties. The parties shall meet and review progress under this agreement on an annual basis, in the format outlined within this memorandum. This MOU may be amended by written agreement of the parties at any time. Any party may withdraw from this MOU by providing the other parties 30 days written notice of its intent to withdraw.

The following signatory parties have executed this Memorandum of Understanding.

*[signatures]*

*Phylis M. L___*   *R. Phen III Kalispel Tribe*

*Ken S. Olm___*   *___*

*Patricia Sheded*   *___*

*Sheila Edwards Lange*   *Ann Rose Comwell-Gage, Quileute Tribe*

*Cheryl A. Kennedy, Conf. Tribes of Grand Ronde*   *Dario Decoteau, Steilacoom Tribe*

*Sil Moffett, Nez Perce Tribe*   *Dana Sands ___, Snoqualmoo*

*LaDena a Wilson, Tlingit Haida*   *Leonard Forsman*

*Michael O. Finley, Colville Conf. Tribes*   *___ Puyallup Tribe*

UW_Reges_0009048

Shane Hill Marion

James W Maher Sauk Suiattle

William B Wyatt   Cedville Tribe

W. Ron Allen, Jamestown S'Klallam

Melvin R Sheldon   TULALIP TRiBes

UW_Reges_0009049

# EXHIBIT 6

Case 2:22-cv-00964-JNC   Document 65   Filed 10/18/23   Page 95 of 106

# Office of the University Registrar

## UW Syllabus Guidelines and Resources

[ Close Menu ]

**Curriculum Office**

Course Applications

Curriculum Reports

Undergraduate Notice of Proposal Form Quick Guide

Undergraduate Program Proposal Process FAQs

UW CM Quick Guides

**UW Syllabus Guidelines and Resources**

- Medical Excuse Notes FAQs



The general principle behind providing a syllabus is to provide a clear statement of course content and performance expectations from the beginning of a class. This statement should be available in a durable and accessible form, whether on paper or online.

The guidelines below are intended to assist faculty in developing that statement for new and revised course proposals.

In addition, this webpage provides faculty with language that may be included in syllabi. Providing this content in syllabi is voluntary.

**Note:** This webpage is maintained by the UW Curriculum Office in collaboration with the Faculty Council on Academic Standards (FCAS). Please contact the UW Curriculum Office at uwcr@uw.edu with any questions or suggested content.

## Syllabus Guidelines

UW_Reges_0003266

## Purpose and Format 

# Purpose and Format

A syllabus is part of the documentation submitted for review of all new course applications and proposals to substantively change existing courses. In addition to forming an important aspect of the review of course proposals, the syllabus is kept by the Office of the University Registrar to aid in documenting the course content for students. Besides its administrative purpose, students depend on the information on a syllabus to understand what is expected of them in the course. While disciplines will vary in the format and specific content of the syllabus, certain components are important for most courses. A syllabus should provide the following information:

1. Course description
    a. Logistics to obtain necessary materials and assistance
    b. Learning/intellectual content
    c. Learning objectives
    d. Characteristics of class meeting (online, lecture-based, seminar, etc.)
2. Course assessment/expectations
    a. Explicit description of due dates and type of assessments, including method (points, percentages, etc.) and general criteria (participation, improvement, content correctness, etc.), for each assignment
    b. Strategies for success in the course
    c. Overall course grading system (absolute scale, curve, etc.)
3. Course guidelines and policies*
    a. Academic misconduct
    b. Accommodation
    c. Religious Accommodation
    d. Grading
    e. Inclusivity
    f. Medical notes
    g. Technology protocol

*These course guidelines and policies are discussed in the Course Guidelines and Policies section of this webpage.

# Guidelines and Policies

UW_Reges_0003267

# Course Guidelines and Policies

## Academic Misconduct 

The university's policy on academic misconduct is a part of the Student Conduct Code, which cites the definition of academic misconduct in WAC 478-121. According to Student Governance Policy, Chapter 209 Section 7.C, academic misconduct includes but is not limited to acts such as cheating, plagiarism, and unauthorized collaboration. Refer to the Community Standards & Student Conduct – Academic Misconduct webpage for more information.

Students have a right to due process, particularly regarding academic misconduct. Thus, the syllabus is important in providing students with a clear statement of the instructor's expectations.

Optional syllabus language is provided in the Syllabus Language section of this webpage.

- Academic Integrity
- Conduct

## Accommodation 

Instructors are obligated to provide reasonable accommodations for students who have disabilities. The university's Disability Resources for Students (DRS) is the campus partner that provides services for students "with either temporary or permanent physical, health, learning, sensory or psychological disabilities." The DRS website provides resources for students and faculty for making accommodations.

Optional campus-specific DRS syllabus statements are provided in the Syllabus Language section of this webpage.

## Religious Accommodations 

Religious law requires faculty to provide students with the University's language about religious accommodations or a link to the Religious Accommodations Policy webpage in syllabi or elsewhere.

The University's religious accommodations language is provided in the Syllabus Language section of this webpage. The language closely mirrors that of the law itself and was developed in close collaboration with the Faculty Senate and the AGs office. The religious accommodations language should not be edited or altered.

## Inclusivity

UW_Reges_0003268

# Inclusivity

Inclusivity

The values of the university are inclusivity and diversity, regardless of race, gender, income, ability, beliefs, and other ways that people distinguish themselves and others. The Diversity webpage provides an overview of the ways the university addresses this value. Inclusivity applied to teaching a course means that assignments and activities should be accessible to all students, including class trips or research in the field. In such cases, alternative assignments should be available to those who need them.

## Medical Notes ⊖

Medical Notes

Faculty are prohibited from requiring or accepting medical documentation from a student for any absences. Requiring such documentation places burdens on all parties involved. For faculty, the Health Insurance Portability and Accountability Act of 1996 (HIPAA) imposes legal requirements upon those who possess the medical information of others (in particular, identifiable health information falls under "The HIPAA Privacy Rule"). For health care providers, in particular Hall Health, requests for "medical excuse notes" consume valuable time that could be spent treating students. For students, requiring documentation discriminates against students who do not have access to medical providers.

In the cases of absences that result in a student missing a course requirement (class activity, assignment submission, exam, etc.) and of extended absences, accommodations are left to the discretion of the instructor. Accommodations might include makeup exams, alternate assignments, or alternate weighting of missed work, so long as the grades for other students in the class are not affected by the accommodation.

Optional syllabus language is provided in the Syllabus Language section of this webpage.

- Medical Excuse Notes
- Excused Absence from Class

## Technology Protocol ⊖

Technology Protocol

There is no general policy on the use of technology (phones, tablets, laptops, etc.) at the university. However, instructors can set expectations about how these devices may be used, including banning them (except in cases where a disability may require the use of a device). Any policy on the use of electronics should be included in the syllabus.

UW_Reges_0003269

# Grading Specific Course Guidelines and Policies

## Grading on Attendance 

Per the Office of Student Financial Aid, the University of Washington is a non-attendance taking institution under the Department of Education eligibility rules. In order to meet federal requirements, grading on participation is encouraged.

## Participation 

Students may be assessed on their participation in the classroom as long as the rubric used to assess the quality of that participation is explicit (i.e., described in detail in the syllabus). In courses where the pedagogy requires that more than 15% of the course grade be based on in-class participation, the assessment rubric is critical so that students understand what is expected of them.

Since disciplines have different methods of teaching, there are also different types of grading on participation. Departmental, school, and college guidelines may provide specific guidelines about participation for certain types of courses. For the purpose of the syllabus, what is most important is providing clear expectations of how participation will be used for evaluation purposes in the class.

## Extra credit ⊖

Extra credit is discouraged. Should it be used, extra credit opportunities must be offered judiciously and not as a replacement for primary course material. Such opportunities are to be:

- fair; that is, available to all students equally;
- not dependent upon a specific time outside the regularly scheduled class period (e.g. attending a specific talk or performance);
- not dependent upon the ability to travel to or from specific locations (e.g. attending a specific talk or performance);
- not dependent upon the expression of political or social interest (e.g. caucusing, voting, watching a debate, volunteering);
- and made explicit in the syllabus.

In no event should extra credit be offered to only a subset of students. If any student in a class cannot feasibly complete an extra credit opportunity, the instructor should offer an alternate but commensurate opportunity to that student.

UW_Reges_0003270

## Peer Evaluation    ⊖

Peer evaluation is to be used judiciously and in moderation. Peer evaluation may not replace grading by the instructor; while peer evaluation may be included in a grading rubric, students are not to assign grades to other students.

## Incompletes    ⊖

An incomplete grade (I) is given only when a student has done satisfactory work up until the last two weeks of the quarter but cannot complete the remaining work because of illness or other circumstances beyond the student's control. The instructor must file a written statement with the head of the department or the dean of the college listing the work that a student will need to do to remove the incomplete. For further information on incompletes, refer to the <u>Office of the University Registrar Incomplete Grades webpage</u> and the <u>university grading policy</u> on their use.

# Optional Syllabus Language

## Academic Integrity    ⊖

<u>Sample Unit: Student Conduct</u>

**Optional Syllabus Language:**

The University takes academic integrity very seriously. Behaving with integrity is part of our responsibility to our shared learning community. If you're uncertain about if something is academic misconduct, ask me. I am willing to discuss questions you might have.

Acts of academic misconduct may include but are not limited to:

- Cheating (working collaboratively on quizzes/exams and discussion submissions, sharing answers, and previewing quizzes/exams)
- Plagiarism (representing the work of others as your own without giving appropriate credit to the original author(s))
- Unauthorized collaboration (working with each other on assignments)

Concerns about these or other behaviors prohibited by the Student Conduct Code will be referred for investigation and adjudication by (include information for specific campus office).

Students found to have engaged in academic misconduct may receive a zero on the assignment (or other possible outcome).

UW_Reges_0003271

5/11/23, 11:55 AM
Case 2:22-cv-00964-JNW Document 65 Filed 12/18/23 Page 101 of 106
UW Syllabus Guidelines and Resources | Office of the University Registrar

**For Faculty:**

The provided language is a starting point. You should consider making adjustments to reflect your specific discipline or the dynamics of your coursework. You may also consult with your campus conduct office, departmental leadership, and/or Associate Dean regarding who has responsibility for investigating academic misconduct in your school or college.

**PREPARING TO TEACH: CHEATING OR PLAGIARISM**

## Conduct ⊖

**Conduct**

**Campus Unit: Student Conduct**

**Optional Syllabus Language:**

The University of Washington Student Conduct Code (WAC 478-121) defines prohibited academic and behavioral conduct and describes how the University holds students accountable as they pursue their academic goals. Allegations of misconduct by students may be referred to the appropriate campus office for investigation and resolution. More information can be found online at https://www.washington.edu/studentconduct/

**CONDUCT CODE AND POLICY**

## Disability Resources ⊖

**Disability Resources**

**Campus Unit: Disability Resources for Students (DRS)**

**Optional Syllabus Language:**

Disability Resources for Students (DRS) offers the following statements for faculty to include in their syllabi:

**SEATTLE**　　　　**TACOMA**　　　　**BOTHELL**

## Excused Absence from Class ⊖

**Excused Absence from Class**

**Campus Unit: Faculty Senate**

**Optional Syllabus Language:**

Students are expected to attend class and to participate in all graded activities, including midterms and final examinations. A student who is anticipating being absent from class due to a Religious

UW_Reges_0003272

Accommodation activity needs to complete the Religious Accommodations request process by the second Friday of the quarter. Students who anticipate missing class due to attendance at academic conferences or field trips, or participation in university-sponsored activities should provide a written notice to the instructor ahead of the absence. The instructor will determine if the graded activity or exam can be rescheduled or if there is equivalent work that can be done as an equivalent, as determined by the instructor.

### Face Coverings in the Classroom                                                              ⊖

## Face Coverings in the Classroom

Faculty Senate is encouraged to include a syllabus statement for students regarding the use of face coverings when attending class.

**Campus Unit: Faculty Senate**

**Optional Syllabus Language:**

### Face Coverings in the Classroom

The health and safety of the University of Washington community are the institution's priorities. Please review and adhere to the UW COVID Face Covering Policy [pdf].

## Referenced Links

**UW COVID-19 FACE COVERING POLICY [PDF]**

### Guidance to Students Taking Courses Outside the U.S.                                          ⊖

## Guidance to Students Taking Courses Outside the U.S.

**Campus Unit: Faculty Senate Committee on Planning & Budgeting**

**Optional Syllabus Language:**

Faculty members at U.S. universities – including the University of Washington – have the right to academic freedom which includes presenting and exploring topics and content that other governments may consider to be illegal and, therefore, choose to censor. Examples may include topics and content involving religion, gender and sexuality, human rights, democracy and representative government, and historic events.

If, as a UW student, you are living outside of the United States while taking courses remotely, you are subject to the laws of your local jurisdiction. Local authorities may limit your access to course material and take punitive action towards you. Unfortunately, the University of Washington has no authority over the laws in your jurisdictions or how local authorities enforce those laws.

UW_Reges_0003273

If you are taking UW courses outside of the United States, you have reason to exercise caution when enrolling in courses that cover topics and issues censored in your jurisdiction. If you have concerns regarding a course or courses that you have registered for, please contact your academic advisor who will assist you in exploring options.

## Medical Excuse Notes 

**Medical Excuse Notes**

**Optional Syllabus Language:**

Students are expected to attend class and to participate in all graded activities, including midterms and final examinations. To protect student privacy and the integrity of the academic experience, students will not be required to provide a medical excuse note to justify an absence from class due to illness. A student absent from any graded class activity or examination due to illness must request, in writing, to take a rescheduled examination or perform work judged by the instructor to be the equivalent. Students are responsible for taking any number of examinations for which they are scheduled on a given day and may not request an adjustment for this reason alone.

**For Faculty:**

Faculty are prohibited from requiring or accepting medical excuse notes from students. Requiring a medical excuse note creates an inequitable burden on certain students, strains the limited resources of Hall Health, and provides no actual confirmation of the veracity, intensity, or duration of a student's illness, and thus is not a reliable check on student behavior.

This will not change the documentation needed for a disability, hardship, or other significant circumstances (including medical conditions) requiring longer-term absences from the University; nor does it prevent instructors from requiring students to justify the unavoidable nature of an absence, or require that instructors develop new accommodations. This change is intended to protect students from having to disclose private information to faculty, engage in potentially risky behaviors, or face undue financial and emotional burdens, to conserve resources at Hall Health, and encourage personal responsibility and professional conduct among students.

The provided language is a starting point to shift away from requiring medical notes. Given the reality that some students will miss some work during a quarter, it will be most useful to plan ahead with course policies that reflect the dynamics of your own course and will streamline your response. You may wish to provide a template for students to use when contacting you with a request for adjustments or you may consider providing a link to an automated form that students may use (e.g., Google Forms) to make such a request. More ideas are provided in the FAQ linked below. You may also consult with the Center for Teaching and Learning and your departmental leadership regarding planning ahead for student absences.

UW_Reges_0003274

**EXAM GUIDELINES**

**PREPARING TO TEACH**

**PROVISIONS FOR CHANGING ENROLLMENT STATUS IN A CLASS**

**LEAVE OF ABSENCE POLICY**

**MEDICAL EXCUSE NOTES FAQS**

## Religious Accommodations                                    ⊖

**Religious Accommodations**

**Responsible Unit: Office of the Registrar**

State law requires faculty to provide students with the University's language about religious accommodations or a link to the Religious Accommodations Policy webpage in syllabi or elsewhere. The following language closely mirrors that of the law itself and was developed in close collaboration with Faculty Senate and the AGs office.

**Syllabus Language: [DO NOT AMEND]** "Washington state law requires that UW develop a policy for accommodation of student absences or significant hardship due to reasons of faith or conscience, or for organized religious activities. The UW's policy, including more information about how to request an accommodation, is available at Religious Accommodations Policy (https://registrar.washington.edu/staffandfaculty/religious-accommodations-policy/). Accommodations must be requested within the first two weeks of this course using the Religious Accommodations Request form (https://registrar.washington.edu/students/religious-accommodations-request/)."

## Referenced Links

**RELIGIOUS ACCOMMODATIONS POLICY**

**RELIGIOUS ACCOMMODATIONS REQUEST FORM**

## Safety                                                      ⊖

UW_Reges_0003275

# Safety

**Safety Unit: Safe Campus**

**Optional Syllabus Language:**

Call SafeCampus at 206-685-7233 anytime – no matter where you work or study – to anonymously discuss safety and well-being concerns for yourself or others. SafeCampus's team of caring professionals will provide individualized support, while discussing short- and long-term solutions and connecting you with additional resources when requested.

**UW POLICE**

## Title IX ⊖

**Title IX Unit: Office of the Title IX Coordinator**

**Optional Syllabus Language:**

The Office of the Title IX Coordinator provides the following statement for faculty to include in their syllabi:

**TITLE IX SYLLABUS STATEMENT**

### Curriculum Office

Course Applications

Curriculum Reports

Undergraduate Notice of Proposal Form Quick Guide

Undergraduate Program Proposal Process FAQs

UW CM Quick Guides

**UW Syllabus Guidelines and Resources**

- Medical Excuse Notes FAQs

UW_Reges_0003276

# SEARCH OUR

Search for:

# SUBMIT A QUESTION

**Topic of Inquiry, Request, or Comment** *(Required)*

Let us know what your question or request is about and we'll make sure it's routed to the appropriate office and generate a ticket.

- Choose a Topic -

# HOLIDAY CLOSURES

## Spring 2023

Mon, May 29 (Memorial Day)