*Reges v. Cauce, et al.*

# Exhibit F
# to Declaration of
# Gabriel Walters

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

--------------------------------------------------------

STUART REGES,                         )   No.

                    Plaintiff,        )   2:22-cv-00964-JHC

        vs.                           )

ANA MARI CAUCE, et al.,               )

                    Defendants.       )


--------------------------------------------------------

Videotaped

Deposition Upon Oral Examination Of

NANCY ALLBRITTON

--------------------------------------------------------

June 20, 2023

401 Union Street, Suite 3300, Seattle, Washington

Magna Legal Services

(866) 624-6221

www.MagnaLS.com




REPORTED BY:  PEGGY FRITSCHY HAMILTON, RPR, CSR, CLR,

29906/No. 2704



```
                                                    Page 3
 1   APPEARANCES (Cont'd)

 2   And:                 AARON P. BRECHER

 3                        Orrick

 4                        401 Union Street  Suite 3300

 5                        Seattle, Washington  98101

 6                        (206) 839-4332

 7                        Abrecher@orrick.com

 8   Also Present:        Tania Grant (videographer)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

```
 1   E X H I B I T S
 2   NO.        DESCRIPTION                         MARKED
 3   30         December 8, 2021 email to Ed          38
 4              Lazowska and others from Stuart Reges
 5   31         Email chain, top email January 4,     50
 6              2022 to Aileen Trilles and others
 7              from Magdalena Balazinska
 8   32         January 5, 2022 email to Magdalena    77
 9              Balazinska, and others, from
10              Aileen Trilles
11   33         Email chain, top email January 4,     81
12              2022 to Aileen Trilles and others
13              from Magdalena Balazinska
14   34         Email chain, top email to Magdalena   82
15              Balazinska and others, from Nancy
16              Allbritton
17   35         Email chain, top email March 25,     154
18              2022 to Heather Hoeksema, and others,
19              from Lucia Ersfeld
20   36         June 7, 2022 email to engr-chairs and 180
21              others, from Nancy Allbritton
22   37         July 11, 2022 email to Louisa        183
23              Mackenzie, and others, from Nancy
24              Allbritton
25
```



Page 5

1    E X H I B I T S CONT'D

2    NO.      DESCRIPTION                          MARKED

3    38      Letter from Kayla Marie Shuster        190

4    39      March 2, 2022 letter to Teaching       192

5            Professor Stuart Reges from Magdalena

6            Balazinska

7    40      March 9, 2022 letter to Teaching       193

8            Professor Stuart Reges from Magdalena

9            Balazinska

10   41      Email chain, top email to Rickey L.    193

11           Hall, and others, from Magdalena

12           Balazinska

13   42      Email chain, top email March 28,       198

14           2022 to Nancy Allbritton, and others,

15           from Heather Hoeksema

16

17    E X A M I N A T I O N

18   BY                      PAGES

19   ATTORNEY WALTERS      7 - 202

20

21

22   *****  (*  Denotes phonetic spelling.)

23

24

25



Page 17

1      Q.   And the president of the University of

2   Washington is Ana Mari Cauce; correct?

3      A.   That is correct.

4      Q.   What are your job responsibilities?

5      A.   I oversee the college of engineering with

6   respect to academics, finances, and administration.

7      Q.   What is the Office of Minority Affairs and

8   Diversity at the University of Washington?

9      A.   The office is a central unit.  I don't know

10   all of their exact job duties.  They oversee minority

11   affairs and diversity at the university.

12      Q.   Are they at the university level, or within

13   the college of engineering, or something else?

14      A.   They are at the university level.

15      Q.   If I were to say the words "UW Central," what

16   does that mean to you?

17      A.   It means the provost and president's offices.

18      Q.   Is that what's referred to as "the leadership

19   team"?

20      A.   I don't understand that question, because

21   there are many leadership teams.

22      Q.   That's okay.  Would you say the University of

23   Washington is somewhat decentralized?

24           ATTORNEY HOSP:  Object to the form.

25           You can answer.



Page 72

```
 1       A.   At the current time, no.

 2       Q.   The next sentence says, "While the syllabus

 3  is the purview of the faculty and we respect academic

 4  freedom, we are opposed to conduct that intentionally

 5  creates a hostile environment in the classroom," and

 6  it goes on.  What does that mean, that "the syllabus

 7  is the purview of the faculty"?

 8            ATTORNEY HOSP:  Objection to form.

 9            You can answer.

10       A.   Different faculty run their classes in

11  different manners, and they can select which manner

12  instructional delivery they choose.

13       Q.   Including in their syllabi?

14       A.   Excuse me?

15       Q.   I believe you just testified that different

16  faculty can run their classes in different manners,

17  and they can choose which methods their instruction

18  follows.  Something along those lines.  Tell me if I'm

19  mischaracterizing your prior testimony.

20       A.   That's correct.

21       Q.   Can faculty choose the content of their

22  syllabi?

23       A.   Many faculty have great flexibility, but it

24  should match the topic of the course.

25       Q.   Do you review faculty syllabi ever?
```



1      A.    The complaints indicate that there is a

2  challenge in the classroom environment, and it's my

3  opinion that if, if a student feels they're being

4  denigrated by a faculty member, they're going to

5  have -- be challenged to pay attention, to learn the

6  material, to get things done like they need to get

7  done.

8      Q.    And student and staff complaints that you

9  refer to in this portion of the document, were those

10  in reaction to Stuart including his land

11  acknowledgment statement in his course syllabus?

12      A.    Yes.

13      Q.    The next bullet point says, "The direct

14  impact of the inclusion of the statement on your

15  syllabus on Native American members of the university

16  community, including for or example."  And then it

17  says, "One Native American student feeling compelled

18  to take a leave of absence from the university."

19            Without tell me the name of the student,

20  do you know who that student is?

21      A.    No, I do not know who that student is.

22      Q.    How did that information come to you?

23      A.    It was conveyed to me, it may have been the

24  oral report out of the SIC.

25      Q.    It might have been, but you are not sure?



Page 101

```
 1        A.    I'm pretty sure it was.

 2        Q.    Do you recall what the special investigating

 3   committee found?

 4        A.    I don't recall the exact details.

 5        Q.    And do you know what the special

 6   investigating committee based this conclusion upon?

 7        A.    I do not know the details of that.

 8        Q.    Did you ask them?

 9        A.    No, I did not, or I don't recall asking them.

10        Q.    The next bullet point says, "One Native

11   American student feeling compelled to drop out of the

12   university."  Was that a conclusion of the special

13   investigating committee?

14        A.    I believe so.

15        Q.    Do you have any independent knowledge of that

16   fact?

17        A.    I do not, but I have no reason to doubt it.

18        Q.    Do you know what the special investigating

19   committee based that conclusion upon?

20        A.    I do not.

21        Q.    Did you ask them?

22        A.    I don't recall.

23        Q.    The next bullet point says, "Multiple Native

24   American students expressing the view that the

25   inclusion of the statement on your syllabus made them
```



Page 112

 1      A.    I don't recall other, other objections.

 2      Q.    And you've had an opportunity to review this

 3 exhibit, and in fact, there is nothing other than

 4 faculty, student, and staff complaints evidencing

 5 disruption to the learning environment referenced in

 6 this letter; correct?

 7            ATTORNEY HOSP:   Objection to the form.

 8      A.    I believe that is correct.

 9      Q.    Thank you.  Turning to page 3 of this

10 exhibit, I'd like to ask you some questions about the

11 fifth bullet point, so I'll draw your attention to

12 that part of the document.  And there are one, two,

13 three, four subbullet points.  So can you see where I

14 am; correct?

15      A.    Yes, I do.

16      Q.    This is discussing directions that Director

17 Balazinska -- excuse me.  This is discussing actions

18 that Director Balazinska took in response to Stuart's

19 inclusion of his land acknowledgment statement on his

20 syllabus and his refusal to remove that statement;

21 correct?

22      A.    Yes, it is.

23      Q.    And it says in the first subbullet that

24 Director Balazinska instructed the IT department to

25 take down the online version of the syllabus and



Page 150

1   recall that; correct?

2        A.   Yes.

3        Q.   If Stuart had done none of those, what I'll

4   call them, "colloquially bad behaviors" and removed

5   the land acknowledgment statement, would that have

6   satisfied this third subbullet point that we're

7   looking at now?

8        A.   Yes.

9        Q.   And the last bullet point on this page says

10  that, "You agree that you will avoid any retaliation."

11  You see where I am; correct?

12       A.   Yes.

13       Q.   "Even the appearance of same"; correct?

14       A.   Yes.

15       Q.   Did you ever have any reason to believe that

16  Stuart Reges did retaliate against persons who

17  complained about his land acknowledgment statement?

18       A.   No, I did not.

19       Q.   Did you have any reason to believe that he

20  might retaliate against anyone who complained?

21       A.   Not specifically, no.

22       Q.   Did you have any reason to believe that

23  Stuart Reges would have created the appearance of

24  retaliation because of complaints?

25       A.   No, I do not.



Page 173

1          ATTORNEY HOSP:  Objection.  Calls for

2    hypothetical.

3        A.   Then it would begin going up through the

4    process again, and then we'd follow the process.

5        Q.   Is that a yes?

6        A.   No.  It's a begin.  We would begin the

7    process, and we would follow the process, and it would

8    really depend on the outcome of the process.

9        Q.   I haven't had an opportunity to visit the

10   University of Washington campus.  Are there front

11   gates to the campus?

12       A.   There are many, many different entrances to

13   the campus.

14       Q.   If he stood outside one of the entrances to

15   the campus with a poster board with his land

16   acknowledgment statement and it caused disruption as

17   evidenced by student complaints, would he face a

18   Faculty Code Section 25-71 letter?

19          ATTORNEY HOSP:  Objection.  Calls for a

20   hypothetical.

21       A.   If it did not disrupt the learning

22   environment in the course of delivery, then, no.

23       Q.   I'm trying to understand, because it says

24   Stuart is free to continue to express his political

25   views in other ways and other venues that are not



Page 174

1  disruptive to the academic mission of the university.

2  What are the limits to that statement?

3          ATTORNEY HOSP:  Objection.  Calls for a

4  hypothetical.

5      A.   I mean, again, we just go down to, are the

6  students getting educated?  Are they learning the

7  material?  Is the environment of their classroom

8  acceptable so that they can move forward?  And, you

9  know, there's many things he could do.  If that's not

10  a problem, fine.

11      Q.   If Stuart were to post on Reddit that, I

12  acknowledge that by labor theory of property the Coast

13  Salish people can claim historical ownership of almost

14  none of the land currently occupied by the University

15  of Washington, and students complained about his post

16  on Reddit, would that initiate a Faculty Code Section

17  25-71 process?

18          ATTORNEY HOSP:  Objection.  Calls for a

19  hypothetical.

20      A.   Again, if it didn't disrupt the classroom and

21  the classroom environment and the ability of the

22  students to learn, the answer is no.

23      Q.   But if it did, is the answer yes?

24          ATTORNEY HOSP:  Objection.  Calls for a

25  hypothetical.



Page 175

```
 1        A.    Then we'd start the process again, and we'd
 2   see what came out the end.
 3        Q.    So that's a yes?
 4        A.    It's not a yes or a no.  I don't know what
 5   would come out at the very end.
 6        Q.    How many student, faculty, or staff
 7   complaints does it take to initiate a Faculty Code
 8   Section 25-71 process?
 9        A.    Those complaints arise at the department
10   level, the chair director typically.  So they're --
11   they use their judgment as to what is going on, the
12   number of complaints, and then they reach a decision.
13   There's no threshold number, to my knowledge.
14        Q.    So one complaint could be enough in the
15   discretion of the director?
16            ATTORNEY HOSP:  Objection.  Calls for a
17   hypothetical.
18        A.    It just depends on the content of the
19   complaint.
20        Q.    If your employer sent you this letter, what
21   would you think?
22            ATTORNEY HOSP:  Objection to form.
23        A.    I would decide to do my job to the best of my
24   abilities and focus on educating the students and
25   giving them a great education.
```

