Honorable John H. Chun

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

STUART REGES,

Plaintiff,

v.

ANA MARI CAUCE, et al.,

Defendants.

Case No. 2:22-cv-00964-JHC

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

Noted for Hearing: February 2, 2024

**ORAL ARGUMENT REQUESTED**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

I.  INTRODUCTION .................................................................................................................... 1

II. FACTS ....................................................................................................................................... 2

A.  The University did not "silence" Reges .................................................................... 2

B.  Reges's land acknowledgement on the University's Winter 2022 course syllabus disrupted the learning environment ........................................................ 3

C.  The University acted based on the disruption—not Reges's viewpoint ................ 3

D.  The University did not punish Reges .......................................................................... 4

III. LEGAL STANDARD ............................................................................................................... 6

IV. ARGUMENT ............................................................................................................................. 6

A.  Reges's retaliation claims fail ...................................................................................... 7

1.  Reges was not speaking as a citizen ............................................................. 7

2.  The University's interests in efficient operations outweighs any de minimis burden on Reges's expression ...................................................... 13

3.  The University's modest responses to Reges's escalations were appropriate ..................................................................................................... 15

B.  Reges's viewpoint-discrimination claim fails ......................................................... 16

C.  Reges's overbreadth challenge fails ......................................................................... 18

D.  Reges's vagueness challenge fails ............................................................................. 21

V.  CONCLUSION ...................................................................................................................... 23

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

i

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Abcarian v. McDonald,*
5
    617 F.3d 931 (7th Cir. 2010)......................................................................................... 10, 11

6

*Adams v. Trustees of the University of North Carolina-Wilmington,*
    640 F.3d 550 (4th Cir. 2011)......................................................................................... 10, 11

7

*Arnett v. Kennedy,* 416 U.S. 134 (1974) ............................................................................... 23

8

*Battle v. Bd. of Regents for Ga.,*
9
    468 F.3d 755 (11th Cir. 2006)............................................................................................ 17

10

*Berry v. Dep't of Soc. Servs.,*
    447 F.3d 642 (9th Cir. 2006).............................................................................................. 17
11

12

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) .......................................................................................................... 19

13

*Cochran v. City of Atlanta,*
14
    289 F. Supp. 3d 1276 (N.D. Ga. 2017) .............................................................................. 17

15

*Coll. Republicans at S.F. State Univ. v. Reed,*
16
    523 F. Supp. 2d 1005 (N.D. Cal. 2007) ............................................................................. 21

17

*Connick v. Myers,*
    461 U.S. 138 (1983) ............................................................................................... 13, 14, 15

18

*Coszalter v. City of Salem,*
19
    320 F.3d 968 (9th Cir. 2003)............................................................................................. 16

20

*DeJohn v. Temple Univ.,*
    537 F.3d 301 (3d Cir. 2008) .............................................................................................. 21
21

22

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014)................................................................................ 8, 9, 10, 11

23

*Downs v. Los Angeles Unified Sch. Dist.,*
24
    228 F.3d 1003 (9th Cir. 2000)................................................................................. 8, 11, 12

25

*Edge v. City of Everett,*
    929 F.3d 657 (9th Cir. 2019)........................................................................................ 21, 22
26

27

*Flores v. Bennett,*
    635 F. Supp. 3d 1020 (E.D. Cal. 2022) ......................................................................... 21, 22

28

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

ii

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Flores v. City of San Gabriel*,
   824 F.3d 890 (9th Cir. 2016) ......................................................................... 6

*Ford Motor Co. v. Tex. Dep't of Transp.*,
   264 F.3d 493 (5th Cir. 2001) ...................................................................... 22

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) ...................................................................... 22

*Fowler v. Bd. of Educ. of Lincoln Cnty.*,
   819 F.2d 657 (6th Cir. 1987) ...................................................................... 23

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ............................................................................*passim*

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................................. 21, 22

*Hernandez v. City of Phoenix*,
   43 F.4th 966 (9th Cir. 2022) .......................................................... 19, 20, 22

*Johnson v. Poway Unified School District*,
   658 F.3d 954 (9th Cir. 2011) ................................................................ 11, 12

*Levin v. Harleston*,
   966 F.2d 85 (2d Cir. 1992) .................................................................... 15, 16

*McCauley v. Univ. of the Virgin Islands*,
   618 F.3d 232 (9th Cir. 2010) ...................................................................... 20

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ...................................................................... 10

*Pickering v. Bd. of Educ. Twp. High Sch. Dist. 205*,
   391 U.S. 563 (1968) ............................................................................*passim*

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ............................................................................. 13, 14

*Rodriguez v. Maricopa Cnty. Comm. Coll. Dist.*,
   605 F.3d 703 (9th Cir. 2010) ...................................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) ..................................................................................... 8

*San Filippo v. Bongiovanni*,
   961 F.2d 1125 (3d Cir. 1992) .................................................................... 23

*State v. Evergreen Freedom Found.*,
   192 Wn.2d 782, 432 P.3d 805 (2019) ....................................................... 19

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

iii

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

*State v. Roggenkamp,*
    153 Wn.2d 614, 106 P.3d 196 (2005) ................................................................ 20

*United States v. Stevens,*
    559 U.S. 460 (2010) ......................................................................................... 19

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................................................... 19, 21

*United States v. Wunsch,*
    84 F.3d 1110 (9th Cir. 1996) ............................................................................ 22

*Utter v. Bldg. Ind. Ass'n of Wash.,*
    182 Wn.2d 398, 341 P.3d 953 (2015) ............................................................... 19

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ........................................................................................... 8

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ......................................................................................... 19

**Statutes, Rules & Constitutional Provisions**

First Amendment .................................................................................................*passim*

Fifth Amendment ........................................................................................................ 21

Fed. R. Civ. P. 56(a) .................................................................................................... 6

RCW 28B.137.010 ....................................................................................................... 9

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

iv

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1

## I.   INTRODUCTION

2   Reges's Motion for Summary Judgment misstates undisputed facts and misapplies well-

3   established law and must be denied.

4   Contrary to Reges's characterizations, the undisputed facts show that the University of

5   Washington never "censored" or "silenced" Reges. Reges could always voice his views.

6   Similarly, the undisputed facts show that University administrators did not "punish" Reges by

7   repudiating his land acknowledgement. They merely exercised their right to free speech

8   expressing their (and the University's) opposition to Reges's deliberately offensive conduct. And

9   the undisputed facts show that the University took no action based on the view Reges expressed.

10  Rather it acted only to stem the disruption caused to the learning environment by Reges's

11  inclusion of his land acknowledgement on a University course syllabus. In the end, the University

12  took no action to discipline Reges.

13  Reges also ignores First Amendment law applicable when the speaker is a government

14  employee. When the government acts as employer—rather than as sovereign—it has more

15  leeway to respond to otherwise protected speech. The University acted within the law in its mild

16  response to the disruption caused by Reges. The University removed Reges's statement from the

17  online version of a syllabus for one course in one quarter and created an alternative section of the

18  course for any students who did not wish to continue with Reges. In response to Reges's

19  expressed intention to again include the statement on the University syllabi for his courses—and

20  the resulting formal complaint from representatives of the University's student-employee union—

21  the University investigated Reges's conduct but ultimately imposed no discipline. The University

22  did not fire Reges, reduce his salary, or interfere with his placing his purported land

23  acknowledgment on future syllabi, much less his right and ability to express himself in other

24  contexts.

25  In seeking summary judgment, Reges sidesteps undisputed facts, underplays the

26  disruption his actions caused, and overstates the University's response. Reges also misapplies the

27  governing case law. The Court should deny Reges's motion and, based on the undisputed facts,

28  grant Defendants' cross-motion for summary judgment.

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

1

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1

2

## II.    FACTS[1]

### A.    The University did not "silence" Reges.

Reges repeats *ad nauseam* the fiction that the University and its administrators "censored" him (Dkt. 60 at 2, 3,12, 15, 16, 18, 23, 26, 27); "silenced" him (*id.* at 6, 15); "stifled" his speech (*id.* at 22); and prevented him from commenting or expressing himself on a "matter of public concern" (*id.* at 2, 19, 20, 21, 22, 28). But repeating a falsehood does not make it true. The undisputed evidence demonstrates that Reges was afforded virtually unlimited opportunities to express his views, including on campus and in University forums, and he availed himself of those opportunities without interference.

The undisputed facts show that Reges remained free (and remains free) to express his views. He has included his land acknowledgement statement on his University email signature block. December 18, 2023 Declaration of Robert M. McKenna Re: Defendants' Summary Judgment Motion, Dkt. 65 ("McKenna Decl."), Ex. 1 at 60:25–61:15, 64:2–7. He has posted his land acknowledgment statement outside his University faculty office. *Id.* at 105:7–25. He has given interviews to the press—including to University-funded and sanctioned newspapers— expressing his views on land acknowledgments. *See id.* at 111:3–114:22, 161:1–18. He has been permitted to talk about land acknowledgment statements in his classes, and even include his land acknowledgement in University syllabi if doing so did not disrupt or interfere with the teaching and learning environment at the University. *See id.* at 201:24–202:5, 216:15–218:4. The *only* University action that limited Reges's expression was the removal of his land acknowledgement from the course syllabus for his Winter 2022 introductory computer programming class after its inclusion significantly disrupted the University's learning environment. Even in taking that action, Defendants invited Reges to share his views publicly in contexts other than on a University syllabus.

Reges ignores these facts, mischaracterizing the University as having prevented him from

---

[1] While the Court views the facts in the light most favorable to Defendants in considering Reges's motion, these facts are undisputed unless otherwise noted.

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

2

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

expressing his opinions on a matter of public interest. The record disproves that narrative.

**B.     Reges's land acknowledgement on the University's Winter 2022 course syllabus disrupted the learning environment.**

The undisputed facts show that Reges's land acknowledgment immediately and substantially disrupted the University's functioning. *Contra* Dkt. 60 at 9–13. From the start, the statement garnered a "significant amount of attention" on Reddit, "almost all [of it] negative." McKenna Decl., Ex. 1 at 92:4–13, 101:1–7. The attention interfered with University staff functions. Staff spent roughly two weeks dealing with the repercussions, and conveyed to administrators that they were "at a loss for how to best express their concern and frustration about this situation," and worried about the effect on prospective students. Dkt. 66 at 26. The Allen School's recruiter for diversity and access complained that Reges had undermined her function within the School. *Id.* at 30–31. Teaching assistants reported that they could not function effectively as they dealt with the student fallout and complaints caused by the land acknowledgement. *See id.* at 33–34.

Reges's mock land acknowledgment also undermined the learning environment for Native students. A Native student felt "despised" and ultimately took a leave of absence. *Id.* at 19; *see also* Dkt. 67 at 15.

At least one student in Reges's class felt "intimidated" in a required course for her program. Dkt. 66 at 15. Another said that Reges's statement "tarnishes the reputation of the Allen School." *Id.* at 17. Student members of the Allen School Diversity Committee complained. *Id.* at 17–18.

**C.     The University acted based on the disruption—not Reges's viewpoint.**

Reges further asserts that the University and its administrators' actions were based on their disagreement with Reges's viewpoint and were intended to "silence" that viewpoint. Dkt. 60 at 9–13, 15. Not so.

Reges began expressing his viewpoint about land acknowledgments and publicizing his own intentionally offensive land acknowledgment well before the University acted. When Reges originally announced his intention to include his statement on the University syllabus for his introductory course, the University took no action. When Reges included his statement in his

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

3

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1   email signature block and outside his faculty office, the University took no action. When Reges

2   announced his desire to discuss his views in a forum with other faculty, the University took no

3   action. *See* Dkt. 64 at 3, 6. If the University and its administrators' purpose were to silence his

4   viewpoint, they would have responded to his expression of that viewpoint long before he

5   included his land acknowledgment on a syllabus. The University acted only in response to a

6   significant disruption to its learning environment that it could not ignore.

7          Even when the University and its administrators took the land acknowledgment off the

8   online version of the University Winter 2022 syllabus in reaction to the undeniable disruption it

9   caused, they confirmed they were not silencing him, inviting him to "voice [his] opinion and

10   opposition to land acknowledgments … in other settings." Dkt. 66 at 11. And they left untouched

11   the video recording of Reges's lecture on the University's website, in which he noted his land

12   acknowledgement statement in front of his Winter 2022 class. McKenna Decl., Ex. 1 at 98:20–

13   99:5. They also continued to permit him to express his views in myriad other University venues,

14   which he has done.

15          **D.     The University did not punish Reges.**

16          Contrary to Reges's repeated claims of retaliation, the University exacted no punishment

17   for his conduct. Examining the "adverse employment actions" detailed by Reges (Dkt. 60 at 23–

18   24) confirms that there was no "retaliation."

19          First, Reges asserts that the University retaliated against him by "remov[ing] Reges'

20   statement from his syllabus." Dkt. 60 at 23. But this ignores that course syllabi are University—

21   not individual faculty—publications, and that Reges was permitted to express his views in

22   numerous other contexts. He availed himself of those other opportunities, and still does to this

23   day. As a result, this cannot be viewed as any sort of punishment.

24          Second, Reges claims that he was punished because the University "repudiated" his

25   statement both in an email to his students and to the press. Dkt. 60 at 8–9. But Reges offers no

26   evidence that administrators' exercising their right to express their own views constitutes

27   punishment.

28          Third, Reges asserts the University's offering of a separate section of the introductory

DEFENDANTS' OPP'N TO PLAINTIFF'S                        4          Orrick Herrington & Sutcliffe LLP
MOTION FOR SUMMARY JUDGMENT -                                      401 Union Street, Suite 3300
Case No. 2:22-cv-00964-JHC                                        Seattle, Washington 98101
                                                                  tel+1-206-839-4300

1   programming course for students who did not wish to take the class from Reges constituted

2   punishment. But he musters no evidence supporting the theory that students within a required

3   class for the Computer Science major must be forced to listen to his viewpoint.

4          Fourth, Reges argues that administrators "encouraged" students to submit "discrimination

5   and harassment complaints" against him. Dkt. 60 at 9, 23. In fact, Director Balazinska's email to

6   Reges's students expresses her confidence that, despite the land acknowledgment, everyone "can

7   expect to be treated fairly and respectfully in this class." Dkt. 62-17 at 2. The email then notes

8   that, if "anyone has experiences to the contrary, I encourage you to submit a complaint" through

9   one of several channels. *Id.*

10         Finally, all other claims of retaliatory action relate to the investigation conducted under

11  Section 25-71 of the Faculty Code. But this investigation was in response to a formal complaint

12  filed by the union representing student workers at the University, asserting that Reges's plan to

13  include his land acknowledgement on his Spring 2022 syllabus violated the union's collective-

14  bargaining agreement with the University. Dkt. 66 at 33–34; *see also id.* at 42, 46; Dkt. 67 at 10.

15  The complaint asserted that some teaching assistants feared "retaliation from Stuart Reges" and

16  that other student employees' "feelings of belonging in the Allen School have been negatively

17  impacted by the fact that Stuart Reges' behavior has been allowed to continue." Dkt. 66 at 33–34.

18  Reges ignores the union complaint.

19         Having received the union's formal complaint, the University had little option but to

20  investigate under Faculty Code Section 25-71. Following that investigation, Dean Allbritton

21  declined to impose any sanction and reinstated Reges's merit pay increase which, per established

22  University practice, had been held in abeyance during the process. Dkt. 67 at 18–19; Dkt. 69 ¶ 5.

23  Dean Allbritton explained that, if Reges continued to include his land acknowledgment on

24  University syllabi "*and* if that inclusion leads to further disruption," she would conclude that

25  Reges intended the disruption, and the University would proceed according to the Faculty Code.

26  Dkt. 67 at 18–19 (emphasis added).

27         Notwithstanding the investigation and the numerous complaints it has received, the

28  University has done nothing to prevent Reges from expressing his views and publishing his land

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

5

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1  acknowledgement statement. Reges has continued to put the statement on his email signature

2  block. He posted it next to the door to his faculty office. He put it on a page he created on his

3  University website. *See* McKenna Decl., Ex. 1 at 60:25–61:15, 64:2–7, 77:8–25, 105:7–25,

4  99:16–100:1. Reges also has included his land acknowledgment on all syllabi after Winter 2022,

5  and the University has never again removed it. McKenna Decl., Ex. 1 at 201:24–202:5, 216:15–

6  218:4.

7  ## III.    LEGAL STANDARD

8      Summary judgment is proper only when the "the movant shows that there is no genuine

9  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

10  Civ. P. 56(a). When considering cross-motions for summary judgment, courts "review each

11  separately, giving the non-movant for each motion the benefit of all reasonable inferences."

12  *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir. 2016).

13      As Defendants explain in their own summary judgment motion, "two inquiries … guide

14  interpretation of the constitutional protections accorded to public employee speech. The first

15  requires determining whether the employee spoke as a citizen on a matter of public concern."

16  Dkt. 64 at 6 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). If the answer is yes, and

17  "the possibility of a First Amendment claim arises," *id.*, courts "balance … the interests of the

18  teacher, as a citizen, in commenting upon matters of public concern and the interest of the State,

19  as an employer, in promoting the efficiency of the public services it performs," *Pickering v. Bd.*

20  *of Educ. Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

21  ## IV.    ARGUMENT

22      Reges's summary judgment motion fails across the board. First, his retaliation claims fail

23  because Reges's purported land acknowledgment on a University course syllabus is not speech in

24  his capacity as a citizen and because the University's interest in its orderly operations outweighs

25  the virtually non-existent burden imposed on Reges's right to express his views. § IV.A. Second,

26  Reges's viewpoint-discrimination claim is subsumed by his retaliation claims. Even if it were

27  otherwise, his motion fails because it sidesteps undisputed facts showing that Defendants did not

28  "censor" Reges, and their limited actions were based on the disruption Reges caused—not the

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

6

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

view he expressed. § IV.B. Third, Reges's overbreadth challenge to the University's non-discrimination and anti-harassment policy fails because that policy does not proscribe substantial protected speech relative to its lawful sweep. § IV.C. And fourth, that same University policy is not void for vagueness because its mandates are clear and not subject to arbitrary enforcement. § IV.D.

### A.     Reges's retaliation claims fail.

Reges's request for summary judgment on his retaliation claims rests on false premises. Reges repeatedly portrays the University's actions as "stifling" or "censoring" his speech and "casting 'a pall of orthodoxy' on the contested issue of land acknowledgment." Dkt. 60 at 22–23. But Reges included his purported land acknowledgment on a University course syllabus in accordance with his official duties. As a result, the statement is constitutionally unprotected. Next, including the land acknowledgment on the Winter 2022 syllabus did not merely offend students, faculty, and staff; it caused a significant disruption, undermining staff in their work, and when Reges declared he would also include it on the Spring 2022 syllabus, it caused a student-employee union to lodge a formal complaint asserting that Reges's actions put the University in breach of its collective-bargaining agreement. That complaint triggered the 25-71 investigation process. The interest in addressing this disruption outweighs any expressive interest Reges may have had.

### 1.     Reges was not speaking as a citizen.

Throughout his motion, Reges ignores the University's right to comment about land acknowledgments, inclusion, and Reges himself. But the Supreme Court has consistently maintained that the government may express a view when it speaks, and that when public employees speak as part of their official duties, the First Amendment does not protect their individual expression.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. That's what Reges did by including his land acknowledgment on his syllabus. It is undisputed that the

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

7

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

University's land acknowledgment was recommended for use on syllabi to create a more inclusive environment—particularly for Native students. Reges's land acknowledgement threatened to undermine the University's message welcoming Native students on a University syllabus, where his individual statement could be misconstrued as the University's statement. As a result, Reges's speech is not protected under *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014).

"[A]s a general matter, when the government speaks, it is entitled to promote a program, to espouse a policy, or to take a position" and, "[i]n doing so, it represents its citizens and it carries out its duties on their behalf." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). "Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422–23. "When the government is formulating and conveying its message, 'it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted' by its individual messengers." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) (quoting *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995)).

Here, as Defendants' cross-motion describes, the University's land acknowledgment grew out of a years-long process in which University officials collaborated with the Office of the Governor, Tribal leaders from throughout the state and region, and other stakeholders. Dkt. 70 ¶ 6. The purpose of the land acknowledgment is to create a welcoming environment for Native students. The University's drive to welcome Native students and faculty—and help ensure they remain part of the University community—aims to remediate a long history in which the University excluded Native people. And it tracks the University's formal understanding with Tribes throughout the Pacific Northwest and training University leadership receives in communicating with Tribal officials on a government–to–government basis. *Id.* ¶¶ 4–7; McKenna Decl., Ex. 5. The University's land acknowledgment thus represents an effort to achieve these important University goals.

The University also prescribes guidelines for its course syllabi, detailing their purpose and

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

8

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

format and the policies and content they should contain. *See* McKenna Decl., Ex. 6. Washington

law requires public universities to include certain content—including the institution's policy on

religious accommodations—in "course or program syllabi." RCW 28B.137.010. In its "Best

Practices for Inclusive Teaching," the Allen School Diversity Committee suggests including a

welcoming land acknowledgment statement (using the University's statement as an example) to

create a more inclusive environment—identifying the nature of the message the University is

trying to convey. *See* Dkt. 68 ¶ 4; Ex. 1.

      Reges included his land acknowledgment in the University Winter 2022 syllabus for his

introductory course and mentioned it on the first day of class to convey a message antithetical to

the University's. *See* McKenna Decl., Ex. 1 at 85:5–18. He recognized that many students would

find his language offensive. For instance, he omitted the land acknowledgment in emails directly

with students because "that's class business" and "sometimes [students are] asking important

questions, disability accommodation, for example, so it didn't seem … that that was an

appropriate place." *Id.* at 144:12–21.

      The University may constitutionally prevent Reges from garbling its own message with an

offensive land acknowledgment intended to undermine its mission to welcome all people, and its

particular interest in welcoming Native people. "Restricting speech that owes its existence to a

public employee's professional responsibilities does not infringe any liberties the employee might

have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the

employer itself has commissioned or created." *Garcetti*, 547 U.S. at 411–12.

      As Defendants explained in their cross-motion for summary judgment, *Demers* does not

help Reges. *See* Dkt. 64 at 13–14; *contra* Dkt. 60 at 19. There, a professor alleged that university

administrators retaliated against him for distributing (1) a pamphlet he wrote about the faculty

structure and the need for increased influence from "professionals"—i.e., faculty with

professional experience—and reduced influence from faculty with Ph.Ds., and (2) draft chapters

from his book critical of the University. *Demers*, 746 F.3d at 406–07, 414–15. The university

argued that, because Demers spoke pursuant to his official duty as a university professor in each

instance, his speech was not protected under *Garcetti*. *Id.* at 408–09. The Ninth Circuit disagreed,

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

9

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1  holding Demers's speech protected under an exception to *Garcetti* for "speech related to

2  scholarship or teaching." *Id.* at 411, 414–15. The court cautioned, however, that "[i]t may in

3  some cases be difficult to distinguish between what qualifies as speech 'related to scholarship or

4  teaching' within the meaning of *Garcetti*." *Id.* at 415.

5          Reges's other authorities also do not help him. *Contra* Dkt. 60 at 19–20. For example,

6  *Meriwether v. Hartop*, 992 F.3d 492, 506–07 (6th Cir. 2021), held that a university

7  unconstitutionally silences a professor's viewpoint by forbidding *any* expression on a particular

8  topic, including in a syllabus. *Meriwether*, 992 F.3d at 506. *Meriwether* centered on a professor's

9  moral and religious disagreement with the school's policy on preferred pronouns. *Id.* at 498.

10  After being directed to "eliminate all sex-based references from his expression" or refer to

11  students only by their preferred pronouns, the professor asked to express his views in another

12  manner by "plac[ing] a disclaimer in his syllabus" explaining his "personal and religious beliefs

13  about gender identity." *Id.* at 499–500 (internal quotation marks omitted). The university rejected

14  this request. *Id.* The court concluded that the university violated the professor's rights because it

15  forbade him from describing his views on gender identity, whether in the classroom, in the

16  syllabus, or elsewhere. *Id.* at 506. In short, the university truly silenced the professor's viewpoint.

17  *Id.*

18          Similarly, in *Adams v. Trustees of the University of North Carolina-Wilmington*, 640

19  F.3d 550, 563 (4th Cir. 2011), the Fourth Circuit explained that, at times, "a public university

20  faculty member's assigned duties include a specific role in declaring or administering university

21  policy, as opposed to scholarship or teaching. In that circumstance, *Garcetti* may apply to the

22  specific instances of the faculty member's speech carrying out those duties." When speech is

23  "undertaken at the direction of [the university]," it falls within *Garcetti*'s scope. *Id.* at 563–564;

24  *contra* Dkt. 60 at 19.

25          Other courts also have recognized that *Garcetti*'s academic-freedom exception has limits.

26  For example, in *Abcarian v. McDonald*, the Seventh Circuit rejected a medical school department

27  head's argument that his speech—on issues including risk management, fees charged to

28  physicians, and surgeon abuse of prescription medications—was "'expression related to academic

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

10

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

scholarship or classroom instruction' possibly exempt from *Garcetti*." 617 F.3d 931, 938 n.5 (7th Cir. 2010) (citation omitted). The court explained that the department head's "speech involved administrative policies that were much more prosaic than would be covered by principles of academic freedom." *Id.*

Under these cases, Reges's syllabus statements are not the type of "scholarship" or "teaching" that the Supreme Court envisioned protecting. *See Garcetti*, 547 U.S. at 425. Far from the independently published pamphlet in *Demers* or the external publications in *Adams*, Reges's speech was in a University document required to be distributed—precisely the type of university-directed policy administration that *Adams* recognized would *not* constitute "scholarship or teaching" under *Garcetti*. *Adams*, 640 F.3d at 563–34.

Reges's speech is closer to the speech addressed in *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011) and *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000). In *Johnson*, a high school math teacher hung two banners in his classroom referring to God or a "creator." 658 F.3d at 958. After the school required Johnson to remove the banners because they could make students feel unwelcome or ostracized, Johnson sued the school. *Id.* at 959. The court held that the school did not violate Johnson's constitutional rights because he had not spoken "as a private citizen." *Id.* at 966–70. That context controlled the outcome:

> Johnson did not make his speech while performing a function not squarely within the scope of his position. He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. Rather, Johnson hung his banners pursuant to a long-standing [school] policy, practice, and custom of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

*Id.* at 967 (internal quotation marks and citations omitted). Just as Johnson "did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee," he "did not act as an ordinary citizen when espousing God as opposed to no God in his classroom." *Id.* (internal quotation marks and citation omitted). The court contrasted Johnson's speech with that at issue in *Pickering*: "Unlike Pickering, who wrote a letter to his local newspaper as any citizen

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

11

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

might, … Johnson took advantage of his position to press his particular views upon the impressionable and 'captive' minds before him." *Id.* at 968 (internal citation omitted). Nothing "prevent[ed] Johnson from himself propounding his *own opinion* on 'the religious heritage and nature of our nation' or how 'God places prominently in our Nation's history' … on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations. He may not do so, however, when he is speaking as the government, unless the government allows him to be its voice." *Id.* at 970 (internal quotation marks and citation omitted).

Similarly, in *Downs*, a high school teacher objected to his school's recognition of Gay and Lesbian Awareness month by installing a bulletin board across from his classroom—competing with the school's own bulletin board—on which he posted materials describing homosexuality as immoral and illegal. *Downs*, 228 F.3d at 1006–07. Downs sued the school district after it required him to remove the materials. *Id.* at 1008. The court held that the district did not violate Downs's constitutional rights because his speech constituted government speech subject to regulation. *Id.* at 1011, 1013. The court explained that "[a]n arm of local government—such as a school board—may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives." *Id.* at 1014. As in *Johnson*, the court acknowledged that Downs could express his own views when speaking on his own behalf, but not when speaking in his government capacity, unless the government allowed him to be its voice. *Id.* at 1016.

As in *Johnson* and *Downs*, nothing prevents Reges from propounding his opinion on land acknowledgements "on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations." *Johnson*, 658 F.3d at 970; *Downs*, 228 F.3d at 1016. As discussed above, the University never tried to prevent Reges from debating this topic on University grounds in appropriate fora. But Reges cannot do so "when he is speaking as the government." *Johnson*, 658 F.3d at 970 (citation omitted); *Downs*, 228 F.3d at 1016. The University acted within constitutional limits in responding to that act. *See Downs*, 228 F.3d at 1014.

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

12

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1

2

**2.      The University's interests in efficient operations outweighs any de minimis burden on Reges's expression.**

3    Under *Pickering*, a retaliation claim cannot succeed when "the interest[s] of the State, as

4    an employer, in promoting the efficiency of the public services it performs through its

5    employees" outweigh "the interests of the teacher, as a citizen, in commenting upon matters of

6    public concern." *Pickering*, 391 U.S. at 568. Relevant here are the time, place, and manner in

7    which the speech was made as well as the context in which the dispute arose. *Connick v.*

8    *Myers*, 461 U.S. 138, 152–53 (1983). When weighing the interests, "pertinent considerations

9    [include] whether the statement impairs discipline by superiors or harmony among co-workers,

10   has a detrimental impact on close working relationships for which personal loyalty and

11   confidence are necessary, or impedes the performance of the speaker's duties or interferes with

12   the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

13   Reges's claims fail under the *Pickering* balancing test. In claiming that the balance "tips

14   decidedly" in his favor, Reges invokes authorities in which restrictions on academic freedom or

15   campus speech involved severe sanctions or choked off key avenues of expression. *See* Dkt. 60

16   at 21–22. Here, by contrast, Reges has every chance to "speak[] about land acknowledgments in

17   syllabi." *Id.* at 22. Reges has remained free to append his land acknowledgment to the bottom of

18   his emails. McKenna Decl., Ex. 1 at 60:25–61:15, 64:2–7. He can likewise send his statement to

19   his colleagues and post it outside his office on campus. *Id.* at 77:8–25, 105:7–25. Reges has

20   repeatedly given interviews about this case and his land acknowledgment stunt, *e.g.*, *id.* at 111:3–

21   114:22, 161:1–18, belying any suggestion that he could not speak his mind.

22   Reges's motion next casts aside the undisputed facts to contend that only a handful of

23   people found Reges's actions offensive. But the University faced a serious disruption of its

24   operations. That disruption justified the University's actions.

25   For instance, the disruption caused by Reges's actions interfered with University staff

26   functions. Director Balazinska learned that staff were "at a loss for how to best express their

27   concern and frustration about this situation," and worried about the effect on prospective

28   students. Dkt. 66 at 26. The Allen School's recruiter for diversity and access expressed frustration

13

1    that Reges had undermined her function within the School: "How am I supposed to recruit

2    students into an environment where their history is questioned and their rights are denied?" *Id.*

3    at 31. Reges's actions thus "impair[ed] … harmony among co-workers" and "interfere[d] with the

4    regular operation of" the Allen School. *Rankin*, 483 U.S. at 388.

5            Teaching assistants also experienced the disruption Reges caused. Representatives of the

6    University's student-employee union informed Director Balazinska that some teaching assistants

7    felt a "fear of retaliation from Stuart Reges" and that other student employees' "feelings of

8    belonging in the Allen School have been negatively impacted by the fact that Stuart Reges'

9    behavior has been allowed to continue." Dkt. 66 at 33. Reges admits that some teaching assistants

10   "were offended" by his land acknowledgment, and that the situation damaged the cohesiveness of

11   the teaching assistant program. McKenna Decl., Ex. 1 at 124:7–14.

12           Reges's statement in Winter 2022 also caused a disruption for his students and the

13   University community generally. The statement immediately went viral on Reddit, drawing

14   significant negative attention. *See* McKenna Decl., Ex. 1 at 92:4–13, 101:1–7. As a result,

15   Director Balazinska learned that at least one student in the class felt "intimidated" and not

16   "welcome" in a required course for the major. Dkt. 66 at 15. Another student opined that Reges's

17   statement "tarnishes the reputation of the Allen School." *Id.* at 17. Six student members of the

18   Allen School Diversity Committee complained. *Id.* at 17–18. A Native student felt "despised"

19   and ultimately took a leave of absence. *Id.* at 20; *see also* Dkt. 67 at 15. In other words, Reges's

20   actions had a "detrimental impact" on the student–faculty relationship for which "confidence" is

21   necessary. *Rankin*, 483 U.S. at 388. Ultimately, 170 students switched to the alternative class

22   section in Winter 2022. McKenna Decl., Ex. 1 at 115:6–11.

23           And while Reges's actions in fact caused a significant disruption, the University need not

24   have "allow[ed] events to unfold to the extent that the disruption of the [classroom or the school]

25   … [wa]s manifest before taking action." *Connick*, 461 U.S. at 152. Employers can take proactive

26   steps to safeguard their interests, even when there is some effect on an employee's speech

27   interests.

28           In *Connick*, for instance, an assistant district attorney (Myers) sued her boss, the New

DEFENDANTS' OPP'N TO PLAINTIFF'S          14          Orrick Herrington & Sutcliffe LLP
MOTION FOR SUMMARY JUDGMENT -                         401 Union Street, Suite 3300
Case No. 2:22-cv-00964-JHC                           Seattle, Washington 98101
                                                     tel+1-206-839-4300

Orleans District Attorney (Connick), alleging that, after she refused an office transfer, she was wrongfully terminated for distributing a questionnaire about office policies. 461 U.S. at 140–41. The Court found no free-speech violation after weighing "the manner, time, and place in which the questionnaire was distributed." *Id.* at 152. Connick, the Court explained, had a valid interest in maintaining close working relationships at the office and avoiding insubordination, and "the fact that Myers … exercised her rights to speech at the office support[ed] Connick's fears that the functioning of his office was endangered." *Id.* at 153. Myers's limited First Amendment interest was thus outweighed by Connick's interests. Here, not only is the evidence of actual disruption substantially more compelling, but Reges was not fired and his ability to express his views faced no interference except for his including it on the Winter 2022 syllabus for one course.

### 3.    The University's modest responses to Reges's escalations were appropriate.

Reges's motion describes "an escalating series" of adverse actions that "threatened [Reges's] livelihood, professional reputation, and personal finances." Dkt. 60 at 23–24. The record, however, paints a different picture. For example, Reges admits he was disappointed that the University's response was so muted. *See* McKenna Decl., Ex. 1 at 128:5–14, 182:12–183:11.

Reges admits that although he included his land acknowledgment on all syllabi after Winter 2022, the University never again removed it. *See id.* at 201:24–202:5, 216:15–218:4. Reges was not docked pay. *See id.* at 123:3–5. And while his 2022 merit raise was temporarily held in abeyance, University officials confirm that this is standard while an investigation is pending, since the investigation's outcome may affect the final merit determination. Dkt. 69 ¶ 5. Reges has now been fully paid. McKenna Decl., Ex. 1 at 215:15–20.

The University created the alternative class section to accommodate students in response to complaints following Reges's in-class statement. This plainly distinguishes Reges's claim from *Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992), where the university lacked a valid concern that the professor's statement offended its students or harmed the educational process within the classroom. On the contrary, the district court in *Levin* found that "the shadow classes were established with the intent and consequence of stigmatizing Professor Levin solely because of his

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

15

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

1    expression of ideas." *Id.* at 88 (internal quotation marks and citation omitted). An additional class

2    section offered with no evidence of an intent to stigmatize is not "reasonably likely to deter

3    employees from engaging in constitutionally protected speech." *Coszalter v. City of Salem*, 320

4    F.3d 968, 970 (9th Cir. 2003).

5           As for whether Defendants "repudiated" Reges's statement in an email to students or in

6    public statements, Reges marshals no authority suggesting that Defendants' exercise of their own

7    First Amendment rights constitutes adverse employment actions. And Reges omits that Director

8    Balazinska encouraged students to submit formal complaints only if they "ha[d] experiences"

9    conflicting with being "treated fairly and respectfully" in class. *Compare* Dkt. 60 at 9, *with* Dkt.

10   62-17 at 2.

11          Last, contrary to the "sword of Damocles" Reges claims hangs over his head, Dkt. 60

12   at 24, Defendants have not threatened him within any plausible meaning of the term. In electing

13   not to impose any sanction for Reges's conduct, Dean Allbritton noted that future uses of Reges's

14   land acknowledgment *that cause disruption* would prompt a response in accordance with the

15   Faculty Code. *See* Dkt. 67 at 18–19. Reges has continued deploying his mock land

16   acknowledgment in the same way—and many other ways—throughout the life of this case, with

17   no University action because those uses did not cause the disruption that his initial conduct did.

18   Reges's apparent demand for permanent immunity from consequences no matter the disruption

19   he might cause lacks support.

20          *Pickering* requires denying Reges's motion on his retaliation claims.

21          **B.      Reges's viewpoint-discrimination claim fails.**

22          Reges contends that Defendants "censored" him because they and others in the University

23   community thought his purported land acknowledgment was "offensive." Dkt. 60 at 15. But his

24   viewpoint-discrimination claim cannot survive. First, the claim is not viable separate from

25   Reges's retaliation claims. Second, Reges ignores the facts showing the University did not single

26   out Reges's land acknowledgement based on the viewpoint it reflects but on disruption to the

27   learning environment.

28          To begin, as a government employee, no matter how Reges styles his claim, his First

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

16

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel +1-206-839-4300

Amendment rights must outweigh the University's interests under *Pickering* for his claim to succeed. *Pickering* "applies regardless of the reason an employee believes his or her speech is constitutionally protected." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 650 (9th Cir. 2006). "[T]he Supreme Court has established the test to evaluate a city's firing *of an employee* based on speech—*Pickering*—and that test is the most appropriate for any of Plaintiff's claims based upon his alleged speech-based firing"—whether for viewpoint discrimination or retaliation. *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1293–94 (N.D. Ga. 2017). Whether a plaintiff spoke as a citizen or as an employee also controls whether the speech is protected in the first place. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006) (cited in *Cochran*, 289 F. Supp. 3d at 1293). Thus, the analysis of Reges's retaliation claims above (§ IV.A) dooms any separate viewpoint-discrimination claim.

In seeking summary judgment, Reges mostly relies on cases in which the government was not acting as employer. In fact, the only public-employee case Reges cites is *Rodriguez v. Maricopa Cnty. Comm. Coll. Dist.*, 605 F.3d 703, 708–09 (9th Cir. 2010); Dkt. 60 at 15–18. But *Rodriguez* considered an equal-protection suit by college employees based on the college's decision *not* to discipline a faculty member for offensive speech. *Rodriguez*, 605 F.3d at 708–09. It says nothing about *Pickering*'s application here.

In any event, the University did not discriminate based on Reges's viewpoint. The record confirms that Defendants responded to the disruption Reges caused, not the view he expressed. Because the Court must draw reasonable inferences in Defendants' favor, it must deny Reges's motion.

When Reges first announced his intention to include his statement on the University syllabus for his introductory course, the University took no action. When Reges included his statement in his email signature block and outside his faculty office, the University took no action. When Reges announced his desire to discuss his views in a forum with other faculty, the University took no action. *See* Dkt. 64 at 17–18. The University acted only in response to a significant disruption to the learning environment that it could not ignore. Indeed, when Reges put his statement back on course syllabi in later quarters and no disruption ensued, the University

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

17

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1 did not remove the statement—making clear that its objection was not to the statement's

2 viewpoint, but to disruption it had caused when he introduced it on a Winter 2022 syllabus. *Id.*

3 at 17.

4       Nor does the University force faculty to parrot its recommended land acknowledgment or

5 to include one at all on course syllabi. Another faculty member circulated an article opposing

6 such statements, and faced no sanction. *See* Dkt. 66 at 8. No faculty member has been disciplined

7 for not using the Allen School's recommended land acknowledgment; one of the Defendants—

8 Professor Grossman—does not himself include a separate land acknowledgment on the syllabi for

9 his courses. Dkt. 68 ¶ 5. Director Balazinska also asked two other faculty members—whose

10 alternative land acknowledgments may have been insensitive to more conservative students—to

11 change the syllabi. *See* Dkt. 66 ¶ 16. Thus, the facts suggest no discrimination based on partisan

12 or ideological perspective. Indeed, the University left Reges free to disseminate by several other

13 means the exact message it removed from the Winter 2022 syllabus: affixing it to his email

14 signature, hanging it outside his faculty office, discussing it with students, and so on. So Reges's

15 claim that his views led to the University's removal of his land acknowledgment from one course

16 syllabus lacks support. Summary judgment in his favor is improper.

17       **C.**    **Reges's overbreadth challenge fails.**

18       Reges claims that the University's Executive Order 31 is facially overbroad under the

19 First Amendment. Dkt. 60 at 28–30. But his analysis ignores all but snippets of Executive

20 Order 31, sidestepping its language, structure, and context confirming its limited reach. Properly

21 construed, the Order prohibits only conduct closely akin to unprotected discrimination,

22 harassment, and retaliation. Even if some applications of the Order might transgress

23 constitutional limits, those applications are few, relative to the Order's legitimate sweep. Reges's

24 claim thus fails.

25       In moving to dismiss the First Amended Complaint, Defendants explained the legal

26 principles undergirding overbreadth challenges. *See* Dkt. 50 at 16–19; Dkt. 54 at 8–9. Defendants

27 adopt those arguments here.

28       To start, a law or policy is overbroad only if "a substantial number of its applications are

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

18

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1   unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v.*

2   *Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican*

3   *Party*, 552 U.S. 442, 449 n.6 (2008)). The overbreadth doctrine is "strong medicine" to be used

4   "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Nor do

5   courts strike down laws as overbroad "when a limiting construction has been or could be placed

6   on the challenged statute." *Id.* (citation omitted). Overbreadth challenges "in the public

7   employment context" turn on a "modified *Pickering* balancing analysis that closely tracks the test

8   used for First Amendment retaliation claims." *Hernandez v. City of Phoenix*, 43 F.4th 966, 980

9   (9th Cir. 2022) (citation omitted).

10       "The first step in overbreadth analysis is to construe the challenged statute; it is

11   impossible to determine whether a statute reaches too far without first knowing what the statute

12   covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). But Reges plucks a single clause

13   from the Order to press his claim: "the University retains the authority to discipline or take

14   appropriate corrective action for any conduct that is deemed unacceptable or inappropriate,

15   regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or

16   retaliation." Dkt. 62-32 ("Exec. Order 31") § 1; *see* Dkt. 60 at 28–30 (quoting language from only

17   this clause).

18       A more holistic inquiry, however, is necessary. Washington courts read laws as a whole

19   and construe them to avoid constitutional infirmities. *State v. Evergreen Freedom Found.*, 192

20   Wn.2d 782, 789, 432 P.3d 805 (2019) (holding that construction is necessary if more than one

21   interpretation of plain language is reasonable and that the meaning of words in a statute is

22   gleaned from the context); *Utter v. Bldg. Ind. Ass'n of Wash.*, 182 Wn.2d 398, 434, 341 P.3d 953

23   (2015) ("We construe statutes to avoid constitutional doubt.").

24       Here, construing Executive Order 31 consistently with those precepts, it addresses not all

25   "inappropriate" conduct but reaches only conduct closely resembling unlawful retaliation and

26   discrimination, even if the conduct is not retaliation and discrimination under those employment-

27   law principles. The Order states its purpose upfront: "promoting an environment that is free of

28   discrimination, harassment, and retaliation." Exec. Order 31 § 1. The Order anchors the

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC                    19            Orrick Herrington & Sutcliffe LLP
                                                            401 Union Street, Suite 3300
                                                            Seattle, Washington 98101
                                                            tel+1-206-839-4300

1    University's disciplinary authority to "facilitat[ing] that goal." *Id.* It likewise tethers its terms to

2    "the meaning given to them by applicable federal or state laws and regulations." *Id.* § 4. The

3    Order thus ties the words "unacceptable" and "inappropriate"—to which Reges objects—to

4    unlawful discrimination and retaliation. *See State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d

5    196 (2005) (explaining that "a single word in a statute should not be read in isolation" and that

6    the meaning of words "may be indicated or controlled" by other words with which they are

7    associated (citation omitted)).

8            The Order also commits the University to interpret it "in the context of academic freedom

9    in the University environment." Exec. Order § 5(A). In short, "unacceptable" or "inappropriate"

10   conduct must resemble discrimination, harassment, or retaliation to justify "corrective action,"

11   even if it is not unlawful under the employment laws.

12           Next, the above *Pickering* analysis mandates rejecting Reges's overbreadth challenge. In

13   *Hernandez*, the Ninth Circuit largely rejected an overbreadth challenge to a police social-media

14   policy restricting "a broad category of expression" when the policy advanced the employer's

15   interest in prohibiting speech "undermin[ing] the employer's mission or hamper[ing] the effective

16   functioning of the employer's operations." 43 F.4th at 980–83. The policy, which restricted even

17   off-duty social media posts "detrimental to the mission and functions of the Department" or

18   which undermined "the goals and mission of the Department or City," closely "track[ed] interests

19   that the Department may constitutionally pursue." *Id.* at 981. The court therefore could not "say

20   that a substantial number of the policy's applications are unconstitutional." *Id.* Here, prohibiting

21   conduct, much of it independently actionable and conflicting with the University's commitment

22   to combat discrimination and harassment, supports the same outcome. Other courts have turned

23   aside overbreadth challenges to similar policies. *See* Dkt. 50 at 19 (collecting cases).

24           Nor do Reges's cited authorities aid him. *Contra* Dkt. 60 at 29. The challenged provisions

25   in those cases lacked limiting language and context showing that they covered conduct akin to

26   unprotected speech. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 249–50 (9th

27   Cir. 2010) (invaliding ban on "offensive" signs when it lacked "any requirement akin to a

28   showing of severity or pervasiveness" and thus contained no "shelter for core protected speech");

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC                           20                Orrick Herrington & Sutcliffe LLP
                                                                         401 Union Street, Suite 3300
                                                                         Seattle, Washington 98101
                                                                         tel+1-206-839-4300

1    *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008) (invalidating prohibition on

2    "hostile" or "offensive" student conduct without a "requirement akin to a showing of severity or

3    pervasiveness"); *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1037–42 (E.D. Cal. 2022) (considering

4    overbreadth challenge to college *flyer* policy aimed entirely at restricting what speech can appear

5    on college flyers), *aff'd*, No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023); *Coll.*

6    *Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1020 (N.D. Cal. 2007) (observing

7    "[t]here is no clue or signal in the initial paragraphs or in the substantive proscriptions of the

8    regulation that there might be set forth at the end some clarification of or limitations on the

9    regulation's mandates"). The Order here, by contrast, is replete with textual limits on its

10   application.

11        Reges's motion for summary judgment on this claim fails.

12        **D.     Reges's vagueness challenge fails.**

13        Finally, Reges seeks summary judgment on his claim that Executive Order 31 is

14   unconstitutionally vague under the Fifth Amendment. *See* Dkt. 60 at 30–33. This claim too fails.

15   Because the Order, properly construed, addresses conduct like discrimination, harassment, or

16   retaliation—even if the conduct falls short of what is unlawful and legally actionable—University

17   community members are on notice regarding what sort of conduct is "unacceptable" or

18   "inappropriate" under the Order. Together with the greater leeway for restrictions aimed at public

19   employees rather than the public, interpreting the Order sinks Reges's vagueness claim.

20   Defendants explained the bases for rejecting Reges's vagueness challenge in seeking dismissal

21   and adopt those arguments here. *See* Dkt. 50 at 20–22; Dkt. 54 at 10–11.

22        A law is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City*

23   *of Rockford*, 408 U.S. 104, 108 (1972). But the law has never required "perfect clarity and precise

24   guidance … even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304

25   (citation omitted). "[W]e can never expect mathematical certainty from our language." *Grayned*,

26   408 U.S. at 110. The vagueness doctrine incorporates two main requirements. First, the law or

27   policy must give a "person of ordinary intelligence a reasonable opportunity to know what is

28   prohibited." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (quoting *Grayned*, 408

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

21

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

1   U.S. at 108). Second, the policy must avoid arbitrary enforcement. *See id.* "[P]olicies governing

2   public employee speech may be framed in language that might be deemed impermissibly vague if

3   applied to the public at large." *Hernandez*, 43 F.4th at 982.

4        Unlike the cases Reges cites, the Order's language expressly qualifies the references to

5   "inappropriate" and "unacceptable" conduct by tethering them to harassment, discrimination, and

6   retaliation, and by requiring the University to interpret the Order in the context of its commitment

7   to academic freedom and by reference to federal employment law. *Cf. Foti v. City of Menlo*

8   *Park*, 146 F.3d 629, 638–39 (9th Cir. 1998) (invalidating "odd" law banning signs on parked cars

9   depending on subjective intent of driver that invited arbitrary enforcement); *United States v.*

10  *Wunsch*, 84 F.3d 1110, 1119–20 (9th Cir. 1996) (noting that California courts had never applied a

11  narrowing construction to law challenged for vagueness); *Flores*, 635 F. Supp. 3d at 1042–43

12  (finding terms in campus flyer policy vague when defendants did not explain what "specific

13  parameters" existed to interpret the challenged language).

14       Nor does the Order invite arbitrary enforcement. In fact, it must be interpreted "in the

15  context of academic freedom in the University environment." Exec. Order 31 § 5(A). Nothing

16  supports concluding that the Order is meaningless. *See Ford Motor Co. v. Tex. Dep't of*

17  *Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (reasoning that a civil law is void for vagueness only

18  if its terms are "so vague and indefinite as really to be no rule or standard at all" or if it is

19  "substantially incomprehensible" (citation omitted)).

20       Dean Allbritton's letter sharing the results of the Faculty Code Section 25-71

21  investigation of Reges suggests the opposite of arbitrary enforcement. *Contra* Dkt. 60 at 32. Its

22  purported "threat" of future discipline was nothing of the sort. Dean Allbritton simply advised

23  Reges that future disruption associated with his land acknowledgment would prompt action in

24  accordance with the Faculty Code. Dkt. 67 at 18–19. There was no intimation about what that

25  process would lead to. Reges's seeks a blank check to do or say anything he wishes with no

26  chance for the University to respond even if his conduct disrupts the learning environment—

27  reading *Pickering* out of existence.

28       Courts have rejected vagueness challenges to provisions as broad as those in the Order. In

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

22

*Arnett v. Kennedy*, the Supreme Court upheld a standard allowing the dismissal of government employees for any cause "as will promote the efficiency of the service." *See* 416 U.S. 134, 159–60 (1974). The Sixth Circuit upheld an employment policy prohibiting "conduct unbecoming a teacher." *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 664–66 (6th Cir. 1987). So too with the Third Circuit's approving a regulation authorizing dismissal of professors who failed to "maintain standards of sound scholarship and competent teaching." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992). This Court should do the same.

## V.    CONCLUSION

For these reasons, the Court should deny Reges's motion for summary judgment.

DATED: January 22, 2024.

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

23

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  _s/Robert M. McKenna_
     Robert M. McKenna (WSBA# 18327)
     Aaron Brecher (WSBA# 47212)
     401 Union Street, Suite 3300
     Seattle, WA  98101
     Telephone (206) 839-4300
     Fax (206) 839-4301
     rmckenna@orrick.com
     abrecher@orrick.com

     R. David Hosp (*Pro Hac Vice Admission*)
     222 Berkeley Street, Suite 2000
     Boston, MA 02116
     Telephone (617) 880-1802
     Fax (617) 880-1801
     dhosp@orrick.com

*Attorneys for Defendants Ana Mari Cauce, Magdalena Balazinska, Dan Grossman, and Nancy Allbritton*

Counsel certifies that this memorandum contains 8,271 words, in compliance with the Local Civil Rules.

DEFENDANTS' OPP'N TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT -
Case No. 2:22-cv-00964-JHC

24

Orrick Herrington & Sutcliffe LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
tel+1-206-839-4300