*Reges v. Cauce, et al.*

# Exhibit A
# to Notice of
# Supplemental
# Authority

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MATTHEW MEINECKE, | No. 23-35481 |
| *Plaintiff-Appellant*, | D.C. No. 2:23-cv-00352-BJR |
| v. | |
| CITY OF SEATTLE; DANIEL NELSON, Lieutenant, Seattle Police Department; ROBERT BROWN, Lieutenant, Seattle Police Department; SEAN CULBERTSON, Police Officer, Seattle Police Department, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted February 7, 2024
Portland, Oregon

Filed April 18, 2024

Before: M. Margaret McKeown, Jay S. Bybee, and Daniel
A. Bress, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### First Amendment/Heckler's Veto

The panel reversed the district court's denial of Matthew Meinecke's motion for preliminary injunctive relief in a 42 U.S.C. § 1983 action arising from two events—an abortion rally and LGBTQ pride event—at which Meinecke, a devout Christian, sought to read Bible passages and was arrested for obstructing a police officer after he refused to move to a different location.

When attendees at both events began to abuse and physically assault Meinecke, officers asked him to move and ultimately arrested him for obstruction when he refused, rather than deal with the wrongdoers directly.  Meinecke sued the City of Seattle and certain Seattle police officers (together, the City), and sought to preliminary enjoin them from enforcing "time, place, and manner" restrictions and applying the City's obstruction ordinance "to eliminate protected speech in traditional public fora whenever they believe individuals opposing the speech will act hostile toward it."

The panel held that Meinecke has standing to pursue prospective injunctive relief, given that the City has twice enforced its obstruction ordinance against him, he has stated that he will continue his evangelizing efforts at future public events, and the City has communicated that it may file charges against him for doing so.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that Meinecke established a likelihood of success on the merits of his First Amendment claim. The restrictions on his speech were content-based heckler's vetoes, where officers curbed his speech once the audience's hostile reaction manifested. Applying strict scrutiny, the panel held that there were several less speech-restrictive alternatives to achieve public safety, such as requiring protesters to take a step back, calling for more officers, or arresting the individuals who ultimately assaulted Meinecke.

The panel held that Meineke established irreparable harm because a loss of First Amendment freedoms constitutes an irreparable injury, and the balance of equities and public interest favors Meinecke.

The panel remanded with instructions to enter a preliminary injunction consistent with this opinion in favor of Meinecke.

## COUNSEL

Nathan W. Kellum (argued), Center for Religious Expression, Memphis, Tennessee; Keith A. Kemper, Ellis Li & McKinstry PLLC, Seattle, Washington; for Plaintiff-Appellant.

Dallas LePierre (argued), Assistant City Attorney; Ann Davison, Seattle City Attorney; Seattle City Attorney's Office, Seattle, Washington; for Defendants-Appellees.

## OPINION

BYBEE, Circuit Judge:

Appellant Matthew Meinecke's speech was not well received by his audience. On two separate occasions in June 2022—an abortion rally and an LGBTQ pride event—Meinecke sought to read Bible passages to attendees gathered in the city of Seattle. When those attendees began to abuse and physically assault Meinecke, Seattle police officers asked Meinecke to move and ultimately arrested him when he refused, rather than deal with the wrongdoers directly. Meinecke sued the City of Seattle and certain Seattle Police Department officers (together, "the City"), seeking, *inter alia*, preliminary injunctive relief. The district court denied the motion, surmising that the officers' actions were content neutral. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citation omitted). Consequently, "[i]f speech provokes wrongful acts on the part of hecklers, the government must deal with those wrongful acts directly; it may not avoid doing so by suppressing the speech." *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1292–93 (9th Cir. 2015).

We reverse.

## I. BACKGROUND

Matthew Meinecke is a devout Christian who seeks to spread the message of the gospel at well-attended public

events.[1]  When evangelizing, Meinecke often holds up signs, hands out literature, and reads the Bible aloud.  He also converses with members of the public and endeavors to answer their questions about Christianity.  This appeal arises out of two events in June 2022 in the city of Seattle.

A. *June 24, 2022:  Dobbs Protest*

On June 24, 2022, the United States Supreme Court overturned *Roe v. Wade*, 410 U.S. 113 (1973).  *See generally Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).  In response, a significant number of people gathered on Second Avenue outside the federal building in Seattle to protest the decision.   Meinecke arrived that afternoon dressed in a shirt and tie and went to a public walkway adjacent to Second Avenue.  According to his complaint, Meinecke "did not come to this event to condemn abortion" or even to "speak on this topic, but to convey his faith in Christianity to people who were in the area."  He held up a sign, read from the Bible, and handed out Christian literature.

Protestors surrounded Meinecke after about an hour. One protestor seized Meinecke's Bible.  Meinecke retrieved another Bible from his bag and continued reading aloud. Another protestor grabbed hold of—and ripped pages from—the new Bible.  The altercation soon escalated. As protestors, some of whom Seattle police characterized in their written reports as Antifa, encroached, Meinecke took hold of an orange-and-white traffic sawhorse.   Five protestors, some clad in all black and wearing body armor,

---

[1] The facts are drawn from the record, including the district court's opinion, the complaint, the police reports, and video footage of the incidents.

picked up Meinecke and the sawhorse, moved him across the street, and dropped him on the pavement. One law enforcement officer who observed this interaction reported that "'Antifa' members . . . began to fight/assault" Meinecke.

Undeterred, Meinecke walked back to his original location by the federal building and resumed reading and held up a sign. While people gathered on the street, however, some approached Meinecke, knocked him down, and took one of his shoes.

Seattle police finally intervened. Although the officers acknowledged that the protestors had assaulted Meinecke, they took no action against the perpetrators. They instead ordered Meinecke to leave the area. The precise dictates of the officers' order are in dispute. Meinecke maintains that the officers instructed him "to go where no one could hear [his] message or read [his] sign." The City disagrees, claiming that Seattle police simply directed Meinecke to the other side of the street and that they told Meinecke that he "could still display his banner and exercise his [F]irst [A]mendment rights."

Regardless, Meinecke declined to go to a different location. The officers then arrested Meinecke for obstruction under Seattle Municipal Code Ordinance § 12A.16.010(A)(3), which provides, "A person is guilty of obstructing a police officer if, with knowledge that the person obstructed is a police officer, he or she . . . [i]ntentionally refuses to cease an activity or behavior that creates a risk of injury to any person when ordered to do so by a police officer." The officers took Meinecke to the police precinct and kept him there for about two hours; they did not

book him.  Meinecke was released after the abortion protest ended.

B. *June 26, 2022:  PrideFest*

Seattle's annual PrideFest took place on June 26, 2022, two days after the *Dobbs* rally.  The event was held at the Seattle Center, a public park.  Meinecke, again dressed in a shirt and tie, entered the park around noon and began to read from the Bible in a conversational tone.

Eventually, PrideFest attendees noticed Meinecke's presence.  As the district court found, they began "dancing near him, holding up a flag to keep people from seeing him," and making "loud noises so he could not be heard." According to his complaint, "a couple of attendees stood close to Meinecke and howled and barked like dogs, and mocked Meinecke, while he read passages from the Bible. Meinecke did not engage with them."  Another individual poured water on Meinecke's Bible.  Meinecke kept reading aloud.

After a couple of hours, more PrideFest attendees gathered around Meinecke and began yelling.  This attracted the attention of about ten law enforcement officers, who asked Meinecke "to move to a public area located outside the park."  Meinecke declined and continued to read from his Bible.  A PrideFest attendee shouted at the officers, demanding Meinecke's removal.  The officers then told Meinecke "that they were imposing a 'time, place, and manner' restriction on him and ordered him to leave the park."  Again, Meinecke declined to leave.  The officers told Meinecke "that he was posing a risk to public safety," and they again demanded he leave the park.  Meinecke told the officers that he was not in any danger.  The officers then arrested Meinecke for obstruction.

Meinecke again was taken to the precinct. This time, though, the officers booked him. He was later released on bond. At his hearing a few days later, the City informed Meinecke that it was not pursuing the charges against him at that time, but it warned Meinecke that "it could bring up charges for this incident at a later time."

C. *Procedural History*

Meinecke filed suit against the City of Seattle and certain Seattle Police Department officers. He asserted causes of action under 42 U.S.C. § 1983 for violation of his rights under the First, Fourth, and Fourteenth Amendments. Meinecke sought preliminary and permanent injunctive relief, declaratory relief, and damages, costs, and attorneys' fees.

This appeal concerns only Meinecke's motion for preliminary relief. Before the district court, Meinecke sought to enjoin "Defendants from enforcing 'time, place, and manner' restrictions and applying Seattle municipal code ordinance § 12A.16.010(A)(3) 'to eliminate protected speech in traditional public fora whenever they believe individuals opposing the speech will act hostile toward it.'"

The district court denied that motion without prejudice. It first found that that "there is no indication in the record that the City's police officers acted based on the content of Mr. Meinecke's speech." It further found that "the Seattle police officers did not act to 'silence' Mr. Meinecke, nor did they evict or banish him from the forum." Finally, it expressed concern "with the vague request for injunctive relief," opining that Meinecke's request for an injunction would not satisfy the specificity requirements of Federal Rule of Civil Procedure 65(d).

Meinecke timely appealed.

## II. JURISDICTION

Before turning to the merits, we briefly address the City's contention that Meinecke lacks Article III standing for preliminary injunctive relief. "To bring a claim for prospective injunctive relief, '[t]he plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680–81 (9th Cir. 2023) (en banc) (alteration in original) (citation omitted); *see also Tingley v. Ferguson*, 47 F.4th 1055, 1066–67 (9th Cir. 2022) ("The 'unique standing considerations' in the First Amendment context 'tilt dramatically toward a finding of standing' when a plaintiff brings a pre-enforcement challenge." (citation omitted)). To make such a showing, plaintiffs like Meinecke "may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." *City & County of San Francisco v. USCIS*, 944 F.3d 773, 787 (9th Cir. 2019) (alteration in original) (citation omitted).

Meinecke easily satisfies this standard. He has identified two instances when the City enforced its obstruction ordinance against him for violating putative "time, place, and manner" restrictions, and he has stated that he will continue his evangelizing efforts at future, well-attended public events. The events at which Meinecke hopes to speak are also typically impromptu, in response to unpredictable political events; under such circumstances, we "do not require plaintiffs to specify 'when, to whom, where, or under

what circumstances' they plan to violate the law when they have already violated the law in the past." *Tingley*, 47 F.4th at 1068 (citation omitted). Moreover, the City notified Meinecke that the "Seattle City Attorney's office" had elected not to pursue charges against Meinecke "at th[at] time," but communicated that it "may file charges against [him] in the future." Meinecke has demonstrated a credible threat of future enforcement adequate to establish Article III standing for his request for preliminary injunctive relief.

The City does not challenge this conclusion. Instead, it argues that Meinecke lacks standing to pursue a facial overbreadth claim. But Meinecke does not bring a facial overbreadth claim, and we are satisfied that he has standing to pursue the relief he seeks. We have jurisdiction over his appeal from the denial of his motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1).

### III. FIRST AMENDMENT

We review the denial of a preliminary injunction for abuse of discretion, but we review *de novo* the underlying issues of law. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022). Though we defer to the district court's findings of historical facts, "we review constitutional facts *de novo*." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021). "In First Amendment cases, we make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* (internal quotation marks and citations omitted).

This case comes to us following the denial of a preliminary injunction. "The appropriate legal standard to analyze a preliminary injunction motion requires a district

court to determine whether a movant has established that (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because "the party opposing injunctive relief is a government entity" here, the third and fourth factors "merge." *Fellowship of Christian Athletes*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

We address these factors in turn.

A. *Likelihood of Success on the Merits*

We start with the likelihood of success on the merits, which is the most important factor in the preliminary injunction analysis. *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019). It is all the more critical "when a plaintiff alleges a constitutional violation and injury." *Baird*, 81 F.4th at 1040. Consequently, we have articulated a unique likelihood-of-success standard in First Amendment cases: "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Com.*, 29 F.4th at 478 (citation and quotation marks omitted); *accord Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

1. First Amendment standard

The First Amendment, made applicable to the states through the Due Process Clause of the Fourteenth

Amendment, provides: "[The States] shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. We typically assess First Amendment claims in three steps. First, we must decide whether the relevant speech "is protected by the First Amendment"; second, "we must identify the nature of the forum"; and third, "we must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

The first two steps are not at issue here. The parties agree that the First Amendment protects religious speech like Meinecke's. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022); *Widmar v. Vincent*, 454 U.S. 263, 269 & n.6 (1981). The City does not attempt to justify its actions based on theories of incitement or fighting words. *See*, *e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 791 (2011). It is also beyond debate that Meinecke's speech occurred in traditional public fora—public sidewalks and a public park. *See Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988); *ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1099 (9th Cir. 2003) ("The quintessential traditional public forums are sidewalks, streets, and parks."). Indeed, we have previously observed that the Seattle Center—the park at issue here—is an "especially important locale[] for communication among the citizenry." *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009).

Instead, only the third step—whether the City's restrictions satisfied the requisite level of scrutiny—is in dispute. Content-based restrictions, on the one hand, are "presumptively invalid." *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020). If a restriction is content based, it is subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). On the other hand,

municipalities may permissibly issue time, place, or manner restrictions. "To pass constitutional muster, a time, place, or manner restriction must meet three criteria: (1) it must be content-neutral; (2) it must be narrowly tailored to serve a significant governmental interest; and (3) it must leave open ample alternative channels for communication of the information." *Berger*, 569 U.S. at 1036 (citation and quotation marks omitted).

In urging us to affirm the district court's judgment, the City contends that it enforced a permissible content-neutral "time, place, or manner" restriction on Meinecke's speech. Meinecke counters, maintaining that the City's actions were content based and fail strict scrutiny. We agree with Meinecke: the restrictions on his speech were content-based heckler's vetoes, and the City has not carried its burden to justify those restrictions under strict scrutiny.

2. Whether the restrictions were content neutral

Meinecke does not bring a facial challenge to the Seattle obstruction ordinance under which he was arrested. It makes little difference to our analysis, however, that the ordinance is facially neutral. If a facially neutral statute "as read by officers on the scene[] would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'" *Ctr. For Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008).

The City's enforcement actions against Meinecke are content-based heckler's vetoes. Our precedent on this point is clear: "The prototypical heckler's veto case is one in which the government silences *particular* speech or a

14      MEINECKE V. CITY OF SEATTLE

*particular* speaker 'due to an anticipated disorderly or violent reaction of the audience.'" *Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1293 (quoting *Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1158 (9th Cir. 2007)); *see also United States v. Rundo*, 990 F.3d 709, 719 (9th Cir. 2021).   As such, it "is a form of content discrimination, generally forbidden in a traditional or designated public forum." *Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502 (9th Cir. 2015). The Supreme Court has emphasized as "firmly settled" that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object to peaceful and orderly demonstrations." *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) (quotation marks and citations omitted); *see Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").  It is apparent from the facts, including the video available from police body cameras, that the Seattle police directed Meinecke to leave the area because of the reaction his Bible-reading provoked at the *Dobbs* and PrideFest protests.

The City resists this conclusion by repeatedly referring to its actions as time, place, or manner restrictions.  The police officers on scene, for example, can be heard on the video recordings discussing "time, place or manner," and they told Meinecke that they were enforcing a "time, place, and manner" restriction on him.  But incanting the words "time," "place," and "manner" over a content-based restriction does not transmute it into one that is content neutral.  The evidence in the record is indisputable that the officers curbed Meinecke's speech because of the potential reaction of the listeners.  The arresting officer during the

*Dobbs* protest reported that law enforcement "wanted to place a time and manner restriction on [Meinecke] . . . . due to the fact that the government interest and the police role at that point was to restore public order and prevent further violence." The officer's report for PrideFest used nearly identical language. The City on appeal acknowledges that the restrictions were the direct result of "assaults on [Meinecke]" and the "threat to public safety" posed by the protestors. And the district court emphasized that the officers' actions "were prompted by physical altercations and threats of violent behavior." Those threats did not come from Meinecke, and there is no evidence of any protester being arrested for "physical altercations and threats of violent behavior," including those who seized and ripped his Bible, poured water on him, took his shoes, and physically carried him across the street.

The City cannot point to any legitimate time, place, or manner restriction at issue here, such as a noise ordinance. *See Ward v. Rock Against Racism*, 491 U.S. 781, 803 (1989). Instead, the invocation of "time, place, and manner" appears to have been a shorthand for the convenience of the officers in maintaining order for the primary events. The City's citation to buffer- and protest-zone cases is inapposite here. Buffer and protest zones are regulations of general applicability, often erected ex ante. *See*, *e.g.*, *Edwards v. City of Santa Barbara*, 150 F.3d 1213, 1215 (9th Cir. 1998) (per curiam) ("Ordinance 4812 prohibits all demonstration activity within a specified distance of health care facilities and places of worship without regard to the message conveyed."); *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) ("Under Order No. 3, persons could not protest—in support of or against—*any* topic within the restricted zone . . . . The restricted zone established by

Order No. 3 applied equally to persons of all viewpoints."); *see also Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 535 (1980) ("[T]ime, place, and manner regulations must be 'applicable to all speech regardless of content.'" (citation omitted)). The City acknowledged at oral argument that it had not created protest zones in advance of either gathering. To be sure, the June 24 protest was an impromptu reaction to the Supreme Court's *Dobbs* decision that very same day. Although we are sensitive to the logistical difficulties of handling such a dynamic situation, the City acted on Meinecke's speech— and on the record before us, no other speech—based exclusively on the reaction of Meinecke's audience. PrideFest presents an even easier case, because the gathering was planned and the City was aware of that event well in advance. At both events, the Seattle police targeted Meinecke's speech only once the audience's hostile reaction manifested. That is part and parcel of a heckler's veto. *See Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1294.

In a final attempt to avoid strict scrutiny, the City maintains that the police officers merely sought to relocate Meinecke's speech rather than ban it outright. The district court followed this reasoning, surmising that the "officers did not act to 'silence' Mr. Meinecke, nor did they evict or banish him from the forum," but only "order[ed] Mr. Meinecke to move to a safer location."

But the government cannot escape First Amendment scrutiny simply because its actions "can somehow be described as a burden rather than outright suppression." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000). The buffer zone cases on this point belie rather than support the City's position. In *McCullen v. Coakley*, 573 U.S. 464 (2014), for example, the Supreme Court invalidated

a Massachusetts statute that criminalized knowingly standing on a public sidewalk within thirty-five feet of a place where abortions are performed.  There, the petitioners sought to "approach and talk to women outside such facilities, attempting to dissuade them from having abortions."  *Id.* at 469.  Although the petitioners could engage in expressive activity beyond the buffer zone, the Court nevertheless concluded that the "buffer zones impose serious burdens on the petitioners' speech" because they "compromise[d] petitioners' ability to initiate . . . close, personal conversations."  *Id.* at 487.  The Court continued, "while the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms— such as normal conversation . . . —have historically been more closely associated with the transmission of ideas than others."  *Id.* at 488.  "When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.* at 489.

Even assuming that the officers simply instructed Meinecke to cross the street, their directions burdened Meinecke's speech.  Meinecke had a right, just as those participating in the anti-*Dobbs* rally or the celebration of PrideFest, to use public sidewalks and streets for the peaceful dissemination of his views.  Like the petitioners in *McCullen*, Meinecke "hands out literature" and "engages in conversation and answers questions" about Christianity.  The evidence is even clearer as to the officers' restrictions during PrideFest.  The district court recognized that the officers "ordered him to leave the park" altogether.  When the police single out a nonthreatening speaker for discipline, the government is simply choosing sides in the debate and using the obstruction statute to enforce its choice.

In short, the City's attempt to relocate Meinecke's speech—and subsequently arresting him for failing to comply—was a content-based burden on Meinecke's expressive activity because the City did so only in response to the actual and potential reaction of the audience.

3.   Whether the restrictions satisfy strict scrutiny

Because the City's restrictions on Meinecke's speech were not content neutral, they are permissible only if they satisfy strict scrutiny.  "To satisfy strict scrutiny, a restriction on speech is justified only if the government demonstrates that it is narrowly tailored to serve a compelling state interest." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023).  "It is rare that a regulation restricting speech because of its content will ever be permissible." *Askins v. U.S. Dep't Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018) (citation omitted).  The parties do not dispute that public safety and security are compelling interests. *Menotti*, 409 F.3d at 1143 n.57 ("[T]he City's interest in restoring and maintaining safety and security also was a 'compelling state interest.'").  Instead, they spar over whether the City's restrictions satisfy the narrow tailoring element of strict scrutiny.

When a speech restriction is content-based, the narrow tailoring requirement is demanding of the government. *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015) ("The least-restrictive-means standard is exceptionally demanding." (citation omitted)); *Brown*, 564 U.S. at 799 (recognizing that narrow tailoring "is a demanding standard" in content-based cases).  "To be narrowly drawn, a 'curtailment of free speech must be actually necessary to the solution.'" *Twitter*, 61 F.4th at 698 (quoting *Brown*, 564 U.S. at 799).   Put differently, "[i]f a less restrictive alternative would serve the Government's purpose, the [Government] must use that

alternative." *Id.* (quoting *Playboy Ent. Grp., Inc.*, 529 U.S. at 813); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020) ("Even if a state intends to advance a compelling government interest, we will not permit speech-restrictive measures when the state may remedy the problem by implementing or enforcing laws that do not infringe on speech.").

Curtailing speech based on the listeners' reaction is rarely—if ever—the least restrictive means to achieve the government's interest in safety.   "If speech provokes wrongful acts on the part of hecklers, the government must deal with those wrongful acts directly; it may not avoid doing so by suppressing the speech." *Santa Monica Nativity Scenes Comm.*, 784 F.3d at 1292–93; *cf. Playboy Ent. Grp.*, 529 U.S. at 813 ("Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists.").

In this case, there were several less speech-restrictive alternatives to achieve public safety.  The officers could have required the protestors to take a step back from Meinecke. They could have called for more officers—as they did after Meinecke was arrested.  They could have erected a free speech barricade.  They could have warned the protestors that any sort of physical altercation would result in the perpetrators' arrests.  And they could have arrested the individuals who ultimately assaulted Meinecke. *See, e.g.*, *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc).  The City did none of those things.  Instead, the police report on Meinecke's arrest simply recites that "[w]hen resources allowed in the past[,] SPD would try and keep the two opposing groups separated."  That is hardly the sort of concrete proof necessary to establish that restricting

Meinecke's speech was the only way to avoid violence. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019) ("[T]he state must provide 'more than anecdote and supposition;' it must point to evidence . . . that demonstrates why the challenged restriction, rather than a less restrictive alternative, is necessary to further its significant interests." (citation omitted)); *Brown*, 564 U.S. at 799–800 ("[B]ecause [the government] bears the risk of uncertainty, ambiguous proof will not suffice." (internal citation omitted)).

Meinecke has established a likelihood of success on his First Amendment claim.

B. *Irreparable Harm*

The district court properly recognized that a loss of First Amendment freedoms constitutes an irreparable injury. *Fellowship of Christian Athletes*, 82 F.4th at 694 ("It is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (citation omitted)). The City replies that there is "no irreparable harm where there is no infringement on [Meinecke's] First Amendment rights." That argument does not move the needle because Meinecke has demonstrated a likelihood of a First Amendment injury for the reasons explained above. *See Am. Bev. Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) ("Because Plaintiffs have a colorable First Amendment claim, they have demonstrated that they likely will suffer irreparable harm.").

C. *Balance of Equities and Public Interest*

The balance of equities and public interest favor Meinecke. "[I]t is always in the public interest to prevent

the violation of a party's constitutional rights." *Fellowship of Christian Athletes*, 82 F.4th at 695 (citation omitted). When a party "'raise[s] serious First Amendment questions,' that alone 'compels a finding that the balance of hardships tips sharply in [its] favor." *Id.* (second alteration in original) (quoting *Am. Bev. Ass'n*, 916 F.3d at 758). The government doubtlessly has an interest in maintaining public order. But even "undeniably admirable goals" "must yield" when they "collide with the . . . Constitution." *Id.* That is especially true here because the City had other means of vindicating its interests without restricting Meinecke's speech.

D. *Specificity of Injunctive Relief*

Although the district court concluded that "Meinecke's request for a preliminary injunction is overbroad and lacks the specificity that is required by Federal Rule of Civil Procedure 65(d)," a sufficiently particularized injunction can be drawn here. District courts have "considerable discretion in fashioning suitable relief and defining the terms of an injunction," *Hecox v. Little*, 79 F.4th 1009, 1036 (9th Cir. 2023) (citation omitted), so the court was not required to adopt Meinecke's proposed language verbatim. At oral argument, Meinecke confirmed that he was focused on seeking an injunction specific to him. Consistent with Rule 65(d), the district court could have enjoined the City and its officers from enforcing § 12A.16.010(A)(3) against Meinecke in public parks and streets based on the anticipated hostile reaction of an audience. This would provide the "fair and precisely drawn notice" required by Rule 65. *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1263 (9th Cir. 2020) (citation omitted), *aff'd sub nom. Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021).

## IV.  CONCLUSION

We reverse the district court and remand with instructions to enter a preliminary injunction consistent with this opinion in favor of Meinecke.  Because we reverse as to the First Amendment claim, we need not reach Meinecke's void-for-vagueness theory.

**REVERSED and REMANDED.**