UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STUART REGES,

              Plaintiff,

     v.

ANA MARI CAUCE et al.,

              Defendants.

CASE NO. 2:22-cv-00964-JHC

AMENDED ORDER RE: DEFENDANTS'
MOTION TO DISMISS AND CROSS-
MOTIONS FOR SUMMARY JUDGMENT

# I

## INTRODUCTION

The University of Washington (UW) states that it "acknowledges that the Coast Salish peoples remain part of the community in the Puget Sound region" and "seeks to provide a welcoming environment for indigenous people—particularly Native students who would attend the University." Pursuing this goal, UW's Paul G. Allen School of Computer Science and Engineering (Allen School) suggested that its faculty include an "Indigenous Land Acknowledgment Statement" in their syllabi.

Plaintiff, a faculty member of the Allen School, drafted his own acknowledgment statement, which says, "I acknowledge that by the labor theory of property the Coast Salish

people can claim historical ownership of almost none of the land currently occupied by the University of Washington."  Plaintiff placed this statement outside his faculty office door, included it at the bottom of his emails, and discussed it with colleagues.  However—and central to this case—he also included it in the syllabus for Computer Science and Engineering 143: Computer Programming II (CSE 143), a required course for certain majors.  Significant disruption ensued.  The Allen School removed the statement from the syllabus and commenced investigatory proceedings.

The Court agrees with Plaintiff that, under the law, his speech—i.e., his acknowledgment statement in the syllabus—"related to scholarship or teaching."  But the Court agrees with Defendants that, despite this status, under *Pickering v. Board of Education*,[1] the disruption caused by Plaintiff's speech rendered it unprotected.  To be sure, in *Pickering*, the Supreme Court recognized that "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" may in some cases outweigh "the interests of the teacher, as a citizen, in comment upon matters of public concern."

For these reasons, and those discussed below, the Court DENIES Defendants' motion to dismiss (Dkt. # 50) as to Plaintiff's retaliation and viewpoint discrimination claims; GRANTS Defendants' motion to dismiss (Dkt. # 50) as to the facial overbreadth and vagueness challenges to Executive Order 31 (EO 31); DENIES Plaintiff's motion for summary judgment (Dkt. # 60); and GRANTS Defendants' motion for summary judgment (Dkt. # 64) as to the retaliation and viewpoint discrimination claims.

---

[1] 391 U.S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968).

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 2

1

2

# II

## Background

3

Plaintiff brings a claim for First Amendment viewpoint discrimination against all

4

individual-capacity Defendants,[2] a First Amendment retaliation claim under 42 U.S.C. § 1983

5

against all individual-capacity Defendants and all Defendants in their official capacities,[3] and a

6

facial overbreadth challenge and facial vagueness challenge to EO 31 against Ana Marie Cauce,

7

President of UW, in her official capacity.

8

Plaintiff is a faculty member at the Allen School.  Dkt. # 46 at 9.  He has taught there

9

since 2004 as a Principal Lecturer and a Teaching Professor.  *Id.*

10

UW states that it "acknowledges that the Coast Salish peoples remain part of the

11

community in the Puget Sound region" and "seeks to provide a welcoming environment for

12

indigenous people—particularly Native students who would attend the University."  Dkt. # 64 at

13

6 (citing Dkt. # 70 at 2).  Consistent with this goal, the Allen School released a document, "Allen

14

School best practices for inclusive teaching," which suggests that faculty include an "Indigenous

15

Land Acknowledgment Statement" in their syllabi.  Dkt. # 46 at 12.  An example statement

16

provided by the Allen School says, "The University of Washington acknowledges the Coast

17

Salish peoples of this land, the land which touches the shared waters of all tribes and bands

18

within the Suquamish, Tulalip and Muckleshoot nations."  *Id.*  This statement resulted from "a

19

years-long process in which University officials worked with the Governor's Office of Indian

20

21

22

23

24

---

[2] These include Magdalena Balazinska, Director of the Allen School; Dan Grossman, Vice Director of the Allen School; and Nancy Allbritton, Dean of the College of Engineering at UW.  Dkt. # 46 at 10–11.

[3] These include Ana Marie Cauce, President of UW; Magdalena Balazinska; Dan Grossman; and Nancy Allbritton.  Dkt. # 46 at 10–11.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 3

Affairs, Tribal leaders from throughout the state and region, and other stakeholders." Dkt. # 70 at 2.

The "best practices for inclusive teaching" document does not mandate including any statement in syllabi. Dkt. # 68 at 2.[4]  Some examples of other suggested statements included in the document are "[a] statement that [the] class welcomes all students of all backgrounds"[5] and "[a] statement about accommodating students' needs and pointing to [Disability Resources for Students] for disability accommodations[.]"[6]  *Id.* at 5–6.

Plaintiff prepared his own acknowledgment statement, which provides, "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington."  Dkt. # 46 at 13. He included this statement in the Winter 2022 syllabus for CSE 143, a required course for certain majors at the Allen School.  Dkt. # 66 at 31.  Plaintiff testified that he "intended to make fun of land acknowledgments."  Dkt. # 65 at 29.  He said, "I knew people would be upset by what I was doing."  *Id.* at 55.  And he said, "I was causing trouble on purpose[.]"  *Id.*  Plaintiff also included his acknowledgment statement outside his faculty office door and at the bottom of his emails,

---

[4] The document acknowledges that the UW's syllabi guidelines include a required statement about accommodating students' religions.  Dkt. # 68 at 6.

[5] "An example statement: This course welcomes all students of all backgrounds. The computer science and computer engineering industries have significant lack of diversity. This is due to a lack of sufficient past efforts by the field toward even greater diversity, equity, and inclusion. The Allen School seeks to create a more diverse, inclusive, and equitable environment for our community and our field. You should expect and demand to be treated by your classmates and the course staff with respect. If any incident occurs that challenges this commitment to a supportive, diverse, inclusive, and equitable environment, please let the instructor know so the issue can be addressed."  Dkt. # 68 at 5.

[6] "An example statement: Embedded in the core values of the University of Washington is a commitment to ensuring access to a quality higher education experience for a diverse student population. Disability Resources for Students (DRS) recognizes disability as an aspect of diversity that is integral to society and to our campus community. DRS serves as a partner in fostering an inclusive and equitable environment for all University of Washington Students. . . ."  Dkt. # 68 at 5–6.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 4

and he has discussed the statement with colleagues—all with no limitation by UW.  Dkt. # 65 at 25, 26, 43–44, and 46.

The CSE 143 class for winter 2022 first met on January 3, 2022, and students accessed the syllabus then.  Dkt. # 46 at 13.  In response to Plaintiff's acknowledgment statement in the syllabus, students, faculty, staff, and teaching assistants contacted UW administrators.  For example, the Allen School's recruiter for diversity and access, Kayla Shuster, expressed concern to Defendant Balazinska that Plaintiff's statement undermined their function within the Allen School.  Dkt. # 66 at 31.  Defendants also received emails from students.  On the first day of class, a student in the course submitted an official complaint, expressing that they felt "intimidated" and "already do not feel welcome in this class, nor do I feel like I will be supported and led to be successful in this required course for my major."  Dkt. # 66 at 15.

In the early afternoon of January 4, 2022, six students "representing the 'DEI Student Committee'" emailed Yoshi Kohno, the school's assistant director for DEI.  Dkt. # 66  at 17–18. The students said that Plaintiff's statement "clearly contradicts the Allen School's promise for creating an inclusive environment."  *Id.*

On January 4, at 3:40 PM, after receiving responses from members of the UW community about the statement, Defendant Balazinska requested via email that Plaintiff remove the statement from the syllabus stating it was "offensive" and caused a "toxic environment." Dkt. # 46 at 13; Dkt. # 66 at 11.  She said, "You are welcome to voice your opinion and opposition to land acknowledgments, as you have, in other settings. The current statement in your course syllabus is inappropriate and must be removed."  *Id.*  Plaintiff refused.  Dkt. # 63 at 5.  Defendant Balazinska worked with Information Technology (IT) to have the statement removed from the syllabus and an updated syllabus uploaded to UW's class portal.  Dkt. # 46 at

14; Dkt. # 62-6 at 37. Later that day, Plaintiff wrote in his journal, "I'm shaking all over. It's partly because it's cold, but it's more because the shit has hit the fan over my land acknowledgment and now it's getting very real."  Dkt. # 76-5 at 5.

Later that day, UW received a complaint through the "anonymous student feedback form." Dkt. # 66 at 16–19.  It described Plaintiff's statement as "factually wrong, intentionally inflammatory, and trauma-mocking[,]" which "tarnishes the reputation of the Allen School."  *Id.* at 17.  The student expressed that "[h]aving a professor like this, with a history of misogynistic and racist statements, and who places statements like this in their course policies, signals an environment in our department which I do not think aligns with our department's goals of being inclusive." *Id.*

On January 5, Defendant Balazinska alerted the students and staff of the 2022 winter quarter CSE 143 class of the updated course syllabus and expressed her confidence that "[i]n spite of this incident" everyone "can expect to be treated fairly and respectfully in this class[]" and stated that "[i]f anyone has experiences to the contrary, I encourage you to submit a complaint" through one of several channels.  Dkt. # 62-17 at 2.

In the early morning of January 6, Defendant Balazinska said to Plaintiff in an email, "Because the current text under 'Indigenous Land Acknowledgement' in your CSE 143 syllabus is causing a disruption to instruction in your class and because it is not related to course content, it needs to be removed."  Dkt. # 62-18 at 2.  She informed Plaintiff that the statement was removed from the syllabus and that IT added an updated syllabus to the course website.  *Id.*

Also on January 6, 2022, Defendants Balazinska and Grossman received an email from Chloe Dolese Mandeville, Assistant Director for Diversity & Access (D&A), who wrote on

behalf of the D&A team and shared their concerns of the impact that the statement will have on prospective students, current students, and staff.  Dkt. # 66 at 26–27.

The same day, two students—one of whom self-identified as Native—separately emailed Defendant Balazinska and Assistant Director Kohno.  Dkt. # 66 at 20.  These emails discuss the alienating nature of Plaintiff's statement.  *Id.* at 20–21.  One student shared that Plaintiff's statement made them feel "so directly despised and unsafe that I'm certain if I hadn't transferred in I wouldn't be at the Paul Allen school right now[.]"  *Id.* at 20.

On January 7, the Allen School opened an alternate section of Plaintiff's CSE 143 course, which was taught by a different faculty member.  Dkt. # 46 at 15–16.  Around 170 students out of around 500 students transferred to this alternate section, which started at eight o'clock in the morning.  Dkt. # 65 at 51; Dkt. # 75 at 31; Dkt. # 69 at 6.

In February 2022, Plaintiff emailed the Allen School's diversity-allies listserv— accessible by both students and faculty—explaining his intent to continue including his land acknowledgment statement in syllabi in Spring 2022.  Dkt. # 46 at 17; Dkt. # 66 at 3.

Defendant Balazinska then received an email from UAW 4121 union representatives, representing CSE academic student employees (ASEs), expressing concerns that Plaintiff's statement and intention to continue including the statement in future syllabi violated the antidiscrimination provision (Article 20) in the union's collective-bargaining agreement with UW.  Dkt. # 64 at 9; Dkt. # 66 at 33–34.  The email requests that UW "**take prompt action to address this behavior, to align with both Article 20 of the contract and the Allen School's stated commitment to Diversity, Equity, and Inclusion.**"  *Id.* at 34 (emphasis in original).  As a result of this complaint and the other complaints UW administrators received following Plaintiff's inclusion of his statement in the CSE 143 syllabus, Defendant Balazinska initiated

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 7

UW's Faculty Code Section 25-71 process on March 2, 2022.  Dkt. # 46 at 18; Dkt. # 66 at 3, 42–44.  She wrote to Plaintiff, "The allegations, if true, may constitute a violation of Executive Order 31, which prohibits discrimination or harassment against a member of the University community."  Dkt. # 66 at 42.

The Faculty Code Section 25-71 process governs when a member of the academic community is "alleged to have violated a rule or regulation of the University, its schools, colleges, or departments."  Dkt. # 65 at 87–89.  Here, this process first required a meeting between Plaintiff, his counsel, Defendant Grossman, and Defendant Balazinska to "discuss allegations that 'may, if true, constitute a violation of' several University policies, including University of Washington Executive Order 31."  Dkt. # 46 at 18; *see also* Dkt. # 62-32.  EO 31 is the UW's Nondiscrimination and Affirmative Action policy and has a "goal of promoting an environment that is free of discrimination, harassment, and retaliation."[7]

Defendant Balazinska, Defendant Grossman, Plaintiff, and his counsel met on March 8, 2022.  Dkt. # 46 at 18.  During this meeting, Defendant Balazinska and Defendant Grossman explained that "they continued to receive student complaints about his statement and expected further disruption to his classes as a result."  Dkt. # 50 at 9–10 (citing Dkt. # 46 at 18–19).  Defendant Balazinska also told Plaintiff that "she expected faculty to 'interact respectfully' and create a 'welcoming,' 'professional,' and 'positive' environment."  Dkt. # 46 at 18.

On March 9, 2022, Defendant Balazinska sent Plaintiff a proposed resolution that included, among other things, a provision that Plaintiff would "agree not to include . . . [his]

---

[7] UW EO 31: Nondiscrimination and Affirmative Action (updated Aug. 14, 2020) https://www.washington.edu/admin/rules/policies/PO/EO31.html (cited by Defendants at Dkt. # 50 at 9 n.3).

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 8

version of the land acknowledgment that was published in the [Computer Science and Engineering] 143 Winter 2022 online course syllabus in . . . future course syllabi." Dkt. # 46 at 19–20. The next day, Plaintiff declined the proposed resolution. *Id.* As a result, Defendant Balazinska continued the Section 25-71 process and referred the matter to Dean Allbritton. Dkt. # 66 at 4.

Defendant Allbritton then arranged a meeting with Plaintiff, step two of the process under Faculty Code Section 25-71.D. Dkt. # 46 at 20. This meeting occurred on March 25, 2022. *Id.* On April 21, 2022, Defendant Allbritton informed Plaintiff that she planned to proceed with formal charges against him and that a special investigating committee would convene to "look into this matter" under University Faculty Code Section 25-71.D.3. *Id.* at 21. While the committee was being assembled, Plaintiff included his statement in the syllabi for courses he taught in the spring 2022 quarter. *Id.* The Allen School did not remove the statement from those syllabi but did offer an alternate section of the CSE 143. *Id.*

The committee formally began its investigation on July 11, 2022. Dkt. # 46 at 22. Plaintiff then started this lawsuit on July 13, 2022. *Id.* The investigation was "placed on hold" on August 25, 2022. *Id.* But on September 28, 2022, "the senior director of human resources wrote to the members of the special investigating committee, copying Dean Allbritton, to inform them that the investigation was no longer on hold and to ask them to report orally to the Dean as soon as possible." *Id.* at 23.

On June 13, 2023, Defendant Allbritton informed Plaintiff via letter of the investigation's conclusions. Defendant Allbritton stated that Plaintiff's land acknowledgment statement "created an immediate and significant disruption to the University teaching environment." Dkt. # 46 at 23. The committee reached their conclusions "based on multiple interviews with directly

affected parties … and on review of contemporaneous documents and [Reges's] public statements[.]"  Dkt. # 50 at 10 (quoting Dkt. # 51 at 10–11).  Despite these conclusions, Defendant Allbritton "decline[d] to impose any sanction[.]"  Dkt. # 51 at 14.  Defendant Allbritton explained,

> This forbearance is because, while your actions have been rationally viewed by many in the community, including students and faculty, to be intended as a political stunt in an effort at self aggrandizement, I will not at this time fully discount your assertion that your actions were intended to generate discussion, rather than merely to denigrate members of the community and cause disruption to garner attention for yourself. It is clear, though, that your land acknowledgment statement has, in fact, caused significant disruption and will likely continue to do so when included in a purely academic setting, such as on a syllabus or in connection with the teaching of computer science courses. And there can be no question that you are now fully aware of that disruption. As a result, if you include this statement in the future, and if that inclusion leads to further disruption, I will have no option but to conclude that your intent is to cause deliberate offense and further that disruption, and view that as an intentional violation of Executive Order 31, as well as Section 24-33 of the Faculty Code. In that event, the University will proceed with next steps in accordance with the Faculty Code. You are, of course, free to continue to express your political views (including by publicizing your land acknowledgment statement) in other ways and in other venues that are not disruptive to the academic mission of the University, as you have done in the past.

*Id.* at 14–15.  At the investigation's conclusion, Plaintiff's merit pay, which "ha[d] been automatically held in abeyance pending th[e] investigation in accordance to University policy, [was] reinstated and [Plaintiff] receive[d] merit for AY 2021-22 and AY 2022-23."  *Id.* at 14.

Plaintiff filed his amended complaint on August 2, 2023.  Dkt. # 46.  Defendants moved to dismiss for failure to state a claim.  Dkt. # 50.  While that motion was pending, the parties continued with discovery and then cross-moved for summary judgment on all claims.  Dkt. ## 60, 64.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 10

1
2

### III

### DISCUSSION

3

A.    Motion to Dismiss

4
5

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss a cause of action

6

for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When

7

considering a motion to dismiss under Rule 12(b)(6), a court must construe the complaint in the

8

light most favorable to the nonmoving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,

9

416 F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pleaded facts as true and draw

10

all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys.,*

11

*Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). But courts are not required "to accept as true allegations

12

that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."

13

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on*

14

*denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001). "To survive a motion to dismiss, a complaint

15

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

16

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

17

550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual

18

content that allows the court to draw the reasonable inference that the defendant is liable for the

19

misconduct alleged." *Iqbal*, 556 U.S. at 677–78.

20

1.    Plaintiff states a Section 1983 claim for First Amendment retaliation

21

"In order to state a claim against a government employer for violation of the First

22

Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the

23
24

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 11

1   employer took 'adverse employment action';[8] and (3) that his or her speech was a 'substantial or

2   motivating' factor for the adverse employment action." *Coszalter v. City of Salem*, 320 F.3d

3   968, 973 (9th Cir. 2003); *see also Hodge v. Antelope Valley Cmty. Coll. Dist.*, No. CV 12–780

4   PSG (Ex), 2014 WL 12776507, at *5 (C.D. Cal. Feb. 14, 2014) (along with showing they

5   engaged in protected speech, the Ninth Circuit requires a public employee to show that the

6   government took adverse employment action and that the speech was a substantial or motivating

7   factor in the adverse action.).

8       In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make

9   statements pursuant to their official duties, the employees are not speaking as citizens for First

10  Amendment purposes, and the Constitution does not insulate their communications from

11  employer discipline."  547 U.S. 410, 421 (2006).  But the Supreme Court acknowledged that

12

13       there is some argument that expression related to academic scholarship or
         classroom instruction implicates additional constitutional interests that are not fully
14       accounted for by this Court's customary employee-speech jurisprudence. We need
         not, and for that reason do not, decide whether the analysis we conduct today would
15       apply in the same manner to a case involving speech related to scholarship or
         teaching.

16  *Id.* at 425.

17       The Ninth Circuit then held in *Demers v. Austin* that "*Garcetti* does not apply to 'speech

18  related to scholarship or teaching.' . . . Rather, such speech is governed by *Pickering v. Board of*

19  *Education*[.]"  746 F.3d 402, 406 (9th Cir. 2014).

20

21

22

23       [8] Defendants note correctly that Plaintiff must establish that he suffered an adverse employment
    action (AEA) to adequately plead a First Amendment retaliation claim.  Dkt. # 50 at 11.  But Defendants
    do not address the legitimacy of the various alleged AEAs.  Dkt. # 50 at 19.  Thus, this order does not
24  analyze the issue.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 12

Defendants argue first that Plaintiff did not speak "as a citizen" and so, under *Garcetti*, his speech is not constitutionally protected.  Dkt. # 50 at 12.  To support this argument, Defendants say that Plaintiff's speech was not "related to scholarship or teaching" and thus not protected under *Demers*, 746 F.3d at 402.  Dkt. # 50 at 12.  Next, Defendants argue that even if, under *Demers*, Plaintiff's speech related to scholarship or teaching, he cannot satisfy the *Pickering* balancing test that applies to such speech.  Dkt. # 50 at 16–20.

　　　　　a.　　Plaintiff's speech related to scholarship or teaching

The Court must determine whether Plaintiff's speech "related to scholarship or teaching." *Demers*, 746 F.3d at 406.  Defendants assert that Plaintiff's own acknowledgment statement was not "speech related to scholarship or teaching" and instead was a "statement[] [made] pursuant to [his] official duties" and therefore governed by *Garcetti*.  Dkt. # 50 at 12.  Defendants cite two out-of-circuit, pre-*Demers* cases to support this assertion: *Abcarian v. McDonald*, 617 F.3d 931, 938 n.5 (7th Cir. 2010) and *Adams v. Trustees of the University of North Carolina-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011).  Dkt. # 50 at 12–13.  The Court does not see either as particularly apt here.

Defendants cite *Abcarian* for a proposition that the case opinion includes in a footnote, which says,

> We also reject [Plaintiff's] unsupported assertion that his speech could be considered "expression related to academic scholarship or classroom instruction" possible exempt from *Garcetti*. *See* 547 U.S. at 425, 126 S.Ct. 1951. [Plaintiff's] speech involved administrative policies that were much more prosaic than would be covered by principles of academic freedom.

617 F.3d at 938 n.5.  But this case does not instruct on how to determine what is academic speech.  And the facts were different.  There, the plaintiff "was Head of the Department of Surgery at the University of Illinois College of Medicine at Chicago and Service Chief of the

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 13

1

Department of Surgery of the University of Illinois Medical Center at Chicago." *Id.* at 934.  He

2

spoke as an administrator—not a teacher—on the subjects of "risk management, the fees charged

3

to physicians, and surgeon abuse of prescription medications, among other things[.]" *Id.* at 937.

4

      *Adams* is similarly inapposite.  The case does acknowledge that "[t]here may be instances

5

in which a public university faculty member's assigned duties include a specific role in declaring

6

or administering university policy, as opposed to scholarship or teaching [and] [i]n that

7

circumstance, *Garcetti* may apply to the specific instances of the faculty member's speech

8

carrying out those duties."  But there was no such instance in *Adams* and thus no decision on it.

9

640 F.3d at 563–64.

10

      Plaintiff, however, cites two out-of-circuit cases—with facts more like the facts here—

11

that apply the *Pickering* balancing test to the plaintiff-professor's speech: *Buchanan v.*

12

*Alexander*, 919 F.3d 847, 852–53 (5th Cir. 2019), *Meriwether v. Hartop*, 992 F.3d 492, 506–07

13

(6th Cir. 2021).  Dkt. # 52 at 25.

14

      In *Buchanan*, the plaintiff was a university professor who made comments in the

15

classroom that were, according to university administrators, "inappropriate, unwelcome, and a

16

direct violation of the University's Policy Statements on Sexual Harassment[.]"  919 F.3d at 851.

17

The Fifth Circuit explained that "[p]ublic university professors are public employees[,]" and thus

18

"[t]o establish a § 1983 claim for violation of the First Amendment right to free speech, they

19

must show that (1) they were disciplined or fired for speech that is a matter of public concern,

20

and (2) their interest in the speech outweighed the university's interest in regulating the

21

speech"—i.e., the *Pickering* balancing test.  *Id.* at 853.  It does not appear that whether *Pickering*

22

applied was disputed.

23

24

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 14

And in *Meriwether*, the Sixth Circuit also applied the *Pickering* balancing test to speech made by the plaintiff-professor in his classroom, including speech in a syllabus.  992 F.3d at 504–06.  There, a philosophy professor at a public college was disciplined for refusing, based on asserted religious views, to use a student's preferred pronouns in class.  *Id.* at 498–503.  The court held that "[b]y forbidding [plaintiff] from describing his views on gender identity even in his syllabus, Shawnee State silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion[,]" *id.* at 506, and explained that it must apply the "*Pickering-Connick* framework to determine whether Meriwether has plausibly alleged that his in-class speech was protected by the First Amendment[,]" *id.* at 507.

Defendants then argue that Reges's statement was made in a "University-sanctioned document" "over which the University exercises specific oversight and approval."  Dkt. # 50 at 13.  They say that Plaintiff's alternate land acknowledgment statement "garbled" and "distorted" UW's message.  *Id.*  The "policy" in question was UW's policy of developing an inclusive environment and recruitment of a diverse student body, including increased recruitment of Native students, to the Allen School.  At oral argument, counsel for Defendants described the policy as "not limited to the recommended 'Indigenous Land Acknowledgment Statement.'"  Dkt. # 87 at 7.  Counsel explained that the suggested statement

> was produced as a part of a broader policy to create an inclusive and welcome learning environment for all students, including Native American students. And the Allen School, and the University more generally, have been concerned for a long time about increasing the number of Native American students at the University and in the Allen School and in helping them successfully complete the program.

*Id.*

Defendants liken Reges's speech, and the context in which it was made, to the speech at issue in *Downs v. Los Angeles Unified School District*, 228 F.3d 1003 (9th Cir. 2000), and

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 15

*Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), two cases that preceded *Demers*. Dkt. # 50 at 14.

In *Downs*, the Los Angeles Unified School District issued a memorandum titled "Gay and Lesbian Awareness Month" (Memorandum No. 11) that designated the month of "June of each year as 'a time to focus on gay and lesbian issues.'" 228 F.3d at 1005. This was done "to support 'Educating for Diversity.'" *Id.* Some staff members at a high school in the district "created a bulletin board inside the school building on which faculty and staff could post materials related to Gay and Lesbian Awareness Month[.]" *Id.* at 1006. Plaintiff, a teacher, who objected to recognition of Gay and Lesbian Awareness Month, placed his own bulletin board across the hall and posted anti-LGBTQ items such as quotes from the Book of Leviticus, anti-sodomy laws, and statistics on beliefs on the morality of "homosexuality." *Id.* at 1007. Multiple faculty members complained about these materials, which were ultimately removed as inconsistent with the purpose of Memorandum No. 11. *Id.* Plaintiff claimed a violation of his First Amendment rights.

The Ninth Circuit concluded that plaintiff's speech constituted government speech in a nonpublic forum. 228 F.3d at 1012. It explained that "[w]hen the government is formulating and conveying its message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by its individual messengers." *Id.* at 1013–14 (internal quotation marks and citation omitted). The policy in that case—Memorandum No. 11— "made clear that it was 'the District's multicultural and human relations education policy' to 'Educat[e] for Diversity,' and that this included the expectation that all students would be given equal access to a quality education and the academic and social activities of the school." *Id.* at 1014.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

In *Johnson*, the Ninth Circuit addressed a similar situation in which a high school calculus teacher, who was ordered to remove religious banners in his classroom, brought First Amendment claims.  658 F.3d at 960.  The Ninth Circuit, in reversing the district court's conclusion that the school district violated plaintiff's constitutional rights, explained that "it would consider whether Poway's actions ran afoul of the sequential five-step *Pickering*-based test[9] we adopted in *Eng v. Cooley*, 552 F.3d 1062, 1070–72 (9th Cir. 2009)."  *Id.* at 961.

The pertinent issue in *Johnson* was whether the plaintiff spoke as a private citizen or as a public employee—step two of *Eng*.  The Ninth Circuit held that plaintiff "clear[ly] . . . spoke as an employee."  *Id.* at 967.  It explained,

> Johnson did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee. *Cf.* [*Garcetti*], 547 U.S. at 422, 126 S.Ct. 1951. . . . Similarly, Johnson did not act as an ordinary citizen when "espousing God as opposed to no God" in his classroom. . . . *Mayer* [*v. Monroe County Community School Corp.*], 474 F.3d [477,] 479–80 [(7th Cir. 2007)] ("The Constitution does not entitle teachers to present personal views to *captive audiences* against the instructions of elected officials.")[.]

*Id.* (emphasis added).

*Downs* and *Johnson* concern speech by high school teachers, not college faculty.  This distinction appears to make a legal difference.

Notably, both decisions precede *Demers*, which clarifies that "*Garcetti* does not apply to 'speech related to scholarship or teaching.' . . . Rather, such speech is governed by *Pickering v.*

---

[9] This "sequential five-step" test includes: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech."  *Johnson*, 658 F.3d at 961 (quoting *Eng*, 552 F.3d at 1070).

1

*Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." *Demers*, 746 F.3d at

2

406.

3

Next, in *Johnson*, the Ninth Circuit observed that *Garcetti's* "'academic freedom' carve-

4

out, 547 U.S. at 425, 126 S.Ct. 1951, applied to teachers at 'public colleges and universities,' . . .,

5

not primary and secondary school teachers." 658 F.3d at 966 n.12.

6

And even two years before *Demers*, another court in this circuit recognized the

7

"academic freedom" carve out as applying to "public colleges and universities." *Lopez v. Fresno*

8

*City Coll.*, No. 1:11-CV-01468 AWI, 2012 WL 844911, at *8 (E.D. Cal. Mar. 12, 2012). In

9

*Lopez*, the Eastern District of California addressed a college professor's First Amendment

10

retaliation claim on a motion to dismiss. *Id.* at *7. The professor had made allegedly

11

discriminatory and harmful statements in the classroom, which resulted in the university limiting

12

his speech. *Id.* at *1. In denying the defendants' motion to dismiss on this point, the court

13

explained that,

14

15

16

17

18

19

> [t]he Ninth Circuit has applied the [*Garcetti*] analysis (the second step of the five-step *Eng* test) in a case involving a secondary school teacher, noting that the academic freedom carve-out contemplated by [*Garcetti*] concerned the applicability of the decision to teachers at "public colleges and universities." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 n. 12 (9th Cir.2011) . . . Because both the Supreme Court and the Ninth Circuit have expressed concerns about applying the [*Garcetti*] analysis to a teacher in Plaintiff's position, the Court will not apply the second step of the *Eng* test, which requires Plaintiff to show he spoke as a private citizen and not a public employee.

20

*Id.* at *8.

21

Finally, a case cited in *Johnson* suggests that its analysis is specific to the secondary

22

school situation. *Johnson*, 658 F.3d at 967 (citing *Mayer*, 474 F.3d at 479–80). In *Mayer*, the

23

court explained "[t]he Constitution does not entitle teachers to present personal views to captive

24

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 18

audiences against the instructions of elected officials."  474 F.3d at 479–80.  And a later Ninth

Circuit case also suggests that *Johnson* was limited to the secondary school situation:

> [*Johnson*] held that, "because of the position of trust and authority they hold and
> the impressionable young minds with which they interact, teachers necessarily act
> as teachers ... when at school or a school function, in the general presence of
> students, in a capacity one might reasonably view as official." [*Johnson*], 658 F.3d
> at 968. . . . [*Johnson*] focused on the "impressionable and captive minds" to whom
> the employees at issue espoused their views.

*Greisen v. Hanken*, 925 F.3d 1097, 1112 (9th Cir. 2019).

For these reasons, the Court sees *Downs* and *Johnson* as distinguishable concludes that

Plaintiff's speech was "related to scholarship or teaching" and is thus governed by *Pickering*.

*Demers*, 746 F.3d at 406.

   b.   *Pickering* two-step test

The first step in *Pickering* "is to determine whether [the speech] addressed a matter of

public concern."  *Demers*, 746 F.3d at 415.  The second step requires a court to consider whether

"the interest of the State, as an employer, in promoting the efficiency of the public services it

performs through its employees" outweighs "the interests of the teacher, as a citizen, in comment

upon matters of public concern."  *Pickering*, 391 U.S. at 568.

   (1)   Plaintiff's speech involved a matter of public concern

"Speech involves a matter of public concern when it can fairly be considered to relate to

any matter of political, social, or other concern to the community."  *Demers*, 746 F.3d at 415.

"Public interest is defined broadly," and the Ninth Circuit has "adopted a liberal construction of

what an issue of public concern is under the First Amendment."  *Id.* (internal quotation marks

omitted).

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 19

1    Plaintiff argues that his speech "presents a view on a social and political issue, a matter of

2    public concern at UW and beyond: indigenous land acknowledgments and their meaning,

3    purpose, appropriateness, effectiveness, or utility." Dkt. # 52 at 28. Defendants do not contest

4    this point in their briefing. The Court agrees with Plaintiff and concludes that he spoke on a

5    matter of public concern.

6                    (2)    The Court cannot employ the balancing test at this stage

7

8        "Once a plaintiff shows that his or her statements were of public concern, the burden

9    shifts to the defendant to show that, under the *Pickering* balancing test, its legitimate

10   administrative interests in regulating the speech outweigh the plaintiff's First Amendment

11   rights." *Hodge*, 2014 WL 12776507, at *9 (citing *Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir.

12   2001). The standard the Court must employ for this balancing test is explained in detail below.

13   *Infra* section III.B.1.

14       "Because of the inherently fact-intensive nature of this inquiry, the Court can rarely

15   perform the *Pickering* balancing on a motion to dismiss." *Guadalupe Police Officer's Ass'n v.

16   City of Guadalupe*, No. CV 10–8061 GAF (FFMx), 2011 WL 13217672, at *10 (C.D. Cal. June

17   8, 2011) (citing *Decotiis v. Whittemore*, 635 F.3d 22, 35 n.15 (1st Cir. 2011) (noting that 'the

18   *Pickering* balancing test … does not easily lend itself to dismissal on a Rule 12(b)(6) motion'));

19   *see also Montclair Police Officers' Ass'n v. City of Montclair*, No. CV 12-6444 PSG (PLAx),

20   2012 WL 12888427, at *7 (C.D. Cal. Oct. 24, 2012) ("[I]n the context of a motion to dismiss, the

21   [c]ourt rarely performs the *Pickering* analysis because of the fact-intensive nature of the inquiry.

22   . . Plaintiffs have met their burden as to establishing that the speech in question is protected

23   based on the pleadings; whether the government can establish that the restriction is justified

24   based on *Pickering* is not appropriately decided on a motion to dismiss."). Thus, taking

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 20

Plaintiff's well-pleaded facts as true, as the Court must at this stage, it cannot find that Plaintiff has failed to plead a Section 1983 claim for First Amendment retaliation.

  2.  Plaintiff states a claim for viewpoint discrimination

  As for Plaintiff's viewpoint discrimination claim, Defendants first say that it "is not viable separate from [his] retaliation claims" (citing *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642 (9th Cir. 2006)).  Dkt. # 50 at 20.  Second, Defendants contend Plaintiff's "speech constituted government speech that the University was entitled to regulate."  *Id.*  But above, this order rejects this second contention.  *Supra* section III.A.1.a.

  As for the first ground, Plaintiff interprets *Berry* as concluding that the *Pickering* balancing test must be used "'regardless of the reason an employee believes his or her speech is constitutionally protected.' [*Berry*, 447 F.3d at 650]."  Dkt. # 52 at 22–23.  And based on this understanding he says that "[n]othing in *Berry* precludes Reges from bringing his standalone claim for viewpoint discrimination."  *Id.* at 23.

  But the Court does not read Defendants' argument to claim that Plaintiff cannot bring a standalone viewpoint discrimination claim.  Defendants state that Plaintiff's viewpoint discrimination claim is not "*viable* separate from [his] retaliation claims[,]"  Dkt. # 50 at 20 (emphasis added), because the *Pickering* balancing test, which applies to both of Plaintiff's First Amendment claims, yields the same result as to both.

  The parties do not appear to disagree that *Berry* holds that the *Pickering* balancing test applies to both a First Amendment retaliation claim and a viewpoint discrimination claim brought in the government employment context.  And the Court reads *Berry* the same way.  447 F.3d at 650; *see also Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1293–94 (N.D. Ga. 2017)

("The Court finds that *Pickering* is the appropriate test to assess Plaintiff's viewpoint discrimination claim. This balancing appropriately acknowledges the City's unique position as an employer in its firing decision, and it appropriately balances the employee's interest with that of the employer.").

While the Court concludes that Plaintiff's First Amendment viewpoint discrimination claim is subject to the *Pickering* balancing test, as explained above, it cannot conduct the balancing test at the motion to dismiss stage and thus cannot dismiss the claim on Rule 12(b)(6) grounds.

       3.      Executive Order 31 is not facially overbroad

Plaintiff challenges EO 31 as facially overbroad, Dkt. # 46 at 35, and Defendants move to dismiss this claim, Dkt. # 50 at 22.  EO 31 is titled, "Nondiscrimination and Affirmative Action." EO 31.  It provides, in relevant part,

> The University of Washington, as an institution established and maintained by the people of the state, is committed to providing equality of opportunity and an environment that fosters respect for all members of the University community. *This policy has the goal* of promoting an environment that is free of discrimination, harassment, and retaliation. *To facilitate that goal*, the University retains the authority to discipline or take appropriate corrective action for any conduct that is deemed unacceptable or inappropriate, regardless of whether the conduct rises to the level of unlawful discrimination, harassment, or retaliation.

EO 31, *supra* note 7 (emphasis added).  The policy provides definitions for "discrimination," "harassment," "retaliation," and "sexual harassment" and states that "[t]erms used in this policy are intended to have the meaning given to them by applicable federal or state laws and regulations." *Id.*

Plaintiff alleges that EO 31 is facially overbroad because "the prohibition on 'unacceptable' and 'inappropriate' expression covers a broad universe of constitutionally

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 22

protected expression judged in relation to its *legitimate* sweep—actionable harassment or retaliation, as properly legally defined." Dkt. # 46 at 27 (emphasis in original).  Plaintiff argues that,

> the policy would support discipline against a student or faculty member who, during a meeting, made a single offhand remark deemed "inappropriate," even if the remark was not harassing, discriminatory, or targeted at any individual.  It would also support discipline against a student or faculty member who posted an "unacceptable" tweet criticizing the university president or another official for their position on a public issue.

*Id.* at 35–36.  While recognizing that "discrimination, harassment, and retaliation, as properly defined by law," are unprotected by the First Amendment, *Id.* at 36 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999)), Plaintiff asserts that "by permitting 'discipline' and 'corrective action' against those whose speech University administrators deem 'unacceptable' or 'inappropriate,' even when it does not meet the legal definition of discrimination, harassment, or retaliation, Executive Order 31 permits a broad range of unconstitutional applications in violation of the First Amendment[.]"  *Id.* at 36.

Defendants move to dismiss the overbreadth claim on three grounds:

> First, construing the Order shows that its language aims at conduct akin to discrimination, harassment, or retaliation—not protected speech. Second, even the applications of the Order that may restrict expression are permissible under the *Pickering* balance discussed above, which also governs overbreadth challenges in the public-employment context. And third, the Supreme Court and other courts have repeatedly blessed regulations like the Order.

Dkt. # 50 at 22.[10]

---

[10] Defendants say that the *Pickering* balancing test applies to the facial overbreadth challenge.  In *Hernandez v. City of Phoenix* the Ninth Circuit held that, when analyzing overbreadth challenges in the "public employment context," the court "appl[ies] a modified *Pickering* balancing analysis that closely tracks the test used for First Amendment retaliation claims."  43 F.4th 966, 980 (9th Cir. 2022).  But that case does not concern a college or university policy.  The Court cannot find, and Defendants do not cite,

1

2

Plaintiff responds by seeking to illustrate the "'substantial number' of applications to protected speech relative to its legitimate sweep[,]" stating that administrators could,

3

4

5

6

7

> "discipline or take appropriate corrective action" against a member of the UW community who—to draw from a few real-world examples—hosts a drag show, delivers a provocative but attention-grabbing lecture on syllabus day, or discusses with students the use-mention distinction for racial slurs. Administrators could punish professors who place "Black Lives Matter" or "Blue Lives Matter" stickers, or any other conceivable political message, on their office doors because the words "inappropriate" and "offensive" have only the meaning that the beholder ascribes to them.

8

Dkt. # 52 at 37–38.

9

10

11

12

13

Second, Plaintiff states that courts routinely declare higher education policies similar to EO 31 as constitutionally overbroad.  Dkt. # 52 at 38 (citing *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 250, 252 (3d Cir. 2010); *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008); and *Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005 (N.D. Cal. 2007)).

14

15

16

17

Third, Plaintiff argues that because the policy's "legitimate sweep—preventing discriminatory harassment—is already addressed by other applicable policies[,]" and because EO 31 applies "regardless of whether the conduct arises to the level of unlawful discrimination, harassment, or retaliation[,]" EO 31 is "effectively limitless" in its applications.  Dkt. # 52 at 39.

18

19

20

21

"Under the substantial overbreadth doctrine, a statute or regulation may be facially invalid under the First Amendment if there is a realistic danger that it will significantly compromise recognized First Amendment protections of parties not before the Court."  *O'Brien*

22

23

24

any case in which this approach was applied in the college or university context.  The Court hesitates to follow this approach without express direction from the Ninth Circuit or the Supreme Court.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 24

*v. Welty*, 818 F.3d 920, 929–30 (9th Cir. 2016) (internal quotation marks and citation omitted).[11] "Substantial overbreadth exists if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Flores v. Bennet*, 635 F. Supp. 3d 1020, 1037–38 (E.D. Cal. 2022), *aff'd* No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) (internal quotation marks omitted).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Stevens*, 559 U.S. 460, 474 (2010); *see also Arce v. Douglas*, 793 F.3d 968, 984 (9th Cir. 2015).  When construing a statute, policy, or law, the Court looks to the state's own rules of statutory construction.  *See, e.g.*, *Arce*, 793 F.3d at 984 (with an Arizona statute at issue, the court applied that state's rules of statutory construction).  In Washington, when "interpreting statutory terms, a court should take into consideration the meaning naturally attaching to them from the context, and [ ] adopt the sense of the words which best harmonizes with the context." *State v. Roggenkamp*, 153 Wash. 2d 614, 613, 106 P.3d 196 (2005) (internal quotation marks and citations omitted).  Challenged terms must be read within the context they are used.  *See, e.g.*, *O'Brien*, 818 F.3d at 930 ("In the challenged regulation before us, the terms 'harassment' and 'intimidation' do not stand on their own. [The regulation] prohibits only 'harassment' or 'intimidation' that threatens or endangers the health or safety of another in the university community.").

Once construed, the court must determine "whether the statute, as [it has been] construed [], [pen]alizes a substantial amount of protected expressive activity." *United States v. Williams*, 553 U.S. 285, 297 (2008).  A facial overbreadth determination is "strong medicine" and thus

---

[11] The parties do not dispute that the substantial overbreadth doctrine applies to EO 31.

"has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). But a court is "not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance" when considering a party's limiting construction. *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998).

In EO 31, the terms "inappropriate" and "unacceptable" do not stand on their own—rather, the order provides that, to "facilitate [the] goal" of "promoting an environment that is free of discrimination, harassment, and retaliation" all "unacceptable" or "inappropriate" conduct may be addressed. Thus, EO 31 ties the terms "inappropriate" and "unacceptable" to discriminatory, harassing, or retaliatory conduct.

The terms "unacceptable" and "inappropriate" do not allow "unfettered discretion" to administrators. As argued by Defendants, per the terms of EO 31, the conduct at issue must "resemble" discrimination, harassment, or retaliation, even if not unlawful under employment laws. Dkt. # 50 at 24.

Given the stated goal of the policy, and the context in which challenged terms reside, the Court agrees with Defendants' limiting construction of the EO applying to speech that "resemble[s]" discrimination, harassment, or retaliation, even if not unlawful under employment laws. Dkt. # 50 at 24. *See Broadrick*, 413 U.S. at 613.

And EO 31 Section 4: Definitions, states that "terms in this policy are intended to have the meaning given to them by applicable federal or state laws and regulations." EO 31, *supra* note 7. Thus, because the terms "discrimination," "harassment," and "retaliation" are defined, EO 31 provides fair notice of what conduct may be considered "inappropriate" or

"unacceptable." *See, e.g.*, *Corlett v. Oakland Univ. Bd. of Trustees*, 958 F. Supp. 2d 795, 801, 811 (E.D. Mich. 2013) (holds a university regulation that barred anyone from "intimidat[ing], harass[ing], threaten[ing] or assault[ing] any person engaged in lawful activities on campus" was not facially overbroad; explains that because "the terms 'intimidate', 'harass', 'threaten', and 'assault' each have 'long-established legal definitions[,]'" the regulation does not 'sweep within its ambit a substantial amount of [constitutionally] protected speech,' and provides fair notice of what conduct is prohibited thereunder.").

Plaintiff cites three cases on this issue: *McCauley*, 618 F.3d at 232; *DeJohn*, 537 F.3d at 301; and *College Republicans at San Francisco State University*, 523 F. Supp. 2d at 1005. They do not yield a different conclusion here.

In *McCauley*, the Third Circuit considered whether several paragraphs in a "Student Code of Conduct" at a university were facially overbroad. 618 F.3d at 237. At issue was a provision that outlined "Misbehavior at Sports Events, Concerts, and Social-Cultural Events," which included "[d]isplaying in the Field House, softball field, soccer field, cafeteria and [Arts center] any unauthorized or obscene, *offensive* or obstructive sign." *Id.* at 248 (emphasis added). The court held that the term "offensive" is, "on its face, sufficiently broad and subjective that [it] could conceivably be applies to cover any speech … th[at] offends someone." *Id.* at 248–49. It explained that "absent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work [or study]—[the provision] provides to shelter for core protected speech." *Id.* (internal quotation marks and citation omitted).

Unlike the challenged provisions in *McCauley*, EO 31 *does* include a "requirement akin to a showing of severity or pervasiveness." EO 31 requires conduct to be "sufficiently severe,

persistent, or pervasive[.]"  EO 31, *supra* note 7.  And it explains that "harassment" for purposes of this anti-harassment policy includes any conduct that "could reasonably be expected to create an intimidating, hostile, or offensive work or learning environment" or conduct that "has the purpose or effect of unreasonably interfering with an individual's work or academic performance."  *Id.*

In *DeJohn*, the Third Circuit addressed a sexual harassment policy that provided, in relevant part: "all forms of sexual harassment are prohibited, including ... expressive, visual, or physical conduct of a sexual or gender-motivated nature, when ... (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment."  537 F.3d at 305.  Considering the plaintiff's facial overbreadth challenge, the court explained that

> the policy's use of hostile, offensive, and gender-motivated is, on its face,
> sufficiently broad and subjective that they could conceivably be applied to cover
> any speech of a gender-motivated nature the content of which offends someone. . .
> . Absent any requirement akin to a showing of severity or pervasiveness—that is, a
> requirement that the conduct objectively and subjectively creates a hostile
> environment or substantially interferes with an individual's work—the policy
> provides no shelter for core protected speech.

*Id.* at 317–318 (internal quotation marks and citations omitted).  Again, EO 31 does include a requirement "akin to a showing of severity or pervasiveness[.]"  *Id.*  In its definition of "sexual harassment," EO 31 addresses "[u]nwelcome and unsolicited language or conduct that is of a sexual nature and that is sufficiently severe, persistent, or pervasive that it could reasonably be expected to create an intimidating, hostile, or offensive working or learning environment[.]"  EO 31, *supra* note 7.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 28

Finally, *College Republicans at San Francisco State University* involved a challenge to a provision in a university's "Standards of Student Conduct." 523 F. Supp. 2d at 1010. A provision under "unacceptable student behaviors" prohibited "[c]onduct that threatens or endangers the health or safety of any person within or related to the University community, including physical abuse, threats, intimidation, harassment, or sexual misconduct." *Id.* The plaintiff argued that the terms "intimidation" and "harassment" made the provision overbroad. *Id.* at 1013. The court concluded,

> Standing alone, the terms "intimidation" and "harassment" are not clearly self-limiting and could be understood, reasonably, to proscribe at least some expressive activity that would be protected by the First Amendment. These challenged words, however, do not stand alone. They appear in a specific context. Plaintiffs argue that that context cannot be understood, reasonably, as limiting or qualifying the reach of these terms and, therefore, that the court must analyze each of them as if it appeared in isolation, as an independent, unqualified proscription. Because this argument is vulnerable to apparently fatal counter-points, we cannot base issuance of a preliminary injunction on it. . . . In other words, the structure of the challenged provision, viewed as a whole, suggests that it was not intended to proscribe "intimidation" or "harassment" in whatever form "intimidation" or "harassment" might take, but only the sub-category of intimidation or harassment that "threatens or endangers the health or safety of any person."

*Id.* at 1021–22. Here, as explained above, the challenged terms and phrases, when read in context, apply not to *any* conduct but to conduct that resembles or is akin to discriminatory, harassing, or retaliatory conduct. Thus, this case supports Defendants' position.

Finally, in his motion for summary judgment, Plaintiff summarizes *Flores*, 635 F. Supp. 3d at 1020, *aff'd,* 2023 WL 4946605. This case is about a community college district's policy regulating student posters. The policy guidelines stated that "[p]osters with inappropriate or offense language or themes are not permitted and will not be approved." *Id.* at 1028. The plaintiffs argued that the use of the terms "inappropriate" and "offense" rendered the guidelines facially overbroad because a "substantial number of the policy's application prohibit

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 29

1   constitutionally protected speech." *Id.* at 1037.  The Ninth Circuit explained that "what is

2   'inappropriate' or 'offensive' is a subjective determination, which would vary based on a college

3   administrator's personal beliefs."  2023 WL 4946605, at *2.  But unlike the policy in *Flores*,

4   which simply banned "inappropriate" speech, with no specification of what may constitute

5   "inappropriate" (or "offensive"), EO 31 is tied to discriminatory, harassing, and retaliatory

6   conduct.  EO 31, *supra* note 7; *see also O'Brien*, 818 F.3d at 930 (holding that terms must be

7   read within the context they are used).

8          For these reasons, the Court concludes that EO 31 does not penalize a substantial amount

9   of protected expressive activity.

10         4.      Executive Order 31 is not facially vague

11         Defendants move to dismiss Plaintiff's facial vagueness challenge of EO 31.  Dkt. # 50 at

12  26–28.  Plaintiff alleges that because "unacceptable" and "inappropriate" "are undefined and

13  carry no reasonably objective plain meaning," they are "impermissibly vague."  Dkt. # 46 at 27.

14  Plaintiff states that EO 31 "is so vague that it authorizes arbitrary, capricious, and viewpoint-

15  discriminatory application, and fails to provide people of ordinary intelligence a reasonable

16  opportunity to understand what expression is 'unacceptable' or 'inappropriate.'"  *Id.* at 38.

17

18         Plaintiff asserts that EO 31 is facially vague for two reasons.  First, he says it "contains

19  no definition of 'unacceptable or inappropriate,' and those terms do not carry any reasonably

20  objective plain meaning" and thus "fails to provide members of the UW community with 'fair

21  warning' of what expression the policy prohibits."  Dkt. # 52 at 40.  Second, he says, "it fails to

22  provide 'explicit standards' to prevent 'arbitrary and discriminatory enforcement' by

23  administrators" because the use of the terms 'inappropriate' and 'unacceptable' may result in

24  "[d]ifferent administrators [ ] com[ing] to different conclusions as to whether the same speech

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 30

falls within those terms." *Id.* at 41.  And in response to Defendants' assertion that EO 31 applies only to conduct "resembling" discrimination, harassment, or retaliation, Dkt. # 50 at 20, he says, "It is impossible for any member of the UW community to predict what an administrator decides 'resembles' discrimination."  Dkt. # 52 at 41.

Defendants respond that "[b]ecause the Order, properly construed, addresses conduct like discrimination, harassment, or retaliation—even if the conduct falls short of what is unlawful and legally actionable—reasonable members of the University community are on notice of what sort of conduct is 'unacceptable' or 'inappropriate' under the Order."  Dkt. # 50 at 26.  They say, "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Dkt. # 50 at 26 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).[12]

"[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (internal quotation marks and citation omitted).  The vagueness doctrine carries two requirements.

> First, "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." . . .  Typically, all that is required to satisfy this due process concern is "fair notice" of the conduct a statute proscribes.

*Id.* at 664 (citations omitted).  "If it is clear what the challenged provisions proscribe in the vast majority of [their] intended applications, they cannot be deemed unconstitutionally vague on their face."  *Hernandez*, 43 F.4th at 982 (internal quotation marks and citation omitted) (alteration in original).  But "where [F]irst [A]mendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required[.]"  *Edge*, 929 F.3d at 664 (internal quotation

---

[12] The parties do not dispute that the vagueness doctrine applies to EO 31.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 31

marks and citation omitted).  "This enhanced standard protects against laws and regulations that

might have the effect of chilling protected speech or expression by discouraging participation."

*Id.* at 664–65.  But

> even when a law implicates First Amendment rights, the constitution must tolerate
> a certain amount of vagueness. . . . For the purposes of a facial attack on a statute
> or ordinance, a statute's vagueness exceeds constitutional limits if its deterrent
> effect on legitimate expression is … both real and substantial, and if the statute is
> [not] readily subject to a narrowing construction[.] . . . [S]peculation about possible
> vagueness in hypothetical situations not before the Court will not support a facial
> attack on a statute when it is surely valid in the vast majority of its intended
> applications.

*Tucson v. City of Seattle¸* 91 F.4th 1318, 1329 (9th Cir. 2024) (internal quotation marks and

citations omitted).  Moreover, "'otherwise imprecise terms may avoid vagueness problems when

used in combination with terms that provide sufficient clarity.'"  *Edge*, 929 F.3d at 664 (quoting

*Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005)).

       "The vagueness doctrine's second requirement aims to avoid 'arbitrary and

discriminatory enforcement,' and demands that laws 'provide explicit standards for those who

apply them.' *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294."  *Edge*, 929 F.3d at 665.  "Definitions of

proscribed conduct that rest wholly or principally on the subjective viewpoint of a law

enforcement officer run the risk of unconstitutional murkiness."  *Id.* at 666.

       Finally, the Supreme Court has made clear that there is "substantially more room for

imprecision in rules with only civil or employment consequences than would be tolerated in a

criminal code.  *See Arnett* [*v. Kennedy*], 416 U.S. [134,] 159 [(1974)][.]"  *Hiers v. Bd. Of*

*Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 WL 748502, at *20 (E.D. Tex.

Mar. 11, 2022).

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 32

1   As explained in the overbreadth section above, the terms "unacceptable" and

2   "inappropriate" do not stand on their own.  Read in context, the terms relate to conduct that is

3   discriminatory, harassing, or retaliatory as defined by EO 31.  *Supra* section III.A.3; *Edge*, 929

4   F.3d at 664 ("[O]therwise imprecise terms may avoid vagueness problems when used in

5   combination with terms that provide sufficient clarity."); *see also O'Brien*, 818 F.3d at 930

6   (Ninth Circuit explained that "[i]n the challenged regulation before us, the terms 'harassment'

7   and 'intimidation' do not stand on their own. [The regulation] prohibits only 'harassment' or

8   'intimidation' that threatens or endangers the health or safety of another in the university

9   community.").  Moreover, because EO 31 can be construed as covering speech "resembling" or

10  "akin" to discrimination, harassment, or retaliation, *supra* section III.A.3, which are each defined

11  in EO 31, the Court also does not find that it will be "impossible for any member of the UW

12  community to predict what an administrator decides 'resembles' discrimination."  Dkt. # 52 at

13  41.

14      For these reasons, the Court also rejects Plaintiff's vagueness challenge.[13]

---

20  [13] "'In dismissing for failure to state a claim, a district court should grant leave to amend even if
    no request to amend the pleading was made, unless it determines that the pleading could not possibly be
21  cured by the allegation of other facts.' *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (citation
    omitted)." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016).  A district court must grant leave to
22  amend unless one or more of these factors are present: (1) undue delay, (2) bad faith or dilatory motive,
    (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5)
23  futility of amendment.  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing
    *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Here, amendment would be futile.  This order bases its
24  analyses of the facial overbreadth and vagueness challenges on the terms of EO 31.  Amending the
    pleadings would not alter the Court's determination.  Plaintiff does not argue otherwise.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 33

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

B.      Cross Motions for Summary Judgment[14]

Summary judgment is proper if the evidence, viewed in the light most favorable to the

non-moving party, shows "that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  A fact is material if it might affect the outcome of the suit.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of showing "the absence of a genuine issue of

material fact."  *Celotex Corp.*, 477 U.S. at 323.  If that burden is met, the burden shifts to the

nonmoving party to show there is a genuine issue for trial.  *F.T.C. v. Stefanchik*, 559 F.3d 924,

927–28 (9th Cir. 2009).  When the nonmoving party fails "to make a sufficient showing on an

essential element of [their] case with respect to which [they] ha[ve] the burden of proof," "the

moving party is entitled to judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.  On

cross motions, a court must "evaluate each motion separately, giving the nonmoving party in

each instance the benefit of all reasonable inferences."  *A.C.L.U. of Nevada v. City of Las Vegas*,

466 F.3d 784, 790–91 (9th Cir. 2006); *Flores v. City of San Gabriel*, 824 F.3d 890, 897 (9th Cir.

2016); *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015)

("[W]hen simultaneous cross-motions for summary judgment on the same claim are before the

court, the court must consider the appropriate evidentiary material identified and submitted in

support of both motions, and in opposition to both motions, before ruling on each of them."

---

[14] Given the Court's rulings on Defendants' motion to dismiss, the only remaining issues at
summary judgment stage include Plaintiff's First Amendment retaliation claims and viewpoint
discrimination claims.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 34

1   (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th

2   Cir. 2001))).

3        At oral argument, the parties stated that there are no material facts in dispute and that the

4   Court should grant summary judgment for one side or the other.  Dkt. # 87 at 23–24, 25.

5        1.      Plaintiff's First Amendment retaliation claim

6        As explained above, "[i]n order to state a claim against a government employer for

7   violation of the First Amendment, an employee must show (1) that he or she engaged in

8   protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her

9   speech was a 'substantial or motivating' factor for the adverse employment action."  *Coszalter*,

10  320 F.3d at 973; *see also Hodge*, 2014 WL 12776507, at *5.

11

12       There is no genuine issue of material fact relating to whether Plaintiff's speech "related to

13  scholarship or teaching."  *See* Dkt. # 60; Dkt. # 64.  Thus, as noted above, such speech is

14  governed by *Pickering v. Board of Education.  Supra* section III.A.1.a.

15       As discussed above, the first step in *Pickering* "is to determine whether it addressed a

16  matter of public concern."  *Demers*, 746 F.3d at 415.  The second step requires a court to

17  consider whether "the interest of the State, as an employer, in promoting the efficiency of the

18  public services it performs through its employees" outweighs "the interests of the teacher, as a

19  citizen, in comment upon matters of public concern."  *Pickering*, 391 U.S. at 568.

20

21       As explained above, it does not appear that either side contests that Plaintiff's speech was

22  on a matter of public concern.  *Supra* section III.A.1.b.(1).  And the Court concludes that it did

23  address a matter of public concern.

24

1

2

3

4

5

6

7

8

9

10

"Once a plaintiff shows that his or her statements were of public concern, the burden shifts to the defendant to show that, under the *Pickering* balancing test, its legitimate administrative interests in regulating the speech outweigh the plaintiff's First Amendment rights." *Hodge*, 2014 WL 1277650, at *9 (citing *Bauer*, 261 F.3d at 784.  The balancing issue "'is one of law and a determination is to be made by the court.'" *Id.* (quoting *Cochran*, 222 F.3d at 1200)*.*  This involves "'a fact-sensitive and deferential weighing of the government's legitimate interests' as employer against the First Amendment rights of the employee." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 781 (9th Cir. 2022) (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022)).  Here, the balance tips in favor of Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

"'[P]romoting workplace efficiency and avoiding workplace disruption' is a valid government interest that can justify speech restrictions." *Id*.  (quoting *Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir. 2011)).  And "[w]hether speech disrupted the workplace is fact-specific and depends on the manner, time, and place in which the employee's speech took place." *Id.* (internal quotation marks and citation omitted); *see also Rankin v. McPherson*, 483 U.S. 378, 388 (1987) ("In performing the [*Pickering*] balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.").  The Supreme Court has explained that an employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of the working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. 138, 152 (1983).  Indeed, speech can be disruptive when "[there are] 'reasonable predictions of disruption in the workplace." *Dodge*, 56 F.4th at 782.

24

But the Supreme Court has cautioned that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick*, 461 U.S. at 152.

Disruption may be a valid government interest because it

"impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

*Dodge*, 56 F.4th at 782; *see also Rankin*, 483 U.S. at 388.

Defendants outline three categories of disruption.  Dkt. # 64 at 12–13; *see also* Dkt. # 77 at 18.  First, they say that "the disruption caused by Reges's actions interfered with University staff functions."  Dkt. at 77 at 18; *see also* Dkt. # 64 at 12.  Second, they say, "[t]eaching assistants also experienced the disruption Reges caused."  Dkt. # 77 at 19; *see also* Dkt. # 64 at 12.  Third, they say that Reges's statement "caused a disruption for his students and the University community generally."  Dkt. # 77 at 19; *see also* Dkt. # 64 at 12–13.

### a.      University staff functions

Defendants argue that Reges's actions "'impair[ed] … harmony among co-workers'" and "'interfere[d] with the regular operation of' the Allen School."  Dkt. # 77 at 19 (quoting *Rankin*, 483 U.S. at 388).  Defendants highlight that "Director Balazinska learned that staff were 'at a loss for how to best express their concern and frustration about this situation,' and worried about the effect on prospective students."  Dkt. # 77 at 18 (citing Dkt. # 66 at 26); *See also* Dkt. # 64 at 12 (also citing Dkt. # 66 at 26).  But the Ninth Circuit has recognized that "given the nature of academic life, especially at the college level, it [is] not necessary that [a faculty] and the administration enjoy a close working relationship requiring trust and respect[.]"  *Bauer v.*

1    *Sampson*, 261 F.3d 775, 785 (9th Cir. 2001); *see also Hodge*, 2014 WL 12776507, at *10 ("the

2    Court notes the Ninth Circuit's determination in *Bauer* that a 'close working relationship' is not

3    necessary at the university level.").

4        *Dodge* sheds additional light on this issue.  56 F.4th 767 (9th Cir. 2022).  The case

5    concerned a middle school teacher who wore a "Make America Great Again" cap at several

6    teacher-only trainings.  *Id.* at 772.  The principal contended that "her interest in preventing

7    disruption among the staff . . . outweighed [plaintiff's] right to free speech."  *Dodge*, 56 F.4th at

8    782.  The principal "point[ed] to evidence that teachers and staff felt 'intimidated,' 'shock[ed],'

9    'upset,' 'angry,' 'scared,' 'frustrated,' and 'didn't feel safe' after learning about" the teacher's

10   conduct.  *Id.*  The court, however, did not find evidence of emotional reactions to plaintiff's

11   conduct to show disruption of "'the regular operation' of the school[.]"  *Dodge*, 56 F.4th at 782

12   (quoting *Nunez v. Davis*, 169 F.3d 1222, 1229 (9th Cir. 1999)).

13       Given the case law on this point, evidence of co-workers "concern and frustration" about

14   Plaintiff's statement does not serve to tilt the balance in Defendants' favor.

15       But Defendants also highlight that "[t]he Allen School's recruiter for diversity and access

16   expressed frustration in a letter that Reges had undermined [their] function within the School,"

17   Dkt. # 64 at 12 (citing Dkt. # 66 at 31).  This letter was sent to Defendant Balazinska and states,

18   in part,

19

20       [M]y position was created around the goal of creating diverse classroom spaces that
         allow for rich discussion. The Allen School has explicitly stated goals of
21       incorporating indigenous ways of knowing into the curriculum. Additionally, with
         the creation of my position we are seeking to increase our recruitment of native
22       students. How am I supposed to recruit students into an environment where their
         history is questioned and their rights are denied? I do not feel comfortable bringing
23       students into a school where their introductory courses are taught in a way that is
         not conducive to learning. Mr. Reges's Land Acknowledgment Statement is
24       attributable to the university as it is being forced on students in a required course

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 38

taught by a faculty member that we are paying to teach there. If Mr. Reges is allowed to continue to teach, and to distribute his land acknowledgement statement in a paper form where students will be required to see it, the university is essentially supporting his believes and agreeing that they belong in an introductory computer science course.

Dkt. # 66 at 31.

Plaintiff argues that this letter presents a "speculative ill" that "cannot generate a government interest under *Pickering*." Dkt. # 75 at 30–31 (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 408–09 (4th Cir. 2016) (citing *Connick*, 461 U.S. at 152). But as explained above, an employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of the working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. And, as illustrated below, UW believed that Plaintiff's statement was indeed interfering with the learning of many students, including Native American students. *Infra* section III.B.1.c. For example, multiple Native American students expressed feelings of being targeted by the statement, and one felt compelled to drop out of UW. *Infra* section III.B.1.c. A goal of the Allen School is to increase recruitment of Native students. Dkt. # 66 at 31; Dkt. # 87 at 7 (Counsel explained that the suggested statement "was produced as a part of a broader policy to create an inclusive and welcome learning environment for all students, including Native American students. And the Allen School, and the University more generally, have been concerned for a long time about increasing the number of Native American students at the University and in the Allen School and in helping them successfully complete the program."). The school created the position of Recruiter for Diversity and Access in part to pursue this goal. Dkt. # 66 at 31. Thus, the Court concludes that this evidence shows that Plaintiff's statement interfered "with the regular operation of the enterprise." *Nunez*, 169 F.3d at 1228 (quoting *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891).

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 39

1

2          b.      Teaching assistants

3          Defendants point to an email sent to Defendant Balazinska from UAW 4121 union

representatives, representing CSE academic student employees (ASEs), expressing concerns

from teaching assistants who "no longer feel comfortable mentioning their own views on topics

related to land acknowledgements and DEI, for fear of retaliation from Stuart Reges."  Dkt. # 66

at 33.  The email says that the representatives "have heard from other ASEs whose feelings of

belonging in the Allen School have been negatively impacted by the fact that Stuart Reges's

behavior has been allowed to continue."  *Id.*[15]  In this same email, the UAW 4121

representatives expressed their view that Plaintiff's speech violated Article 20: Non-

Discrimination and Harassment of the collective bargaining agreement and that Plaintiff's speech

"goes against the Allen School's commitment to 'create an inclusive environment for people of

all backgrounds.'"  Dkt. # 66 at 33.  And they requested that UW "**take prompt action to**

**address this behavior, to align with both Article 20 of the contract and the Allen School's**

**stated commitment to Diversity, Equity, and Inclusion.**"  *Id.* at 34 (emphasis in original).[16]

Clearly, Plaintiff's speech caused disruption with respect to teaching assistants.

---

[15] Defendants also assert that, in a deposition, "Reges admit[ted] that some teaching assistants 'were offended' by his land acknowledgement, and that the situation damaged the cohesiveness of the teaching assistant program."  Dkt. # 77 at 19 (citing Dkt. # 65 at 124:7-14); *see also* Dkt. # 64 at 12 (also quoting Dkt. # 65 at 54).  But this portion of the deposition includes Reges's acknowledgment that the splitting of the class *and* the statement likely caused the disruption.

[16] Plaintiff argues that had this email been a "legitimate union grievance, they would have followed the process required by their contract.  *See UAW Academic Student (ASEs) Contract*, Univ. of Wash., § 4 https://hr.uw.edu/labor/academic-and-student-unions/uaw-ase/ase-contract (last visited Jan. 30, 2024) (describing grievance procedure with strict time limits and arbitration requirement)."  Dkt. # 80 at 16.  The Court disagrees and views the email as like a demand letter, raising the specter of a grievance if prompt action were not taken.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

c.   Students and UW community

Defendants assert that Reges's statement "had a 'detrimental impact' on the student-faculty relationship for which, 'confidence' is necessary."  Dkt. # 64 at 13 (citing *Rankin*, 483 U.S. at 388).

Defendants state that Plaintiff's statement went viral on Reddit.  Dkt. # 77 at 19 (citing Dkt. # 65 at 41, 45); *see also* Dkt. # 64 at 12 (also citing Dkt. # 65 at 41).  But this alone merely shows discussion of the statement outside the classroom.

Defendants also highlight that "Director Balazinska learned that at least one student in the class felt 'intimidated' and not 'welcome' in a required course for the major."  Dkt. # 77 at 19 (citing Dkt. # 66 at 15); *see also* Dkt. # 64 at 12 (also citing Dkt. # 66 at 15).  This complaint states,

> I am concerned about several things that have come to my attention on the first day of winter quarter as a student starting class with this professor. The main thing that drew my attention was the 'Indigenous Land Acknowledgment' section of the syllabus which starkly contradicts the university's land acknowledgment and seems to be purposefully contradictory of it. After further research, I have found an article written by professor Reges, titled 'Why Women Don't Code' which I honestly have not been able to fully read because it is very triggering. I am intimidated and already do not feel welcome in this class, nor do I feel like I will be supported and led to be successful in this required course for my major.

Dkt. # 66 at 15.

And Defendants emphasize that "[s]ix student members of the Allen School Diversity Committee complained."  Dkt. # 77 at 19 (citing Dkt. # 66 at 17–18); *see also* Dkt. #64 at 13 (also citing Dkt. # 66 at 17–18).  This complaint says,

> We are deeply concerned about this offensive language, and particularly so because it appears in the intro-to-CS course, where students, including those from under-represented indigenous communities, first encounter CS and the Allen School culture. We call for immediate removal of this bigoted statement and replacing it

with a statement acknowledging the right of ingenious [sic] people to the land taken from them through years of colonialism.

Dkt. # 66 at 17–18.  The complaint also explains that Plaintiff's statement

clearly contradicts the Allen School's promise for creating an inclusive environment. We are very disappointed by the School's inaction, especially because our requests and proposals for effective accountability mechanisms have been repeatedly dismissed. We believe lack of strict accountability is partly the reason that [Plaintiff] and others openly engage in harming other members of the community.

*Id.* at 18.

Defendants also explain that, because of Plaintiff's statement, "[a] Native student felt 'despised[.]'"  Dkt. # 77 at 19 (citing Dkt. # 66 at 20).  This includes two emails from students— one of whom was an Indigenous CS transfer student and the other from the student's friend, neither of whom were in Professor Reges's class.  Dkt. # 66 at 20.  The first email states,

I am native, queer, female-presenting individual, and let me tell you this whole incident has made me feel so directly despised and unsafe that I'm certain if I hadn't transferred in I wouldn't be at the Paul Allen school right now, and I hate that. . . . I'd like to do what I can to make sure no one else feels like I do right now ever again, nor give Stuart the opportunity to continue to make people like me, in any facet, feel the same way as he undoubtedly has been.

*Id.* at 20–21.  The second email states that Plaintiff's land acknowledgment statement "is deeply troubling to me as a student who looks to her chosen institution of higher education to be a space free from discrimination."  *Id.* at 21.  The email explains,

The statement itself and the placement within the syllabus are openly alienating of Indigenous students. A syllabus is one of the first things new students see when coming into a class – this syllabus sends a clear message that Indigenous students are not welcome in Professor Reges's classroom and that similar rhetoric disparaging of Indigenous peoples will be tolerated within a space where all students should be safe and respected.

*Id.*  This student continues by expressing that "such a statement gives me serious doubts as to his commitment to providing an equal playing field for all students" and

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 42

[c]ompounding this, Professor Reges wrote the greater portion of text and curriculum for CSE 143, a well-known filter course for Allen School admission which he frequently teaches. His rhetoric and frankly racist attitude within this setting pose a significant systemic barrier to the safety, equality, and education of Indigenous peoples within the Allen School.

*Id.* at 22.

Defendants also explain that "[o]ne Native American student fe[lt] compelled to drop out of the University" and "[m]ultiple Native American students express[ed] the view that the inclusion of the statement on [Plaintiff's] syllabus made them feel that they were being targeted in a manner that would disadvantage them in their education."[17]  Dkt. # 67 at 15.  And notes from a committee meeting state that another student felt Plaintiff was "'playing games with her education.'"  Dkt. # 69 at 5.  These notes also indicate that Professor Eric Schnapper described the level of disruption caused by Plaintiff's statement as "extraordinary."  *Id.*  Moreover, Defendants point to evidence that "[a] student opined that Reges's statement 'tarnishes the reputation of the Allen School.'"  Dkt. # 77 at 19 (quoting Dkt. # 66 at 17[18]); *see also* Dkt. # 64 at 13 (also quoting Dkt. # 66 at 17).

Finally, Defendants emphasize that 170 students out of around 500 students switched to the alternative class in Winter 2022, which started at eight o'clock in the morning.  Dkt. # 77 at

---

[17] Defendants cite Dkt. # 67 at 15 for the assertion that one Native student took a leave of absence as a result of Plaintiff's speech.  Plaintiff objects to this document on hearsay grounds.  The Court does not consider this evidence for the truth of the matter asserted— the leave of absence.  But the document— a letter from Defendant Allbritton to Plaintiff—is otherwise reflective of the University's understanding of disruption caused by Plaintiff's speech.

[18] This complaint was received through the Allen School's "Anonymous Student Feedback" system and states, "This sort of factually wrong, intentionally inflammatory, and trauma-mocking statement tarnishes the reputation of the Allen School. Departmental administration should address this statement, say that it is unacceptable, and work to make our climate actually a welcoming place for Indigenous student. This could include changing instruction personnel for this course. Having a professor like this, with a history of misogynistic and racist statements, and who places statements like this in their course policies, signals an environment in our department which I do not think aligns with our department's goals of being inclusive."

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 43

19 (citing Dkt. # 65 at 51; *see also* Dkt. # 64 at 13 (also citing Dkt. # 65 at 51); Dkt. # 75 at 31; Dkt. # 69 at 6.  Plaintiff counters that the "undisputed facts show only one of Reges's students expressed an intent to switch to the new section because she took offense to Reges's statement[.]" Dkt. # 75 at 31 (citing his own motion for summary judgment, Dkt. # 60, which cites Dkt. # 62-6 at 56[19]).  Plaintiff also argues that because UW failed to investigate why a student would want to switch to the alternative section, the number of students who switched cannot be used to support Defendants' argument of disruption.  Dkt. # 60 at 17 (citing Dkt. #62-24 at 22[20]).  Plaintiff argues that the evidence shows that UW received emails from students asking if the alternative section would "have more favorable testing, grading, and homework resubmission policies." *Id.* (citing Dkt. ## 62-22; 62-26 at 3; 62-24).  But the very evidence Plaintiff cites—an email thread including the professor teaching the alternative session and Defendant Balazinska—clarifies that, in the alternative section, there would not be a change in the grading system:

> I think having two offerings of CSE 143 with different grading systems provides too much incentive for students to switch for the wrong reasons. I think to keep things as straightforward as possible is to say we will be using a grading system consistent with the current offering of CSE 143. Maybe Magda or I could send a follow-up message clarifying that most grading details will be similar to the current offering of CSE 143?

Dkt. # 62-26 at 3.  A follow-up email was then sent to students.  *Id.* at 2.

---

[19] This document includes portions of Defendant Balzinska's deposition in which she stated that one student in the Winter Quarter told her she intended to drop the class because of Plaintiff's statement. Dkt. # 62-6 at 56.  Defendant Balazinska said that she "did not talk with other students" that same evening. *Id.* at 57.  She shared that in her "experience . . . even if there's one student who drops the class . . ., out of the size of the class, there's probably going to be other students." *Id.*

[20] This citation is to the deposition of Defendant Grossman, who testified that the UW did not inquire into why someone was switching to the alternative section: "Out of fairness, if we set up the alternate offering, we'll email everyone in the class and make it available, right? We're not going to – there's not going to be a – you know, a bar to clear or a box to check or a reason to give."

1    While offense alone does not amount to a legitimate interest to justify limiting speech,

2    mitigating interference with students' studies and ability to learn can be such an interest.

3    For example, in *Hodge*, the Central District of California addressed a First Amendment

4    retaliation claim brought by a professor.  2014 WL 12776507, at *4.  The case involved a

5    professor who taught emergency medical technology and prepared students for the National

6    Registry exam and to work in the field as first responders.  *Id.* at *1.  After the Dean of Health

7    Science at the school observed one of plaintiff's classes for a formal performance evaluation, she

8    reported that,

> [p]laintiff referred to various cultural practices, such as the eating of placentas from
> women who have just given birth, as 'weird' practices. . . . In describing other
> "weird" practices, Plaintiff incorrectly referred to the practice of "coining"—where
> heated coins are placed on the bodies of ill individuals in an attempt to heal them—
> as "burning." . . . Plaintiff also told his students, as he raised his hands over his
> head, wiggled his fingers, and spoke in a high-pitched voice, that they might
> encounter "witch stuff" in the field[.]

*Id.* at *2 (internal citations omitted).   The Dean prepared an observation report that stated,

"Plaintiff's 'tone, gestures and use of language was inappropriate and disrespectful to the cultural

beliefs of patients.'"  *Id.*  The report also mentioned that the plaintiff should use "'neutral tone,

gestures, and descriptive, respectful language when discussing cultural beliefs.'"

*Id.*  Additionally, the plaintiff received a "needs improvement" rating in the "sensitivity to

diversity" section of his Tenured Faculty Evaluation Report.  *Id.*  The court concluded that the

balance of interests weighed in plaintiff's favor.  *Id.* at *9–11.  The court explained that,

> Defendants have not proffered any convincing evidence that the speech *had any
> significant negative impact on Plaintiff's teaching or other professional
> responsibilities*. . . . While Defendants do present evidence of two students who
> dropped [p]laintiff's class in 2006, these events far preceded the incidents in
> question. . . . Moreover, none of the students in [p]laintiff's April 2010 class
> complained about his comments or conduct to Defendant[.] . . . Nor have these
> students complained that [p]laintiff's comments interfered with their ability to learn
> in the class.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 45

1

2

*Id.* at *10 (emphasis added).

3

4    By contrast, here, Defendants do present such evidence.  UW administrators received

5   reports of students, including Native students, feeling "unwelcome" and "intimidated" in the

6   course, feeling "despised," feeling "targeted," with one dropping out of school.  *See supra*

7   III.B.1.c.  And around 30% of students transferred to the alternate section.  *Id.*  Thus, unlike in

8   *Hodge*, Defendants have provided evidence of interference with students' "ability to learn in the

9   class."  *Hodge*, 2014 WL 12776507, at *10; *see also Dodge*, 56 F.4th at 783 (suggesting student

10   complaints may illustrate disruption when it pointed out that the plaintiff's expression did not

11   "cause any disruption to school" as "[n]o students or parents ever complained about [plaintiff's]

12   MAGA hat").

13

14    It is true that "'[t]he desire to maintain a sedate academic environment, to avoid the

15   discomfort and unpleasantness that always accompany an unpopular viewpoint,' is not an

16   interest sufficiently compelling . . . to justify limitations on a teacher's freedom to express"

17   themselves.  *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975).  But when a speaker's

18   statement "impedes the performance of the speaker's duties or interferes with the regular

19   operation of the enterprise[,]" the court may restrict said speech.  *Rankin*, 483 U.S at 388.

20

21    Here, Plaintiff's speech was made in the syllabus for an introductory computer science

22   introductory course, which is mandatory for certain majors in the Allen School.  Dkt. # 66 at 31;

23   *Rankin*, 483 U.S. at 388 (the court must consider the time, place, and manner in which the speech

24   took place.).  And Plaintiff was informed that he could have made his speech in various other

settings, including by including the acknowledgment next to his faculty office door, at the

bottom of his emails, and by discussing with colleagues—all of which he did with no limitation

by UW.  Dkt. # 65 at 25, 26, 43–44, and 46.  The evidence here indicates actual and reasonably

anticipated disruption of staff functions, teaching assistant cohesiveness, and students' learning

environment resulting from Plaintiff's own acknowledgment statement in the syllabus.  It

indicates that the statement interfered with the performance of Plaintiff's duties as an instructor.

Because "'promoting workplace efficiency and avoiding workplace disruption' is a valid

government interest that can justify speech restrictions," *Dodge*, 56 F.4th at 781, the Court

concludes Defendants' interests in mitigating disruption outweighs Plaintiff's interest here, *see*

*Pickering*, 391 U.S. at 568.[21]

> 2.      Plaintiff's viewpoint discrimination claim

As explained above, *supra* section III.A.2., Plaintiff's viewpoint discrimination claim

also undergoes the *Pickering* balancing test.  *See Berry*, 447 F.3d at 650; *Cochran*, 289 F. Supp.

3d at 1293–94.  Because the Court finds that Defendants' interests in mitigating disruption to

ensure the efficiency of the Allen School's operations outweighs Plaintiff's interests,

Defendant's viewpoint discrimination claim fails.

**IV**

**CONCLUSION**

For these reasons, the Court:

(1)      DENIES Defendants' motion to dismiss as to Plaintiff's retaliation claim.  Dkt. #

50 at 11–20.

(2)      DENIES Defendants' motion to dismiss as to Plaintiff's viewpoint discrimination

claim.  *Id.* at 20–22.

---

[21] Plaintiff also asserts that several actions taken by UW in response to his statements constitute
Adverse Employment Actions (AEA) for his First Amendment retaliation claim.  Dkt. # 60 at 30–31.
Given the conclusions above, the Court need not reach this issue.

AMENDED ORDER RE: DEFENDANTS' MOTION
TO DISMISS AND CROSS-MOTIONS FOR
SUMMARY JUDGMENT- 47

(3)     GRANTS Defendants' motion to dismiss as to Plaintiff's facial overbreadth challenge to EO 31.  *Id.* at 22–25.  The claim is dismissed with prejudice.

(4)     GRANTS Defendants' motion to dismiss as to Plaintiff's facial vagueness challenge to EO 31 with prejudice.  *Id.* at 26–28.  The claim is dismissed with prejudice.

(5)     GRANTS Defendants' motion for summary judgment as to Plaintiff's retaliation claim.  Dkt. # 64 at 11–15.

(6)     GRANTS Defendants' motion for summary judgment as to Plaintiff's viewpoint discrimination claim.  *Id.* at 20–22.

(7)     DENIES Plaintiff's motion for summary judgment.  Dkt. # 60.

The Court STRIKES its May 3, 2024, Order at Dkt. # 88 and replaces it with this amended order.  Because amendments to this Order are due to scrivener's errors, no amended judgment will issue.

Dated this 8th day of May, 2024.

John H. Chun
United States District Judge